**UNDER SEAL**

Nos. 26-5360 & 26-5558

**UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

STACY SEYB,

*Plaintiff-Appellee*,

v.

RAÚL R. LABRADOR, in his official capacity as Attorney General of Idaho,

*Appellants.*

On Appeal from the United States District Court
for the District of Idaho
Case No. 1:24-cv-00244-BLW

# FURTHER EXCERPTS OF RECORD IN SUPPORT OF ATTORNEY GENERAL LABRADOR AND ADA COUNTY PROSECUTING ATTORNEY'S EMERGENCY MOTION FOR STAY PENDING APPEAL


JOHN J. BURSCH
ALLIANCE DEFENDING FREEDOM
440 First Street NW, Suite 600
Washington, DC 20001
(616) 450-4235
jbursch@ADFlegal.org

JAMES A. CAMPBELL
ERIK BAPTIST
MATHEW W. HOFFMANN
ALLIANCE DEFENDING FREEDOM
44180 Riverside Pkwy
Lansdowne, VA 20176
(571) 707-4655
jcampbell@ADFlegal.org
ebaptist@ADFlegal.org
mhoffmann@ADFlegal.org

RAÚL R. LABRADOR
Attorney General
MICHAEL A. ZARIAN
Solicitor General
JAMES E. M. CRAIG
Chief, Civil Litigation and Constitutional Defense
AARON M. GREEN
Assistant Solicitor General
OFFICE OF THE ATTORNEY GENERAL
P.O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073

*Counsel for Appellants Attorney General Labrador and Ada County Prosecuting Attorney*

| **Document Description** | **ECF No.** | **FER Page #** |
|---|---|---|
| Attorney General Labrador's Appendix to Closing Argument | 144-1 | 1–157 |
| Joint Trial Exhibit 10 – Dispelling the Myths of Abortion History by Joseph Dellapenna | | 158–186 |
| Plaintiff's Trial Exhibit 1054 – The History of the Pleas of the Crown by Sir Matthew Hale | | 187–201 |
| Plaintiff's Trial Exhibit 1057 – The Statutes Project: Lord Ellenborough's Act | | 202–204 |
| Plaintiff's Trial Exhibit 1058 – Offences Against the Person Act 1861 | | 205–223 |
| Excerpts from Trial Transcript Day 1 (pages 118, 125, 128) | | 224–227 |
| Excerpts from Trial Transcript Day 4 (pages 797, 817) | | 228–230 |
| Excerpts from Trial Transcript Day 5 (pages 933, 1015, 1020-1040) | | 231–254 |

RAÚL R. LABRADOR
ATTORNEY GENERAL

YVONNE DUNBAR, ISB #7200
Chief Counsel

JAMES E. M. CRAIG, ISB #6365
Chief, Civil Litigation and
Constitutional Defense

AARON M. GREEN, ISB #12397
Assistant Solicitor General
KYLE D. GRIGSBY, ISB #10709
Deputy Attorney General
Office of the Attorney General
P.O. Box 83720
Boise, ID 83720-0010
Telephone: (208) 334-2400
Facsimile: (208) 854-8073
james.craig@ag.idaho.gov
aaron.green@ag.idaho.gov
kyle.grigsby@ag.idaho.gov

*Attorneys for Defendants Members of the Idaho Board of Medicine, and Intervenor Attorney General Raúl Labrador*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF IDAHO**

| | |
|---|---|
| STACY SEYB, M.D.<br><br>*Plaintiff*,<br><br>v.<br><br>MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; *et al.*,<br><br>*Defendants*. | Case No. 1:24-cv-00244-BLW<br><br>**APPENDIX** |

For the convenience of the Court, the historical documents referred to in the Attorney General's closing argument for legislative facts and a case cited in the Attorney General's Findings of Fact and Conclusions of Law have been assembled as described below. Pincites to historical documents in the Attorney General's closing argument refer to the documents' original pagination.

| **Exhibit** | **Source** |
|---|---|
| **A** | Gunning S. Bedford, M.D., A LECTURE INTRODUCTORY TO A COURSE ON OBSTETRICS AND THE DISEASES OF WOMEN AND CHILDREN IN THE UNIVERSITY OF NEW YORK 17–18 (1847). |
| **B** | *Medical*, The New York Herald, Feb. 13, 1848. |
| **C** | Horatio R. Storer, M.D. ON CRIMINAL ABORTION IN AMERICA 63-65 (1860). |
| **D** | Horatio R. Storer, M.D., WHY NOT? A BOOK FOR EVERY WOMAN 21-26 (1866). |
| **E** | Robert Campbell Eve, M.D., *The Medico-Legal, Legal, and Moral Aspects of Criminal Abortion and Infanticide*, 11 Atl. Med. Surg. J. 516 (1894). |
| **F** | William H. Parish, M.D., *Criminal Abortion*, 14 Proceedings of the Phila. Cnty. Med. Soc. 151 (1893). |
| **G** | Montgomery Russell, M.D., *Criminal Abortion*, 5 Northwest Med. 296 (1907). |
| **H** | C.N. Suttner, M.D., *A Plea for the Protection of the Unborn*, 5 Northwest Med. 305 (1907). |
| **I** | W.W. Watkins, *Abortion and Infanticide from a Medico-Legal Standpoint*, 9 Med. Sentinel 108 (1900). |
| **J** | C.S. Bacon, *The Legal Responsibility of the Physician for the Unborn Child*, 46 JAMA 1981 (1906). |
| **K** | William A. Guy, PRINCIPLES OF FORENSIC MEDICINE, 142–44 (1845). |
| **L** | L. Dennis, M.D., *Ethics of Abortion*, 5 Am. J. Homeopathic Materia Medica & Rec. Med. Sci 115 (1872). |

| Exhibit | Source |
|---|---|
| **M** | T. Gaillard Thomas, M.D., ABORTION AND ITS TREATMENT FROM THE STAND-POINT OF PRACTICAL EXPERIENCE (1896 ed.). |
| **N** | *Criminal Abortions*, 34 Journal-Lancet 82 (1914). |
| **O** | A.C. Stokes, M.D., *Diseases of the Urinary Tract Produced by Diseases of the Genital Tract in the Female*, 34 Journal-Lancet 593 (1914). |
| **P** | William R. Nicholson, *When, Under the Present Code of Medical Ethics, Is it Justifiable to Terminate Pregnancy Before the Third Month*, 69 Am. J. Obstetrics and Diseases of Women and Children 1004 (1914). |
| **Q** | *Doe v. Rampton*, No. C-234-70, Opinion and Judgment (D. Utah Sept. 29, 1971) (with dissent). |

DATED: June 30, 2026

STATE OF IDAHO
OFFICE OF THE ATTORNEY GENERAL

/s/ *James E. M. Craig*
JAMES E. M. CRAIG
Chief, Civil Litigation and
Constitutional Defense

*Attorney for Defendants Members of the Idaho Board of Medicine and Intervenor Attorney General Raúl Labrador*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY THAT on June 30, 2026, the foregoing was electronically filed with the Clerk of the Court using the CM/ECF system which sent a Notice of Electronic Filing to the following persons:

Jamila Johnson
jjohnson@lawyeringproject.org

Tanya Pellegrini
tpellegrini@lawyeringproject.org

Paige Suelzle
psuelzle@lawyeringproject.org

Stephanie Toti
stoti@lawyeringproject.org

Wendy S. Heipt
wheipt@legalvoice.org

Ronelle Tshiela
Rtshiela@lawyeringproject.org

Joy Williams
jwilliams@lawyeringproject.org

Kelly O'Neill
koneill@legalvoice.org

*Attorneys for Plaintiff*

Dayton Reed
dreed@adacounty.id.gov
civilpafiles@adacounty.id.gov

*Attorney for Ada County Prosecuting Attorney*

/s/ *James E. M. Craig*
JAMES E. M. CRAIG

# Exhibit A

Class.
Medical Sc
Given by
Besides th
Subject No.

NEW YORK UNIVERSITY—MEDICAL DEPARTMENT.

A

# LECTURE

INTRODUCTORY TO A COURSE

ON

# OBSTETRICS

AND THE

## DISEASES OF WOMEN AND CHILDREN,

IN THE

UNIVERSITY OF NEW YORK,

SESSION MDCCCXLVII—VIII.

BY

GUNNING S. BEDFORD, M. D.
PROFESSOR OF OBSTETRICS AND THE DISEASES OF WOMEN AND CHILDREN IN THE UNIVERSITY OF NEW YORK.

A.M. M.D. F.R.S.

NEW YORK:
JOSEPH H. JENNINGS, PRINTER, 122 NASSAU STREET.
1847.

FER-006
Digitized by Google

its victims a large proportion of young married women. Thousands of young mothers are annually swept from earth by this relentless malady; friends are made sad, and society deprived of its purest spirits; and yet this immense sacrifice of human life among the young and interesting is regarded as a sort of destiny—as a direct command from Heaven. The wise man will draw no such inference from this prodigal destruction of human life; he will not charge Heaven with these cruel results; he will see, on the contrary, that these disastrous occurrences are but the operation of cause and effect. A young girl, for example, before she has attained the maturity of womanhood, enters into a matrimonial alliance; her osseous system is not yet consolidated; her organs have not acquired their natural development; in a word, her physical system is frail, and unprepared for the important duties connected with the reproductive faculty. The assault, which pregnancy and childbirth make upon the system under these circumstances, occasions a severe shock to the entire economy, if, indeed, it do not lay the foundation of fatal disease. Add to this the fatigue and anxiety to which the young mother is exposed in the constant and devoted attention to her offspring, prostrating the vital forces, and draining the system of its life-blood.

The sexual system of the female, as I have already remarked, is a system in itself; and you will discover that one of the most delicate points in practice—one, indeed, which frequently, when error has been committed, not only brings discredit on the practitioner, but often, too, subjects to severe hazard the life of the patient—is to distinguish between functional and organic disease of the womb. According to statistics collected with great care, the proportion of functional to organic or structural disease of this organ is as 90 to 50. Both, however, have in common many symptoms, which are calculated to embarrass the practitioner, and it will often require great sagacity to enable him to make the proper distinction. The sympathies, too, of the womb with various portions of the economy are universally admitted. This viscus, through these multiplied sympathies, is enabled to produce certain modifications of the vital condition in one or more remote organs; but it would be useless, under existing circumstances, to attempt any expla-



Digitized by Google

nation of the nature of these sympathies; they have so far proved impenetrable to the ken of human observation.

The practitioner, who desires to treat successfully the maladies incident to the female, must bear constantly in mind the numerous sympathies by which the womb is allied to almost every portion of the system. The life of the patient, indeed, will often depend on this knowledge. How often, for example, does it occur that the first indication of disease in the uterus is exhibited, not by any local disturbance of that organ, but by the manifestation of some of the numerous sympathetic phenomena. I have repeatedly been consulted by ladies who have suffered severely for months from local pain in the stomach, kidneys, liver, or some other important organ. They have had various remedies applied, having been treated for disease of the liver, kidneys, &c., but without benefit. On a minute investigation of their case, I have found disease of the neck of the womb, sometimes slight, sometimes of an aggravated character, to be the sole cause of all their suffering. In restoring the womb to a healthy condition, their pains have at once subsided.

The following case will illustrate forcibly the absolute necessity of constantly bearing in mind the influence exerted by the womb in certain forms of disease: During the month of February last, I was requested to visit a lady in consultation with Dr. Whiting of this city. Several medical gentlemen, among whom was Dr. Willard Parker, had, previous to my visit, seen and prescribed for this patient. When I saw her, in company with Dr. Whiting, she was apparently near dissolution. Her prostration was extreme; her countenance almost hippocratic; in a word, her friends had abandoned all hope of recovery. The particulars of the case were these: She was the mother of one child, seventeen months old. About a month previous to my seeing her, she had occasionally been troubled with nausea and vomiting, and for the week previous to my visit she had vomited incessantly. She could retain nothing on her stomach; the vomiting resisted every remedy that had been administered. It was under these circumstances that I was called to her. The medical gentlemen who had preceded me in attendance, ordered cups, leeches, and blisters over the region of the stomach, with various internal remedies, but all without the slightest





Digitized by Google

appreciable effect. The vomiting was still unchecked, and her death hourly expected. On examining critically her case, I arrived at the conclusion that the vomiting was merely a symptom of trouble elsewhere, and that no remedy which could be addressed to the stomach would be of the least avail in rescuing her from the imminent peril in which she was placed. In putting my hand on the abdomen, I found the uterus enlarged, and occupying the hypogastric region. The alarming situation of the patient would not justify delay; if her life were to be saved, every thing admonished us that it was to be done only by instantaneous measures. My opinion of the case was, that the vomiting was sympathetic, produced by irritation of the womb. I therefore suggested the propriety of endeavoring to induce contraction of this organ, in order that its contents might be expelled. This view was concurred in by Dr. Whiting. Accordingly, without a moment's delay, desperate and almost hopeless as the case was, I introduced a female catheter into the womb, and ruptured the membranes; in a short time the uterus contracted, and a mass of hydatids was thrown off. Immediately, as if by enchantment, the vomiting ceased. The patient, after a tedious convalescence from her extreme debility, recovered, and is now in the enjoyment of robust health.

Let this case, gentlemen, impress on your minds the importance of tracing effects to causes; and remember this cardinal truth—that the practitioner who prescribes for mere symptoms can never hope successfully to treat disease.

There is one branch of my department, to which I have made no allusion, and yet it is one involving the discharge of the most sacred duties. I refer to the various medico-legal questions, which the practitioner will occasionally be called upon to determine—questions on the issue of which will often depend character, liberty, and life itself. Take, by way of illustration, the subject of pregnancy. Your opinion will frequently be invoked in questions of doubt by the judges and lawyers of the land; it will become your province to stay the arm of the law in the execution of retributive justice; and, on the accuracy of your decision may depend, not only the well-being of society, and the happiness of individuals, but human life itself will often be at


Digitized by Google

# Exhibit B

# THE NEW YORK HERALD.

Whole No. 5009. NEW YORK, SUNDAY MORNING, FEBRUARY 13, 1848. Price Two Cents.


## The Supreme Court of the United States.

WASHINGTON, Feb. 10, 1848.

*Wm. Houston et al., Defendants in Error, vs. the City Bank of New Orleans.*—Mr. Clay argued this case to-day, before the Supreme Court of the United States, on behalf of the plaintiffs in error.

[illegible]

## PHILADELPHIA, Feb. 12, 1848.

*Attempt at Forgery—The Saturday Courier Case—Snow Storm, &c.*

[illegible]

## Miscellaneous.

[illegible]

## Medical.

NEW YORK UNIVERSITY.—DR. S. BEDFORD'S *Introductory Lecture to a course on Obstetrics and the Diseases on Women and Children.*—The lecture on the above important and interesting subjects by Dr. Bedford, delivered at the University of New York, is of a character to demand more than ordinary attention, and to call for more than merely a transient notice. There is not, perhaps, in all the range of medical science, extensive as it is, any one branch so highly important as that which forms the subject of this lecture, and while we are ready at all times to do justice to the American and English schools, while we are willing to admit their general acknowledged superiority as medical practioners over the physicians of all other countries, candor and justice compel us to say that, in this particular department of medical practice, they are lamentably and deplorably deficient. There was a time when if we had said that Paris was the only theatre where this branch was successfully cultivated, the observation would have been generally correct. But now we are able to say, with equal pride and pleasure, that New York city, by the labors and talents of the medical department of the New York University, can vie with Paris itself in being its equal in the extensive, thorough, and skilful prosecution of this most important department of medicine. It is, perhaps, incalculable how many amiable and estimable woman have been sent to an untimely grave by a medical treatment founded on general symptoms, without a regard or a consideration of the connection of these symptoms with the condition, the sympathy, and the action of the uterus. The following cases mentioned by Dr. Bedford in his lecture, will better explain this interesting subject:—

The practitioner, who desires to treat successfully the maladies incident to the female, must bear constantly in mind the numerous sympathies by which the womb is allied to almost every portion of the system. The life of the patient, indeed, will often depend on this knowledge. How often, for example, does it occur that the first indication of disease in the uterus is exhibited, not by any local disturbance of that organ, but by the manifestation of some of the numerous sympathetic phenomena. I have repeatedly been consulted by ladies who have suffered severely for months from local pain in the stomach, kidneys, liver, or some other important organ. They have had various remedies applied, having been treated for disease of the liver, kidneys, &c., but without benefit. On a minute investigation of their case, I have found disease of the neck of the womb, sometimes slight, sometimes of an aggravated character, to be the sole cause of all their suffering. In restoring the womb to a healthy condition, their pains have at once subsided.

The following case will illustrate forcibly the absolute necessity of constantly bearing in mind the influence exerted by the womb in certain forms of disease:—During the month of February last, I was requested to visit a lady in consultation with Dr. Whiting, of this city. Several medical gentlemen, among whom was Dr. Willard Parker, had, previous to my visit, seen and prescribed for this patient. When I saw her, in company with Dr. Whiting, she was apparently near dissolution. Her prostration was extreme; her countenance almost hippocratic; in a word, her friends had abandoned all hope of recovery. The particulars of the case were these:—She was the mother of one child, seventeen months old. About a month previous to my seeing her, she had occasionally been troubled with nausea and vomiting, and for the week previous to my visit she had vomited incessantly. She could retain nothing on her stomach; the vomiting resisted every remedy that had been administered. It was under these circumstances that I was called to her. The medical gentlemen who had preceded me in attendance, ordered cups, leeches, and blisters over the region of the stomach, with various internal remedies, but all without the slightest appreciable effect. The vomiting was still unchecked, and her death hourly expected. On examining critically her case, I arrived at the conclusion that the vomiting was merely a symptom of trouble elsewhere, and that no remedy which could be addressed to the stomach would be of the least avail in rescuing her from the imminent peril in which she was placed. In putting my hand on the abdomen, I found the uterus enlarged, and occupying the hypogastric region. The alarming situation of the patient would not justify delay; if her life were to be saved, every thing admonished us that it was to be done only by instantaneous measures. My opinion of the case was, that the vomiting was sympathetic, produced by irritation of the womb. I therefore suggested the propriety of endeavoring to induce contraction of this organ, in order that its contents might be expelled. This view was concurred in by Dr. Whiting. Accordingly, without a moment's delay, desperate and almost hopeless as the case was, I introduced a female catheter into the womb, and ruptured the membranes; in a short time the uterus contracted, and a mass of hydatids was thrown off. Immediately, as if by enchantment, the vomiting ceased. The patient, after a tedious convalescence from her extreme debility, recovered, and is now in the enjoyment of robust health.

* * * * * * * * *

There is one branch of my department, to which I have made no allusion, and yet it is one involving the discharge of the most sacred duties. I refer to the various medico-legal questions, which the practitioner will occasionally be called upon to determine—questions on the issue of which will often depend character, liberty, and life itself. Take, by way of illustration, the subject of pregnancy. Your opinion will frequently be invoked in questions of doubt by the judges and lawyers of the land; it will become your province to stay the arm of the law in the execution of retributive justice; and, on the accuracy of your decision may depend, not only the well-being of society, and the happiness of [illegible]

[illegible] father, a venerable and accomplished gentleman. He seemed broken in spirit, and it was evident that grief had taken a deep hold of his frame. On being introduced into his daughter's room, my sympathies were at once awakened on beholding the wreck of beauty which was presented to my view. She was evidently laboring under phthisis, and it was manifest from her wasted frame, that Death had claimed his victim. My presence did not seem to occasion the slightest disturbance, and with the smile of an angel playing on her countenance, she greeted me with these words: "Well, Doctor, I am glad to see you on my beloved father's account, for he will not believe that I cannot yet be restored to health. Life, however has lost all its charms for me, and I long for the repose of the grave." These words were spoken with extraordinary gentleness, but yet with an emphasis that at once gave me an insight into the character of this lovely woman. From her own lips I received the following history of her case. Her father was a clergyman of high standing in the English church, and had a pastoral charge in England, in which he continued until circumstances rendered it necessary for him to leave that country, and seek a residence in America. At a very early age she had lost her mother, and had been almost entirely educated by her father, whole talents and attainments admirably fitted him for the duty. When she had attained her eighteenth year, there was an attachment formed between her and a young barrister of great promise and respectability. This attachment resulted in a matrimonial engagement. Soon after the engagement, she began unaccountably to decline in health—There was considerable irregularity in her menstrual periods, with more or less constant nausea, loss of appetite, inability to sleep, feverishness, and an uncontrollable dislike to society. In addition to these symptoms, there was a marked change in her personal appearance; her abdomen became enlarged, her breasts increased in size, &c. These changes attracted the attention of some of her female acquaintance, and the rumor soon spread that they were the result of pregnancy. The barrister to whom she was affianced heard of these reports, and instead of being the first to stand forth as her protector, and draw near to his heart this lovely and injured girl, thus assuaging the intensity of grief with which she was overwhelmed, addressed a letter to her father, requesting to be released from his engagement. This, of course, was assented to without hesitation. The young lady, conscious of her own innocence, knowing better than any one else her own immaculate character, and relying on the mercy of Heaven to guide her in this her hour of trial, requested that a physician should be sent for, in order that the nature of her case might be fully ascertained. A medical man accordingly visited her; and after an investigation of her symptoms, he informed the father that she was undoubtedly pregnant, and that means should be instantly taken to keep the unpleasant matter secret. The father, indignant at this cruel imputation against the honor of his child, spotless as he knew her to be, spurned the proposition, and immediately requested an additional consultation.—This resulted in a confirmation of the opinion previously expressed, and the feelings of that father can be better appreciated than described. Without delay, that good man determined to resign his living, gather up his little property, and proceed with his daughter to America. On her passage to this country, she became extremely ill, and there being a physician on board the vessel, his advice was requested. After seeing the patient (she was laboring at the time under excessive vomiting from sea-sickness) he told the father that there was danger of premature delivery. Such, therefore, was the general appearance of this lady, that a medical man, merely judging from appearances, at once concluded she was pregnant. This was about the substance of what I learned respecting the previous history of this interesting and extraordinary woman; and my opinion was then requested as to the character of her malady. My feelings were very naturally much enlisted in her behalf, and I proceeded with great caution in the investigation of her case. [illegible]

Here we see at once the danger, we might say more strongly, and it would not be too strong—the criminality of any medical man attempting to prescribe for any symptom or any disease of a female patient, unless he is fully possessed of the knowledge, which it is the object of Professor Bedford to impart in this valuable and instructive course of lectures. We are glad the Dr. goes into the subject with the zeal which he has shown; we are sure he will confer a benefit upon the profession, an honor upon New York and its University, and a lasting blessing upon his fellow creatures, by the talent, skill, and judgment which he displays, both in his general practice, and more especially, in this, its most important department.

## Board of Supervisors.

The Board of Supervisors met yesterday afternoon. In the absence of the Mayor, Alderman Messerole was called to the chair.

[illegible] derman Kelly being prevented, once and again, from answering Alderman Purser. It was a most beautiful piece of finesse, and every way worthy of a time "speaking lawyer."

THE BANKS OF NEW ORLEANS.—In the N. O. *Courier* of the 2d inst., is the report of the Board of Currency, showing the situation for the year 1847 of the several banks of the city of New Orleans. We copy enough from the report to indicate such situation:—

| | |
|---|---|
| On the 25th day of December of the said year the aggregate circulation of those banks amounted to | $3,709,053 00 |
| Their deposits to | 8,308,332 74 |
| Other liabilities | 1,350,271 99 |
| Total | 13,367,657 73 |
| Their assets were as follows:— | |
| Specie | $7,578,510 61 |
| Loans and deposits payable in full at maturity | 8,409,699 32 |
| Due by foreign and domestic banks | 2,763 399 42 |
| Other cash assets | 346,090 59 |
| Total | 19,088,699 95 |
| Excess of the movement assets | 5,721,042, 22 |
| As to the dead weight it was composed as follows:— | |
| Capital paid in | 15,575 970 00 |
| Assets | 16,861,944 60 |
| Liabilities other than movement | 1,342,474 01 |
| Total liabilities of movement and dead weight (exclusive of capital) | 14,710,131 74 |
| Total assets of movement and of dead weight | 35,950,644 55 |
| Leaving an excess of assets | 21,240,512 81 |

On examination of the documents hereunto annexed, to which your attention is called, and of which we have presented you only a brief abstract, your honorable body will see that our banks are in a most flourishing condition, and with regard to safety and successful administration leave nothing to be desired.

## Foreign Items.

Emigration from Bremen in the past year, has gone on to a great extent. About 33,000 persons embarked in 255 ships, to the United States, Texas, Brazil, and South Australia. One hundred vessels were destined to New York alone.

The population of the town of Hamburgh amounts, according to the last census, to between 122,000 and 123,000 souls, of whom more than 20,000 profess the Jewish religion.

The proposition for admitting members of the Jewish persuasion to all commercial assemblies at Hamburgh, has been rejected by a majority of 77 votes.

The Protestant communities in France have as many as 500 ministers in the country, and number 30,000 adherents in Paris alone.

Fourteen newspapers are now published in the papa states.

Maria Louisa is to be buried on the 29th, beside the remains of Napoleon's son, at Vienna.

The Queen of Spain has expressed her wish that the prosecution of Senor Salamanca should not be proceeded with.

The approaching marriage of the Princess Louisa of Prussia to the Crown Prince of Sweden, is much spoken of at Berlin. There is also a report of the marriage of the Princess Caroline, born August 5, 1833, only daughter of the Prince Vasa, son of the predecessor of Bernadotte, to Prince Francis [illegible] Oscar of Sweden, born June 18, 1837.

FER-011

# Exhibit C

ON

# CRIMINAL ABORTION

# IN AMERICA.

BY

HORATIO R. STORER, M.D.,

OF BOSTON.

MEMBER OF THE AMERICAN MEDICAL ASSOCIATION.

"And let the legislator and moralist look to it; for as sure as there is in any nation a hidden tampering with infant life, whether frequent or occasional, systematic or accidental, so sure will the chastisement of the Almighty fall on such a nation."—GRANVILLE, *on Sudden Death*.

[From the North American Medico-Chirurgical Review, January to November, 1859.]

Surgeon Genl's Office. LIBRARY. 55049 Washington, D.C.

PHILADELPHIA:
J. B. LIPPINCOTT & CO.
1860.

The remarkable difference between the practice on the continent and in England, so suggestive to us in this country, is undoubtedly owing to the fact that in Catholic States greater value is attached to the life of the child than "in Protestant States, as Britain, where the child is always sacrificed to save the mother."* The immense excess of embryotomy cases in Catholic Dublin furnishes no exception to this rule, drawn as they are from hospital practice under Protestant control.

So far proof by deduction. In many cases involving the question of craniotomy, that operation is not required; in some of them, not even the induction of premature labor.

Two classes of cases remain, each affording more direct evidence; those where craniotomy being absolutely indicated if the patient were allowed to go her full time, that operation is, and those where it is not performed.

Craniotomy, being necessarily fatal to the fœtus, is indicated only to save the mother's life; to be avoided when any other alternative giving the fœtus a chance of life, and not more than equally hazardous to the mother, can be resorted to. Especially is this the case when it is compared with the induction of premature labor, attended as is the latter, despite a certain amount of danger of its own, with great probability of saving the child, and with decidedly lessened risk to the mother; for craniotomy not merely requires the use of murderous instruments, dangerous to all tissues they may approach or be in contact with, but the operation is usually, though often very improperly, delayed till late in labor, and therefore till the mother's chances of recovery have been proportionally lessened. Premature labor, on the other hand, though of course involving some risk to the child, is not necessarily fatal to it; nor is it usually so, when properly performed. That there is a choice in this respect between the means employed, will hereafter be shown.

Craniotomy, when absolutely indicated at the close of pregnancy, must be for one of two reasons: that the fœtus cannot pass through the pelvis at the full time alive, though it may do so unmutilated, the operation being performed to save the mother the greater risks of protracted labor; or that it cannot pass at the full time unmutilated, even when dead. We defer the consideration of another supposable instance, where the fœtus in the outset of its viability may pass, but not alive, for this pertains to the consideration of the mother's safety alone, no alternative availing for the child. In the other cases, if the necessity could be learned in season, from the previous history of the patient or by pelvic exploration, labor should most certainly be prematurely induced, as

* CLAY, Loc. cit., p. 69.

affording some positive chance of life to the child, and as less dangerous to the mother. It were here worse than foolish, if not criminal, blindly to imitate nature, when, her course being obstructed, she would kill the child.

I have alluded for a double reason to cases, fortunately few, where craniotomy, and much more decidedly premature labor being indicated, the practitioner decides from the outset to perform neither, to give his patient or her child no aid. Such conduct is as cruel and wicked as it is unprofessional, and were not instances occasionally reported, its existence could hardly be believed. We acknowledge with Blundell the evils of meddlesome midwifery, but there are extremes to all things; certainly to the powers of nature and the limits of justifiable delay.

I am aware that I have referred to a reported case, which might in this connection be quoted against the opinion now expressed; but even by its exceptions do we prove the rule. Where chances are so greatly against both mother and child as in these cases if left unaided, it would be the office of the physician, were there no better procedure, by craniotomy to save the one;* but at the present day it is no less plainly his duty, where possible, to anticipate labor, and thus save both. I have elsewhere discussed this question at some length,† and can only repeat, as is indeed allowed by Churchill,‡ that this is no matter on which to select one's words; the deliberately sacrificing an unborn, but still living child, in cases where statistics go to prove that the adoption of another mode of delivery, nothing counter-indicating, would give that child a good chance of successful birth, is nothing short of *wilful murder*, no matter by what schools or by what eminent men it may be sanctioned, and it should be branded as such by the profession.

But, undertaken for the child's sake, not merely should premature labor be resorted to for the purpose of preventing craniotomy, but often in cases of incurable disease, acute and chronic, of the mother, where it is evident that she must inevitably, or even probably, perish before the full period of pregnancy has been attained. Instances of such acute disease

---

* The subject of justifiable craniotomy has of late been ably though controversially discussed by an anonymous writer (Dublin Review, April and October, 1858,) and Dr. Churchill (Dublin Quarterly Journal of Medical Science, August and November, of the same year.) Care must be taken, lest in assenting to the decided and imperative necessity of the operation in certain cases, and by a natural professional sympathy, too great frequency is not allowed to this most horrible and appalling of all the operations to which as physicians we can ever be called.

† Review of CLAY's Obstetric Surgery; Boston Med. and Surg. Journal, November, 1856, p. 283.

‡ Theory and Practice of Midwifery, p. 348.

will readily suggest themselves. The question here is merely between the operation under consideration, the Cæsarean section, and doing nothing. The last, suppose the fœtus viable and to be still living, would in many instances be decidedly unprofessional and unjustifiable. Cæsarean section after the mother's death is comparatively unsuccessful; and before it, is so much more severe and in all probability so much more quickly fatal, that the other should be preferred, unless death be already close at hand.

Instances of chronic incurable disease necessitating the induction of premature labor, may not so readily occur to the mind. The shock of an abortion being frequently greater to the maternal system than that of labor at the full time, it is evident that this rule cannot be universally applied. It cannot in every case of thoracic disease, of the heart, for example, unless its own peculiar symptoms become so aggravated from progressing pregnancy as to render probable earlier decease of the mother, the operation then being performed partly on her account; not so much to save her life as to delay a little her death. But there are other and extreme cases, as cancer of the lower segment of the uterus, or indeed of its fundus, which may have been diagnosticated previously to pregnancy by the use of expansible tents, or of my uterine dilator hereafter referred to, where the mother would probably perish in labor at the full period, with most probably the loss of the child also. Here, by premature labor, the child may be saved, and the mother's life, greater expansion of the uterus and its more probable laceration being prevented, possibly prolonged.

So far complications on the part of the mother necessitating premature labor for the sake of the child. There are others equally imperative, afforded by itself. Excessive size of the fœtus in comparison with a normal pelvis, as evidenced and rendered probable by previous labors, is hardly of less importance in connection with craniotomy, than where the pelvis is distorted or contracted, and the fœtus of natural size; but the operation in question, as compared with premature labor, we have already sufficiently discussed.

Diseases of the placenta, congestive, inflammatory or degenerative, are no less an indication, where known to exist, for an early delivery. Their diagnosis may be difficult, but yet not wholly impossible. The occurrence of the same disease in past labors, and evident intra-uterine disturbance as discovered by auscultation or by unnaturally frequent and strong fœtal movements, are, taken together, frequently sufficient to establish the fact. The impropriety of allowing such cases to proceed unaided, cannot be too strongly insisted upon. By early delivery, if the fœtus have formerly perished after the period of viability, and in addition, by special medication of the parent, if its death had usually occurred before that time, many valuable lives might annually be saved.

Premature labor as resorted to on the mother's behalf alone, putting aside the cases we have incidentally considered, where the lives of both herself and her offspring are of necessity taken into account, includes also its induction in the earlier months of pregnancy before the fœtus is viable. It may be required by diagnosticated malformation or monstrosity of the fœtus and by malformations on the part of the mother; by extreme pelvic contraction, congenital or from rickets or malacosteon, preventing the natural passage of a fœtus after viability, by tumors incapable of elevation or displacement, by contraction of the vagina, or by other severe obstetric complications, either recent or of long standing. Of this last class of causes, obstinate vomiting, puerperal convulsions, which are by no means confined to the full period of pregnancy, dropsies, irreducible displacements of the uterus, varix of the external labial vessels, sometimes fatal by laceration from tension, are all instances in point. With regard to each, the necessity of the abortion must be determined with the greatest caution, and resort be had to it, the child still living, with reluctance; especially should this be the case if the complication be supposed on the part of the fœtus, so important is it to avoid its sacrifice, if possible, and the semblance of disregarding its own important claims.

The rules for the operation when performed for the mother are the same as when for the child, save that if absolutely required, it may be resorted to at an earlier period. If the child must necessarily be lost, the labor should not be long delayed.

There are several subordinate questions arising in this connection, neither metaphysical nor merely casuistic, but practical, and because bearing on the increase of criminal abortion, directly involving human life to an indefinite extent. One of them we shall now mention.

Let physical incapacity to the birth of a living or viable child through the natural passages be supposed to exist on the part of the mother; that this has been proved by examination, or by the result of a former labor, induced or at the full time. To save the mother's life, early abortion is once brought on and the child destroyed; the woman and her husband being of course informed of the true state of the case. Is it right or justifiable, again to destroy the fœtus, and as often as sexual lust may repeat impregnation? Or should the patient be left to the risks of a subsequent Cæsarean section, which would at least give the chance of life to her child?

I am aware on which side of this question lies at present the opinion and the practice of the mass of the profession; that Nægele* and others†

---

* De jure vitæ et necis quod competit medico in partu. Heidelberg, 1826.

† "Where one only can by any possibility be preserved, the female herself may

# Exhibit D

24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 19

# WHY NOT?

## A BOOK FOR EVERY WOMAN.

### The Prize Essay

TO WHICH THE AMERICAN MEDICAL ASSOCIATION
AWARDED THE GOLD MEDAL
FOR MDCCCLXV.

BY

HORATIO ROBINSON STORER, M.D.,
OF BOSTON,
Assistant in Obstetrics and Medical Jurisprudence in Harvard University; Surgeon
to the New England Hospital for Women; and Professor of Obstetrics
and the Diseases of Women in Berkshire Medical College.

ISSUED FOR GENERAL CIRCULATION, BY ORDER OF THE
AMERICAN MEDICAL ASSOCIATION.

*Casta placent superis. Casta cum mente venito,*
*Et manibus puris sumito fontis aquam.*

BOSTON:
LEE AND SHEPARD.
1866.

FER-019

4-cv-00244-BLW Document 144-1 Filed 06/30/26 Page



cal journal, in the published transactions of the national and minor medical associations, in many medical addresses, as that by Dr. Miller, of Louisville, at the meeting of the Association at New Haven, in 1860, over which he presided, and in nearly every general obstetric work of any importance issued in this country since that date, Bedford's Principles and Practice of Obstetrics, for instance, and in many works of criminal law and medical jurisprudence, as Elwell, Wharton and Stillé, and Hartshorne's edition of Taylor, to a much greater extent than the subject in these works had ever been treated before.

I am constrained to acknowledge my indebtedness to the various publications of the writer from whom I have quoted, for much of the evidence I shall now present upon the subject of forced abortions. I trust that thus offered it may lose none of its freshness, point, and force. My frequent extracts from one who has given more thought to the subject than probably any other person in the country, will, I am sure, need no excuse.

An opinion has obtained credence to a certain

extent, and it has been fostered by the miserable wretches, for pecuniary gain, at once pandering to the lust and fattening upon the blood of their victims, that induced abortions are not unfrequently effected by the better class of physicians. Such representations are grossly untrue, for wherever and whenever a practitioner of any standing in the profession has been known, or believed to be guilty of producing abortion, except absolutely to save a woman's life, he has immediately and universally been cast from fellowship, in all cases losing the respect of his associates, and frequently, by formal action, being expelled from all professional associations he may have held or enjoyed.

The old Hippocratic oath, to which each of his pupils was sworn by the father of medicine, pledged the physician never to be guilty of unnecessarily inducing miscarriage. That the standard, in this respect, of the profession of the present day has not deteriorated, is proved by the first of the resolutions adopted by the Convention at Louisville, in 1859: "That while physicians have long been united in condemning

4-cv-00244-BLW Document 144-1 Filed 06/30/26 Page



the procuring of abortion, at every period of gestation, except as necessary for preserving the life of either mother or child, it has become the duty of this Association, in view of the prevalence and increasing frequency of the crime, publicly to enter an earnest and solemn protest against such unwarrantable destruction of human life." [1]

It is true, however, that while physicians are unanimous as to the sanctity of fœtal life, they have yet to a certain extent innocently and unintentionally given grounds for the prevalent ignorance upon this subject, to which I shall soon allude. The fact that in some cases of difficult labor it becomes imperatively necessary to remove the child piecemeal, if dead, or, if living, to destroy it for the sake of saving the mother's life, ought not to imply that the physician has attached a trifling value to the child itself. Compared with the mother, who is already mature and playing so important a part in the world, he

[1] Transactions of the American Medical Association, 1859, vol. xii. p. 75.

FER-022

4-cv-00244-BLW Document 144-1 Filed 06/30/26 Page



justly allows the balance to fall, but he fully recognizes that he is assuming a tremendous responsibility, that his action is only justified by the excuse of dire necessity, and he suffers, if he is a man of any sensibility and feeling, an amount of mental anguish not easily to be described, and that none of us, who have been compelled to so terrible a duty, need feel ashamed to confess.

There are cases again, where, during pregnancy, the patient may be reduced by the shock of severe and long-continued pain or excessive vomiting, and its consequent inanition, to the verge of the grave. In such instances, it has been supposed that abortion was necessary to preserve the woman's life. The advance of science, however, has now shown that this procedure is not only often unnecessary, but in reality unscientific; the disturbances referred to occurring, as they generally do, in the earlier months of gestation, being owing not to the direct pressure of the womb upon the stomach or other organs, but to a so-called reflex and sympathetic disturbance of those organs, through the agency of the nervous system; and that a cure

FER-023

4-cv-00244-BLW Document 144-1 Filed 06/30/26 Page



can in general be readily effected without in any way endangering the vitality of the child.

There are other instances that might be cited, cases of dangerous organic disease, as cancer of the womb, in which, however improbable it might seem, pregnancy does occasionally occur; cases of insanity, of epilepsy, or of other mental lesion, where there is fear of transmitting the malady to a line of offspring; cases of general ill-health, where there is perhaps a chance of the patient becoming an invalid for life; but for all these, and similar emergencies, there is a single answer, and but this one — that abortion, however it may seem indicated, should never be induced by a physician upon his own uncorroborated opinion, and, in a matter so grave, affecting, with his own reputation, the life of at least one, if not of a second human being, every man worthy of so weighty and responsible a trust will seek in consultation a second opinion. This is a matter of such importance to the welfare of the community, that long ago the law should have provided for its various dangers, and should wisely have left it to no man's discretion or

FER-024

4-cv-00244-BLW Document 144-1 Filed 06/30/26 Page



purity of character to withstand the tremendous temptations which must be allowed to here exist. The law now provides, in one or more at least of our States, that the certificate of a single physician, no matter what his skill or standing, cannot commit a patient to the often necessary and beneficial seclusion of a lunatic asylum; two are required. How much more requisite is it that in the question we are now considering, to one mode of deciding which the physician may be prompted by pity, by personal sympathy, the entreaties of a favorite patient, and not seldom by the direct offer of comparatively enormous pecuniary compensation, the law should offer him its protecting shield, saving him even from himself, and helping him to see that the fee for an unnecessarily induced or allowed abortion is in reality the price of blood. As a class, it cannot be gainsaid that physicians of standing will spurn with indignation the direct bribe; let them look to it that they never carelessly permit what they condemn, by endeavoring to bring on the woman's periodical discharge when it is possible that she may have conceived, or by carelessly

FER-025

passing an instrument into her womb without ascertaining whether or no it contain the fruit of impregnation, or by allowing the completion of a miscarriage that may threaten or even have commenced, without resorting to every measure, of whatever character, that can possibly result in its arrest, and the consequent completion of the full period.

III.—*What is the True Nature of an Intentional Abortion when not Requisite to Save the Life of the Mother.*

There are those who will be influenced by evidence presented from abstract morality and religion. To such I shall first address myself. There are others who care nothing for ethical considerations, and who arrogate to themselves a right to decide as to the morality of taking or destroying the life of an unborn child. For these, also, I have an unanswerable argument—their own self-interest—an appeal to which will usually arrest the most hardened adept in other crime, much more these intelligent and otherwise innocent women, who have mostly erred

# Exhibit E

# *ORIGINAL COMMUNICATIONS.*

---

## THE MEDICO-LEGAL, LEGAL, AND MORAL ASPECTS OF CRIMINAL ABORTION AND INFANTICIDE.

By ROBERT CAMPBELL EVE, M.D., Augusta, Ga.,

Assistant to the Professor of Obstetrics in the Medical Department, University of Georgia; Chairman of the Section on Medical Jurisprudence, Augusta Academy of Medicine; Member of the Georgia Medical Association.

In entering upon the task imposed by our Association, allow me to preface my remarks, by stating that there are many facts and circumstances that I can touch upon but lightly, only dealing with them in the most superficial manner.

I shall confine myself more especially to the realm of medical jurisprudence, endeavoring to emphasize, in as brief a manner as possible, the salient points involving the testimony of the medical jurist. In the first place, what is abortion?

Abortion, although spoken of in a restricted sense by most authorities, when alluding to the abnormal termination of gestation, implies the expulsion from the uterus of the products of conception prior to the viability of the fetus. Different authorities or writers have formulated such classifications as appear to them best adapted to the disturbances of pregnancy at different periods, but the one of most universal acceptance may be described as follows:

Abortion from the first to the third month, miscarriage from the third to the seventh month, and premature labor from the seventh to the ninth month. Were I writing a treatise upon abortion from a medical standpoint alone, I could but recognize that this system has its advantages, and conserves a manifold good purpose, and especially so when outlining a treatment applicable to the time, as it may be of a threatened mishap. Yet it is purely an arbitrary one, and does not concern us medico-legally; therefore, in this instance, *I shall treat the subject as defined by legal authorities, so as to make abortion encompass any interruption of pregnancy from the very*

Case: 25-5360, 09/15/2026, DktEntry: 34.3, Page 31 of 256
1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 29



*first moment of the impregnation of the ovule, or conception, to the full maturation of the fetus at term.*

The second question confronting us (and of vital import to the medical jurist) is, what is meant by the terms criminal abortion and infanticide?

I here quote from the law dictionary compiled by the eminent law lexicographer, Bouvier, who not alone defines criminal abortion and infanticide, but reviews the English law upon the subject. He says that abortion is the expulsion of the fetus at a period of utero-gestation, so early that it has not acquired the power of sustaining an independent life. In his résumé of the law, he states that, at common law, an attempt to destroy a child *en ventre sa mere* appears to have been held in England a misdemeanor. "In this country it has been held that it is not an indictable offence at common law to administer a drug or perform an operation upon a pregnant woman with her consent, with the intention and for the purpose of causing an abortion and premature birth of the fetus of which she is pregnant, by means of which, in fact, an abortion is caused, without averring, and proving that, at the time of administration of such drug, or performance of such operation, such woman was quick with child."

"The former English statutes on this subject distinguished between the case where the woman was quick, and was not quick, with child, and under both acts the woman must have been pregnant at the time. The terms of the recent act are, intent to procure the miscarriage of any woman, omitting the words 'being then quick with child,' etc., and it is immaterial whether the woman is or is not pregnant, if a person believes her to be, administers a drug, or uses an instrument, with the intent of producing an abortion. When, in consequence of the means used to secure an abortion, the death of the woman ensues, the crime is murder; and if a person intending to secure an abortion, does an act which causes the child to be born so much earlier than the natural time that it is born in a state much less capable of living, and afterwards dies, in consequence of its exposure to the external world, the person who by this misconduct so brings a child into the world and puts it thereby in a situation in which it cannot live, is guilty of murder,

Case: 26-5360, 09/15/2026, DktEntry: 34.6, Page 32 of 256
Case 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 30



and the mere existence of the possibility that something might have been done to prevent the death does not render it less murder."

"Infanticide is the murder of a new-born infant. It is thus distinguishable from abortion and feticide, which are limited to the destruction of the life of the fetus in utero. *The crime of infanticide can be committed only after the child is wholly born.*"

Now having reviewed this phase of the subject and obtained a definition of criminal abortion and infanticide as required by law, we next proceed to the establishing, in any given case, the facts bearing upon, and the differentiation between, criminal abortion, natural abortion, or innocent abortion, authorized and justifiable abortion, and also to the establishment of infanticide. We are here confronted by a series of barriers, in the shape of important questions and considerations, which, though surmountable, claim a conspicuous rôle, and call into requisition on the part of the medical jurist indefatigable diligence and research in the scrupulously close analysis of every constituent element, for in this manner only are we enabled to render the problem soluble. I shall aim to dwell upon them in their regular order of succession, and in doing so it shall be my main object to develop the situation in its relation to what is of greatest moment to us, the law as it obtains in our own State, those laws embodied in the Code of Georgia.

What is meant by natural or innocent and authorized or justifiable abortion, and what are the facts holding a causal relation to their production, and what are the distinguishable feature deserving attention when a question of criminality arises?

Natural abortion, in law, is the expulsion of the fetus at any stage of gestation, viable or non-viable, incident to maternal dyscrasia, or disease on the one hand, or as the resultant of fetal disease on the other. As relates to the natural causes to be sought in the mother, they may be divided into constitutional and local.

Of the constitutional causes to be found: First, a toxic state of the maternal blood, either incorporating the poison in itself, as in certain fevers, lead or copper poison, etc., or the morbid products, as in jaundice, albuminuria, etc.

FER-030

Case: 25-5360, 09/15/2025, DktEntry: 34.3, Page 33 of 256
Case 1:24-cv-00244-BLW Document 144-1 Filed 06/30/25 Page 31



Second, the mother's blood may be degraded, or impoverished. Under this head may be cited anemia, over-lactation, etc.

Third, derangements of the nervous system attendant upon neurotic affections, such as chorea, extreme enervation as a consequence of obstinate, intractable vomiting, mental shock, etc.

Fourth, disturbances of the circulation attributable to mechanical causes,—*e. g.*, diseases of the liver, heart, and lungs, etc. And I should have here mentioned climacteric abortion.

Of the local causes to be found: Uterine disease, mechanical anomalies, fibroid tumors, polypi, retroversion, pressure of tumors external to uterus, etc.

The fetal diseases may be traceable to a diversity of causes: *e. g.*, diseases of the membranes of the ovum, as fatty degeneration, hydatiform degeneration, congestion, inflammation, apoplexy, and fibrous deposits; or to the embryo itself, as inflammation of serous membranes, diseases of the nervous system, kidney, liver, etc.

Here also are to be found mechanical causes, as malformation, torsion of the cord or funis, etc.

Having familiarized ourselves with the causes of natural abortion, it next rests upon us to determine whether the facts and circumstances surrounding any given case point to a fault of nature, or the intervention of crime.

From what I am able to gather from the literature to which I have had access, I am inclined to think it highly probable that the work of an expert abortionist, in the earlier months of pregnancy, might so closely simulate natural abortion as to involve quite a nice distinction—in fact, to positively preclude a positive opinion, unless corroborated by circumstantial evidence. Therefore, before rendering an ultimatum, I maintain that it is incumbent upon us, in all cases, to elicit a careful history, dating from puberty, or the first menstrual period, up to the time of, and including, the present mishap; noting carefully the character of the menses, habit as to regularity, and, in fact, every detail calculated to shed light upon the investigation.

This, conjointly with the moral environment, temperament, predisposition, and facts of a like nature, is worthy of your most careful study, and though being entitled only to collateral weight,

Case: 26-5360, 09/15/2026, DktEntry: 34.6, Page 34 of 256
1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 32



and rendering at best but subjective evidence, still should never escape your observation, as they form a significant chapter in the antecedent history, and materially aid in unraveling the Gordian knot.

The application of the term innocent abortion includes all abortions superinduced by causes of an accidental nature, and call for no further elaboration in this paper.

The terms authorized, or justifiable, abortion are interchangeable, and are to compass all conditions necessitating the induction of abortion, where the object to be attained is the preservation of the life of the mother or child, or both.

Tidy, when reverting to the law in reference to justifiable abortion, says: "Our laws do not formally recognize the induction of premature labor by the medical practitioner. Judges, however, have always held that medical men are morally justified in inducing premature labor, provided the object be to save the life of the mother, or child, or both, as the law regards operations as justifiable, although, as Dr. Taylor remarks, no such exceptions are made in the statutes on wounding."

"The first general medical agreement upon this question appears to have been about 1756, in which Dr. Kelly informed Dr. Deneman that there was a consultation of the most eminent men at that time in London, to consider the moral rectitude of, and the advantages which might be expected from, this practice, which met with their general approbation."

The induction of abortion is justifiable, and it is recommended in the following cases: extreme narrowness of the pelvic brim, where, owing to deformity, neither the forceps nor version will succeed in bringing into the world a living child at full term; obstinate vomiting, where death seems imminent, and expedients have proven ineffectual; in some cases of pregnancy complicated with insanity; and in certain diseases of the uterus, such as cancer, etc., placenta prævia, rupture of the uterus, narrowing of the soft passages, cicatrices of the vagina, etc.

Though we are justifiable in producing abortion, should any of the above conditions, or conditions equally urgent, present themselves demanding an interference of pregnancy for the preservation

FER-032

1:24-cv-00244-BLW Case: 26-5360, 09/15/2026, DktEntry: 34.3, Document 144-1 Filed 06/30/26 Page 33 of 256



of the life of the mother or child, or both, still at all times we should exert all prudence and caution, and this should be an act of conservatism born of the most mature deliberation and thought. Under no circumstances, when practicable to do otherwise, are we warranted in relying upon our own judgment, but to the contrary it should be the result of a conference with one or more physicians, in whose judgment confidence my be reposed. In order to save all embarrassment, and insure ourselves against any cloud of suspicion that might bring odium upon us, I concur in the opinion, that it is our imperative duty, whenever possible, to get the written consent of the mother, or husband, or guardian. For it is affirmed by the records in not a few instances, that suit for malpractice, or damaging reports have been the outcome of precipitate judgment, and a lack of regard for these precautions. Though it be justifiable, and so held by law, nevertheless by this inadvertent act, we inflict upon ourselves an irreparable injury, and place an ineffaceable blot upon our professional escutcheon. For the cause of the plaintiff, groundless though it be, still finds a champion. Therefore, let me not fail to forcibly impress your mind with the gravity of the responsibility that rests upon you, for in event any untoward sequelæ ensue, or as it has not infrequently happened, death be the sad termination, how much enhanced would your comfort be, that in the performance of this duty you had obeyed the dictates of law and conscience. Your position would then be rendered invulnerable and beyond a breath of reproach.

Of the various agencies resorted to by criminal abortionists in effecting this horrible purpose, it is manifest that they compass all known methods, from the most crude and barbaric to the most enlightened and scientific. They shall be mentioned only in a general way, and may be divided into two classes, *viz.:*

General or constitutional, and local or mechanical.

The general or constitutional seek to effect the expulsion through the constitution of the mother, and may be broadly classified, as, supposed or reputed abortifacients. These depend for their effectiveness upon an exciting uterine action, some of which have a direct, and some an indirect emmenagogic effect. The most prominent

Case: 24-5360, 09/15/2026, DktEntry: 34.6, Page 36 of 256
Case 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 34



are emetics, purgatives, especially the drastic purgatives, such as croton oil, elaterium, gamboge, etc.

DIURETICS.—Their administration usually proves fatal to the mother, owing to the necessarily large quantity required. Extract of cotton wood has been used in the Southern States, but is of uncertain action.

Carrot seed is a popular abortifacient in upper India.

Vegetable preparations: savine, rue, tansy, quinine, belladonna, ergot, etc.

Animal substances: cantharides, etc.

Each of these preparations and substances have certain authorities to claim for them the possession of potent abortifacient properties, while equally noted authorities will write avowing a negative opinion. Therefore, before reaching a conclusion, or determining a drug or substance to be effectual or ineffectual, we should not lose sight of the fact, that in women disposed to abort, the effect of the drug, conjointly with the mental impression, often proves sufficient to bring about an abortion; whereas, were we administering the same drug to a differently constituted, or less impressionable woman, it would be found devoid of any emmenagogic effect.

Of the local or mechanical causes, anything approaching a thorough enumeration, and description of the various means and methods, would indeed be prolix and out of order. Suffice it to say, that almost every conceivable device and horrible measure has been found in the employment of criminal abortionists in their attempts at the production of abortion. They direct their efforts toward the destruction of fetal life, or more properly speaking, the arresting of gestation.

This purpose has been accomplished by the destruction of the ovum, puncturing or separating the membrane, and a variety of other procedures, that light up an abnormal irritation and contraction of the uterus.

The fatality to the mother and terrible after-consequences, are attributable, in the greater number of cases, to haste, excitement, and septic conditions attending the work of an unskilled operator. It is here to be borne in mind that some days may elapse after puncturing the membrane, before the expulsion of the uterine contents;

FER-034

Case 24-5360, 09/15/2026, DktEntry: 34.3, Page 37 of 256
1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 35



also a fatal inflammation may be set up without any actual injury to the womb.

At other times, death has resulted from the instrument being driven through the womb, and inflicting injury upon parts incredibly distant.

Horrible as it may appear, the human hand alone has been used with such extreme violence as to even drag away the intestines.

In instituting a plan of investigation I have adopted the one laid down by Tidy. He defines the duties of a medical expert, in cases of suspected abortion as stated below:

1st. Examination of the mother, if living.

Temperature.

As to the woman's predisposition to abort and the period at which abortion has commonly occurred.

General state of health (note existence of leucorrhea, excessive menstruations, syphilis, asthma, malignant disease, uterine disease, etc.)

Whether the woman be well or ill formed (note pelvic malformations, effects of tight lacing, etc.)

Whether or not there be signs of recent delivery, or of the expulsion of the uterine contents.

Whether any cause can be assigned to account for the abortion, (*e. g.*, violent coughing, blood-letting, straining at stool, violent exercise, undue excitement, septic poisoning, violence, administrations of medicine, etc.)

All injuries of the genital organs (consider whether the injuries might be self-inflicted.)

2d. Examination of the body of the mother, if dead.

The necessity for care not to mistake the effects of menstruation for those produced by abortion.

To avoid injuring the parts by the knife or otherwise during the autopsy.

To consider the possibility of injury being self-inflicted.

Note the existence of any marks of violence on the abdomen or other parts.

Condition of the genital organs, noting all inflammation, rents, tears, perforations, etc. (if the uterus be injured it should be preserved.)

Note also:

1. The condition of the passage (relaxed or otherwise.)
2. The condition of the os uteri (virginal or gaping, etc.)
3. Vaginal secretions, and if present, their character.
4. The general appearance of the breasts, presence of milk, etc.

Whether there be any signs of irritant poisoning in the stomach, or inflammation of the bladder, kidneys, rectum, etc. (The contents of the stomach, if necessary to be preserved.)

Whether the viscera generally indicates loss of blood during life.

3d. Examination of the products of conception.

Nature of the supposed product of conception.

Consider whether there is evidence of a diseased condition of the membranes, or of the placenta,—*e. g.*, structural degeneration. If a fetus be found, determine whether it was born alive, its probable age, and the cause of its death.

Determine whether, if there be wounds or other injuries, they were inflicted during life or after death.

4th. Examination of all drugs, instruments, etc.

If during life the examination be made, we must remember that the earlier it is done, the more certain are the signs, and if delayed much beyond a week or ten days, the evidence of recent delivery will at best be of an indefinite character. Confirmatory of this, an Indian surgeon of some experience writes that with some persons within twenty-four hours all signs of delivery disappear. This, of course, is very exceptional, as the lochia itself rarely ceases before a week or ten days.

## INFANTICIDE.

The thorough appreciation, and the ability to recognize infanticide, presupposes a knowledge replete with the many details surrounding the cause and effect of still birth, and the assigned meaning from a forensic point of view of the terms live-birth, and newly born. The term "still-birth," in its broad application, is corrupted, and would imply any child born dead, *i. e.* in common parlance, and often medically speaking. But when the law intervenes it has a definite and restricted meaning. To the medico-legal expert it conveys the idea of a child born dead, from natural causes, or in-

1:24-cv-00244-BLW Case: 26-5360, 09/15/2026, DktEntry: 34.2, Page 39 of 256 Document 144-1 Filed 06/30/26 Page 37



evitable causes arising from some justifiable procedure in the attempt at delivery.

Live-birth is stated by Bouvier in the following language, "The act of being wholly brought into the world. The conditions of live-birth are not satisfied when a part only of the body is born. The whole of the body must be brought into the world, and detached from that of the mother, and after this event the child must be alive. The circulating system must also be changed, and the child must have an independent circulation, but it is not necessary that there should have been a separation of the umbilical cord; that may still connect the child with its mother, and yet the killing of it will constitute murder."

We must satisfy our minds upon these several points, before judging the facts accordant with the legal conception of a live-birth.

It is here interesting to note the distinction between physiological life and legal life made by a distinguished judge in his charge to the jury in a trial for infanticide. "Medically," he said, this might be a live child, but legally it was not one, for in law, the birth of the child must be complete. As the result a prisoner who had murdered a child while being born by cutting off its head was acquitted.

I shall forego any amplification of this branch of my paper, further than the strictly medico-legal points, for by recourse to the abundant literature written in this connection, you have doubtless become aware, that it is teeming with statistical facts, and diffuse in its descriptions of recorded cases.

That it exists as a crime of measurably frequent occurrence, even in our own community, cannot be controverted, though seldom if ever does it take the shape of an indictable offence, owing to the lack of positive proof, though the assumptive is often very strong. I will here mention that on more than one occasion I have had my attention arrested and suspicion aroused by the conduct of mothers whose infants were insured by certain life insurance companies. The incentive for gain among a certain class, whose moral sensibilities are blunted, proves too much for them, and induces an apathy and extreme indifference, which deprives them of the ability to execute the injunctions enjoined by the attending physician. In all

Case 1:24-cv-00344-BLW Document 144-1 Filed 06/30/26 Page 38
Case 23-5360, 09/15/2026, DktEntry: 34.3, Page 40 of 256



events, it is a singular and often to be observed fact, that there exists a noticeable want of motherly feeling and care among this element. In order to subject this to a crucial test, I will be glad if each member will feel it incumbent upon him to fathom the truth of my assertion, and if I be correct, I comprehend it from a moral standpoint to be the unswerving duty of this society to denounce it as a pernicious practice, and further to interest itself in preventing its continuance.

In an issue of the *British and Foreign Medical Review* an authority estimates the proportion of still-births to be one in eighteen, or one in twenty. This calculation is based upon a series of eight million births. A comparative ratio of still-births, among legitimate and illegitimate children, is supposed to be about one in twenty to the former, and about one in ten to the latter.

What constitutes a sufficient manifestation, or sign, to prove the existence of live-birth? In law we are not called upon to show that the life existed for any given length of time. A single second of life is all the law requires. The evidence, according to Tidy, may be of three kinds: First, the evidence of life furnished by an examination immediately after the birth. Second, the evidence of death, furnished by an examination immediately after the birth. Third, the evidence of live or of still-birth furnished by a post mortem examination.

*First:* The evidence of life furnished by an examination of the child immediately after its birth. These are muscular twitchings which *per se* would not be accepted as sufficient evidence of live-birth.

*Second:* Respiration—*i. e.*, breathing as evidenced by chest and other movements, is a true sign of life, but on the other hand, it does not follow because the child does not breathe, therefore it is not living.

*Third:* Crying after complete delivery is an indisputable sign of live-birth. It is not necessary, however, for the child to cry to prove live-birth, because it is possible it may be dumb. This is regarded as one of the strongest signs, as the act necessitates breathing.

*Fourth:* Pulsation in the cord. This is an undoubted sign. The

FER-038

Case 26-5360, 09/15/2026, DktEntry 34.3, 41 of 256
1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 39



pulsation being in the umbilical or hypogastric arteries and is due to the action of the child's heart.

*Fifth :* Beating of the heart. The beating of the child's heart is of all tests, the test of live-birth. Monsieur Bouchant records a case where the heart beat was audible for twenty-three hours after birth, although there were no signs of respiration during the time.

Evidence of live or still-birth furnished by a post mortem examination. We consider first the condition of the respiratory organs. The relationship of respiration to live-birth considered legally and physiologically is entirely different, for a child may breathe *in utero* (*vagitus uteranus*) whilst its head is in the vagina (*vagitus vaginatus*), or further, a child may breathe after the head only is external—*i. e.*, before the rest of the body is born, and still either, or all, of these facts would not constitute evidence of live-birth.

Our second inquiry is in regard to the shape of the chest and alteration in the position of the diaphragm. The diaphragm, before respiration, is arched and high up into the chest; after respiration, it is flattened and depressed.

The respective characters of lungs that have and have not breathed, may be concisely expressed by Tidy's tabular form denoting them :

| LUNGS WHICH HAVE NOT BREATHED. | LUNGS WHICH HAVE BREATHED. |
|---|---|
| 1st. Dark in color (black, blue, maroon, or purple), resembling liver. | 1st. Light in color (rose-pink, pale-pink, light-red, or crimson). |
| 2d. Air-vesicles not visible to the naked eye. | 2d. Air-vesicles distinctly visible to the naked eye, or to a lens of low power (say a two-inch or even a common reading glass). |
| 3d. Do not crepitate or crackle when squeezed or cut. | 3d. Crepitate or crackle freely. |
| 4th. Contain but little blood, therefore but little escapes on section | 4th. Contain a good deal of blood, which escapes freely on section. |
| 5th The blood present is not frothy, unless there be putrefaction. | 5th. This blood is freely mixed with air, and therefore appears frothy. |
| 6th. Sink in water, unless putrid, and often even then. | 6th. Float in water, or at all events, the parts which have been expanded, or have breathed, float. If fully expanded, they will even buoy up the heart. |
| 7th. Bubbles of gas arising from putrefaction may be squeezed out, and as they escape are usually noted to be of large size. | 7th. The air cannot be squeezed out. |

FER-039

Case: 25-5360, 09/15/2026, DktEntry: 34.3, Page 42 of 256
Case 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 40



The extent of these changes depends upon the length of time the child breathed. Forderes or Schmit's test regarding the relative weight of respired or unrespired lungs is practically of no value. Plocquet's test, the ratio of weight of the lungs to weight of the body, is valueless. Speaking relatively to the hydrostatic test, which was first suggested by Ruggaet in 1862, it is based upon the specific gravity of the respired and unrespired lungs ; the specific gravity of the respired, when compared with water, is 1050, whilst that of the unrespired is 960.

My paper will not admit of a description of the mechanism of this test, which is fraught with difficulties, and involves a deep and close investigation in many particulars, and though it were not so at best, it could but prove the fact of respiration having taken place.

We are reminded that life and breathing are not convertible terms. It still remains but one of the proofs of live-birth, and by no means an exclusive one. Many reasons may be shown to evidence the fact that a child may be born alive and live for some hours without breathing. Amongst them, as pointed out by Dr. Hicks, in Guy's Hospital Reports of 1866, to exclude breathing, a spasm of the larynx and retraction of the tongue.

### THE LEGAL ASPECT IN GEORGIA.

I find by retrospective survey of the laws of Georgia that they are silent upon criminal abortion, prior to the act of 1876. That this crime is comparatively rare in the Southern States before the war cannot be doubted, yet I am at a complete loss to adduce a reason for its being so, and it would, in all probability, be a profitless and useless expenditure of mental energy to indulge in hypotheses offered in explanation, for unaltered would the fact remain. Yet I cannot refrain from reverting to certain historical facts that engrafted an indelible impress upon the character of that régime. These are the institutions peculiar to that period of Georgia's history, the common avocation of her people, that of agriculturists, and the fact of slavery being in operation, all of which, singly and conjointly, contributed their effect and reflected their influence upon the morals of society. Its existence, in a degree, is equally certain, and there is nothing to condone Georgia's failure to recognize it as a crime.

Case 24-5360, 09/15/2026, DktEntry: 34.2, Page 43 of 256 — 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 41



Not until twelve years after, when the aurora of another epoch had fully dawned upon her, when the crowning era of advancement marking her civilization was permanently established, and she finds the negroes and whites on a parity, legally, is she aroused to the necessity of enacting, in this direction, laws which purport to be the conservators of the public weal and the strong bulwark of morality. And what do we find to be the fruition of their puerile efforts? Naught more than inadequacy.

Let us scan them, and let us see if I have been guilty of perpetrating a dogma, unwarranted by facts, in making this broad assertion. For your edification upon the chief principles meriting your attention, I shall quote the several sections of the Code delineating the law, and if a full discussion tending to a correction of these laws be provoked, I shall have realized the *bonum desideratum* of my paper:

Section 4337(a). *Feticide, How Punished.*—The willful killing of an unborn child, so far developed as to be ordinarily called "quick," by any injury to the mother of such child, which would be murder if it resulted in the death of such mother, shall be guilty of a felony, and punishable by death or imprisonment for life, as the jury trying the case may recommend.

Section 4337(b). *Use of Medicine, Assault with Intent to Murder.*—Every person who shall administer to any woman pregnant with child any medicine, drug, or substance whatever, or shall use or employ any instrument or other means with intent thereby to destroy such child, unless the same shall have been necessary to preserve the life of such mother, or shall have been advised by two physicians to be necessary for such purpose, shall, in case the death of such child or mother be thereby produced, be declared guilty of an assault with intent to murder.

Section 4337(c). *Abortion, Punishment of.*—Any person who shall willfully administer to any pregnant woman any medicine, drug, or substance, or anything whatever, or shall employ any instrument or means whatever with intent thereby to produce the miscarriage or abortion of any such woman, unless the same shall have been necessary to preserve the life of such woman, or shall have been advised by two physicians to be necessary for that purpose,



FER-041

shall, upon conviction, be punished as prescribed in section 4310 of the Code.

Section 4310 provides for a fine not exceeding one thousand dollars, imprisonment not to exceed six months, to work on the chain-gang, on the public works, or on such other works as the county authorities may employ the chain-gang, not to exceed twelve months, and any one or more of these punishments may be ordered in the discretion of the judge.

### THE MORAL ASPECT.

Criminal abortion and infanticide, the two most inhuman of crimes, directly opposed and in violation of the divine laws of God, of nature, and of man, appreciated doubtless by all in the abstract sense, yet I dare say that few of us are in possession of a concrete knowledge of these, of all evils the most horrible and abandoned. The latter, not nearly so common as the former, but of relatively frequent occurrence, its practice being confined, in a vast majority of instances, to the larger cities, notably London, Paris, New York, etc. Not until we view this subject in its entirety and resolve its direct and collateral effects to an analysis, are we awakened from our lethargy of indifference to a realization of the direful results entailed morally, socially, and physically. They are not to be exaggerated, and no language that could be used, be it never so potent, would accentuate with sufficient force the burning necessity of active co-operative service on the part of medicine and law in the employment of every means directed towards the suppression of these evils. 'Tis unquestionably culpable remissness on the part of the physician that connives at the existence of these crimes. His position should not be a neutral one. He should ever be ready, where there is tangible evidence of guilt, to put it to a test, and to suffer it to pass unnoticed is to criminate himself, if not in the sight of man, certainly in the sight of God.

I hold that one endowed with the inherent attributes of a true physician has an exalted duty to devolve upon him, which is not satisfied with the mere administering to the physical ills and the amelioration of suffering, but demands that his character and life shall bear the impress of an ennobled spirit. To morality he owes

1:24-cv-00244-BLW Case: 26-5360, 09/15/2026, DktEntry: 34.3, Page 45 of 256 Document 144-1 Filed 06/30/26 Page 43



an inviolable allegiance, and should ever be actuated and governed by the purest impulses and God-inspired feeling of love, tending toward the promotion, among his associates and those to whom he is called upon to administer in the darkest moments of suffering and despair, of the highest and loftiest sense of Christian morality.

---

## A PLEA FOR HIGHER MEDICAL EDUCATION IN THE SOUTH.*

By WM. SIMPSON ELKIN, M.D., Atlanta, Ga.,
Professor of Operative Surgery, Southern Medical College; Surgeon to Grady Hospital.

My remarks this morning will be upon the subject of medical education, or rather "A Plea for Higher Medical Education in the South."

There is no disguising the fact that our medical colleges in the South have not been quick to emulate the examples of some of our Northern colleges in their efforts to elevate the standard of medical education; but this fact is not altogether due to any lack of desire on our part, but to some extent to our impecunious condition and inability to secure private, state, or municipal aid to endow and properly equip our medical colleges.

I claim, gentlemen, that to elevate the standard of medical education three requirements, at least, are essential. First: A higher standard of classical education and preliminary training. Second: A graded medical course of, at least, three years. Third: State Medical Examining Boards. If you will think for a moment, young gentlemen, and fully realize the great responsibility that rests on you, you will see in an instant the importance and actual necessity of becoming proficient in every branch of medical science that pertains to your profession. You are intrusted with the lives of human beings; you treat the physical body, a complicated anatomical structure that takes many years of assiduous labor to thoroughly understand, and a slight mistake on your part would be culpable neglect, probably costing your patient's life, and bring into disrepute the profession you are supposed to represent.

*Abstract of opening address delivered at Southern Medical College, October 2, 1894.

# Exhibit F

# PROCEEDINGS

OF THE

# PHILADELPHIA COUNTY MEDICAL SOCIETY.

VOLUME XIV.

*SESSION OF 1893.*

LEWIS H. ADLER, Jr., M.D.,
EDITOR.

PHILADELPHIA:
PRINTED FOR THE SOCIETY.
1893.



Digitized by Google

# CRIMINAL ABORTION.

By WM. H. PARISH, M.D.

[Read March 22, 1893.]

In submitting a paper this evening upon the subject of criminal abortion, I must refer to some extent to the law relating to it, and I shall do so with no little hesitation in the presence of the learned legal gentlemen with us.

I am very forcibly reminded of something I read during my college days, in one of those dead languages which we learn so slowly and forget so quickly—namely, that he who is ignorant of the science of warfare should not discuss military matters in the presence of Hannibal—so I, ignorant of law, might well be silent in reference to matters of law in the presence of that legal Hannibal, our very able District Attorney, Mr. Graham. But I hope he will correct me when in error, and I am sure that he and the other legal gentlemen present, and our Coroner, Mr. Ashbridge, will present in a most interesting and instructive manner, the correct relations, under the law, of the physician to cases of criminal abortion, when the after-treatment comes under his charge.

The practice of destroying the fœtus *in utero* is not of modern introduction, but is recorded in history from the earlier nations, with the sole exception of the Jews. Aristotle and Plato defend it (*Travels of Anacharsis*, v. p. 270; *Ibid.*, iv., p. 342). It is mentioned by Juvenal, Ovid, Seneca, and Cicero, and denounced by the earlier Christians. It was common in Europe through the Middle Ages and still prevails among the Mohammedans, Chinese, Japanese, and Hindoos; it has been so extensively resorted to in most of the nations of Africa and Polynesia that it is doubtful if more have died in these countries by plague, famine, and the sword.

In approaching the consideration of this subject the first query which very naturally presents itself is, "What constitutes crim-


Digitized by Google

Case 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 47 of 15



inal abortion?" In attempting to reply to this question we must not confound the different interpretations given to the term abortion. In medical language the word indicates delivery prior to the viability of the child, or it is restricted by some to delivery prior to the formation of the placenta; in other words, it is limited to delivery during the first six months or the first three months of pregnancy. In law this term is not thus limited, but is applied to delivery at any time prior to intra-uterine maturity.

The expulsion of the ovum, fœtus, or child by criminal violence, at any period of utero-gestation, is regarded in law as a miscarriage or abortion. Criminal abortion, then, is criminal delivery prior to maturity. What constitutes criminal abortion as distinguished from non-criminal abortion? Wherein rests its criminality under human or Divine law?

"Abortion" has been legally defined thus: "Any person who does any act calculated to prevent a child from being born alive is guilty of abortion. The intention constitutes the crime, not the means employed. The drugs may even be harmless." He, then, who resorts to any procedure, however harmless in itself, with the intention of producing an abortion, is guilty.

If the woman, with or without the advice of another, administers to herself a drug or resorts to some mechanical procedure with the intention of producing an abortion, she is herself guilty and liable to punishment under the law, even though the drug or the procedure be itself harmless.

If she voluntarily submits to the use by another of mechanical means which she knows are intended to produce on her an abortion, she is guilty along with him who uses the instrument or other means.

In order that an attempt to produce an abortion may constitute a felony, it is not necessary that the woman be pregnant—even though she be not pregnant, the intention constitutes the crime.

I will not argue before this Society the great moral criminality of what is known under the law as criminal abortion. The medical profession looks upon this crime as one of the most heinous, and as closely allied to infanticide. He who is believed to be guilty of such a crime could never be received into membership in this or any other medical society; or if a member should so far forget his high calling as to be guilty of this crime, his expulsion would quickly follow upon the presentation of adequate evidence of his guilt.

The physician who resorts to criminal abortion does so in the most secret manner, for he knows not only that he is punishable under the


Digitized by Google

ase 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 48 of 1



law, but he also knows that professional ostracism will make him forever an outcast from the medical profession.

Undoubtedly many criminal abortions are produced by legalized practitioners of medicine; but in this State the law legalizing the practice of medicine is a very lax one, and in some States there is no law determining who shall practice medicine. I do not believe that criminal abortion is frequently performed, even ever so secretly, by men or women of recognized professional standing; but that it is at times produced by some such members is certainly the case, as the records of the criminal docket show. The habitual abortionist, if a legalized practitioner, is nearly always one around whom suspicion, at least, has rested, and this suspicion has been sufficient to debar him from that affiliation with the worthy members of the medical profession which constitutes to a large degree the stamp of professional respectability. The medical profession draws a wide distinction between a legalized practitioner of medicine and a worthy, reputable physician. Unfortunately, this distinction is not sharply drawn by some lay minds.

Graduates of the best medical schools have proved false to their noble avocation, and have brought dishonor upon themselves and, to a certain degree, discredit upon the profession of medicine. But this experience is not limited to our profession—a like experience occurs in the sister professions of theology and of law, and, in fact, we may say in all avocations of life.

There are those, however, who produce, or attempt to produce, criminal abortion who are not legalized practitioners of medicine—are not practitioners of medicine at all. Often such persons are exceedingly ignorant; they know nothing of the anatomy concerned; they possess no manual skill in the manœuvres undertaken; they have only the most vague knowledge of the injuries which may be inflicted; they know nothing, or almost nothing, of the effects of the drugs administered; they only believe that certain procedures and certain drugs have the reputation of producing abortion; yet he who attempts to produce an abortion always knows that what he is doing is criminal.

Criminal abortion, however, is not infrequently produced or attempted by the pregnant woman herself. I think that such women are not always cognizant of the fact that they are liable to the law for such an act. Each one knows that if she commits the crime on another she is amenable to punishment; but for a self-produced abortion she seems not to know that she is punishable.

Digitized by Google

ase 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 49 of 15



A few words in reference to the justifiable production of abortion or of premature labor by members of the medical profession. That the production of delivery before the viability of the child, *i. e.*, before the end of the sixth month, is at times justifiable, is recognized in the courts and by the medical profession. But the conditions which justifiy such a radical procedure are not numerous.

Whenever it is necessary to terminate pregnancy in order to save the life of the mother, such a procedure is justifiable; if not thus necessary, the procedure is criminal. I grant that there is room for difference of opinion in the medical profession as to what conditions justify the production of abortion. The resort to an abortion may be reprehensible though not criminal; for instance, when it is performed by a practitioner of medicine under the mistaken, though honest, opinion that an abortion is necessary to save the life of the mother. It is quite generally accepted that there are cases of disorders of the kidneys, or of the heart, of degenerations of the ovum —as myxoma of the chorion and polyhydramnios—and very rarely instances of uncontrollable vomiting, in which the production of early or late abortion is demanded and justifiable, because it is necessary to save the life of the mother, and also because the death of the mother always involves the death of the embryo and usually that of the child approaching maturity. The authoritative works on "Medical Jurisprudence" class among the conditions justifying abortion, extreme pelvic deformity. Although this statement was a proper one at one time, it is not so at present, in my opinion.

The very favorable results of the Cæsarean section, and of its modification, the Porro operation, and of symphysiotomy so recently introduced into this country—the results, I say, of these operations are now so very favorable, both to the mother and to the child, that it is time to eliminate even extreme pelvic deformity from the list of conditions justifying early abortion. The law leaves it quite entirely to the medical profession to determine what constitutes justifiable abortion, either early or late. The responsibility in this direction thus placed upon us is a very weighty one, and the privilege conferred with it should be exercised with the utmost discretion. I have, in a very few instances, felt that the physician was getting very close to criminal ground when he produced an abortion under the plea of justifiability. For instance, a lady pregnant three months wanted an abortion produced, and so did her husband, because she, having had one very painful labor, had great dread of another labor in advanced pregnancy. They both expressed great fear that in-

FER-049

Digitized by Google

Case 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 50 of 1



sanity would develop if her pregnancy was not terminated. Her physician asked me in consultation. We decided that an abortion, was unjustifiable. She returned to her former home in a distant city, and there the abortion was produced by a regular practitioner. I saw a letter from this physician in which he attempted to justify on medical grounds, not only this abortion, but also two previous ones on the same lady. His plea was that of justifiability because of apprehended insanity. Such and similar cases seem to me to quite merge into criminality. Professional opinion in reference to what constitutes justifiable abortion should be so firmly crystallized that criminal abortion could not be performed under a false plea of justifiability.

As to the frequency of the occurrence of criminal abortion, it is impossible to give any statement of even approximate accuracy. Secrecy is so closely associated with its performance, that it is impossible to arrive at more than the crudest opinion as to the frequency of its occurrence.

I suppose every physician of some reputation as an obstetrician or gynecologist has applications from those desiring that an abortion should be produced. Probably a half-dozen such applicants call upon me during each year. Doubtless the same women visit other physicians on like errands. Also, nearly every physician is called in to take charge of the after-treatment of cases of criminal abortion. He will suspect some of them to be criminal, but in most instances he is unable to assert that the abortion is or is not a criminal one. Many cases of early criminal abortion do not come under reputable professional care at any period of their course. Even all the fatal cases are not recognized as criminal. For these reasons it is impossible to do more than to form an opinion that criminal abortion is performed with considerable frequency. All statistical statements as to the frequency of criminal abortion are, therefore, valueless, and are merely expressions of opinion.

It is well recognized that criminal abortion brings to the patient enhanced dangers—dangers greater than those pertaining to accidental or justifiably produced abortion. The increased dangers are due to the character of the manœuvres and to the drugs employed. The mechanical measures are often carried out in a bungling, unskilled manner, and without regard to the liability of conveying a septic poison. Often drugs are used, which, when given in too large quantities, endanger the life of the patient whether or not an abortion is produced. The woman, desirous of securing secrecy, often does


Digitized by Google

not call in a physician sufficiently early to enable him to prevent a fatal result.

The methods of producing, or of attempting to produce, criminal abortion are numerous and widely diverse in character. Of the drugs resorted to in this country, probably the ones most frequently used, and also the ones most likely to effect the result aimed at, are the preparations of ergot and of cotton-root. These drugs act by stimulating directly the contraction of the uterus. I have known a patient to treasure up a bottle of ergot left over from her labor, and to successfully partake of its contents at the incipiency of her next pregnancy. But even these drugs usually fail to effect an abortion at any period of pregnancy. Among other drugs frequently administered are aloes and savine. The entire list of medicines occasionally resorted to would be a long one—among them may be mentioned elaterium, croton oil, colocynth, gamboge, cantharides, arsenic, strychnine, corrosive sublimate, and other forms of mercury; pennyroyal, tansy, black hellebore, and not a few others, some of which are active poisons, others are dangerous in large quantities, and some are harmless. None of them produce abortion except occasionally, and then only through their injurious effects upon other organs or upon the general system. Some of them will produce the death of the patient without producing an abortion.

Tardieu, in his classical treatise, gives numerous cases of abortion produced, or attempted, by mechanical means. The professional abortionist usually dilates the cervix with a metallic dilator, and introduces a slender instrument into the uterus and punctures the membrane—or he may use the latter instrument without previous dilation of the cervix. Very usually, after the membranes have been punctured, he dismisses the patient and an abortion comes on generally in from three to ten days.

The more modern method of the criminal abortionist of advanced ideas is to dilate the uterus with graduated dilators, under ether, and at once to empty the uterus with all antiseptic precaution, usually receiving the woman into his private hospital for this operation. A lady applied to one of the medical men who advertised in the New York papers. He admitted her into his hospital in New York City, and practised the immediate removal of the ovum. She returned to Philadelphia at the expiration of a week's absence.

But sometimes the operator is ignorant and unskilled, and a great variety of instruments have been carried into the uterus: wooden skewer, crochet-needle, hair-pin, knitting-needle, a weaver's spindle,



Digitized by Google

ase 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 52 of 1



whalebone, wire, umbrella-rib, penholder, catheter, bougie, sound, tent, and dilator. Tardieu speaks of the frequent use in France, of what is there termed a hedgehog, which I believe is a slender instrument having near the end a number of bristles, which lie close to the handle when introduced into the uterus, but expand after introduction, and which, when rotated, very effectually break up the ovum, but have proved disastrous also to the mother. Electricity is effectually resorted to, one pole being usually introduced into the uterus.

Injections of corrosive or other irritant substances into the vagina are occasionally resorted to by the patient or by an ignorant abortionist. I have known a patient to produce an exfoliation of almost all of the epithelial lining of the vagina, by means of a strong solution of alum, without producing an abortion. Injections of different fluids, even water, into the uterus are resorted to, and if the membranes are largely detached or ruptured, abortion inevitably follows. In a few instances the most violent measures, such as the introduction of the hand into the uterus and attempts to drag out the entire uterus, have produced most disastrous effects.

What lesions do we find following attempts at criminal abortion? Naturally, from the variety of the means employed, these are various, and may be numerous in an individual case. In one authentic case the patient herself carried an umbrella-rib into the uterus, perforated its wall, entered and passed upward and through the abdomen, through the diaphragm and into the lungs. She did not desist in her efforts until coughing of blood and troubled breathing alarmed her. She concealed her manœuvre, and the umbrella-rib was found *in situ* at a post-mortem examination. During pregnancy the physiological softening of the uterine tissue permits the easy passage of a somewhat sharp instrument through it into the peritoneal cavity, and generally with resultant fatal peritonitis. When mechanical means are resorted to, if perforation of the uterus does not occur, there is usually, though not invariably, laceration—it may be a slight one—of the neck of the uterus or of the vagina. Rupture of the vagina or of the uterus has occurred from the introduction of the hand. Abscesses at various points in the uterus or in close proximity to it may follow. Blood-poisoning with local inflammations constitute the pathological conditions following many cases of criminal abortion. When drugs have been administered, gastric and intestinal inflammation may result, and evidences of such be seen after death.

It is not usually difficult to determine that an abortion is in pro-

FER-052

Digitized by Google

gress; but it is by no means an easy matter to determine with certainty, from the examination of the patient during life, whether or not the abortion is criminal in character. Even fatal perforations of the uterus are not usually recognizable during life. The statements of the patient may give this information; but she may, and usually does, deny that any attempt has been made to produce an abortion. Her statements, if accepted, would usually be misleading. Hence cases which recover, and the very great majority do recover, can usually be only diagnosticated as probably criminal abortions.

In the lesions found post-mortem there is no characteristic evidence that the abortion has been a criminal one, excepting the wounds, which are usually, though not always, present in such cases as have resulted from the use of mechanical means. Even then the history of the case must be looked into, for the abortion may have been innocently produced by a reputable physician who had failed to recognize the existence of pregnancy. Lacerations of the vulva, perineum, or vagina, may result from violent sexual intercourse, and excessive or violent sexual intercourse is not an infrequent cause of abortion in the young.

The after-treatment of criminal abortion must be according to the peculiarities of the case. If the abortion is incomplete, the indications are absolute to immediately empty the uterus and to render it aseptic. Here the expectant treatment is fraught with great danger. Such cases usually call for the utmost skill of the expert to effect the recovery of the woman.

Most frequently the underlying cause of a fatal result is septic infection or blood-poisoning. The traumatism produced is in itself usually slight and insignificant, but septic poison develops in the retained fragments of the products of conception, or is carried into the genitals by the abortionist. Blood-poisoning and the associated inflammatory lesions result.

Abdominal section with ablation of the uterus and its appendages, or of the appendages alone, may be necessitated.

When a patient suffering from a criminal abortion is sent to a hospital, it should be to one having a maternity or a gynecological ward; otherwise, the best treatment may not be secured.

In the management of cases of criminal abortion, the physician is often placed in a most trying position. If, perchance, he has been informed by the patient, or, if in his examinations he has discovered that measures or drugs have been resorted to with the view of producing an abortion, what becomes his duty under the law? Here we



Digitized by Google

would like to have an expression of the views of the Coroner, the District Attorney, and the other lawyers present.

Is it incumbent upon the physician to notify the officers of the law that an abortion has been produced, or attempted, illegally? If he does not thus furnish this information, to what extent, if any, does he render himself a *particeps criminis* under the law? Should the information thus gained in the practice of his profession be held sacred in deference to the good name of his patient, who is usually, though not always; more sinned against than sinning, or in deference often to the fair fame and happiness of the other members of the family?

I believe that very often the physician does all that is in his power to conceal both the fact that an illegitimate pregnancy has occurred, and also that an abortion, even though criminal, has resulted. Is the physician then acting with justice to himself and with a proper appreciation of his duties under the circumstances? Is it incumbent upon him to become an informer?

I know that in this State the information gained in the practice of his profession, and necessary to the proper treatment of his patient is not privileged, but may be extorted from him in our courts. Yet must he voluntarily convey this information to the officers of the law? Or shall he draw a distinction between the fatal and the non-fatal cases? Shall he report only the fatal cases to an officer of the law, withholding his certificate of death in such instances, and letting the Coroner investigate the circumstances? Certainly, if the case is about to terminate fatally the proper information should be given in order that an ante-mortem statement may be secured, and undoubtedly also no physician should give a death certificate in any case in which the death has resulted from what he strongly suspects or believes or knows to have been a criminal abortion.

These rules are in accord with justice to the physician whose reputation is at stake, and are also in accord with law and with the welfare of the community. But if the patient is recovering, is it required by law, or is it in accord with the general welfare of the community, that information bearing upon the character of the abortion should be formally brought by the physician before the officers of the law? I will answer the question in the negative, and will ask the gentlemen present to tell us in the discussion whether or not I am correct. In my opinion the physician should not become an informer.

I will further say, that he should not elicit or extort from the patient any information bearing upon her criminality, other than



Digitized by Google

that which is necessary for his guidance in the performance of his professional duties. He must not perform the functions of a detective.

In all serious cases of abortion, especially if criminal, the physician should secure another physician in consultation for the protection of his own reputation, as well as for the welfare of the patient. Let the physician remember, also, that he can examine the patient's genitals only with her consent. If he, by an exercise of force, secures such examination, he renders himself liable to punishment by legal process.

The consideration of the measures which may tend to diminish the number of criminal abortions becomes very important in every large city, for it is believed that where the population has become concentrated, there this crime occurs with greatest frequency. Those conditions or habits of life which diminish the number of marriages, increase the number of illegitimate pregnancies and the number of criminal abortions. But many such abortions occur in the married, and largely in proportion to the tendencies on the part of the married to indulge in expensive habits of life beyond their financial abilities.

The disgrace and shame attendant upon illegitimate pregnancy or maternity is the impelling motive on the part of the great majority of the unmarried. A recognition of the difficulties and of the disgrace attendant upon the care of an illegitimate child, on the part of its unmarried mother, impels many to resort to criminal abortion.

With all, however, there is an underlying immorality, usually on the part of both sexes, which leads up to the commission of an act as unnatural as it is criminal. The preservation of the purity of morals, then, of the youth of both sexes constitutes the only efficient safeguard against the occurrence, in any community, of criminal abortion—other measures are adjuncts only.

Digitized by Google

# Exhibit G

# NORTHWEST MEDICINE

CLARENCE A. SMITH, A. B., M. D.,
EDITOR-IN-CHIEF.

JAMES B. EAGLESON, M. D.,
MANAGING EDITOR.

VOL. V
JANUARY TO DECEMBER, 1907

PUBLISHED BY THE
Washington Medical Library Association
SEATTLE, WASH.



Digitized by Google

though I have seen many, very many, who lost their health and their lives because of such procedures.

No woman, however, goes to the professional abortionist first. She always consults her family physician first. The opportunity, then, is his to place her on the right road. Show her the physical danger as well as the moral wrong, and if he but will, he may impart a lesson which will never be effaced. True, he will fail in some cases, but in many, very many cases, he has the opportunity of saving the young woman for her home and for herself.

The physician's influence, then, must, if properly exerted, be the strongest deterring force in preventing this form of debasement. His knowledge of the dangers give him the right to speak with authority, and if he be true to the best traditions of his beloved profession he will also use that moral power which it is his right and duty to use, and he will thus do more to prevent this form of crime than all the other forces in society. But to do this, he must have a clearly thought out and unassailable line of truth with which to show the correctness of his position. And after all, in our fight against this crime of abortion, we must always find our strongest ally in the teachings of those eternal principles of morality and of right, which have proven themselves to be the indispensible conditions of all true civilization, and of all social order.

These, then, are some of the truths which should be impressed upon the mother's mind and heart, and the responsibility for which rests upon the physician. His duties and responsibilities are thus seen to be far greater than merely ministering to the ills of the flesh. And when he essays those higher duties to humanity, he approaches the noble standard of the ideal physician, of whom the sacred book speaks when it bids us to "Honor the physician for the need thou hast of him, for the Most High hath created him. The skill of the physician shall lift up his head, and in the sight of great men he shall be praised, and of his works there shall be no end."

---

## CRIMINAL ABORTION.*

By Montgomery Russell, M. D.,
SEATTLE, WASH.

The definitions of the term abortion vary somewhat in different countries, and are not used in the same sense by the medical and legal professions, nor yet by all doctors or all lawyers. By many doctors the term abortion is confined to the expulsion of the contents of the womb during the first three

*Read before the Washington State Medical Association, Seattle, Wash., Sept. 10-12, 1907.



Digitized by Google

months of gestation, that is, before the placenta has fully formed. Miscarriage is the term employed from the third month to the end of the sixth or seventh, when the child is said to be viable, and premature labor is said to occur at any time after the child is viable to the end of the full-time pregnancy.

Artificial divisions of time for defining abortion are used only for convenience, but all these are not without great imperfections, for Nature has no fixed rules of time and is not confined to hard lines of demarkation. It is no less difficult than to define "where lamb ends and mutton begins." Bouvier's Law Dictionary defines abortion to be the "expulsion of the fetus at a period of utero-gestation so early that it has not acquired the power of sustaining an independent life." Storer defines abortion to be, "the violent and premature expulsion of the product of conception, independent of its age, viability, and normal function." The Century Dictionary says that the distinction between the terms abortion and miscarriage is somewhat useless, and that "criminal abortion is premeditated or intentional abortion procured, at any period of pregnancy, by artificial means, and solely for the purpose of preventing the birth of a living child, that is, feticide."

At common law the criminality depended on the abortion being caused after quickening. Some modern statutes provide otherwise. The law requires that the procuring of abortion, in order to be criminal, must be with felonious intent, for it may be necessary as a therapeutic measure.

Again, abortion has been legally defined thus: "Any person who does any act calculated to prevent a child being born alive is guilty of abortion." The intention constitutes the crime, not the means employed. In this country, in several of our states, "it has been held that abortion is not an indicatable offense unless the woman be 'quick' with child." But we, as physicians, know that the individual has life and, therefore, the rights of a separate being, from the moment of conception, and that the earliest part of that life is, if anything, fuller of developmental incidents and changes than any of the later periods of existence. Some would seek to maintain that the soul does not enter the fetus until quickening has been felt by the mother; these are the kind of people who would argue as to how many angels could balance themselves on the point of a needle. The soul, being an unsubstantial entity, is, of course, incapable of demonstration, but those who have faith



Digitized by Google

Case 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 60 of 157



to believe that mortal man has such a gift, cannot in reason assume the task of defining when it has entered into the body. We do know, however, that if the fetus were left to fulfill its normal destiny it would have the chance to round out a useful career, and it is not for us to say whether it shall be destroyed any more than if it were a few stages further advanced in life. It is a misconception to assume that the spark of life in the embryo is precarious and easily quenched. On the contrary, it seems that the younger it is the more tenacious is it of life.

In the United States many of the states still lay stress in their statutory laws on the objectionable term "quick," though this disastrous word has been intelligently stricken out from the laws of many of our commonwealths, and it will doubtless soon be universally recognized by the legal procession that this requirement of "quickening" is of no moment whatever in fixing the degree of the crime of procuring abortion.

What is the significance of this sinister word "quickening," which has for so many centuries been the cause of millions of deaths, and which has persisted in our statutes, so that our laws have made it the basis of a distinction between the degrees of guilt of criminal abortion?

The pregnant woman receives a great many hints as the signs and symptoms accumulate and corroborate each other that a live and growing fetus is developing in her uterus, but she now awaits for a decided kick before she will believe that the fetus is alive. This kick is awaited anxiously by the woman as well as the law to announce that the child is sufficiently formed for its destruction to constitute even a misdemeanor. But we know that the child is as much alive in one month as another, and that the fetus is quite able to employ its muscles at the tenth week. Some women are not absolutely certain that they have felt quickening at all, and yet that fact does not imply that the fetus is not perfectly well and healthy.

It is certainly absurd to suppose that the fetus is not endowed with life until the mother can feel its motions. Its muscles and the bones to which they are attached must, of necessity, have time to grow and develop before it can make movements of sufficient violence for the mother to detect. None of us are conscious that the blood in our arteries and veins is coursing through them, endowed with vitality, and yet because we cannot detect any sensation whatever, it is none the less vital. Some advance the argument that the fetus, being dependent for its existence on its connections with the mother, is not a separate life, and that consequently it may be wilfully de-


Digitized by Google

stroyed without incurring the guilt of murder. But are we not all of us dependent for our existence upon the media of our environments, the atmosphere we breathe, the food and drink which nourish us, and the fire and raiment which give us warmth?

Neither do we adults lead independent existences, and to deprive us of any one of these agencies, upon which our lives hang, would be murder. The infant at its mother's breast is no less dependent upon her than the fetus which gets its nourishment through the umbilical cord and placenta. The plea that the child may be killed because it is dependent for its existence upon its mother is as applicable to the suckling as to the fetus.

The history of criminal abortion is a picture of human crimes and weaknesses. Feticide has been chronicled from the earliest times and casts a shadow over our land today. It is no new crime, but has been practised among all nations with the sole exception of the Jews. Jewish women have ever considered it an honor to bear large families to their husbands, and this is doubtless one reason why the Jews have spread over the earth and prospered in spite of the most violent opposition. This is due to a strict adherence to the Mosaic laws governing their sexual hygiene and relationships. However, it has been said that the crime is beginning to spread among the Americanized Jewesses, but only among that class who have put aside their religion.

Catholic women rarely resort to the crime of criminal abortion, the private spiritual and hygienic directions which are given in the "confessionals" by men who are usually intelligent and saintly are unodubtedly of great value to certain classes of people who are incapable of judging rigidly for themselves.

Among the Mohammedans the practice is very prevalent. In China, Japan, India and Africa it is fearfully prevalent. It is related that during the last century vehicles went regularly around the streets of Pekin every day to collect the bodies of infants, martyrs to abortion. Rome was filled with abortionists, the crime prevailing chiefly among the upper classes of society. The crime was vehemently denounced by Juvenal in one of his satires, who said: "You will scarce hear tell of a lying-in among the ladies of quality, such is the power of art, such the force of medicines prepared by the midwife to cause barrenness and abortion."



Digitized by Google

With the present standard of health in civilized society, one pregnancy out of every five results in accidental abortion, and ninety per cent. of married women suffer such a mishap at least once during their child-bearing life. But with every allowance for the great frequency of accidental abortion, it is well recognized by those in position to know, that the intentional and unnecessary destruction of the fetus represents a carnage of such vast proportions as to be almost beyond belief, and probably at no period has the slaughter been greater than in our own times, and with the spread of atrocious advertising by abortionists, and the open display and sale of alleged abortifcient nostrums by the druggist, one cannot wonder at the fact that it is alarmingly on the increase.

The consultation rooms of physicians are often in reality confessionals, wherein, trusting in the known inviolability of a doctor's confidence, the patients daily tell of their misdeeds, led to do so by the desire to aid in their bodily cure. Statistics never have been, and never can be published showing the frequency of the crime, and our only evidence must be by confession, for the deed is done secretly; the woman cannot be compelled by law to testify against herself, and the abortionist takes good care that there shall be no interruption while he performs the operation. Countless thousands of abortions occur that are never returned as such to the health bureau. Many a death from abortion is reported as being due to heart failure, anemia, syncope, inflammation of the bowels, peritonitis, pelvic abscess, embolism, etc. We are quite frequently called upon to attend women who are aborting or who have aborted. We know criminal abortion to be prominent among the great vices of the day, and it has increased so rapidly in our day and generation that it has created surprise and alarm in the minds of all conscientious persons who are informed of the extent to which it is carried.

Prior to 1840, the testimony of American physicians is that criminal abortion was not practised very generally, and to but a slight extent by married women; but this verification has now all been changed. The report of a special committee on criminal abortion, appointed by the Michigan State Board of Health, contains this startling passage:

"To so great an extent is abortion now practised by American women that, by calculation of one of the committee based upon correspondence with nearly one hundred physicians, there comes to the knowledge of the profession seventeen abor-


Digitized by Google

Case 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 63 of 157



tions to every one hundred pregnancies; to these the committee believe may be added as many more that never come to the physicians' knowledge, making thirty-four per cent., or one-third, of all cases ending in miscarriage; that in the United States the number is not less than one hundred thousand, and the number of women who die from its immediate effects not less than six thousand per annum."

It has also been declared that more than half of the human race die before birth, and that three-fourths of these are abortions by intent. Some professional abortionists are found in every city, town, and village, and the crime is not limited to any section or country. A combination of circumstances has produced a debauched and depraved public sentiment that not only winks at but condones, palliates, and defends the crime. It goes further in many instances, it often recognizes the abortionist as a useful member of society, and even sometimes extols him as a benefactor. The professional abortionist is a creature who recognizes no higher law than his own base interests. His heart has long ceased to know a human feeling; his hands are stained with the blood of victims of his foul lust for gain; he is devoid of all reason, all morality, all pity and all mercy. He is the spontaneous product of a social and national pandering to vice which is fanned and stimulated by the immoralities and indecencies of our modern amusements and orgies. He goes about his work with a total disregard for all surgical rules, in the preparation of the patient, in the preparation of his hands and instruments, and in the subsequent care and treatment of the case. He proceeds to do a serious operation by stealth, with no preliminary preparations. All he desires is the fee and nothing else, except that the woman shall not die, her shattered health being a matter of no concern to the coarse and unskilled brute.

The free dispensaries and charity hospitals in our large cities afford innumerable examples of broken constitutions and ruined lives which have had their sad beginning in an improperly treated abortion. Frequenters of gynecologic clinics often state that the displacements or inflammations of the uterus from which they suffer, date back to abortions occurring three, five or even ten years previously. Many of the cases now operated on for otherwise incurable pus tubes or chronic inflammatory disease of the ovaries date all their troubles back to a neglected abortion.

For even after a criminal abortion, if the woman were to

FER-063
Digitized by Google

apply for efficient medical treatment at once, the results would not as often be serious, but even then her subsequent history will likely be a sad one. She will probably never be entirely well again, and if she desires in the future to bear a child, she is likely to be either sterile or to lose the products of conception by an abortion or miscarriage, for one of these calamities predisposes to another and soon in increasing ratio.

The daily press is often responsible for the increasing frequency of the crime of abortion, by admitting to its columns the advertisements of abortionists, baby-farmers, and charlatans. All the papers are not equally culpable in this respect, but in a great many of the Sunday editions of the papers of our large cities will be found innumerable alluring advertisements. There is no misunderstanding these advertisements by "those who are in trouble," and of course the remedies advertised are sold merely for profit and not for philanthropic motives, being utterly inefficient, but neverless the minds of the community become poisoned. Pregnant women, having tried the abortificent remedies advertised, become desperate after their failure to act, and seek other more effective means, until they succeed in their undertaking.

In an editorial of one of the numbers of the *New York Medical Record,* the punishments accorded to the crime in the various countries of the civilized world are thus summed up: In England and Ireland the punishment is penal servitude for life, or a less term. Should the mother die, the crime becomes murder, which may be punished by death. In Scotland, the punishment is arbitrary. In France, Spain, the German Empire, Austria, Hungary, Italy, Russian, Norway, Sweden, and Denmark, in short throughout the whole of Europe, the crime is punished with imprisonment for from six months to twenty years, or for life. In Canada the penalty is imprisonment for life. In the United States it is punished with fines, ranging from $100 to $5,000, with imprisonment for long periods, and with death. In Washington, our own state, the law is as follows:

"Every person who shall administer to any pregnant woman whom he supposes to be pregnant any medicine, drug, or substance whatever, or shall use or employ any instrument or other means thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life, shall, on conviction thereof, be imprisoned in the penitentiary not

Digitized by Google

more than five years, nor less than one year, or be imprisoned in the county jail not more than twelve months nor less than one month, and be fined in any sum not exceeding one thousand dollars.''

And it is not necessary in this state, to constitute the crime, that a woman be quick with child. But how often do we hear of an abortionist being punished. Judicial investigation has proved to be almost totally worthless in regard to this crime, and the administration of justice concerning it is practically a dead letter.

The crime being perpetrated secretly by parties whose mutual interest it is to cover up their guilt, an arrest is seldom made unless the woman dies, while juries, reasoning from some obscure psychologic process, seldom convict the abortionist. It is a notorious fact that abortionists almost invariably escape, and even in the states of Germany, where the laws are strict and rigidly enforced, there has seldom, if ever, been a conviction. Abortionists are sheltered by the words of the law and the sympathy of the community. If the hearts and consciences of the people are callous, if they cannot see the expediency and justice of the laws, and if public opinion does not sustain the decree of the bench, then the laws are dead letters and should be stricken from the statute books, since they cannot be enforced. The arrests of abortionists are usually not for the crime intended by them, but for bungling work, which has resulted in the death of the mother.

Abortion, of course, is sometimes justifiable as a therapeutic measure, and there are very few physicians who have practised medicine for any length of time who have not had to perform the operation to save the life of the mother.

The law leaves it entirely to the judgment of the medical profession to determine when it is necessary and warrantable to produce abortion. No wise physician, however, would bring this about except after deliberate consultation with one or more fellow-practitioners of repute. There is no immorality in producing an abortion therapeutically if it gives a chance of saving the life of the mother, when, if it were not done, it would be almost certain that both mother and child would perish. The indications for therapeutic abortion appear, "whenever the mother is suffering from disease arising from the pregnancy or originating before it, or accidentally occurring during it, which imperils her life, and there is a reasonable probability that she will recover if abortion occur."



Digitized by Google

"Abortion has been brought on in the interests of the mother in ertain diseases, for instance, in several affections of the heart, or lungs, or kidneys, when acute symptoms supervene, in uncontrollable vomiting of pregnancy, in pernicious anemia, in chorea and convulsions, in placenta previa, in extreme pelvic deformity where it would be impossible for the woman to bear a full-time child, and in certain displacements of the gravid uterus when it has become incarcerated and is liable to gangrene.

"No intelligent critic can offer any valid objection to therapeutic abortion when it is done after deliberation and consultation, and the law in every civilized community concedes this privilege to the medical profession."

Man is not like the tree which, after the growth of hundreds of years, at last falls as a mere log but, as we believe, his physical nature is inseparably correlated with the moral, and while he is yet a dumb and unseen embryo, undergoing a secret growth, he is by degrees being shaped and perfected for the hopes of the loftiest estate of any created thing of which we have knowledge. That this hope should be blighted, and that the precarious life of the defenseless human being should be snapped off by a violent expulsion from its natural place or lodgement, is an outrage which disappointed Nature punished by calamities to the mother, both physical and moral. of the most threatening kind.

Criminal abortion is undoubtedly an abhorrent and villainous crime against the infant, the mother, the family circle, society and Nature. Except therapeutically, the destruction of the fetus is absolutely indefensible. It is attended with extreme danger to the mother's health of mind and body, to her happiness, and to her life. It is no trifling factor in the awful waste of human life and is possible only in a community whose standard of morality is at a very low ebb.

---

REFERENCES.

Heredity and Morals, J. F. Scott, M. D.
Bouvier's Law Dictionary.
The Century Dictionary.
Common Law Statutes.
Pepper's System of Medicine.
Parvin, Text-Book on Obstetrics
Transactions of the Mich. State Board of Health.
Ballinger's Annoted Codes and Statutes of Washington.

Digitized by Google

# Exhibit H

# NORTHWEST MEDICINE

---

CLARENCE A. SMITH, A. B., M. D.,
EDITOR-IN-CHIEF.

---

JAMES B. EAGLESON, M. D.,
MANAGING EDITOR.

---

VOL. V

JANUARY TO DECEMBER, 1907

PUBLISHED BY THE
Washington Medical Library Association
SEATTLE, WASH.

Digitized by Google

# A PLEA FOR THE PROTECTION OF THE UNBORN.*

By C. N. Suttner, M. D.,
WALLA WALLA, WASH.

That the medical profession of today occupies a position of intimate confidence and importance with the family, and does more, by wise counsel and help, than can be accomplished by cruel legal enactments in the development of our race, no one will deny. That ever since the priest physician became the plain physician, it has been our lot to direct the body along lines of nature's laws, assisted by and assisting the kindly mentor of ethics and morals.

Inasmuch as the physician is nearest the home, the unit of our society system, it behooves us, and it seems opportune, to regocnize fairly the ills of our social system, and see if there be a betterment.

The correlation of the various branches of our social system, and their mutual inter-dependence, enact the final cause of creation—the propagation of the species; their ulterior perfection by civilization necessitates healthy bodies with healthy minds. The standard of the twentieth century, with its restless strife in the industries and the enjoyments of its fruits by physical debauchery, and the lamentable excess in the social whirlpool, bid fair to destroy the home, and if the home, the state as well. Now, the greatest factor in the destruction of the home is the murder of the unborn child. In this regard it may not be amiss to call your attention to a few facts which all know to exist.

Children in our "society" are not wanted, generally speaking. The young wife, if not already cognizant of how to prevent maternity, soon finds the means to frustrate nature's laws. So prevalent and general is this abominable crime of abortion that nothing is thought of it. They (these women) brazenly tell you, say in life insurance examinations, that they have had three to five criminal abortions. In our private practice we are daily asked to perform this crime. Often they come asking about a fee, saying Dr. W. will do it for so much, and so forth.

How about abortion? What is the moral and legal status of the unborn child? It is no longer necessary to discuss when the embryonal child lives. Only some people, to hush their consciences, and some doctors, to fill their purses, claim "quickening" to be the pivot.

Intentional abortions are of two classes: Criminal, when performed for social reasons; and obstetric, when performed by the physician to save the life of the mother. We all consider it a

*Read before the Washington State Medical Association, Seattle, Wash., Sept. 10-12, 1907.


Digitized by Google

gross blunder against the science of obstetrics to sacrifice the life of the infant, unless it be the only means to save the life of the mother. Of the latter form of abortion, it is scarcely necessary to speak, as the profession, with asepsis, and perfected technic, has relegated craniotomy and other similar operations to oblivion, where they rightfully belong. But of the former there is an appalling increase. In fact, the modern Herod, in his slaughter of the innocents, is holding sway.

Among ninety-seven women who, during the last nine years came under my observation, and of whose cases a record was kept, and who were advised correctly, i. e., if single, to get married; if unable to get married, to go to a foundling asylum conducted by the sisters; if married, to abide by their vow, only twenty-one, as far as I can correctly determine, followed my advice. The others—what became of their unborn babes? Some of these women I found in hospital, when I was naively told by the nurse, "Oh! They had a currettement." Or others, when stopped and quizzed, would say: "I did not need one of you doctors," and haughtily walked away. One young lady of the upper class consented to go to a maternity, and hid her shame for seven months; when her brother found out her condition, he promptly got the doctor! But where is the child? She is again in society.

What of all such hyenas with the title of M. D.? Here is a woman, married for six years, who had prevented conception all of this while. Accidentally she became pregnant. She must get rid of it. She consults Dr. W. He tells her impossible for her to have a child; pelvic diameter too small; she must have a currettement at once; must wire husband immediately; must go to hospital for preparation to hold her till husband arrives to fix fee (only $150). Told her to have no Caesarian section, etc.; it would kill her. Through the influence of a friend, I saw this woman. By getting her history, and then calling Dr. J. F. Boyle, who was in the same suite, we convinced her, by facts and threats, to let nature alone. She did, and gave birth to a boy, per viam naturalem.

Now, how to find out about men who perform such heinous crimes. A certain doctor hired an educated man who, disguised as a laborer, visited all the doctors in a certain city with an hypothetical case. He found some few (only five out of twenty-eight) who, some for as small a fee as twenty-five dollars, would perform the vile deed.


Digitized by Google

I believe that we should be as proud of saving a child from the modern Herod as of curing it of the rabies, or of cerebro-spinal meningitis. It is needless to expatiate upon the accomplishments of pathology, surgery, etc., so long as we do not effectually, by word and deed, oppose the murder of the innocents, and the prevention of their conception.

The dictum that the unborn child (viable) has an equal right to its life as has the mother, has spurred the obstetrician and gynecologist to greater efforts, and has been crowned by more brilliant results than in any other division of applied surgery. Indeed, craniotomy on a live child is seldom heard of, and he who does it should be branded and expelled from the profession.

While improved skill and technic diminish the death rate to mother and child yet how much the scales tip in favor of good, we cannot surmise, as the criminal abortionist applies asepsis, etc., flourishes in purse and, in the graces of a perverted, degenerate society, builds palaces, travels, and perhaps until he is gone to early death, escapes the minions of the law. The doctor makes his diagnosis on the operation table, when the patient is under ether and, having scraped out a fetus, accuses the patient of lying, i. e., to sand the assistant's eyes; seeing this woman desirous of getting away with the fruits of her sin, he promptly finds pelvic deformities such as would frustrate the birth of a viable child and, for a big fee from the paramour, the fetus lands prematurely in the crematory; or weak in purse, and weaker still in conscience, he tells his client, "Oh! You are not pregnant, you have a cold," but gives the strongest of emmenagogues.

We lament the foreigner populating this country of ours. Is it justly thus? His rugged body, his devotion to his home, his obeyance of nature's laws, justly entitle him to take the place of those degenerates of lust, lasciviousness, excesses, and murders of the innocents.

It is not our province, some may say, to get into the realm of the preacher. But it is our province to advise correctly, to direct and suggest effectively.

Howard A. Kelly says that religion alone can give the true conception of right and wrong in this delicate field of morals. Very true, but how many, what percentage, are nowadays taught these morals by denominational religions, and how effectually? It is up to the physician not only by example, but by precept, to stem the tide, or the extinction of this great American race is as near as that of France. It is foolish to lament about the avalanche

Digitized by Google

of foreigners flooding our country. We could not exist without the hardy foreigner; we could not carry on our industries, and soon he will occupy our places of trust and policy, because he is free of the murder of the innocents.

Not only must we direct the future mother by true advice, but those mutilating pelvic operations, purposely executed to prevent pregnancy, must stop.

That some of this crime should be brought about by educated men seems almost beyond conception. It seems that much of the universal education of today is merely the increase of crime, the placing of deadly weapons in the clutches of the murdrer, the implement of lust, divorce and adultery, in pursuit of the kingdom of the dollar in the realm of the devil.

The morality in the upper and lower strata of the social fabric has not been augmented; statistics, newspapers and official bulletins tell the story. When pagan Rome was all-powerful, when their men and women were virtuous, they were in their zenith, but when enervated by luxury and debauchery, they were unnerved, and an easy prey to the Goths and Vandals.

Another factor leading to the deplorable state of affairs is the shameful advertisements in some of our metropolitan press anent matters sexual. Look at the blazing advertisements of regulators and angel makers. Is the cowardly youth when tempted appalled by the enormity of his crime, when he can so easily find assistance from drugs, angel maker and criminal abortionist? Again, the existence of the unborn is prevented by fraud, such as the viavi; by fake gynecologists and ignorant pelvic surgery. The "M. D." who daily gives local treatment for retroversion, assuring the anxious mother that she will be relieved of habitual abortion, ought to have his license revoked. Such women ought to be sent to the most skilled and experinced gynecologists, men who can so correct the displacement that nature can functionate, not to men who will "tack" the womb to the anterior belly wall, thus adding insult to injury.

More, or perhaps as much damage as done by radical pelvic surgery, must be attributed to that rank fraud called "viavi." It is maintained by the most insinuating female agents who, by glib tongues and persuasive manners, inveigle themselves into the confidence of womenkind. If a woman wants to be childless, *their* tratment will accomplish it. If she suffer from sterility, *their* treatment, again, will accomplish the result, though I find the same methods and "succor" applied in each case. Of course,


Digitized by Google

the *fee* in advance. I know in one city of instances like these: a hard working clerk, whose wife is suffering from sterility due to cervical stenosis, paid the fraud $58.00 to fertilize her with coca-butter!

Another factor productive of low birth rate, one child sterility, and diseased pelvic organs, is found, as we all know, in the alarming prevalence of venereal diseases. That sound morals are conducive to freedom from this disease, worse than the pest, is true. Genito-urinary men tell us that from seventy-five to ninety-eight per cent. of our male city population is or has been afflicted by gonorrhea. If this be true, can we conceive of the enormity of the damage to the race when we know the induced sterility of the female, and likewise of the male?

Dr. Prince A. Morrow, in his Treatise on the Social Disease and Marriage, has done more toward opening the eyes of the American public as to the great danger emanating from gonorrhea and syphilis than any other author. Dr. Fournier, of France, has collected statistics which prove conclusively that venereal diseases are largely responsible for the diminished birth rate of France. Dr. G. Frank Lydston, in his Treatise on the Diseases of Society, in Relation to the Vice and Crime Problem, gives us anything but a gloomy prognosis. That the profession is becoming thoroughly aroused to the above evils is well illustrated by the contribution through medical literature at the recent meeting of the American Medical Association.

Dr. Clement Clveland, in his address to the fellows of the American Gynecological Society, discusses the prophylaxis of venereal disease from the standpoint of the gynecologist. In fact, he clearly points out that a gynecologist is treating only with results. It is a sphere that belongs to the domain of the genito-urinary specialist and the general practitioner to eradicate these fearful operations by exterminating venereal diseases. The only way to accomplish this is by prophylaxis, the proper education of the young at home, in the schools, and in the colleges, as to the dire results of these diseases, education emanating from the press, as in Collier's and others, the dissemination of knowledge pertaining to this subject by emminent lecturers, such as Dr. Morrow and others. Only by continuous urging and activity are we able to meet this hideous evil. Only when the laity knows the truth, the whole truth, and the fundamental facts of the complete physiology of their sexual apparatus, will we be able; even then not by moral impulses, but from the terrible results of this disease will they shrink from committing sins ruining their lives.

Dr. Noegerath, in his paper, Latent Gonorrhea (1876), stated



Digitized by Google

what in later years we have had to acknowledge, much to our sorrow. Notwithstanding the enormous damages of the venereal peril, we are unable to treat these diseases as we should. They are shunned at hospitals, few, in fact, accepting them. They are treated by druggists, by quacks and general practitioners, whereas, it would pay us as a nation to isolate them in detention hospitals and refer them to the genito-urinary specialist (de facto specialist) until cured.

The laity must be enlightened by education along lines of hygiene and prophylaxis. We have a Society of Sanitary and Moral Phophylaxis, started in 1905, the parent of which was founded by Fournier, of France, in 1900. Periodicals may print the proper advice, we may disseminate pamphlets among laborers, students, schools and colleges, yet it will not take the place of the spoken word. Lectures emanating from a properly directed course, will do more good in keeping the youth in the right channel. Strange as it may seem, our body shrinks to tell collectively what he would individually.

No mind, even if a master mind, can compass today's medical and surgical knowledge in volumes. Might it not be possible that the state some day will empower us to register every pregnancy as soon as it is determined. Then and only then can we trace the case to its determination.

But what about the abortionists whom we know to exist? Will we ever have the courage of our convictions to ostracize them from our medical societies, to banish them from our homes, and when in the hands of the law to leave them justly where they brought themselves by their own folly?

The physician has many proper ways of providing for his patients without advocating practices which are a snare for "innocence." Let him show the greatest regard for the laws of morality, the main support of individual and social happiness. The wishes of a physician in such matters, manifested by his conduct and conversation, but especially in the conduct of such cases involving the application of moral principles, will go far to influence the community in which we move. (Coppens, S. J.)

---

DISCUSSION.

Judge G. E. Morris, of Seattle: I have been much interested in these papers which are of vital importance to physicians, lawyers and all good citizens who are concerned in the welfare of mankind. Moral questions should be discussed in all their phases. In sight of the law abortion is the procuring of miscarriage or premature birth. In the state of Washington any one who, by use of drugs or instruments, shall cause abortion, except to save the life of the mother, is liable to im-



Digitized by Google

# Exhibit I

CLOSED STACKS



E. T. REICHART, M. D.
Philadelphia, Pa.

LIBRARY OF UNIVERSITY OF CALIFORNIA MEDICAL SCHOOL

# MEDICAL SENTINEL

PORTLAND, OREGON.

MEDICAL SENTINEL PUBLISHING Co. PUBLISHERS

A MONTHLY MAGAZINE OF MEDICINE

APRIL, 1901

TWO DOLLARS PER YEAR
TWENTY-FIVE CTS. PER COPY



**HYDROZONE** (30 vol. preserved $H_2$ $O_2$ solution)

Is the Most Powerful Antiseptic and Pus Destroyer.
Harmless Stimulant to Healthy Granulations.

**GLYCOZONE** (C. P. Glycerine combined with Ozone.

IS THE MOST POWERFUL HEALING AGENT KNOWN.
Successfully used in DYSPEPSIA, GASTRITIS, GASTRIC ULCER, HEART-BURN, CONSTIPATION, DIARRHOEA, TYPHOID FEVER, TYPHUS, YELLOW FEVER, CHOLERA INFANTUM, ASIATIC CHOLERA, DYSENTERY, Etc.

Send for free 300-page book "Rational Treatment of Diseases caused by Germs, containing reprints of 140 scientific articles by leading contributors to medical literature.

Physicians remitting 50 cents will receive one complimentary sample of each, "Hydrozone" and "Glycozone."

**Hydrozone** is put up only in extra small, small, medium and large size bottles bearing a red label, white letters, gold and blue border with my signature.

**Glycozone** is put up only in 4 oz., 8-oz., and 16-oz. bottles bearing a yellow label, white and blue border with my signature.

**Marchand's Eye Balsam**
cures all inflammatory and contagious diseases of the eyes.

DISTRIBUTING AGENTS
Thomas Christy & Co., 25 Lime St., London, Eng.
Leeming, Miles & Co., 53 St. Sulpice St., Montreal, Ca.
Beckett, Zeilin & Co., 220 Sutter St., San Francisco
E. H. Buehler, 134 Lake St., Chicago, Ill.
John W. Lehman, 428 Camp St., New Orleans, La.

Sold by Leading Druggists
Avoid Imitations
Mention this Publication.

PREPARED ONLY BY
Charles Marchand
*Chemist and Graduate of the "Ecole Centrale des Arts et Manufactures de Paris" (France).*
57-59 Prince St., New York.



Digitized by Google

## Abortion and Infanticide from a Medico-Legal Standpoint.

W. W. Watkins, M. D.,
Moscow, Idaho.

Medico-legally, abortion means the premature casting forth, or expulsion from the womb, of the product of conception. Criminally considered, it means an unlawful or criminal interference with the natural course of gestation so as to cause the expulsion of the contents of the womb, conception being established. A destruction of the life of the foetus before it is born, and before it has a separate existence from its mother, constitutes feoticide. The early destruction of a newly born child, which has a separate existence from its mother is infanticide.

Much confusion arises from the different consideration of "foetus or child." We can have criminal abortion, and yet not have a viable child born alive, although its birth may be premature, and no attempt be made upon its life after birth, yet criminal abortion may have taken place without either feoticide or infanticide. Again they may occur co-existent, one a factor of the other. In a case of still birth, cardiac action and cord pulsation existing well marked, the attendant, medically and surgically educated, and no attempt to establish respiration or use of usual methods to establish life action, is negligent, and consequently crime.

The general opinion in ancient times was that the foetus was a part of its mother until its birth, and that she had the right to remove it from her body, as she would a tumor or growth of any kind. The Stoics thought that it received its soul or spirit when respiration was established; the Justinian code considered that life existed at forty days after conception, but modern law has traced the human embryo as a distinct being, dating from conception, and legally as well as physiologically, life is postulated from the first moment of impregnation.

The medical man in daily practice is often confronted with clinical conditions denoting abortion, in which a true clinical history of the case is very hard to obtain, especially if criminality is a factor in the case. One author has laid down four very pertinent questions, which we should endeavor to solve:

1st Has abortion taken place?

2d If so, was it spontaneous (from natural causes) or induced (by the intentional act of the mother or any other person)?

3d If intentionally induced, was the act justifiable or criminal?

4th Did the induced abortion injure health?

A fifth question may arise in some cases, viz: Does the fact of non-pregnancy invalidate a charge of criminal abortion?

In regard to the fifth question, the following will illustrate:

"Hoffman relates the case of a woman who was not pregnant, but, believing herself to be so, adopted means to procure an abortion. It was held that, although abortion could not take place in a non-pregnant woman, yet the penalty of the attempt was not excluded, and the attempt was held punishable, whether the completion of the act was possible or not." Again: "A case of this kind was tried a few years ago in Chicago. A girl died of



Digitized by Google

metro-peritonitis, and a midwife was accused of causing her death by an attempt to induce abortion. The post-mortem showed that abortion had undoubtedly been attempted, but the girl had never been pregnant."

Our diagnosis of abortion is generally an easy matter, if two methods of examination are made available:

1st The examination of the mother herself.

2d The examination of all discharged matters.

I emphasize the word *all,* for in many cases a part of such matter has been cast away in the vault, and in early cases, when such is the fact, the medical man is often seriously embarrassed in establishing the conditions, more especially if, as is generally the case, we are called late to the patient, when we have largely to be governed by her statement of facts, and I need not remind you that they are often misleading.

I recall to mind a case happening over twenty-five years ago, of a young woman who averred that she had passed nothing worthy of note from the vagina, but what she had was thrown down the vault. By attaching a lantern to a rope and lowering it, I discovered a well formed two months' foetus. This fact materially asisted me in my diagnosis.

Most of the criminal abortions take place during the first three months of pregnancy, for even those who are so unfortunate as to practice this nefarious business hestitate to act when viability is established. When an accused woman denies that pregnancy has ever existed with her it oftimes devolves upon the medical man to either disprove or verify her statement. Most of conditions present, upon examination, will depend upon the period of pregnancy, and the length of time that has elapsed since the abortion; when recent, we have a correllation of circumstances to guide us—hemorrhages, passage of blood clots, subsequent pallor, weakness, etc., but these symptoms might be manifest from other causes, as polypi, tumors, membranous dysmorrhea and other affections to which a menstruating woman is subject.

The condition of the maternal structures, during or immediately after an abortion, differ in appearance according to duration of pregnancy. Very shortly after passage of a two months' foetus, if complete escape has been made, it is very difficult for an expert to hazard a definite opinion as to age of pregnancy, while from six to seven months, all structures are materially changed, and we may have a slight cervical laceration, or the perineum may be nicked as at full term birth. If, in either case, marks of instruments or other violence can be made out, the probability of criminal interference is manifest.

A case in point occurs to my memory, happening during the past six months. A married lady, the mother of children, came to my office and made confession of operating upon herself, was suffering acutely physically, and was in great mental agony as well. She admitted a discharge of clear liquid and a great deal of blood. She had had used the stylet of a gum catheter, and, upon examination, I found that she had penerated the contents of the womb. A foul discharge, septic in appearance, was present, and to left of os in cervix I found a deep penetrating wound entering body of uterus; after ev-



Digitized by Google

ase 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 79 of 15



ery antiseptic precaution had been taken I freely curetted, and, excepting a protracted soreness, she made an uneventful recovery. The use of instruments by unskilled and ignorant persons is very apt to leave marks and so injure the parts that a careful examination will disclose these facts.

It is remarkable to what lengths women will go at times to procure abortion, and many of you have undoubtedly read the remarkable case presented by Thomas: An umbrella rib was prepared and inserted, and by some peculiar suction action it escaped her grasp and disappeared. A post-mortem disclosed that the rib had penetrated through the womb, diaphram, and two inches into the lung tissue. The woman was not pregnant. Our authorities are full of remarkable cases of a like nature.

In the examination of discharged matters all clots, shreds and remnants should be examined under water, thereby more easily isolating organized material from blood. The older the ovum the more easy its detection. When expelled by natural causes during the first three months, the whole products of conception are liable to come away in their entirety, but after placental formation is well advanced membranes will rupture, foetus escape and the difficult part of abortion ensues, viz: retention, with septic infection probable. Finding the embryo is not essential to a diagnosis of a given case, as there are other foetal structures such as the placenta, amnion, chorion or chorionic villi. If portions of membranes only are available they should be subject to a microscopical examination. It should always be in mind that when called to cases where criminality is the factor, that we should receive, cum grano salis, all statements of the patient, their tendency being to protect the operator.

When is the induction of abortion justifiable? I quote:

"1. Whenever there is such mechanical obstruction that the birth of a viable child is impossible.

"2d. Whenever the mother is suffering from such grave diseases that her life is in imminent peril, and can be saved only by the arrest of gestation."

Should we not also consider when the profession is *not* justified in the induction of abortion? Should not the profession learn to say *no*, and emphasize the word?

The law does not formally recognize the right of the physician to provoke labor, no matter what the environments may be, yet, the court morally justifies it, when it can be proven that life in either mother or child would be put in jeopardy, should nature be allowed to run its course. We are at times as much justified in inducing abortion as in extirpating a cancerous breast or amputating a diseased or injured limb. Physicians should never undertake this procedure except in a frank, open manner, and with a consultant's concurrence, as well as that of the friends, and no attempt at concealment, any more than with any other surgical act.

With regard to criminal abortion: "If it can be shown that abortion was not due to natural causes, but was caused by interference, and if such interference was not undertaken by a competent medical practitioner for sufficient cause, the case is narrowed down to one of criminal abortion." The law is laid down so plain "that he who runs may read." The law is shamefully violated every day in

FER-079

Digitized by Google

the year in our land, and the peculiar surroundings of a criminal operation of this kind are generally so completely secreted that it is only at rare intervals that conviction follows, because direct evidence cannot be obtained. Indirect evidence is generally plentiful, but the latter will not convict, or be allowed in court, hence the material is abundant for so much criticism by the laity.

It is a plain, obvious fact in law, that if a person attempts to commit abortion upon a woman, whether that woman is, or is not pregnant, he is guilty of an offense against the law of the land. If he gives her aid, whether the means used are medicinal or mechanical or instrumental, whether effectual or not, whether injury either temporal or permanent results, whether the foetus is viable or non-viable, whether with or without the consent of the woman, the participant is guilty, but proof must be adduced. The woman who gives her consent is accessory, and liable to penalty; "But if the woman is chloroformed or under the influence of liquor, or in any way rendered unconscious of what is being done, she cannot be an accessory, provided always she was unaware previously of what was to be attempted."

Frequently a post-mortem discloses that violent intestinal irritants have been used with a view to abortion, and such irritants have proved fatal by poisoning, yet have not disturbed the contents of the womb; again we have very grave abdominal or pelvic inflammations from the ingestions of these drugs. When the instrumental procedure is adopted by unskilled persons, who neglect the proper antiseptic precautions, or who, through ignorance of pelvic anatomy produce dangerous wounds of pelvic viscera, or expose the woman to a dangerous hemorrhage, inflammation or septic absorption, our attempts to make an exact diagnosis are made much easier, and our location as a factor in the case from a remedial standpoint, can be made much more exact.

In such cases, even with the woman's consent, should death result, the English law holds the guilty party as guilty of murder, but often reduced to manslaughter, if it be proven that the drug or instrument was not dangerous, and not used to destroy life, although employed for an unlawful, purpose; many escape the murder penalty because the intent to commit murder can not be proven, and naturally is absent. In nearly all cases of criminal abortion the court gives the jury a wider latitude and greater discretionary powers of action in rendering a verdict, than in almost any other criminal case.

Among the common people the measures used to produce abortion is mostly internal medication, conceded by the educated profession as being the most unreliable method of all. Whenever effective it is generally so by sympathy emanating from a general profound disturbance of the intestinal tract, and at great expense of the general system. There are those who are predisposed to abort at the least offense to the general system, and to these is due the publicity and celebrity of certain abortifacients,, which with thousands of others would not impress the system one iota.

There is the greatest diversity of opinion in regard to the abortifacient value of different drugs. In many cases to which the profession is called to attend, the presence of gastro-intestinal inflamma-

FER-080

Digitized by Google

Case 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 81 of 15



tion or irritation will oftimes give us a clue to the modus-operandi adopted, and a knowledge of the medical properties of such drugs as savin, hedeoma, ergot, gossypium root, rue, tansy and many others, will often enable us to strike the right track of inquiry which will lead to decided results. In looking for cause it is well for the physician to examine carefully for hypodermic signs, as some medication, as ergotin, for instance, could be used this way.

"When the court asks an opinion as to the abortive power of a drug, it is not needful to establish its specific action on the uterus, or its certainty as an abortifacient; it is sufficient to show its special liability to set up constitutional disturbances which are apt to terminate in abortion. If such a drug is given to a pregnant woman, but in too small a dose to cause abortion, or if it fails because of the peculiar strength and resisting power of the woman, the charge still holds." Most abortives are gastro-intestinal irritants and great disturbing agents to the system, and we would reasonably expect to find in the vomit traces or odors that would lead us to rightful conclusions as to what drug has been used. Our daily press is flooded with advertisements of nostrums and "Female Regulators," etc., and when in the form of pills they generally contain aloes, hellebore, powdered savine, ergot, iron and solid extract of tansy and rue.

Under general measures that are adopted some are effectual and others are not. Whatever will produce a hemorrhage between the womb and the membranes will produce the abortion. All classes of women adopt such measures as lifting heavy weights, long walks, running up and down stairs, jumping from a height, rough roads, snuff taking to produce sneezing, tight lacing, alternate cold and hot baths, electricity, direct violence applied to abdomen, blows, kicks, kneading the belly. Hoffman tells of a peasant girl who let a heavy barn door fall upon her abdomen, and yet the result was not attained. Massage of the uterus through the abdominal walls is often practiced, and it is claimed with oftime fruitful results. Generally when such measures obtain, we are apt to find marks or other signs that will throw light upon the case, but even then it is a difficult matter to so correlate the circumstances as to give us evidence to convict in court, and to determine whether the violence was criminal or accidental.

Local or direct interference methods are many and various. Irritating applications, pastes and tampons have been introduced well up in the vagina in close contact with the os uteri; hot douches, tents, dilators, sharpened twigs, skewers, wires, knitting needles, probes, sounds, etc., etc. Proper aseptic technique is ignored, and as much danger arises from septic influences as from possible injury to the maternal structures through faulty anatomical knowledge. In competent hands this operation is not within itself necessarily dangerous, but ignorance, hurry and filth in the handling constitute the elements of danger.

When these methods are successful abortion occurs in a day, or may be prolonged for weeks, thereby entailing septic dangers. When the foetus does eventually pass, the degree of maceration or decay often enables us to ascertain the length of time that has elapsed since procedure was commenced; we should

FER-081
Digitized by Google

observe very carefully for vaginal or uterine lacerations or wounds in this class of cases. The question is often raised, are women capable of performing this operation upon themselves? Yes, and with no knowledge of their structure; many women have not the most remote idea of their physical construction, others are thoroughly informed, and a knowledge of these facts often enables us to judge as to their personal culpability.

If pregnancy is well advanced, besides other possible damages to the woman, critically examine the foetus for marks or wounds. When abortion takes place from natural causes we are apt to find that the contents of the womb have escaped in their entirety. It is often important to ascertain if the membranes have been ruptured. Ranking second to sepsis as a devastating agent in abortion, is hemorrhage, and its degree is governed largely by the slow or speedy termination of the miscarriage, and tardy delivery of foetal debris is conducive at times to severe hemorrhages.

Within the past year a lady from abroad was visiting when I was summoned to meet one of the most terrific uterine hemorrhages I have ever met. Upon careful inquiry as to her clinical history, she at last reluctantly informed me that it *was possible*, although she was not sure, that six weeks prior, she *might* have had a miscariage. I immediately gave her a thorough currettement under antiseptic conditions, removing nearly a teacupful of broken down debris of a partial abortion, packed the uterus, and no more hemorrhages ensued, and, although almost exsanguinated, she made an uneventful recovery, and soon returned to her home city.

There is no doubt that we will have more septicemia in cases of natural abortion among the filthy, great unwashed classes, than we would of criminal abortion if the latter were performed under proper antiseptic principles. Some authors give a per cent. rate of fatalities of 79 in criminal abortion, which I am inclined to think is greatly exaggerated. The regular profession has duties of great import in the matter of criminal abortion. Most of the general practitioners are unaccustomed to medico-legal work, and oftimes carelessly overlook vital important matters along this line. We could greatly facilitate the ends of justice if we could persuade our courts to take expert advice, and draw up a code of rules for the preparation and taking of medical evidence, and for especial guidance of post-mortem work. . The practitioner of medicine is often placed in most difficult positions, but he should learn to say no, and say it with emphasis. Infanticide means the murder of a new born child. In all cases of this crime much depends upon the medical evidence, in fact the expert in medicine is generally the most important of all witnesses. Much is expected of him, and any or either of you who listen to this paper are liable within a day to be called to fill this position, and a knowledge of this line of jurisprudence becomes of value.

To substantiate the charge of infanticide the law requires satisfactory proof that the child lived after complete birth, and that its death was due to criminal violence. The law assumes the child to have been born dead, unless the prosecution is enabled to prove live birth, and 'the burden of the proof must rest upon the prosecution. If any violence has been inflicted it must

FER-082

Digitized by Google

be clearly established that such fatal violence ensued after a live birth. All legal bearings and interpretations of facts are not within the province of the medical witness. Such belong to court and jury. The expert should confine himself strictly to the medical, surgical or post-mortem facts and relate them without prejudice. We, as witnesses, representing the dignity and knowledge of our profession, should always keep in mind that we are not trying the case; our responsibilities cease when we have rendered our evidence, and then rests upon judge and jury. The most important questions that confront us in this line of cases, and the one great point upon which a successful prosecution hinges, is, was the child live born. Can we prove that the child cried, breathed or moved after being extruded from its mother's body; certain proofs of this are recognized by the law.

In English law all courts are unanimous in their construction of the law, that the child must be completely born before a charge of infanticide will stand. From our standpoint of observation it looks absurd, that if a child lie upon the bed, and one foot is not yet born, and it has breathed and cried, it is not considered as born, yet such is English law in the charge of infanticide, and if the child is murdered before the foot is completely extruded from the maternal passages the charge falls.

We have two classifications of evidence which is necessary, viz: presence or absence of live birth.

"1st. Evidence of life or death obtainable immediately after birth.

"2d. Evidence of life or death, obtainable from a post-mortem examination." I will condense. First, as proof of life we would have feotal heart beat, pulsation of cord, which are ultimate tests of life, muscular movements, wrinkling of brows and twitching of eye lids, sucking movements of mouth, opening of eyes, etc. Crying is a positive proof of life; breathing or gasping is positive proof, maceration or putrefaction positively proves death; also mummification.

Referring to post-mortem evidence, all marks, abrasions, cuts and bruises should be carefully noted. The thorax is generally flat before respiration and well rounded after, the diaphragm is arched before respiration and depressed after. During intra-uterine life the lungs have no function, and lie well back in the chest, when aerated the air cells expand, and when once expanded residual air remains even after death, and here comes in the great value of the Hydrostatic test. Lungs in feotal condition sink in water, where respiration has existed, float. As to method of this test you are referred to any text-book which will also explain affirmative and negative technicalities of the test.

I have in this paper only outlined leading points, especially upon the subject of infanticide; there are hundreds of others, all valuable to an expert, and in a feeble way I have simply led up, and I trust stimulated you at your leisure hours to take up some of these lines of medical jurisprudence. To the world there is no greater test of a medical man's worth than his ability to stand a creditable examination in the courts of our land, prove by his evidence and demeanor while in the witness box that he understands his position, and, above all, is unprejudiced in the case under consideration.



Digitized by Google

# Exhibit J

The Journal of the
American Medical Association
Published under the Auspices of the Board of Trustees

VOL. XLVI    CHICAGO, ILLINOIS, JUNE 30, 1906.    No. 26.

## Address

# THE LEGAL RESPONSIBILITY OF THE PHYSICIAN FOR THE UNBORN CHILD.

CHAIRMAN'S ADDRESS IN THE SECTION ON OBSTETRICS AND DISEASES OF WOMEN, AT THE FIFTY-SEVENTH ANNUAL SESSION OF THE AMERICAN MEDICAL ASSOCIATION. BOSTON, 1906.

C. S BACON, M.D.
CHICAGO.

### INTRODUCTORY.

Since the last session of the Association in Portland, our Section has lost by death two of its Ex-chairmen, Drs. Dudley and Dunning, both of whom were members of the Executive Committee of the Section.

Dr. Augustus Palmer Dudley was born at Phillipsburg, Me., July 4, 1853, and died in Liverpool, England, July, 15, 1905, of tuberculosis, at the age of 53. After completing a high school course he served an apprenticeship in an iron and steel manufactory, where he became a skilled mechanic. Then he began the study of medicine in the office of Dr. Seth Gordon and graduated at the Dartmouth Medical School, in 1877. After practicing four years in Portland, Me., he took the course of an interne in the Woman's Hospital, of New York. After a short service as assistant surgeon in the Woman's Hospital, in San Francisco, he returned to New York in 1884; this city was his home until his death. During this period he was Professor of Gynecology in the Postgraduate Medical School and in the Dartmouth Medical School and was connected with several hospitals.

Dr. Dudley was a skillful operator and a successful teacher. He also made many and important original contributions to the literature of his specialty, the most important of which were his papers on "Conservative Treatment of the Uterine Appendages." He was a Fellow of the American Gynecological Society, the British Gynecological Society and a member of the state and local societies, as well as the American Medical Association. He was also a very active member of the International Congress of Obstetrics and Gynecology and did much for it as the American secretary. Dr. Dudley left a wife and two daughters. He was not only a good physician and a good teacher, but he was also a good citizen and a good fellow, kind to all, loved by all who knew him, a most devoted husband and father. His social qualities were characteristic.

Dr. Lehmann H. Dunning died at his home in Indianapolis, Ind., from heart disease, Jan. 4, 1906, at the age of 55. He graduated at Rush Medical College, Chicago, in 1872. For a number of years he had been Professor of Diseases of Women in the Medical College of Indiana and surgeon in the Indianapolis City Hospital and gynecologist in the Deaconess Hospital. He was a member of the American Association of Obstetricians and Gynecologists, as well as of his county, state and national societies. His numerous contributions to the literature of his specialty were of a practical character. He was a careful, conservative and judicious man, whose influence in the community and in the profession was always for the best.

In the name of this Section I desire to express here the highest appreciation for the earnest and faithful work of these men who have been our worthy leaders, and the deepest and most sorrowful regret for their loss.

### THE LEGAL RESPONSIBILITY OF THE PHYSICIAN FOR THE CHILD IN UTERO.

All physicians, as well as other biologists, must regard the child in the womb as much a human being while still in the womb as after its expulsion. Although dependent on its mother for nourishment and for protection from injury and cold, it is still a living being and as much an independent existence as, for example, an intestinal parasite which depends on its host for protection and nourishment. That it lacks some of the functions of the individual *ex utero,* for example, the respiratory does not disprove its independence or its human nature. The infant also lacks functions that are possessed by the adult. The self-conscience of the fetus is only in abeyance because not aroused. The embryo or fetus is then to the biologist a separate human individual and not a *pars viscerum* like the ovary or the appendix.

We must regard this human being as just as independent at the beginning of its intrauterine life as after it has reached a stage where it can live outside of the uterus. The old legal distinction between a fetus *animatus* and *inanimatus* has, of course, no biologic foundation, although the statutes of certain states give a kind of authority for the perpetuation of these terms which are now in reality meaningless. The preception by the mother of fetal movements does not prove or disprove the life of the child any more than would a lack of consciousness of movements of other parasites which exist in her body disprove their existence. Likewise, there is no biologic basis for the ancient legal distinction which gave different vital and human attributes on the fetus *formatus* and the fetus *informatus.*

### LEGAL STATUS OF FETUS.

The legal status of the child *in utero* does not conform to its biologic status. All human beings *ex utero* are on the same plane and neither a physician or any one else has the right to take the life of one for the benefit of another or for any reason whatever, unless the state, through its judicial officers, declares the life of an individual forfeited because of his crimes and because its extinction is necessary for the welfare of the state. The unborn child has not the same legal protection. Under certain circumstances its life may be taken. The laws of most states and countries justify feticide when it is necessary to save the life of the mother. The provisions

FER-085

Downloaded From: http://jama.jamanetwork.com/ by a University of New South Wales User on 05/18/2015

Case: 26-5360, 09/15/2026, DktEntry: 24.2, Page 88 of 256



of these laws are of great importance to the medical profession and should be well known. Every physician should understand his legal responsibilities, rights, and obligations in this connection. The religious and ethical questions involved will not be considered in this discussion or only incidentally.

Surgeons of all kinds are learning to appreciate more and more the importance of having a definite understanding or contract with the patients on whom they operate. If the patient is not in condition to give consent or is not old enough to decide, the contract should be made with the legal representatives of the patient. In case no verbal or written or implied contract is made the surgeon operates at his own risk. When a contract exists he is still liable if he does more or differently than arranged for. Of course under any circumstances he is responsible for his management of the case if it is not skillful or if he is negligent.

The risks of the obstetrician are perhaps still greater. Many of the recent malpractice suits occur in obstetrical cases. The laity are coming to believe that puerperal infection is preventable and that its occurrence is due to malpractice. Obstetrical operations are exposed to the same risks as surgical operations. But operations involving the destruction of life of the fetus introduce a question that is quite different from any that can come before the surgeon and involve an additional risk. It is to this special risk or responsibility of the obstetrician that I wish to call attention as the subjective side of the question.

There is another classification of intrauterine life that might seem more natural and reasonable than those already mentioned, namely, that based on the viability or non-viability of the child. Some may ask, is the destruction of a viable child, especially one near or at term, a more serious matter than that of an unformed embryo, or even than the destruction of a 24-weeks' fetus that can live out of the uterus at most only a few hours? On mature consideration such a question will probably be found to have no biologic basis. As to the juristic side of the question it appears that in most states in this country the law makes no distinction in the legal rights of children *in utero*.

### LAWS OF VARIOUS COUNTRIES AND STATES.

We shall be much disappointed if we expect to find that the laws of the country or of any states form a body of well-digested and consistent and logical rules of action. Logical consistency is hardly a characteristic of any law. The law rather expresses the common opinion or judgment of the people, and this expression must conform to the conflicting variety of sentiments held by people of all stages of mental and moral development. If the law is ahead of the people or imposed on them by outside authority, it is apt to be executed indifferently or not at all, or it may raise opposition that leads to its annulment. In this country, as well as in England, whence our laws originally came, the laws are self-made and are generally an index of popular sentiment.

According to the ancient English common law, by which we mean the ancient precedents, the decisions or *dicta* of courts not founded on legislative enactment, the embryo or fetus before the term of quickening had no legal rights whatever. Up to the time of quickening no offense could be committed by an operation that led to the destruction or premature delivery of the fetus. If the woman gave consent, the bringing about of an abortion was not recognized as a punishable offense. Abortion produced without her consent was punishable as assault. The theory of the courts was that life, in contemplation of the law, begins when the child is able to stir in the womb and prior to this time the child does not exist as capable of being the object of criminal intent or action. Hence, when the mother gives her consent, the operation could only be considered as a wrong against something that does not legally exist.

This was the common law till shortly before the separation of the colonies from the mother country. This common law was the basis of the law of this country. In many states, this theory of the legal nonenity of the unquickened fetus was held by the courts to be the law and the early statutes of some states particularly or impliedly approved this theory. Now, however, this provision of the common law has been superseded by the statutes which have been passed by the several states. These statutes, in most of the states, make no distinction between the commission of an offense on the child before or after quickening, although some states still provide a more serious punishment when the act is committed after quickening.

It will not be possible for me to go into an examination of the statutes of the different states, and I must content myself with calling your attention to the practical abrogation of the common law, the substitution of statutary regulations as just outlined, which practically recognize certain rights of the fetus, although they do not place it in the same category with the individual *ex utero*.

I shall pass by a number of interesting questions which do not pertain strictly to the subject, for example, the responsibilities of the mother, and briefly refer to the general provisions that have a bearing on the legal status of the fetus as concerns the physician.

At common law, procurement of an abortion after quickening, with the mother's consent was forbidden, but was not a crime punishable with imprisonment. If, however, the mother died as the result of the abortion the one who performed the act was guilty of murder.

The statutes of the several states generally provide that any attempt to procure an abortion, either by the administration of drugs or by the employment of instruments, is punishable by imprisonment, unless the act is necessary to preserve the life of the mother. When the death of the mother results the crime becomes manslaughter and is punishable as such.

Before considering the question of most interest to us, namely, that of the justification of the act, a moment's attention should be given to a few side questions of importance. For example, how far is one responsible for advice to take medicine or to use means to produce an abortion. It is held that one is responsible for such advice if it is acted on, but not otherwise. The question also arises concerning the efficiency of the means employed. Here it is held that the intent governs. This ruling shows that the object of the law is not only or not so much to protect the fetus as to protect the life and health of the mother from the consequences of the attempts at abortion. This also explains, in part at least, the ruling that the viability of the fetus is not necessary to commission of the crime, although, no doubt, the vitality of the fetus at term, is a very important consideration in determining the justification of an obstetrical operation.

### LEGAL JUSTIFIABILITY OF FETICIDE.

We now come to the most vital question of the legal justifiability of feticide. In some wording or other all statutes provide for exemption from punishment for

FER-086

Downloaded From: http://jama.jamanetwork.com/ by a University of New South Wales User on 05/18/2015

Case 1:24-cv-00244-BLW Case: 26-5360, 09/15/2026 DktEntry: 34.2, Page 89 of 256 Document 144-1 Filed 06/30/26 Page 87 of 157



abortion in case it is necessary to preserve the life of the mother. This provision expressly implies that in the eyes of the law there is a difference in the value of human lives. It is the codification or the reflection of the popular belief or popular conscience that the mother's life is worth more than that of the child *in utero*. Whether this popular opinion or this expression of it in the statutes is morally justifiable or not, is not within the limits of my subject to discuss. We are simply concerned to learn definitely what the law provides. There seems to be no doubt of the far-reaching consequences of this provision concerning the necessity of preserving the life of the mother at the expense of her child. It is on this provision that the physician probably must rely for exemption in case of mutilating obstetrical operations made on the living child.

Just what is comprehended in the provision, "necessary to preserve the life of the mother," must be determined by the court in each case, and decisions have varied in some points. In some states the statutes require that the advice of two physicians be secured to determine the necessity of an abortion. Where such a rule holds it is, of course, necessary to show that the physician acts in good faith, in calling a consultant who is not in collusion with him to perform a criminal act. Where the rule does not hold, consultation is not necessary, but always desirable. It is always necessary to show that the physical condition of the mother requires the abortion. Fear of suicide or of remote results, developing from a possible nervous condition, does not justify the performance of the act. The practice of many physicians who make the probable injury to health an indication for the induction of abortion, is not justified by law and might lead to trouble in the event that such a case were brought before a strict constructionist court. It has sometimes been held that the burden of proving the necessity of the abortion falls on the physician and sometimes that the absence of necessity must be proven by the state. No doubt the circumstances in individual cases would have some bearing here, while in different states the practice varies.

So far, our attention has been addressed chiefly to the rights of the non-viable fetus and to the responsibilities incurred by the physician in its destruction. Neither the statutes nor the decisions of the courts in this country have fixed the status of the viable child *in utero*, except as it has been included with all intrauterine life in the provisions already discussed.

### INDICATIONS FOR EMBRYOTOMY.

All obstetrical writers in discussing the indications for embryotomy of the living child have laid down certain rules based on their own conclusions concerning the justifiability of the practice. Nearly all admit that the operation should be done at times. A few, like Pinard, would do away with it entirely. In general, the operation is admitted in cases in which delivery is impossible without Cesarean section or some operation to enlarge the pelvic girdle, and when the latter procedure is refused by the mother. The question is variously discussed from the usual religious and social standpoints, but rarely, or never, is the legal standpoint presented. The individual views of each writer are given and they generally coincide with those of others, so that the two or three sentences devoted to the subject are practically the same in all text-books. I have been able to find nothing authoritative in English concerning the legal status of the operation. Sippel, studying the German criminal law, concludes that: "In practice, the destruction of the life of the child by the induction of abortion or by embryotomy in order to save that of the mother, is not a punishable offense, and modern criminal law practice agrees in this respect. In theory, however, jurisprudence has reached no conclusion as to whether this destruction of fetal life should be allowed or condemned, nor as to how this destruction should be legally construed." Both Kossmann and von Franqué call attention to the fact that in Germany a physician who destroys a living fetus may be in danger from an unfriendly court. In this country, there is little or no doubt that the destructive operation, if necessary to save the life of the mother, would always be justified by the courts.

### POINT DECIDED BY MEDICOLEGAL SOCIETY OF FRANCE.

One important point has been discussed and decided by the medicolegal society of France. A physician is not compelled to make a destructive operation against his own judgment or conscience. In other words, if a physician advices a Cesarean secton or a symphyseotomy or pubiotomy and this operation is refused by the patient or her husband or guardian, he can not be compelled to substitute an embryotomy for the operation he proposes, even if he be the only physician in the place. Such a rule would undoubtedly be followed in this country, although I do not know that any case of the kind has ever been decided. It is inconceivable that a court would hold a physician responsible for the death of a woman because he refused to perform an embryotomy on her living child, and he certainly could not be convicted of civil malpractice in such a case. Of course, the physician has no right to leave his patient who has refused his advised conservative operation and he demands an embryotomy until some other physician has arrived, or until he is summarily dismissed from the case.

As to the legal justification of a destructive operation, probably the same can be said as was stated in regard to therapeutic abortion. In some states it might be necessary for the physician to prove that the operation was necessary to save the mother's life, while in most states the burden of proof would be on the state to prove that the operation was not necessary.

### INDICATIONS FOR OPERATION.

It is not in my province to enumerate the various indications for the operation, any more than it was my plan to discuss the different pathologic states that required the induction of abortion. In general, it might be affirmed that the indications for destructive operations are becoming contracted and many pathologic states that previously were treated by embryotomy, would not now be accepted as indications.

### CONCLUSION.

This review of the legal status of the child *in utero* has led probably to less results than were expected. I have been disappointed in finding less material than was expected. It shows, I believe, that the legal responsibilities of the physician are comparatively simple. No physician need be in doubt in any case. If he believes that the preservation of the life of the mother requires the sacrifice of the child he may operate without fear. It is always better, however, to fortify his opinions by consultation with a reputable colleague. The law does not recognize that the life of the child *in utero* is of equal value with that of the mother.

In deciding on his moral responsibilities, however, the

FER-087

Downloaded From: http://jama.jamanetwork.com/ by a University of New South Wales User on 05/18/2015

Case 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 88 of 157 Case: 26-5360, 09/15/2026, DktEntry: 34.6, Page 90 of 256



physician may have much greater difficulty. The statute law is frequently behind or at variance with the ethical law and the variance seems to be marked in this case. Many operations would be legally safe that would be undoubtedly wrong.

It is difficult to deny to the human fetus the innate right of every human being the equal right to life. On the protection of this moral law the child *in utero* must chiefly rely for its preservation. The moral responsibilities of the physician for the child *in utero* are greater than his legal responsibilities. It is hard to dispute Pinard when he holds that neither the father, the mother, the physician, nor any other person has the right of life and death over the fetus. The frequency and boldness with which that right is claimed by the father or by the relatives of the mother should meet with firm resistance. I see no ground on which the physician can stand when he decides to destroy the fetus, except a kind of implied authorization by the state, which agrees to uphold the right of the mother to self-preservation when her life is endangered by that of the fetus.

## Original Articles

# DENDRITIC KERATITIS OF MALARIAL ORIGIN.*

E. C. ELLETT, M.D.
MEMPHIS, TENN.

Among the less common diseases of the cornea is that known as dendritic keratitis, to apply the name which its appearance suggests, or mycotic keratitis, a name more in accord with its etiology. This disease appears, when fully developed, as a finely branched ulceration of the cornea, running a rather protracted course. In my personal observation it has almost always appeared as a complication of acute malaria, though the same picture has been occasionally seen in patients who had no malarial manifestations, and who had not suffered from malaria at any time sufficiently recent for it to have any possible bearing on the eye trouble.

The disease is not common. Even in malarial districts it is not one of the commoner eye diseases, and when compared with the large number of persons who have malaria, it is seen to be an unusual complication of that disease. I can only state the case thus vaguely, as I have no means of arriving at accurate statistics. The following remarks apply to its characteristics as seen by me:

It is decidedly more common in the late summer and fall, corresponding to the time of the greatest prevalence of malaria. It is rare to have an opportunity to see it prior to the ulcerative stage, though Kipp of Newark has described it as beginning as a series of small subepithelial lymphoid papules, which quickly break down just as phlyctenulæ may do. Judging from the size of the lesions when it is what might be called fully developed, these initial papules must be of almost microscopic size. The rapid coalescence of several lesions results in a fine shallow linear ulcer, with a tendency to branch, this giving the characteristic dendritic arrangement. The amount of infiltration of the surrounding tissue is variable. Often the lesion is merely an abrasion of the epithelium, this being especially true of recent lesions, but frequently it has a gray border or base rendering it more conspicuous. A proper conception of its extent only can be obtained by staining with fluorescin. We might even say that the characteristic arrangement of the ulcer is not suggested until made conspicuous by staining. When seen in the earlier stages, with the ulcer involving the epithelium only, and arrested by Bowman's membrane, the unstained cornea fails to show any more than a little roughness. Later, the infiltration of the substantia propria at least suggests the character and extent of the condition, but at all stages fluorescin definitely outlines the denuded area so clearly and so sharply as to present a picture which can hardly be confused with anything else.

Late in the course of the disease and possibly somewhat influenced by treatment, if energetic, the loss of the epithelium may become very considerable, as much as one-half of the cornea being denuded. I have never seen the lesions suppurate, and while a moderate degree of iritis may occur, it is never more than moderate, and hypopyon is never seen. The lesion is rarely or never multiple. No matter how extensive, it will be found that the ulceration is all a part of a single system or tree, though as healing progresses the bridging of the ulcer here and there may leave separate denuded areas. The history is always given of a preceding chill or chills. It is very rare in chronic forms of malaria and in those unaccompanied by chills. The course tends to be protracted when untreated. In spite of treatment some cases will last for weeks or even months, the corneal picture changing daily. One attack predisposes to others, but one attack is not necessarily followed by others. Still I have seen many patients in whom every attack of malaria "settles in the eye." From the superficial character of the lesions, serious damage to the cornea is not unusual. Nebulæ are usually left, and if central or nearly central, the opacity itself and the resultant irregular astigmatism frequently reduces the vision to from 20/40 to 20/100. That the changes of curvature are a more potent factor in this result than the opacity, is shown by the improvement of vision by cylindrical lenses. It is rare for both eyes to be attacked, even when the disease recurs.

The subjective symptoms are usually marked, the sensation of a foreign body being present, with some deeper aching pain. I have not noticed the supraorbital neuralgia at the beginning, of which Kipp speaks, but neuralgic pains in all the branches of the fifth are not rarely present during the course of the attack. Some patients suffer very little. The ball is injected and photophobia usually marked. It can not be said that there are any characteristic changes in the sensibility of the cornea. The tension is not altered.

It seems to me that this is not the disease described by Horner as herpes corneæ, but is the same, as Kipp suggests, as that described by Hansen Grut and Emmert under the name of dendritic keratitis or keratitis exulcerans dendritica mycotica, respectively. It is convenient to tell the patient he has "fever blisters on his eye," but from the observations which it has been possible to make on this disease in its early stages, and from watching its development and the formation of new buds and off-shoots from the original furrow, I am satisfied that the lesions are not vesicular, but are subepithelial lymphoid collections, resembling phlyctenules, but very much smaller. As far as my personal observation goes, I have only seen this corneal lesion in its typical form in one case where no malarial history was

* Read in the Section on Ophthalmology of the American Medical Association, at the Fifty-seventh Annual Session, June, 1906.

FER-088

Downloaded From: http://jama.jamanetwork.com/ by a University of New South Wales User on 05/18/2015

Case: 26-5360, 09/15/2026, DktEntry: 34.2, (91 of 256)

# Exhibit K

THE LATEST AND BEST WORK ON FORENSIC MEDICINE.

# PRINCIPLES

OF

# MEDICAL JURISPRUDENCE,

WITH SO MUCH OF

## ANATOMY, PHYSIOLOGY, PATHOLOGY,

AND THE

## PRACTICE OF MEDICINE AND SURGERY

AS ARE ESSENTIAL TO BE KNOWN BY

LAWYERS, CORONERS, MAGISTRATES, OFFICERS OF THE ARMY AND NAVY, ETC., ETC.

BY

WILLIAM A. GUY, M.B.,

CANTAB PROFESSOR OF FORENSIC MEDICINE, KING'S COLLEGE, LONDON; PHYSICIAN TO KING'S COLLEGE HOSPITAL, ETC., ETC.

FIRST AMERICAN EDITION

EDITED BY

C. A. LEE, M.D.,

Who has added 200 pages of original matter, adapting the work to the wants of the Medical and Legal Professions in the United States. 1 vol. 8vo.

"The Editor has enjoyed the advantages of freely consulting Chancellor Kent, on many of the legal questions which come under discussion; and the opinions of this eminent jurist on several important points will be found embodied in the text, from his own notes kindly furnished, and which he has permitted the editor to publish."

NEW-YORK:

PUBLISHED BY HARPER & BROTHERS,

No. 82 Cliff-Street.

1845.

Digitized by Google

rolling themselves upon the floor till exhausted for the purpose of procuring abortion, and all without success; so that unless there is a predisposition of the habit to this accident, it is not so easily brought on as is generally supposed.]

Precisely the same remarks apply to the *introduction of instruments into the womb*, as to the causes of abortion which have been already mentioned. In some instances abortion has been produced; in others, though considerable injury has been inflicted, the child has been born alive; and in all of them the mother's life has been endangered or sacrificed. When the object has been to puncture the membranes, considerable difficulty has occurred, especially at the early periods of gestation, and in such cases the uterus has generally been seriously, and often fatally, injured. As to the difficulty of puncturing the membranes during the early months of pregnancy, Dr. William Hunter's experience is conclusive. He attempted to puncture the membranes in a young woman in the third month of pregnancy, but unfortunately injured the neck of the uterus so much as to destroy the life of the mother.†

[A case is recorded by Dr. John Baxter, late of New-York, in which a female had employed a person to cause abortion, by introducing a silver catheter; by which the os tincæ was wounded and the membranes ruptured, without the expulsion of the fœtus. The consequence was, that 15 days afterwards she was found with violent pains, which were not relieved by blood-letting, &c.—but which ceased on the expulsion of a fœtus of 4 months; which was hastened by the administration of ergot.—(*Med. Record. vol.* 8, *p.* 461.)

Another case occurred a few years since, in the state of Vermont, where various means were tried, by a man named Norman Cleaveland, to procure abortion in a female whom he had seduced. Among other measures, he resorted to the introduction of a sharp-pointed instrument into the vagina, which resulted in the immediate death of the woman. On a post-mortem examination, the neck of the uterus was found punctured in six places, each puncture being from half an inch to three-fourths of an inch wide. The punctures appeared to have been made by a two-edged instrument, like a lancet. In addition to this, the iliac vein was wounded, and the abdomen filled with coagulated blood. The prisoner was convicted and sentenced to be hung; which punishment was, however, afterwards commuted by the Legislature to 5 years' hard labour in the State Prison.—*Beck's Med. Juris. vol.* 1, *p.* 348–9.]

In most of the instances on record, mechanical violence has been applied to the exterior of the abdomen as well as to the uterus, and frequently after medicines have entirely failed.

One case of this sort, which occurred in the practice of Dr. Wagner of Berlin, shows very strikingly how much violence may be employed without producing abortion.

"A young woman, seven months with child, had employed savin and

* This case is quoted by Gooch.



Digitized by Google

Case 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 92 of



other drugs with a view to produce miscarriage. As these had not the desired effect, a strong leathern strap (the thong of a skate) was tightly bound round her body. This too availing nothing, her paramour (according to his own confession) knelt upon her, and compressed the abdomen with all his strength: yet neither did this effect the desired object. The man now trampled on the girl's person while she lay on her back; and as this also failed, he took a sharp-pointed pair of scissors, and proceeded to perforate the uterus through the vagina. Much pain and hæmorrhage ensued, but did not last long. The woman's health did not suffer in the least; and pretty much about the regular time, a living child was brought into the world without any marks of external injury upon it."

Sulphuric acid, in one extraordinary case, has been injected into the vagina with a view of producing abortion. The result was the most violent inflammation of the parts, and adhesion of the os tincæ, with the formation of a dense membrane over it. After attempting delivery by incisions into the neck of the uterus, it was found necessary to perform the Cæsarian operation—and both the mother and the child died.*

It appears, then, that to mechanical violence applied externally to the abdomen or internally to the uterus, very nearly the same observations apply as to the more active remedies; often failing, and where they succeed always endangering the life of the mother.

Where slight external violence has been used, it will of course be necessary to ascertain whether the female (in case abortion should take place) was predisposed to it, or whether the placenta was diseased or misplaced in such a manner as to render abortion probable without the application of force.†

*Examination of the Female.*—In cases of abortion we may be required to examine the person of the suspected female. We should be guided in such an examination by the signs already laid down in speaking of delivery, bearing in mind that these signs will of course be less strongly developed in the early than in the later months. Before two months, little dependence can be placed on these signs.

If the female dies, we may be required to examine the body, when we should be guided by the same signs which exist in delivery at the full period, but less distinct as the period of utero-gestation is earlier. For more minute particulars concerning the size of the uterus,

* This case is given in the report of M. Guerin to the Académie Nationale of Paris, and is cited in the Lancet, vol. viii. p. 38.

† During some late trials in this city for procuring abortion, it was proved conclusively, that the usual method resorted to for this purpose, is the introduction of a sharp-pointed instrument within the os uteri, and puncturing the membranes. There are two or more well-known female practitioners in New York, who are extensively engaged in this business, and who employ physicians to perform the operation, whose names as well as persons are kept concealed from the patient, and thus all chance of detection avoided There is abundant evidence to prove that the life of the woman is frequently sacrificed by these unprincipled persons; and yet, although two or more trials have taken place, they have thus far eluded punishment. It is but a few days since the papers contained the account of a female in the country, who lost her life during the operation which was attempted by the physician, who had been her seducer.—*Am. Ed.*

FER-092

Digitized by Google

e 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 93 of



&c. at different periods of utero-gestation, the reader is referred to works on Midwifery.

The following is a summary of the chief points to be attended to in cases of *abortion:* The supposed product of conception must be submitted to minute and careful examination. Having made out that a fœtus has been expelled, its age must be determined by the rules already laid down. The reputed mother, whether alive or dead, must then be examined;—if alive, we must endeavour to ascertain whether there was or was not such a predisposition to *abortion* as to account for its having taken place, without attributing any great efficacy to the means employed. With a view of determining whether or not such a predisposition exists, we must inquire into the general state of health of the mother before the abortion took place, and especially whether she has had previous abortions—and if so, whether they occurred at or about the same period of gestation. If the female died from the means employed, we must use the same care in examining the state of the uterus as well as other organs.

The circumstantial evidence of abortion does not require the interference of a skilled witness; it need not, therefore, be noticed in this place.

Some questions of medical ethics mix themselves up with the question of abortion, as

*Under what circumstances, and by what means, is it morally and legally proper to induce premature delivery? What circumstances will justify the Cæsarian operation? &c.*

Such questions as these are easily answered. The medical man is clearly justified in resorting to any measures which promise to preserve the life of mother and child when both are threatened; and where one only can by any possibility be preserved, the female herself may use her right of self-preservation, and choose whether her own life or that of her child shall fall a sacrifice to the means recommended to be used.

## INFANTICIDE.

*Legal Relations.*—QUESTIONS RELATING TO THE CHILD.—*Degree of Maturity.*—Was the Child born alive?—*Evidence* before Respiration, *Affirmative and Negative.*—*Intra-uterine Maceration.*—*Severe Injuries inflicted while the Blood is still circulating*—after Respiration.—*Developed Air-cells—their Characters—how distinguished from the Effects of Putrefaction.*—Lung Tests.—Static Tests.—*Ploucquet's Test.*—Hydrostatic Test (as originally applied.) *Objections*—to the Sinking of the Lungs as a proof of Still Birth.—1. *Disease.*—2. *Imperfect Respiration*—to the Floating of the Lungs as a Proof of Respiration.—1. *Putrefaction* (including Emphysema which is incipient putrefaction.)—2. *Inflation*—(as now applied.) *Objections*—to the Sinking of the Lungs as a Proof of Still-Birth.—1. Disease.—2. Imperfect Respiration—to the Floating of the Lungs as a Proof of Res-



FER-093
Digitized by Google

# Exhibit L

THE

# AMERICAN JOURNAL

OF

# HOMŒOPATHIC MATERIA MEDICA

AND

# Record of Medical Science.

---

CONDUCTED BY THE FACULTY OF THE HAHNEMANN MEDICAL COLLEGE OF PHILADELPHIA.

A. R. THOMAS, M. D., GENERAL EDITOR.

---

VOL. V.—NEW SERIES, VOL. I.

---

PHILADELPHIA:
J. M. STODDART & Co., PUBLISHERS.
1872.

FER-095
Digitized by Google

se 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 96 of 1



with a crutch, which he will soon dispense with, being able to bear some weight on the foot of the affected limb. His general health is rather better than before the operation.

M. M.

———:o:———

Department of

## OBSTETRICS AND GYNÆCOLOGY.

O. B. GAUSE, M.D., *Editor.*

# ETHICS OF ABORTION.

*Read before the New Jersey State Homœopathic Medical Society, October 11th,* 1871. *By* DR. L. DENNIS.

BY abortion, we mean the production of the discharge of the contents of the uterus before the period of viability, i. e., the destruction, indirectly, of the life of the fœtus. This, to all intents and purposes, is killing the child, fœticide or infanticide; for, as the great dramatist has justly said:—

"You take my life
When you do take the means whereby I live."

It seems appropriate to call attention to this subject at the present time, for several reasons. Perhaps never before in civilized society has the practice been so common as now. Certainly, the demands of fashionable life and the desire to meet them, have never been more imperative; and one of these is the attendance upon society in its social festivities, receptions, promenading, parties, with their dressing, dancing, late hours, &c., with which the cares and duties of motherhood are almost entirely incompatible. What so desirable, then, to a fashionable wife, as the means of relieving herself of the latter and enjoying the former? With the demand for this relief, and the ability to pay handsomely and exorbitantly to procure it, has sprung up in the community a class of godless, unprincipled scoundrels, who care only for gain, and respect no law, human or Divine; whose chief business it is to obscure and hide the

FER-096
Digitized by Google

ase 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 97 of 1



guilt of their nefarious practices and lead weak women into ways which too often entail life long misery, or conduct into the dark valley of the shadow of death.

This is no longer a secret calling, as witness the columns of at least one of our great daily newspapers, teeming with the advertisements of those devoting themselves to it. Elegant rooms, strict privacy, professional skill, tender nursing, entire relief and perfect safety, are the inducements held out to catch the popular eye; and while the simple minded, the credulous, the ignorant and the vicious so greatly preponderate over the wise, the learned, the good and the pure, these temptations will be successful.

As an illustration of the terrible results of this practice, we need only mention the poor victim of the New York "trunk mystery," who was well known by a number of the members of this Society; for whom, indeed, several of us have often prescribed; who went down to a miserable death, deprived of the comforts and consolations of home and friends, and in her ruin dragged into disgrace and notoriety a worthy Christian mother, and two sisters just merging into womanhood, whose prospects for life are thus at least severely impaired, if not utterly blighted.

Even respectable physicians, are found sometimes engaged in this business, in a way that is to say the least, most damaging to professional reputation. This very year, one of the first surgeons in the city of Newark, the chief city of our State, was convicted of this crime, and only on the appeal of his fellow physicians was spared the disgrace of confinement in the State Prison, and sentenced instead to a fine of $500. Others less prominent of the regular profession, in the same place, have acquired unenviable reputations in a similar way. Doubtless, you are all acquainted with cases of a like sort; men, who, whether justly or not, have attached to them this stigma, that their professional lives are not above suspicion; who have not been careful to avoid even the appearance of evil. It is even said that some of the members of this body are somewhat too lax in their principles in this matter. Some have even given expression to a maudlin sympathy and pity for those in the distress of pregnancy, accompanied with the utterance of a desire or purpose to assist them, such as to make us feel that we need again to ascertain if there be any law underlying this business, which our consciences are bound to respect, and our practice observe.


Digitized by Google

It is that we may know where we stand, what are our principles, what our relations to our patients, to society and its laws, and to the Divine law, that we ask your earnest attention to this subject at the present.

The product of conception we regard from the outset as a living being; whether endowed or not with a *soul* before birth, none but the Father of us all may say. That it has *life*, none will deny. The destruction of this, is therefore a violation of the Divine command, "Thou shalt not kill." This, to one not an Atheist, is sufficient to establish the sanctity of even the imperfectly developed creature.

Society has also put its ban and prohibition upon this practice, and in all civilized communities the penalties are weighty in proportion to the enlightenment of the people as to the enormity of the offence. In our own State the law declares: "If any person or persons, maliciously or without lawful justification, with intent to cause and procure the miscarriage of a woman then pregnant with child, shall administer to her, prescribe for her, or advise or direct her to take or swallow, any poison, drug, medicine, or noxious thing; and if any person or persons, maliciously and without lawful justification, shall use any instrument or means whatever with the like intent; and every person with the like intent knowingly aiding and assisting such offender or offenders, shall, on conviction thereof, be adjudged guilty of a high misdemeanor; and if the woman die in consequence thereof, shall be punished with a fine not exceeding $1,000, or imprisonment at hard labor not to exceed fifteen years, or both." If the woman do not die, the fine not to exceed $500, and the term of imprisonment not to exceed seven years.

The law of individual right of existence, which the Divine and human precepts above quoted are undoubtedly designed to maintain, also prohibits the destruction of that life. These three laws then, viz., those of God, society or human government, and the individual well being, are the bases on which rest the stability and security of life, and, consequently, the subsequent development of that life in all its infinite variety and ramifications. By these, therefore, we are bound to test our conduct in the sacred matter of the destruction of the life of any human being, and woe betide him who wantonly, maliciously, thoughtlessly, or avariciously dares to extinguish the flame which God has lighted, or put asunder what He has joined.



Digitized by Google

se 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 99 of 1



Now it may seem a simple matter to state thus explicitly the laws which shall regulate our actions, but we by no means admit that it is equally simple and easy to live in accordance with them, and yet maintain a clean conscience with regard to our fellow men. The well being, or the contingencies of society, for example, may require or excuse the violation of this most important law respecting the sanctity of human life, and may justify one in destroying his fellow creature. Thus, justifiable homicide is defined as that which is committed, 1st, By unavoidable necessity; 2d, For the advancement of public justice; 3d, For the prevention of any atrocious crime attempted to be committed by force; such as murder, robbery, housebreaking in the night time, rape, mayhem, or any other act of felony against the person. But in such cases the attempt must not be merely suspected, but apparent, and the danger must be imminent, and the opposing force or resistance, necessary to avert the danger or defeat the attempt. Under this exercise of self-defence, the principal civil and natural relations are comprehended. Therefore master and servant, parent and child, husband and wife, killing an assailant in the necessary defence of each other respectively, are excused; the act of the relation assisting being construed the same as the act of the party himself.

We come then to the most important part of our subject: Are there any cases in which the physician is justified in taking the life of the unborn child? In other words, is there any justifiable fœticide? In this matter our laws leave us almost entirely without guidance, and we must look to general principles for direction. The text of the law above quoted in reference to the production of miscarriage, you will observe, declares that this procedure is punishable when conducted "maliciously, or without lawful justification." The law of justifiable homicide, permits the taking of life to save another life, or to prevent serious harm to person or property. Evidently, then, in the eye of the law, the fœtus may be destroyed to save the life of the mother or to prevent serious mischief from befalling her person. Thus in cases of deformity of the pelvis, such as to preclude the birth of a viable child, or to necessitate the resort to measures, in the delivery of even the dead fœtus, which would seriously endanger the life and well being of the mother, such as Cæsarian section, craniotomy, cephalotripsy, or symphyseotomy, all right minded persons seem


Digitized by Google

to be agreed that the unborn and undeveloped should be sacrificed to the safety of the mature and useful member of society. So, too, the physiological functions of the mother may be so deranged as to require her relief; excessive and uncontrollable vomiting may waste her strength, and actually endanger her life; the pressure upon the kidneys by the enlarging uterus may so interfere with their functions as to produce uræmic symptoms of the head, vertigo, diplopia, hemiopia, distracting headaches, general dropsies, and finally, convulsions and death. In all these, where the gravity of the symptoms is such that the life or permanent health of the mother is endangered, no conscientious physician would hesitate as to his duty, and no jury of his fellow citizens would fail to exculpate him from blame. Without doubt, however, even here, in the language of the law, "*the danger must be imminent*," and the measures employed "*necessary*" to avert the same.

Beyond this permission, we are not aware that human governments suffer us to go with impunity. Yet just here we need all the support of right thinking and conscientious acting, for the trying cases that appeal to our sympathies are of another class. They involve injuries and wrongs to the mother, to the child, or to society, of a lesser sort, it is true, but oftentimes very grievous and hard to be borne. Perhaps the most common case which presents itself to the physician is that in which a young woman has been seduced from the path of virtue, either by false promises, or by the irresistible power of a passion fostered by the indulgence of solitary vice or the permission of liberties by the opposite sex only safely allowed to the wedded, and then deserted to bear the world's scorn and ignominy alone, her reputation blasted and her prospects for life ruined, if she be forced to bear, bring forth, and nurture the illegitimate testimony to her guilt. Sad and terrible indeed is it that one false step should entail life long misery and degradation. Yet none but the Supreme Judge may dare to arrest the progress of laws whose violation must be followed by such consequences. Are not the effects of sin and wrongdoing everywhere direful? How else in an evil world were it possible to save from utter ruin, those whose tendencies and inclinations all lead them downward, how save ourselves from a dread relapse into the barbarism of promiscuous intercourse and make possible the establishment of the



Digitized by Google

*family*, with its tender ties, loving associations, purity, peace, and blessedness?

Everywhere the penalties attached to the violation of laws are severe and far reaching in proportion to the relative importance of the precepts infringed. Most fitting is it then, that the sanctities of virtue, without which society and family are impossible, be hedged about with thorns which shall indeed tear the flesh and fester in the life of those who may dare to break and destroy what God and man have pronounced inviolable. Only, we say, let the wounds inflicted fall upon *both* parties, and he who now so often goes comparatively free, be made to bleed and suffer with the weaker and more to be pitied vessel subject to his passion. Herein we have a duty to perform towards society, in educating it, and to this end we are bound to throw the weight of our influence, precept, and example. If we are estopped from the physical relief of the poor victim, let us strike hands in fellowship with no base libertine, whatever his rank or station in life.

Sometimes the appeal for help comes from one who has known the blessedness of wedded life, but has forgotten or ignored her wifely honor, and cast her pearls before swine, only to have them trampled under foot. But if the unfettered by spoken obligations, may not be shielded, how much less she, who to the destruction of honor, has added that of the family and its most sacred vows? What shall save us from utter rottenness, when household ties are broken, and its gods are not merely unhonored, but bemired and cast under the feet of strangers?

Not only the unmarried, but also the lawfully married, are frequent in their demands for release from the pangs and cares of maternity. As already stated, the *fashionable* find them incompatible with the demands of society, and many hesitate not to risk their own lives and health, as well as annihilate their offspring, that they may be spared a little trouble, or flutter a little longer about the gay flame, whose glitter dazzles but to destroy. May no member of this body, who fears God, or regards man, be a participant in any such slaughter of the innocents. What shall we say, however, in those cases in which wives are forced to submit their persons as instruments to gratify the passions of brutish, lustful husbands? No love cheers the weary weeks and months of waiting, and sustains in the hour of trial or comforts in the subsequent nurture and watching. Again and



Digitized by Google

again the burden is borne, and with each addition the load grows heavier, while the strength to bear and the ability to provide for the increasing family as rapidly diminish. It may be that the sustenance of the household is already fully consumed, and that pinching poverty must dwarf the lives and contract the bodies of all subsequent comers. The father may be so tainted by previous vices or diseases, that with a feeble delicate wife, he cannot beget children having even a chance of coming to maturity, or of being anything but a burden to themselves, and loathsome to society. His habits may be such that a drunkard's training, education and lot, will almost inevitably befall his offspring. In any of these cases, or all combined, our sympathies must go out toward the suffering ones. Mothers are wronged, society is wronged, and most of all the innocents themselves are weighted with the crimes of their fathers, in which they had no part or lot.

We can only say such is the mystery of life; not irremediable, but the remedy is not to be found in the indiscriminate or hasty destruction of those who seem to us to have no right to life. Neither does it lie within the scope of our present purpose to say how such men as the above mentioned are to be best punished or treated. When a diviner truth, a wiser knowledge and a more God-like love shall have interpenetrated the hearts of men, such things will not be. To diffuse these, to enlighten men and women as to a better way of life, and by precept and example to maintain the right, should be our highest aim, our motto, the sentiment of our own poet:

"Let us then be up and doing,
With a heart for any fate,
Still acheiving, still pursuing,
Learn to *labor* and to *wait.*"

One other case presents itself, though rarely, for our consideration and action, which we are bound to meet in a manly, straightforward way. It is that in which an innocent, virtuous woman has been the subject of violence and rape, and has probably or certainly become pregnant in consequence thereof. Suppose that all the signs of pregnancy existed in such a case, and that it were in the judgment of the physician well nigh certain that such condition were present. Suppose, furthermore, that the woman were per-



Digitized by Google

fectly guiltless, and that her ruin, if known, would entail disgrace on a worthy family, besides destroying her own prospects for life; what should the physician do? Were it his own sister, mother, wife, or even dear friend, thus terribly injured, his action would doubtless be prompt and decisive, irrespective of consequences. Still, such important matters ought to be decided on quite other grounds than those of relationship or personal interest.

At the meeting of this society, held one year ago, a professional brother stated in private conversation, that a case of this kind had occurred in his practice, and asked what should be done. We were taken somewhat by surprise at the startling character of the affair, and replied that we saw no principle upon which to base any action different from that which guides us generally, when the life and health of the mother are not at stake, and should allow nature to take her course. On farther reflection, however, it does seem to us that there are important principles to guide us. Such a crime in the first place, is a gross violation of the law of God against adultery, and the resulting offspring has no right to life without the consent expressed or implied, in the sexual relation of both parties. The act is likewise a crime against society, which must ultimately suffer from all illegitimates, and which permits the taking of adult life to prevent serious bodily harm to person or even property. Much more when the danger threatened is irreparable and imminent, is the injured one justified in freeing herself at the expense of the life of a loathsome and hateful product of the lust of a wretch. It is likewise a crime against the woman too terrible to be borne. No precept of God or man justifies the imposition by force and violence upon an innocent woman of a nauseating load which she must nourish with her life blood through long and weary months, then bring forth at terrible sacrifice of pain and strength, only to continue the hateful slavery of her powers for its support.

We hold that there is an important difference between this case and those mentioned previously in *this* respect. The woman who is seduced, gives her honor *voluntarily* into the hand of the man who, she knows, *may* deceive her. The married woman entrusts her interests to the keeping of the one she weds, for better or worse. In both cases there is no constraint. Each enters into the relation freely, assuming its responsibilities, consenting to bear its burdens,

Digitized by Google

se 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 104 of 1



and taking upon herself the consequences of her choice. Each is perfectly aware that hundreds and thousands of women have been degraded, debased, maltreated, neglected and *utterly ruined*, through the deceit, treachery, lust and selfishness of so-called lovers and husbands. Yet, in spite of these facts, she ventures her nobler life, her better self, her all, upon the act, and must therefore abide by the results. On the contrary, in this case, it is as though some brutish fiend had forcibly twined and fastened about the neck of the innocent and helpless woman a galling chain, or fixed to her breast a foul beast whose life, disgusting to her, is supported at the expense and sacrifice of her own. That she should tamely submit to such a burden, and meekly surrender her life to such a torture, is too monstrous for belief. We say then, unhesitatingly, she *has* a right to relief, and her physician is right in granting it. It may be objected to this practice that the physician is liable to be imposed on by designing and wicked persons, and deceived as to the origin of the pregnancies which he is solicited to relieve. Of course the hasty action on insufficient testimony would be unjustifiable, and each man must be satisfied in his own mind, that he has arrived at the facts of the case.

Again, it may be said, if it is right to destroy the fœtus in utero, why is it not equally so to do it at any subsequent stage of its growth and development, as immediately after birth, thus avoiding all risk to the mother? We reply—the object of the early destruction of the fœtus is two-fold: 1st, The relief of the injured woman from the burden of a pregnancy which is hateful to her, which has been forced upon her, and which she has a right to throw off when, where, and *as soon* as it shall please her so to do. 2d, To save her from the disgrace of the publicity of her misfortune, which would attach to the carrying and delivering at term of the child. Neither of these would be effected were the child born in condition to live. Then, too, it could be otherwise disposed of without resort to infanticide, and it is universally recognized as a duty to spare life when it can be done without too great a sacrifice.

We have said that we believe this practice, to this extent, and for these objects alone, is *right*. We believe it so in the sight of God and in the judgment of men of good conscience and sound mind. But it is not *lawful*, or supported by any statutes of our State or any other with which we are acquainted. We believe, however, that our duty lies in the

FER-104
Digitized by Google

se 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 105 of 1



direction of so educating public opinion and sentiment that, one day our Legislatures shall be wise enough to see the justice of the distinctions we have urged, and pass laws accordingly. We believe that even now, no body of twelve honest and candid jurymen could be found to convict of crime a physician who, not for gain, but for love of his kind, in the attempt to relieve the miseries of such a suffering woman, should be unfortunate enough to send her to an untimely death. On the other hand, too, we believe that no right-minded, God-fearing and man-loving physician will lightly or thoughtlessly take upon his hands the lives of two such beings as mother and child above indicated, and that *none*, for *mere gain*, would dare to sink his manhood and stain his soul with the blood of his fellow creatures.

In this field we must approach near to the foundation truths of our profession as well as of our *life*, and to feel the importance of such considerations as these, we need only remind ourselves that in the great life which lies beyond, our duties as physicians shall *cease*, but, if living aright, our duties as witnesses for the truth *shall* NEVER *cease*.

---

## BOOK NOTICES.

LECTURES ON DISEASES OF THE HEART—.By EDWIN M. HALE, M. D., special lecturer on Diseases of the Heart, and Professor, etc., in Hahnemann Medical College, Chicago; author of "New Remedies," etc., etc. Bœricke & Tafel, New York and San Francisco. London: H. Turner & Co., 1871.

This work is creditable, not only to the author, but to the publishers. Printed on fine tinted paper, and with new type, it is, typographically, a success.

Part first treats of Functional disorders of the Heart.

Part second, of Inflammatory Affections of the Heart, and,

Part third, of Organic Diseases of the Heart.

The author enters largely into a discussion of the etiology and differential diagnosis of diseases, and quotes from standard authorities. The treatment is in accordance with his interpretation of the doctrines founded upon our law of cure.

While we could not in all respects accept his views of treatment, we are willing to accord to him, as he accords to the profession, the largest liberty in these matters, and

FER-105
Digitized by Google

# Exhibit M

# ABORTION

## AND ITS TREATMENT, FROM THE STAND-POINT OF PRACTICAL EXPERIENCE

A SPECIAL COURSE OF LECTURES DELIVERED AT
THE COLLEGE OF PHYSICIANS AND SURGEONS, NEW YORK
SESSION OF 1889-'90

BY
T. GAILLARD THOMAS, M. D.
EMERITUS PROFESSOR OF OBSTETRICS AND GYNÆCOLOGY

FROM NOTES
By P. BRYNBERG PORTER, M. D.
REVISED BY THE AUTHOR

NEW YORK
D. APPLETON AND COMPANY
1896

FER-107

Generated through HathiTrust on 2026-06-29 22:54 GMT
https://hdl.handle.net/2027/hvd.hc21fc / Public Domain
Digitized by Google
Original from
HARVARD UNIVERSITY

[redacted]



way and the fœtus has come out, with a small portion of the membranes; leaving the remainder of the shell still *in utero*. This shell may remain for months or years, constituting what is known as a "molar pregnancy." In one instance I knew it to remain for twenty years, the mass in the mean time having undergone calcareous degeneration.

You will find in the community in general very positive ideas regarding pregnancy. People think that a medical man ought to know at once whether a woman is pregnant or not, under all circumstances. In fact, however, the diagnosis of pregnancy in the early stages is often one of the most difficult that the physician is called upon to make. Still further, it is by no means always easy to make the diagnosis even at a later period; and every now and then a pregnant uterus is cut down upon, under the supposition that it is an ovarian tumor—often by most excellent and careful physicians.

We now come to the consideration of the



Generated through HathiTrust on 2026-06-29 22:54 GMT / https://hdl.handle.net/2027/hvd.hc21fc / Public Domain
Digitized by Google
Original from HARVARD UNIVERSITY

24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 10



question of the artificial production of abortion.

In regard to bringing on abortion artifically you will have to be constantly on your guard, or else you will sometimes be imposed upon. All women may be divided into two great classes—those who desire to bear children, and those who do not. It is among the latter class that you will have to look out for deception. For instance, individuals of this class have been known to take small and repeated doses of tartar emetic in order to produce such constant and violent nausea and vomiting that the physician felt called upon to bring on abortion to save the patient's life, as he supposed.

Here let me give you one rule which I have always followed and which—although I have practiced medicine for thirty-five years, and naturally have some confidence in my own judgment—I still follow at the present time. This rule is, *Never induce an abortion without first having a consultation.* You may per-

FER-109

Generated through HathiTrust on 2026-06-29 22:54 GMT
https://hdl.handle.net/2027/hvd.hc21fc / Public Domain
Digitized by Google
Original from
HARVARD UNIVERSITY

24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 110
[redacted]



haps ask me why. Remember, in the first place, that a human life depends upon your decision. It is better, therefore, that the responsibility should be shared. He who can take a human life into his hands without a desire to thus have the responsibility divided is not, in my opinion, a man of proper feeling.

If the physician whom you consult does not agree with you that abortion should be produced, the pregnancy may be allowed to go on; but if he does agree with you on this point, your position is naturally very greatly strengthened. Such a course as I have recommended is in the interest both of the patient and of the medical attendant.

Let us next inquire what are the indications for the artificial induction of abortion. In a general way, it may be stated that whenever it is felt that the prolongation of pregnancy is going to destroy the life or intellect, or to permanently ruin the health of a patient, abortion should be brought on. It is a well known fact, for instance, that a large number of pa-

FER-110

Generated through HathiTrust on 2026-06-29 22:54 GMT
https://hdl.handle.net/2027/hvd.hc21fc / Public Domain

Digitized by Google

Original from
HARVARD UNIVERSITY

24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 11



tients die every year from the vomiting of pregnancy. It was to this condition that the gifted Charlotte Brontë, who married somewhat late in life and who was believed to be suffering from acute gastritis, unfortunately fell a victim. As I have indicated, you will have to be on your guard against deception. Many women will either use drugs to produce vomiting, or else they will suffer from nausea only when the physician is in the room. Such women generally influence their husbands at will, and you must get the evidence of a trustworthy nurse, or of friends who are not under the influence of the patient. Then, again, the general character of the vomiting, and the condition of the patient, will assist you in deciding whether her sufferings are real or not. When you find that the obstinate vomiting is a reality, and it seems probable that the woman will die if she is not relieved, it will be nothing less than criminal not to bring on abortion. In such cases it is astonishing to see how quickly the symptoms are relieved and the patient be-

FER-111

Generated through HathiTrust on 2026-06-29 22:54 GMT / https://hdl.handle.net/2027/hvd.hc21fc / Public Domain
Digitized by Google
Original from HARVARD UNIVERSITY

24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 11
[redacted]



gins to improve in every way, when the uterus has once been emptied of its contents.

But there are other conditions besides uncontrollable vomiting which call for artificial abortion. There is some peculiar influence over the kidneys exercised by puerperality, the nature of which we do not know. It is a fact, however, that a great many women die annually of puerperal nephritis. As a rule, such nephritis does not begin until after the fourth month, but in exceptional cases it occurs even earlier than this; or, possibly, the patient may have had desquamative nephritis before the commencement of pregnancy. I can not but regard it as cruel to allow a patient with marked symptoms of this affection to go on in utero-gestation, with the imminent risk of dying in labor of puerperal convulsions, or, if she does not die then, of being doomed to chronic Bright's disease with its attendant suffering and dangers.

In the next place, if you have a pregnant patient with cardiac disease of such a character that you think her life is in danger, it is

FER-112

Generated through HathiTrust on 2026-06-29 22:54 GMT
https://hdl.handle.net/2027/hvd.hc21fc / Public Domain

Digitized by Google

Original from
HARVARD UNIVERSITY

24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 11



your duty to induce abortion. If she should have cancer, or be in the third stage of phthisis, you should not do this, because, in the first class of cases, you have two lives to consider, as the woman may have a long life before her, while in the last it is impossible that she should live under any circumstances.

The fourth condition which I would mention is chorea. In one case only in my experience have I had to induce abortion on account of this affection. The trouble was so violent that I feared the patient would die before the end of gestation, and I therefore brought on abortion at the end of the fourth month.

Fifth, when the pelvic diameters are very much contracted, so as to render delivery at full term absolutely impossible, the uterus should be prematurely emptied.

While acknowledging the improvements that are constantly being made in the management of the Cæsarean section, Porro's operation, and similar procedures, I still do not believe that, when we can avoid it by inducing abortion, we

Generated through HathiTrust on 2026-06-29 22:54 GMT
https://hdl.handle.net/2027/hvd.hc21fc / Public Domain



Digitized by Google
Original from
HARVARD UNIVERSITY

24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 11

[redacted]



are justified in subjecting our patient to the great risk attending these operations even under the most favorable conditions.

Sixth, in case of violent convulsions from any cause whatever, abortion is indicated. It makes no difference whether the convulsions are choreic, uræmic, epileptic, or of any other character except hysterical. Even if you succeed in controlling the seizures for the time being, it is entirely improbable that the woman can go on for five months, or more, longer without a return of the trouble, and most likely in a form so aggravated that death will inevitably result.

Seventh, artificial abortion is called for sometimes on account of uncontrollable uterine hæmorrhage. Placenta prævia is a condition which does not occur at the early period of pregnancy which we are now considering, and the hæmorrhage to which I refer is occasioned by the separation and sliding away of the *decidua reflexa* from the *decidua verá*. After styptics and the tampon have been given a thorough trial, and the trouble still continues,

Generated through HathiTrust on 2026-06-29 22:54 GMT
https://hdl.handle.net/2027/hvd.hc21fc / Public Domain

FER-114

Digitized by Google
Original from
HARVARD UNIVERSITY

24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 115



there is nothing left for us but to bring on abortion; for, if this is not done, the most serious results will almost certainly ensue.

In this enumeration I do not pretend to give you all the conditions which may from time to time call for this measure. I only aim to show you some of the principal ones, as they have been met with by me in actual practice, and to point out to you the general principles which should guide you in deciding whether in any case of serious difficulty that presents itself you ought to resort to artificial abortion.

The next step naturally is to consider the methods by which abortion is brought on; and the procedures which I mention first I only refer to in order that you may carefully avoid them. The first method is to introduce a metallic sound into the os uteri, and push it forcibly through the fœtal shell. If there be a brutal and stupid method of inducing abortion, it is certainly this. Yet it is done every day, and is the one commonly practiced in criminal abortions. There is no doubt whatever about its killing the fœtus,

FER-115

Generated through HathiTrust on 2026-06-29 22:54 GMT
https://hdl.handle.net/2027/hvd.hc21fc / Public Domain
Digitized by Google
Original from
HARVARD UNIVERSITY

# Exhibit N

# THE JOURNAL-LANCET

The Journal of the Minnesota State Medical Association
and Official Organ of the
North Dakota and South Dakota State Medical Associations

PUBLISHED TWICE A MONTH

A SEMIMONTHLY MEDICAL JOURNAL

W. A. JONES, M. D., EDITOR

VOLUME XXXIV

MINNEAPOLIS
W. L. KLEIN, PUBLISHER
1914

Case 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 118 of 157



lieve nothing that you hear and only half that you see."

For the present, radium will not be given out freely by boards of health, and until it can be purchased as cheaply as neosalvarsan it might be well to accept good old-time advice, and wait until the present excitement subsides.

## CRIMINAL ABORTIONS

The record of abortions performed in Minneapolis is only an index of what is done elsewhere. *The Minneapolis Journal* has investigated the subject, and in the issue of January 22d records twelve known deaths in the past two years. It also gives the information that approximately 250 criminal operations have been performed in two years which were not reported to the authorities. It does not attempt to give the number of abortions produced by women themselves without the aid of a doctor. All physicians who have practised general medicine know that a large number of abortions are self-inflicted by various means. Lead-pencils, darning-needles, button-hooks, expanding pessaries, and catheters are commonly employed by those in trouble, especially by married women who do not wish to be encumbered by a pregnancy. Many of the "self-inflicted" usually get along without a doctor, but a few are obliged to receive treatment to remove remnants left in the uterus. The public hears nothing of this class, but it is pretty generally acquainted with the professional abortionist.

It seems rather strange that a physician, irregular or regular, will take the desperate chances incurred in performing an abortion. There are not infrequently cases in which an abortion is imperative: the mentally unfit who might become deranged; the woman with a narrow brim or outlet because of which her life might be in danger and a Cesarian section is the only relief; the woman who may bleed to death; the eclamptic; and those suffering from dangerous diseases. This class, fortunately, is small in number; and an abortion is performed only after a deliberate and careful consultation in which the dangers of the abortion are weighed from every side.

The majority of abortions are among those who decline pregnancy and who become pregnant through lack of moral sense. This list includes unmarried, as well as married, women.

The principal prompting to a physician for performing an abortion is the fee he may demand, and the price ranges from a few dollars to several hundred dollars. The usual fee is not uncommonly five dollars, a ridiculous fee for so dangerous an experiment. A common reason is the sympathy of the doctor for the pregnant girl or woman who may lose her reputation if her condition becomes known.

The professional abortionist who does the work for gain, regardless of the moral law, will, in the end, get his just dues. The practice has grown to such proportions that it is almost impossible to prevent it, unless county medical societies assist county attorneys in the work of prevention or elimination.

Within the past two years the Hennepin County Medical Society has expelled or suspended two of its members engaged in this work, and it has investigated many complaints, but it has been unable to get sufficiently convincing evidence for conviction. The average abortionist does his work alone with the patient; and his word is as good as hers, except in a few instances where the circumstantial evidence is very strong. The county attorney naturally hesitates in a prosecution unless he has evidence that is conclusive.

Juries are naturally sympathetic; and if the doctor can give a plausible reason for the unfortunate outcome of a case there will be no conviction. The man who performs an abortion is rarely called for the after-treatment. If he is a professional abortionist, his work is finished in the office; and not infrequently he does not record the name of the patient. Under such circumstances his conviction is exceedingly unlikely.

It occasionally happens that the physician who is called in such emergency cases is blamed for the whole affair, and he is thus placed in an embarrassing position. If he be wise, he has witnesses present before he attempts relief.

A physician in the country one time openly boasted that he could not be convicted of abortions, as he had performed the service for the judge, the county attorney, the sheriff, and many of the jurors! If such conditions prevail there is nothing to be done.

An amendment to the law is necessary before the abortionist can be stamped out. Even then the practise will continue secretly; but many lives will be saved and many people kept out of invalidism if public sentiment is aroused, and honest and conscientious doctors absolutely decline to perform abortions unless from humanitarian reasons.

FER-118

# Exhibit O

# THE JOURNAL-LANCET

The Journal of the Minnesota State Medical Association
and Official Organ of the
North Dakota and South Dakota State Medical Associations
PUBLISHED TWICE A MONTH

A SEMIMONTHLY MEDICAL JOURNAL

W. A. JONES, M. D., EDITOR

VOLUME XXXIV

MINNEAPOLIS
W. L. KLEIN, PUBLISHER
1914

Case 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 121 of 157



objects: (1) the perfection of a system of collecting the statistics of infectious diseases, and (2) the making of adequate provision for the care of cases of the advanced type.

Oh, yet we trust that, somehow, good
Shall be the final goal of ill,
To pangs of nature, sin of will,
Defects of doubt, and taints of blood;
That nothing walks with aimless feet,
That not one life shall be destroyed,
Or cast as rubbish to the void,
When God hath made his pile complete.
That not a worm is cloven in vain,
That not a moth with vain desire
Is shrivelled in a fruitless fire,
Or but subserves another's gain.

DISCUSSION

Dr. Victor Stickney (Dickinson): I am very much interested in Dr. Lamont's work, but am not prepared to discuss his paper at this time. I wish there was something I might say to further enlighten this body on the effort that is being made to control tuberculosis in the state. You will have noted that the North Dakota Anti-Tuberculosis Society has been a potent factor in helping Dr. Lamont carry on his work. There is a too-loose connection between the North Dakota Medical Association and the Anti-Tuberculosis Association. A much better condition might be obtained if this Association would take some definite action in helping forward this righteous work.

Dr. James Grassick (Grand Forks): I am very much interested in this paper, for it covers a subject in which we are all interested. I am of the opinion that the estimate of 5,000 active cases of tuberculosis in this state is perhaps a little too high. I believe, however, that there are at least 3,500 cases of active tuberculosis in the state of North Dakota at the present time, and this estimate I base on the most reliable data at my disposal. Our statistics, as we all know, are very defective. Under the present conditions this is unavoidable. There are a few counties, however, whose records are sufficiently correct to enable us to draw fairly accurate conclusions of health conditions throughout the state. From an analysis of these I find that there were a little over 700 deaths in North Dakota from tuberculosis during last year. This is a greater death-rate than from any other disease we have. Our sanatorium since it started, a year and a half ago, took in 150 cases and we have 3,500 active cases in the state. It stands to reason, therefore, that these 3,500, lacking the 150, must be taken care of by people at home; and the way in which this is done is a matter of very great importance. It is a question of educating every man, woman, and child in the state as to the nature of the disease and its prevention. When we get that accomplished then tuberculosis will not be so much of a scourge as it is at the present time.

The North Dakota Anti-Tuberculosis Association has been trying to do a little along this line, a very little, but it has done something. They have tried to enlist the sympathy and assistance of various agencies that have to do with the uplift of humanity,—clubs, schools, churches, societies, etc., and a good deal of splendid work has been done by these. This is not the problem of the North Dakota Anti-Tuberculosis Association alone, but it is the problem of every organization, every man and woman, every society in the state of North Dakota, because it affects everybody. I believe with Dr. Stickney that there should be a closer relationship between this organization and the Anti-Tuberculosis Association. The North Dakota Medical Association should come into it, and make it by active co-operation a greater power for good in the state. The North Dakota Medical Association has, according to its report read today, some $1,900 in the treasury. I know of no better way that we could expend some of this surplus than by helping the educational work of the anti-tuberculosis movement by teaching the people how to live; for right living is at the bottom of the whole problem.

# DISEASES OF THE URINARY TRACT PRODUCED BY DISEASES OF THE GENITAL TRACT IN THE FEMALE*

By A. C. Stokes, M. D.
OMAHA, NEBRASKA

In the January number of *Surgery, Gynecology and Obstetrics* appeared an article by Drs. J. G. Clark and Floyd F. Keene, of Philadelphia, which directed my thought towards a field in medicine that seemed but little explored, and in which I had had some special experience along lines which were extremely interesting and exceedingly important.

Drs. Clark and Keene discuss conditions in the urinary system either mistaken for genital disease in the female or produced by such disease. We refer to diseases of the kidneys, bladder, ureters, and urethra, which are either mistaken for diseases in the genital organs, and for which operations have been done on the genital organs, or for diseases of the urinary organs produced by tumors, inflammations, displacements, or abnormalities in the genital organs.

We desire, first, to direct your attention to the kidney and ureter.

*Read at the 33d annual meeting of the South Dakota State Medical Association at Watertown, May 27 and 28, 1914.

FER-121

Hydronephrosis must be regarded as of mechanical origin in the great majority of cases, and, except in a few cases of congenital origin, may be traced to mal-positions, strictures, stones, or inflammations obstructing the ureter or the kidney-pelvis.

With the advent of the cystoscope and the use of bismuth and wire ureteral catheters we have shown that mal-positions of the ureter are not uncommon; also, that a certain number of these conditions originate from pelvic inflammations, displacements and growths. Hydronephrosis is one of the most commonly overlooked conditions with which we deal. Its symptoms are often either regarded of no particular moment and so dismissed by the physician, or are placed at the door of the appendix, gall-bladder, stomach, or colon.

I wish in this paper to bring to your attention cases which occurred in my practice illustrative of these conditions in which diagnosis was not made at first, and only after careful study of the case by the instruments of accuracy used in genito-urinary diagnosis were we able to solve the problem.

Case 1.—Mrs. H., aged 24, married, one child, weight 185 pounds, height 5 feet 6 inches. Patient entered Wise Memorial Hospital, Omaha, on Jan. 8, 1913.

Her family and personal history was negative, except that she had suffered from a left-sided pain for several years. Had a leucorrheal discharge. The menstrual functions were regular, but were accompanied by extreme pain at times.

Physical examination developed a retroverted uterus and possibly some ovarian or tubal infection or congestion. No very definite lesion.

A diagnosis of infection and uterine displacement had been made by her physician, in which we concurred. We operated for the same and discovered exceedingly little of a pathologic condition, but corrected the position of the uterus. Her pain continued, and in April, 1914, she presented herself again with the same symptoms,—excruciating pain in the left side.

On the 4th of April we cystoscoped her bladder, and on attempting to pass a catheter in the left ureter found an obstruction about one inch up and through which the catheter would not pass. Occasionally small spurts of urine came from this ureter; the right was perfectly patent.

We have not operated on this case again as yet, but made a diagnosis of hydronephrosis caused by some form of ureteral obstruction.

Cases similar to this can be duplicated in the practice of many, I have no doubt. Yet the symptoms were not translated as referring to the urinary system, and, unless one would make routine cystoscopic examination of such cases, one might easily be led into an oversight, and mutilating and unnecessary operations be done.

Case 2.—Mrs. O'K. Family and personal history, negative.

About four years ago she began to have pains in her right side, extending up into the back. These pains were paroxysmal. She suffered at times with frequent urination. She visited us first in December, 1913, at which time we made a diagnosis of hydronephrosis, and advised operation. She had seen several physicians in Omaha, and there was such a difference of opinion that she finally went to Rochester, Minn., at which place they made the same diagnosis, and there her hydronephrosis was removed.

In her rounds among the physicians, operations upon her genital organs had been advised. She had been told that she had appendicitis. One prominent surgeon was very anxious to remove her gall-bladder; others informed her that she was neurotic, and others imaginative, until the woman was baffled by the divergence of opinion.

She afterwards returned to me for treatment of an old remaining cystitis. Two or three treatments entirely relieved the condition, and now she is strong and healthy. Her pain has disappeared, and her neuroses and neurasthenias have all yielded to the definite diagnosis made possible by accurate instrumentation and careful study.

Operations on the genital organs are, in my judgment, common where a more careful study would have changed the diagnosis, and found the cause, not in the genital organs at all, but entirely outside of them, or that it is secondary to inflammation in this region. Many of our bad results following pelvic operations can be traced to diseases of the ureter and kidney. When we remember that the course of the ureter in the pelvis follows external to the internal iliac artery across the rim of the pelvis under the broad ligament under the uterine artery, and within less than a quarter of an inch of the body of the uterus, it is to be expected that a metritis and salpingitis, or any inflammation extending into the broad ligament or in the cellular tissues of the pelvis, may easily distort and kink the ureter.

As an illustration of such a condition I wish to submit the following case:

Case 3.—Mrs. T. first came under the writer's care for acute septic abortion. The uterus were emptied, and after a rather continued run of temperature the patient made a symptomatic recovery.

About two years after that we were called to see her again. She had been suffering during the interval with pain in her lower abdomen extending to the right side. Bimanual examination discovered the presence of large inflammatory masses in the pelvis. The examination of the kidney on the right side showed a rather large tumor, which was sore and gave continuous distress. An attempt to catheterize the ureter on that side failed. At operation we discovered a large inflammatory mass on the right side, which inflammation extended into the tissues lining the pelvis, the contractions and adhesions of which had drawn the ureter to one side, and caused it to become dilated, so that above this mass the ureter could be easily felt through the peritoneum and was as

large as a whip-stock. At the second operation the kidney was removed with a large hydronephrosis.

Growths in the walls of the uterus extending into the broad ligaments, such as intramural fibroids, may often produce pressure on the ureter as it enters the bladder below the broad ligament, thus producing ureteral and kidney symptoms. These symptoms are frequently relieved by the removal of the growth, but at times the ureter becomes so firmly fixed in its new course by adhesions and new formations of tissue that it does not come back into its normal bed. As an illustration of such a fact I submit the following case:

Case 4.—Mrs. E., aged 45, married twice. Personal and family history, negative. She had had severe trouble with menstrual periods for the last four or five years, with frequent urination.

Upon examination we discovered the presence of a large fibroid in the pelvis.

The patient entered the Swedish Hospital in 1908. The fibroid was removed and she made an uninterrupted recovery from the operation. She continued to suffer from pain in her right side. The pain was paroxysmal in nature, and often extremely severe. This pain became more and more frequent. I was unable to locate the trouble, and she finally went to another physician, who removed her right kidney for beginning hydronephrosis. After this she was perfectly well.

Pregnancy with enlargement of the uterus in certain cases carries with it the ureter, so that during the period of pregnancy symptoms of hydronephrosis and obstruction of the ureters may be common.

As an illustration of this point I have no personal case of my own, but our obstetricians frequently report such cases, and as an illustration I take the following case from the literature:

Mrs. T., aged 23, married. Well until pregnancy. At the sixth month she suffered from a severe pain in her right side; relieved upon parturition. Repeated on second pregnancy. So in third, after which the pain became chronic and recurrent. Her appendix had been removed; the uterus was suspended and the tubes and ovaries trimmed up. But finally the removal of a right-sided hydronephrosis relieved the pain.

Pyelitis may be mistaken for salpingitis.

The diagnosis of pyelitis may be easy or difficult; usually it is easy, if we have an accompanying pyelonephrosis, but even then it is often mistaken for gall-stone, appendicitis, and diseases of the genital organs.

A typical case presents this picture. The patient has complained of urinary disturbances for some days or weeks, when suddenly she is seized with acute pain in one or the other hypochondria, more often the right, the pain being located deeply toward the back. This attack of pain is accompanied or preceded by a chill and high fever and, very often, by vomiting. The urine, examined at this time, is rather scanty, but otherwise may be nearly normal, since the urine is from the normal kidney, the affected ureter being occluded. On examination we find acute tenderness and often a tumor mass in the affected side, the tenderness being usually high under the ribs and rather deeply seated. After some hours or days the obstruction is usually overcome, and there is a rather profuse flow of pus-laden urine and an entire cessation of all subjective symptoms, the patient considering herself well. This occurrence may be repeated at irregular intervals until the patient is exhausted. Many patients have had operations on the genital organs when the pathology was a pyelitis.

Mrs. E., aged 25, married, two children.

Patient entered the Swedish Hospital in December, 1910. Family and personal history, negative. Menstrual history, regular, preceded by pain; flow, four days. She complained for five years of pains in left side extending over the entire left abdomen, which pains were paroxysmal. Had been operated on twice without benefit. Urine examination discovered pus. This had never been discovered before, although several examinations of urine had been made by competent men. Tube and appendix had been removed. A diagnosis of right-sided pyonephritis was made.

It is a well-known fact that extensive cancer of the uterus spreads into the broad ligament and around the ureter, and anyone ever having attempted the Wertheim operation for removal of the glands of the pelvis for cancer has, no doubt, in many cases, discovered ureteral enlargement above the point of the cancer. We have had several cases of this kind, one case of which we will cite as illustration.

Mrs. P. Family and personal history negative. Operated on in the Wise Hospital in 1906 for extensive cancer of the uterus involving the glands along the iliac vessels. Glands removed, and the ureter dissected out on each side for about six inches.

Patient made an operative recovery.

Later she returned for treatment on account of pain in her right side, which we thought at first to be the extension of the cancer, but we afterwards discovered it to be a case of hydronephrosis. We removed the kidney, in 1910, because of a very large hydronephrosis, the origin of which, so far as we were able to determine, was a stricture of the ureter in the pelvis. Such cases must be fairly common.

In such complications following pelvic operations the symptoms are not relieved, the patient returns time and again with all sorts of complaints, and the physician blames himself and his work, little thinking that the work itself may be perfect for the thing which it was intended to accomplish, and that other symptoms have been produced secondary to th[illegible] condition

Case 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 124 of 157



which was the point of attack, and because of which secondary complications must themselves be treated for their own pathological condition. We believe that ureteral obstructions follow pelvic operations in a good many cases.

I have not been privileged to follow in detail many post-operative cases for Wertheim's operation, but I have always suspected that in cases where it is necessary to dissect out the ureter for such a long distance that post-operative cicatricial contractions might, in some cases, produce kidney and bladder symptoms, and I have no doubt it does.

Diseases of the lower urinary tract are even more frequently secondary to diseases of the genital organs than those of the upper; I mean particularly the urethra and bladder.

It is a well-known fact that, if a pyosalpinx abscess lies upon the surface of the bladder, a circumscribed cystitis may be produced in the bladder in the region where the tube lies upon the bladder.

The experiments of Clado have shown that, if the rectum be tied off in dogs, the micro-organisms will migrate into the bladder.

Infections of the fundus of the bladder rarely produce much pain, and seldom increase urination to any great degree until they have extended to the base of the trigone, at which time they cause frequency of urination, tenesmus, pain, and smarting to a degree depending on the virulency of the infection. In a case illustrative of this point, Mrs. B., wife of a physician, presented herself at our office in December, 1913. She was suffering with frequent urination.

We examined the urethra with the endoscope and the bladder with the cystoscope. We found the urethra normal, but the bladder inflamed, the inflammation extending down from the fundus of the bladder towards the base. Examination of the genital organs discovered a growth upon the side of the bladder. Upon operation we found this growth to be a pyosalpinx. This was removed. The bladder symptoms have since cleared up, and the patient is completely well.

Inflammations of the tube cause bladder trouble, not only by extension, but also by the fact that the tubes may become adherent to the bladder, and retraction of the inflamed areas hold the bladder from closing. Thus an attempt to close it, produces pain. It is therefore always well to know whether pain at urination is at the beginning, during, or at the end. If it is at the end of urination, and if of a sharp cutting nature, you may expect it to be due to adhesions in the abdomen. If it is of a dull tenesmus-like form, it is always possible that it is an inflammatory process.

DISCUSSION

Dr. S. M. Hohf (Yankton): If there is one thing that we learn from this complete paper it is this fact, that very many conditions referable to the bladder may be extraneous to that organ, and that tumors, kidney lesions, cancers, abscesses, which develop, cause bladder symptoms, and in directing treatment to the bladder we may ignore entirely the real cause of the disturbance. We know the hospitals receive many cases in which the general practitioner has failed to make a diagnosis. He has directed treatment to the symptoms of cystitis, but has entirely overlooked the real cause. Now, this brings to my mind the very important point that the doctor dwelt on: if you would avoid mistakes in diagnosis, you should examine the patient thoroughly. Be sure that you make a proper diagnosis. If you do not, what will be the result of your treatment? Absolutely nothing. Under ordinary conditions the general practitioner is qualified to render efficient treatment, but he often fails to make a correct diagnosis. You may fail to obtain a good clinical history of the case, but if you can obtain a history of these cases, it will enable you to clear up matters. Again, oftentimes, even though the extraneous disturbance causes symptoms, and the bladder may be eliminated, we fail to give the general constitution of the patient proper consideration.

Anemias will develop with bladder and kidney lesions, and many times the general practitioner refers his treatment to the bladder with good, bad, and indifferent results, neglecting the general constitution of the patient.

The doctor spoke of so many of these cases of cystitis being infectious. I believe they are more infectious than we sometimes think, and while in some instances the bacteria causing the infection may not be found, at the same time a perfectly normal healthy condition surrounding the bladder is not susceptible to the invasion or inroads of bacteria, as an unhealthy one would be. Therefore, given a case that is already undermined you will have an invasion of bacteria with a resulting cystitis.

I feel that this paper has been worth a good deal to me because of the important points that have been brought out in making a diagnosis and the utter futility of trying any treatment unless you know absolutely and positively just what you have got to deal with. This point is particularly to be emphasized. How many times patients come to our offices and we make a slipshod, hasty examination, and as a result our treatment is unsatisfactory! Let us detain the patient longer, and make a more thorough examination, and insist on repeated observation. Then, if we do not get results from treatment, we can rest assured we have failed in the diagnosis. I am emphasizing this because I feel it is of the utmost importance, not only in the treatment of disease of the urinary tract, but in all forms of disease that we meet with.

The point that was brought out of introducing instruments into the bladder and causing cystitis is well taken. I do not believe a catheter should be used by anyone with the expectation that it will not cause a cystitis. I believe its use will invite a cystitis.

The cystoscope is one of the most important instru-

ments in our hands, but it must also be used carefully. It must be used with the greatest precaution because our greatest danger again is infection.

One thing along the line of treatment: How many times do we have cases of inflammation of the bladder and we institute apparently good treatment? We have done all we can, but with unsatisfactory results. There is another point I would offer right here along the line of treatment of cystitis, and it is this: Put the patient to bed.

I hope the doctor in his closing remarks will tell us a little more of his manner of handling these cases of pure cystitis, because I know the general practitioner meets frequently with cases of cystitis developing after taking cold, as they often say. These patients say to us, "I was out and got wet, and immediately after I had a terrible burning on urination." The train of symptoms of cystitis then soon becomes chronic. The best results can be obtained by putting the patient in bed, and keeping her there until she is cured, and you will be surprised how the results of treatment will turn in your favor as compared with the result of treatment when the patient walks about and does her work. So I would emphasize the advantage of putting her to bed and keeping her quiet. In hospitals the patient should not be permitted to be on her feet at all, always remembering that you have made a correct diagnosis, and that there really exists nothing more than an irritable bladder, which may mean, after all, a good deal.

Constitutional treatment should be given these patients if anemia exists. The patient should be encouraged to be out in the open air, if possible, but build up the general constitution.

I do not know of any condition we meet with that is more troublesome than these chronic urinary disturbances, more especially those of the bladder. They do become chronic, and they are more or less constantly with us, and are troublesome cases to handle. But the treatment I have outlined has always given me the best results.

I wish to thank the doctor for his instructive paper, and I must say it has given me an insight into many conditions that may exist which we are prone to overlook.

Dr. M. A. Stern (Sioux Falls): It has been my good fortune to spend a year in the Wertheim Clinic. Dr. Stokes mentioned the complications following the Wertheim operation. I want to say, cystitis is a common complication after that operation for two reasons: In the first place, the trophic nerves of the bladder are cut, and, secondly, the support of the bladder is removed so that it falls back, it has no support, and it is impossible for it to empty itself properly and immediately after this operation. The bladder is washed out at intervals for a week afterwards, and in spite of washing it out with boric acid every case develops cystitis, and in many of these cases of cystitis the bladder is paralyzed, and they have muscular retention. The urine is free from pus, but after several days there is pus-retention, high fever, and chills, and when the bladder is able to empty itself all of the symptoms disappear. Cases of pyelitis, however, although very rare, eventually get well by themselves. I saw ten cases of pyelitis following this operation, and the one case I have in mind particularly ran a course of seven or eight months with recurrent chills, pus in the urine, general malaise, etc., but finally cleaned up. Nephrectomy was not necessary in any of them.

Just a word or two about the operation: As Dr. Stokes mentioned, the ureter is exposed from the brim of the pelvis, where it enters the bladder. The course of the ureter is from the connective tissue of the pelvis through parametrium, and it is often difficult to expose it, and not infrequently the ureter is cut. They have operated on 900 cases of carcinoma by that method, and the end-results show 50 per cent of cured five years after the operation.

With regard to prolapse, there are two general classes of prolapse, that class of prolapse where the suspensory ligaments of the uterus give way and the uterus comes down *in toto*. There is practically no distortion of the uterus, but a weakness of the broad ligaments, the uterosacral ligaments, and the round ligaments. There is a second class of prolapse which is far more common. It consists of a larger elongation of the cervix; the body of the uterus is held in a certain position, but the cervix is very long, and it may be projected between the labia and fundus of the uterus up in good position. That particular kind of prolapsus does pull on the ureter and occasion a lot of urinary disturbance, and not only that, but it pulls the bladder down with it and makes it possible for the bladder not to empty itself entirely, so that there is always residual urine.

Regarding the anterior position of the uterus causing urinary disturbances, I have seen a great number of cases, but I have never seen many of that kind.

Dr. Stokes (closing): I have nothing of importance to add to what Dr. Hohf has already said regarding treatment. I think his treatment is about the best that can be advised in acute cystitis, namely, put the patient to bed and let her stay there; put on an ice-bag or a hot-water bag, and keep the patient quiet. I do not see very much difference between any other acute infection and an acute cystitis; and I do not see much, if any, difference between the treatment of an acutely infected bladder and an acutely infected finger. Both require proper drainage and rest. You cannot do very much more. If the bladder is performing its function all right, rest of the patient in bed, with a few urinary remedies to make the urine bland, is the best line of treatment.

When it comes to the treatment of chronic cystitis, it is difficult. Infections of the bladder will take care of themselves if the bladder is normal. If the bladder cannot empty itself, the infection will get on the rampage.

To me chronic cystitis means some mechanical proposition in the bladder with which we have to deal in almost all cases. Some of you may not agree with me on that point, but the longer and more you study this proposition, the more you will lean towards this idea. I do not mean to include trophic nerve-degeneration. This of course is another story. If the mechanical supports cannot be restored and mechanical obstruction removed, we cannot hope much from operation or treatment.

I am very glad to have heard what Dr. Stearn said about the Wertheim operation. It is very difficult in the Wertheim operation to remove all of the glands, and while I have not had enough experience with the operation to draw any definite conclusions, yet I know there are many kidney infections following this procedure.

# Exhibit P

e 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 127 of

THE

# AMERICAN JOURNAL OF OBSTETRICS

AND

## Diseases of Women and Children

EDITED BY

BROOKS H. WELLS, M. D.

GEORGE W. KOSMAK, M. D.

VOLUME LXIX.

January–June, 1914

NEW YORK

WILLIAM WOOD & COMPANY

1914

FER-127

Digitized by Google

Numerous other cases are on record.
17. Marx, S. Inversion of the puerperal uterus; a clinical report. *Am. Gynec. and Obst. Jour.*, 1897, xi, 415–422.
18. Quoted by Stone, W. S. Acute inversion of the uterus following parturition, with report of a case. Am. Jour. Obst., 1898, xxxviii, 208–217.
19. Meigs, C. C. *Treatise on Obstetrics*, 1867, 608–623.
20. Bacon, C. S. Unpublished discussion at meeting of Chicago Gynecological Society, Dec. 20, 1912.
21. Long, J. W. Placenta previa. Am. Jour. Obst., 1896, xxxiii, 42–45.
22. Crosse. *Loc. cit.*
23. Barbour, A. H. F. The atony and the relations of the uterus during the third stage of labor and the first days of the puerperium. *Edinburg Med. Jour.*, 1884, xxx, 22–237; 313–322.
24. McIntosh, T. M. Complete inversion of the uterus treated by abdominal section. *Med. Record*, New York, 1893, xliv, 176.

15 East Washington Street.

---

# WHEN, UNDER THE PRESENT CODE OF MEDICAL ETHICS, IS IT JUSTIFIABLE TO TERMINATE PREGNANCY BEFORE THE THIRD MONTH; WHAT SHOULD OUR ATTITUDE BE TOWARD A PATIENT UPON WHOM A CRIMINAL OPERATION HAS BEEN PERFORMED; WHAT SHOULD BE OUR ATTITUDE TOWARD THOSE SUSPECTED OF THE PERFORMANCE OF CRIMINAL OPERATIONS?*

BY

WILLIAM R. NICHOLSON, M. D.,

Philadelphia, Pa.

Mr. President and Fellows of the Obstetrical Society of New York and Members of the Philadelphia Obstetrical Society:

It is my privilege to open the discussion upon the very important question which you have chosen for our consideration. Aside from the therapeutic indications for the induction of abortion, than which there are few questions in obstetrics of greater importance, we have to consider the unjustifiable or criminal interference with pregnancy, a subject which has engaged the attention of master minds in past generations. It is evident that time will not permit more than

* Read at a Joint Meeting of the New York and Philadelphia Obstetrical Societies, at New York City, March 10, 1914.

Digitized by Google

se 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 129 of 1



a cursory treatment of the various questions involved. In other words the writer can hope but to touch the high places, leaving the details to be dealt with by those who shall subsequently discuss the subject.

Before this audience it is not necessary to argue regarding the sacredness of the life of the unborn. As scientists we are agreed that one should undertake the therapeutic abortion with just as much hesitation as he would commit justifiable homicide, since we realize that, in each and every interference with pregnancy before viability, we are destroying actual life and that abortion is therefore homicide, justifiable, we believe, under certain conditions, but homicide nevertheless.

It is impossible to answer the first question of the subject in a specific and final manner since, in a given case the decision for or against the employment of the therapeutic abortion will depend upon certain generalizations, interpreted by the personal experience of the physicians in charge of the case. It is impossible to so crystallize our imperfect knowledge that iron-clad rules may be established by which this decision as to the justifiability in a given case may be reached.

We may, however, make the following statement as a working hypothesis. *Abortion is justifiable first, when the mother is in danger of losing her life or health if the pregnancy be allowed to continue, because of some pathological condition directly dependent upon the pregnancy itself; and second, when the continuation of the pregnancy threatens an aggravation of an independent pathological condition, which will eventually destroy life or health, even though neither is actually threatened at the time the interference is proposed.* In other words we are in favor of a wide latitude always provided that the decision be made by a man, or better, and this for many reasons, by men who by their experience are qualified to make such a decision righteously.

The justification for the above attitude is based on the inherent right of self-preservation possessed by the pregnant woman in common with all other human beings, which right she is by no means obliged to resign in order to attempt to bring into existence a merely possible life. Statute laws give the individual the right to protect his life at the expense of another adult life if necessary, and therefore the life of the unborn child may be sacrificed if, to use an old common law term, the life of the mother is in duress through the child *in utero*. It is needless to call attention to the fact that in by far the greatest number of cases in which therapeutic abortion



Digitized by Google

may be justifiably considered the life of the child is forfeited, if the intervention be not practised, and that therefore in these cases there is really a conservation of life by the destruction of the unborn child.

Before resorting to the therapeutic abortion there should always be a consultation and the decision shoud rest entirely upon physical signs and such other demonstrable data as may be available and but little attention should be paid to the subjective symptom-complex.

The pathological conditions which may at times present a clinical picture somber enough to justify abortion may be briefly mentioned as follows. Vomiting, if truly uncontrollable and associated with progressive emaciation, after all medicinal means have been exhausted including rectal alimentation. This is the most important indication met with in point of frequency at this period, and it may be said that here it is of the utmost importance to err on the safe side and when in doubt, to induce. Cardiac disease may very rarely be an indication during this period in the presence of signs of failing compensation. Tuberculosis in its early stages or when a quiescent focus may be diagnosticated may also be an indication. If advanced, however, the child's life should be considered of paramount importance. In very rare cases of anemia therapeutic abortion may be indicated but as a rule viability may be awaited. Chorea may also be an indication though the few cases in the experience of the writer have demanded intervention at a later period. It may be mentioned that the operation is not justified at the present day to meet indications presented by contracted pelvis, atresia of the soft structures, pelvic tumors or incarcerated uterus.

*What should be our attitude toward the patient upon whom a criminal operation has been performed?* Let it be understood first of all that the denunciatory generalizations in the remainder of the paper are not intended to have reference to the isolated cases of pregnancy in the very young, or indeed to any case of true rape with pregnancy as a sequel, no matter what the age of the woman may be. While the author believes firmly that the only standard is that based on the sacredness of life as such, he is nevertheless willing to condone a criminal operation in certain rare instances. He has included this statement in this discussion with some misgiving lest it be misunderstood. Nevertheless he feels that it is necessary to mention this matter since cases of this type are almost invariably cited as an argument against what some consider a too sweeping limitation of the employment of abortion. This matter, however, is entirely academic; opinions on this point are negligible since

Digitized by Google

these harrowing cases form but an infinitesimal part of the criminal abortions performed. To relieve a child or a woman of an illegitimate pregnancy which is the result of a rape is one thing; it is quite another to advocate the sophistry that the same deliverance should be extended to a complacent cohabiting partner on the ground that the preservation of her good name is of more value than the fetal life. In other words, our duty is to condemn the performance of this operation absolutely except on therapeutic grounds. We need not fear that by so doing we deny the chance of relief to the occasional type referred to above. There can be but one attitude for the conscientious physician. On both scientific and moral grounds a crime has been committed no less in enormity than infanticide. Whatever opinion the laity may choose to hold on this matter, the physician can have no doubts of the truth of this statement, and the correct attitude is not maintained if he does not express at some time during the conduct of the case this opinion to the patient. How often is this done?

*Should all criminal abortions be reported to the officers of the law?* Not under the present methods of legal procedure, since the mere reporting of an abortion will be of no value to the community. We submit that the doctor is not an officer of the law; he is not a detective and he has no business to assume any such function. He has just the same responsibility in this matter as has any citizen who knows from hearsay that a crime has been committed and in ordinary felonies it is not recognized as the obligatory duty of a citizen to make a report to the police. It may not be amiss to note here that there is no legal penalty for silence and until by special enactment the reporting of criminal abortions is made obligatory, as is the case with contagious disease, there can be none. Call this misprision of felony if you will. The mere use of sonorous terms does not alter facts.

It must be realized that this is a very different matter from the refusal to testify before a properly constituted court of law. A physician cannot claim legally that the knowledge which he has gained in his professional capacity is privileged, and so refusal to testify might subject him to discipline for contempt.

The request which has been made by police officials that all criminal abortions be reported to them is ludicrous in the extreme since if this were done and any attempt were made to investigate them, there would, under present conditions, be chaos produced in police circles without beneficial result to the community. It is quite true that if it were possible to create an attitude in the medical


Digitized by Google

profession which would result in the reporting of even the majority of these cases, and if the police were prepared to make a real investigation of each it might then be possible to curb this crime by legal means and under these circumstances the duty to report would be absolute, but this is purely fanciful since no law can be enforced, even if enacted, unless supported by the community, and in this instance no such law could be enforced without a degree of co-operation on the part of the medical profession which is seemingly impossible.

The writer holds that, while in every case of criminal abortion, a deplorable and a despicable crime has been committed, that the duty of the physician under the existing laws and popular attitude is to hold sacred the facts which he has acquired in a professional capacity and by so doing to conserve the interest of the individual patient, not because he desires to shield a criminal, but for the reason that any other course will not result in any general good to the community at large, and will cause useless shame and suffering on the part of the patient and innocent relatives. On the other hand, when the woman is in danger of death and is willing to aid by her statements the prosecution of the particular abortionist responsible, there is then good and sufficient reason for a report in that there is a possible advantage to the community in the attempted conviction. But these cases form but a small part of the whole since serious complications develop in but the very small minority, the majority of abortionists at the present day being more or less imbued with the principles of asepsis, while the expert among them can operate as safely as the best legitimate surgeon.

A consideration of this phase of the subject would not be complete if the duty of the physician to himself were not made plain. It is a recognized principle that, in making a decision as to the propriety of the therapeutic abortion, there should be a consultation of physicians in order to share the responsibility and also that there may be no suspicionof wrong doing. In dealing with a criminal case, at least outside of hospitals, it would be much safer to follow the same plan since otherwise there is a chance, as in a case known to the writer, that an evily disposed woman might make serious trouble for a perfectly legitimate operator. The courts have wisely held that the patient in a criminal abortion is not an accomplice, since it is a well-founded rule of evidence that the testimony of an accomplice must have substantiation. This necessity for substantiation would defeat the ends of justice and therefore the ruling just referred to. It is thus evident how the testimony of

Digitized by Google

se 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 133 of



an evily disposed woman might damage an innocent physician, who had legitimately operated after a criminal operation had been done by another. While this is theoretically true there does not seem to be any great danger of such an actual happening since the charge would either be that he did the criminal operation or else that he was an accessory after the fact. From the first of these charges, a physician is, if innocent, protected by the rules of evidence since actual commission of the crime by him must be proved, while as to the latter, the meaning of the term accessory, in so far as it relates to cases of abortion, has not as yet been determined by the courts. The importance of the consultation is, however, that with it no action would ever be brought, while without it, though in all probability an innocent man would not be convicted, yet such a one might be occasioned financial trouble and mental anguish.

*What should be our attitude toward abortionists?*

If we value our own private honor and the honor of the profession of medicine, there is but one attitude possible for us, namely, to avoid any association, even if itself legitimate, with these vermin. We cannot of course recognize them as members of an honorable profession. It goes without saying that we cannot admit them to any official relationship, if we desire to retain our self-respect. If there be suspicion aroused regarding a member of any of our medical societies the matter should be sifted and guilt or innocence established.

These panderers to human lust, these debased murderers, whether skulking in the slums and plying their stinking traffic in secret for a pittance or openly defying the laws of God and man in the well-appointed operating room, form the most ghastly blot upon a profession whose general accomplishment of its ideals is second to none. As criminals they are more debased and much more blameworthy than the murderers in our prisons. With many of the latter it is possible, the provocation being realized, for a right thinking man to have a feeling of pity, sometimes even of sympathy, but for these foul, hired butchers there can be nothing but the most loathing contempt. The activities of any one of them in active practice puts to the blush the work of the most fiendish killer of modern times. This is no exaggeration, there is not a trace of hyperbole in the statement. While we have no dependable data as to the actual frequency of this crime, since no statistics available nearly approach its true magnitude, no one of experience can doubt the truth of the above statement.

Shall we have dealings in any but one way with this wretchedly


Digitized by Google

debased clan which one author has called "the disgusting caudal appendage of the medical profession."

Gentlemen, the profession of medicine is not blameless in this matter. Until the profession of medicine can be brought to the proper moral elevation there is little that can be done. While medical men, who would either be afraid to perform these operations or who honestly are aghast at the idea of doing such crime, are willing by open statement or guarded suggestion to point the way to such accommodation, or are willing, even if by veiled hints, to assure a cordial reception to the patient immediately subsequent to a criminal interference, they must consider themselves as accessories to the crime of abortion.

*Should the medical profession attempt to secure the conviction of the professional abortionist?*

The detection of crime is a matter for the police. It is not the duty of the medical profession to attempt the legal control of this matter. Let the police and the courts attend to their business, and let us attend to our own, by attempting to create a proper medical and public conscience in this matter. This does not mean that whenever we have definite proof we should hesitate to place it in the hands of the authorities, and moreover it is not intended to belittle the activities of those in the medical profession who feel that they have a vocation which may only be fulfilled by the hunting down of this special type of criminal. The conception of the writer is that it is the duty of the medical profession to attempt to create an enlightened public conscience in this matter. This is much more important than is the attempt to run to earth the individual abortionist since unless the former is possible, the latter is a waste of time. It is to be remembered that we are not combating ordinary crime, repugnant to the public in general, but that we are fighting an evil which is enshrined in the affections of a very large portion of the community and which is not considered as evil by them.

The laws at present on our statutes are ample, the police and the courts as well as the legislatures of the various states are for the most part anxious to combat this evil, but the difficulties met with in the detection of this crime seem sometimes unsurmountable, since, unlike the ordinary homicide, the subject of this crime, the fetus, cannot, while the moral accomplice, the woman, as a general rule will not give testimony. Even in fatal cases the law is compelled to refuse at times to convict, even if there be no real doubt of the guilt of the accused, because the legal evidence is not sufficient. This



Digitized by Google

is a necessity, since if the attitude of the courts were different there would be no doctor safe from blackmailing attempts.

Can it be that there is no remedy for this evil? Shall the United States by the wanton murder of the unborn move toward a certain decadence? In the agitation concerning criminal abortion which took place during the later years of the nineteenth century, the cry for help of some of the protestants was to the church, and some of the writers of those times were hopeful that the church could by its ban do much toward the suppression of the evil; but the gradual change of the times renders it very doubtful whether the influence wielded at least by the denominations other than the Roman Catholic, would be sufficient to effect any appreciable impression. We therefore are compelled to turn to some other field of influence and it seems to the writer that this is presented by education along scientific lines. It will be remembered that under the Common Law, abortion was never considered a serious offense if done with maternal consent before quickening, and the destruction of the child even during labor, if any portion of its body besides the umbilical cord still remained within the birth canal, was not infanticide. It is true that it was considered an unlawful act after quickening, and that if the mother died it was murder. Thus in 1672, Sir Matthew Hale stated that "If a woman be quick with child and any one gives her a potion to destroy the child within her, and she takes it and it works so strongly that it kills her, this is murder; for it was not to cure her of a disease but unlawfully to destroy the child within her; and therefore he that gives a potion to this end, must take the hazard, and, if it kills the mother, it is murder." The conception was therefore that before quickening there was no real life to be considered, that the child was really *pars matris viscerum*, and that its destruction at this period of pregnancy was but a venial matter. Gradually the scientific and legal conception underwent an evolutionary development as evidenced by the dictum expressed by Mr. Justice Coulter in the early part of the nineteenth century that "it is not necessary that the mother have quickened to constitute the crime of committing abortion; it is not the murder of a living child which constitutes the offense but the destruction of the gestation by wicked means and against nature. The moment the womb is instinct with embryo life and gestation has begun, the crime may be perpetrated." And finally we come to our own period when both scientifically and legally we are of one mind that the life of both the embryo and the fetus is sacred and that any interference is murder.

But while this is the proven scientific belief, the large mass of the



Digitized by Google

women of to-day have no such creed but still hold firmly to that which was originally the universal and very convenient opinion, namely, that there is no life before quickening, and that therefore before this period an abortion is but a minor offense. One who needs confirmation of this statement has only to suggest to the woman anxious for relief from the duties of motherhood, that she wait until the child is born and then kill it. The horror expressed at such a suggestion will satisfy the most doubting that the women of the twentieth century with all their intelligence and relative emancipation have no conception of the enormity of the contemplated crime in that they do not consider feticide in any way akin to infanticide. This lack of knowledge appeals to the writer as the crux of the whole matter, in so far as mitigation or possible cure is concerned. There are but two causes which lead a woman to attempt or submit to criminal abortion, one the avoidance of shame and the other the avoidance, for any one of a million reasons, of the duties of legitimate motherhood. It may be that the girl whose good name is in the balance would not be hindered by the knowledge that she is consenting to murder, since her reputation is more to her than life itself, but such knowledge would certainly be potent to the many married women, who to-day recount their induced abortions as calmly as they do their menstrual history and request the destruction of their unborn children upon the most absurd pretexts.

If then by proper teaching, and here preparatory school biology is competent to help greatly, we can convince the women of the next generation as to the presence of actual life from conception onward, the writer believes that we will do more to curb this national evil than in any other way. The law is powerless to even control, much less prevent and no campaign by the medical profession along any line but that of education will be found available. It is useless to attempt the control of this evil merely by the prosecution of individual abortionists, since, as has been said, the introduction of asepsis renders the operation in the hands of the skilled abortionist as safe as it is in the hands of any expert surgeon, and therefore it is a very difficult matter to gain the evidence needful for conviction. As we all know there are numbers of moral degenerates in the medical profession who gain their livelihood by this abominable business, and to-day, thanks to asepsis, many of these men can operate without hindrance for long periods of time. We know many of them but we could not prove them abortionists to the satisfaction of any court of law. The only weapon we possess is



Digitized by Google

se 1:24-cv-00244-BLW Document 144-1 Filed 06/30/26 Page 137 of 1



that of education and the responsibility for agitation to this end rests primarily with the medical profession.

Finally, let it be noted that this education cannot be given at the time when a distracted woman is facing the loss of her reputation or when a married woman is clamoring for abortion upon grounds which seem to her to be adequate. It must be a matter of early training; it must be so taught that a girl will grow up firmly convinced that feticide destroys the life of a child just as really and in exactly the same degree as does infanticide.

We are living in a period in which the dissemination of knowledge is more widespread than at any previous time in the history of the world. Subjects are discussed, more or less intelligently, by the women of to-day of the existence of which their mothers were in ignorance. If, as we believe, the present dissemination of sexual knowledge will work ultimate good to the community, we can look forward to the same result if this vital question be also illumined for the instruction of the public.

1731 Pine Street.

---

# A CALCAREOUS SHELL IN THE EXTERNAL ILIAC VEIN TWENTY YEARS AFTER PUERPERAL PHLEBITIS.

BY

GEORGE ERETY SHOEMAKER, M. D.,

Gynecologist to the Presbyterian Hospital, Philadelphia.

Mrs. X., aged fifty-nine, had had thirteen children and after one of the labors, twenty years ago, there had been septic phlebitis involving the right leg, thigh and groin. There had been much disability for many years following, but the return circulation of the extremity had gradually become practically normal. There were many symptoms which might have been due to the lacerations of the pelvic floor, to cholecystis, etc. Recurrent appendicitis required operation in February, 1914, and she entered the Presbyterian Hospital. After the removal of the appendix an exploration of the pelvis was done. There was an entire absence of chronic adhesions, peritonitis or chronic salpingitis; the right broad ligament tube and ovary being entirely free and readily manipulated. At the base of the broad ligament in front there was noted a moderate varicose dilatation of the veins and deep down a hard body, beginning near the femoral ring.

In order to expose this body the peritoneum was dissected off beginning at the side of the parietal incision. It was found to lie within the wall of the external iliac vein which it did not entirely encircle; being shaped like a long peanut shell or half cylinder, con-

FER-137

Digitized by Google

Case: 26-5360, 09/15/2026, DktEntry: 34.2, Page 140 of 256

# Exhibit Q

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

Filed in United States District Court, District of Utah.
Time: SEP 29 1971
Clerk

JANE DOE, Plaintiff,

v.

CALVIN L. RAMPTON, Governor of the State of Utah, and VERNON B. ROMNEY, Attorney General of the State of Utah, Defendants.

No. C-234-70.

OPINION AND JUDGMENT

This action was originally brought by Jane Doe acting as representative of a class, defined as those women in Utah having unwanted pregnancies and who desire to terminate those pregnancies. Injunctive and declaratory relief are sought under 42 U.S.C. § 1983; specifically, plaintiff alleged that the abortion statutes of Utah are unconstitutional and sought an injunction against their enforcement. When the action was originally brought, the "named" plaintiff was pregnant. On September 14, 1970, the United States District Court for the District of Utah issued a temporary restraining order enjoining the enforcement

of the Utah abortion statutes against Jane Doe. Soon thereafter, Jane Doe aborted her pregnancy. On September 15, 1970, a three-judge court was constituted pursuant to 28 U.S.C. §§ 2281 and 2284 to hear this case. Argument was heard on January 27, 1971. At that time it was ruled from the bench that this action was not maintainable as a class action. Accordingly, the only plaintiff in this action is Jane Doe. At the outset it must be noted that this case is not moot. While it is true that Jane Doe is no longer threatened by enforcement of the abortion statutes, the case seems to fall within the so-called "continuing controversy" exception to the mootness doctrine, as set forth in Moore v. Ogilvie, 394 U.S. 814 (1969). It is a case presenting a question almost certain to recur and yet which will evade review by reason of the inexorable biological timetable.

In relation to the standing issue the statutes which are allegedly unconstitutional are the following:

§ 76-2-1, Utah Code Anno. 1953:

> "Every person who provides, supplies or administers to any pregnant woman, or procures any such woman to take, any medicine, drug or substance, or uses or employs any instrument or other

means whatever, with intent thereby to procure the miscarriage of such woman, unless the same is necessary to preserve her life, is punishable by imprisonment in the state prison not less than two nor more than ten years."

And

§ 76-2-2, Utah Code Anno. 1953:

"Every woman who solicits of any person any medicine, drug or substance whatever, and takes the same, or who submits to any operation or to the use of any means whatever, with intent thereby to procure a miscarriage, unless the same is necessary to preserve her life, is punishable by imprisonment in the state prison not less than one nor more than five years."

Defendants urge that plaintiff Doe does not have standing to challenge section 76-2-1, as that statute is addressed to abortionists rather than the procuring woman. Plaintiff cites Griswold v. Connecticut, 381 U.S. 479 (1965), in support of her contention that she has standing to assert the constitutional rights of those at whom section 76-2-1 is directed. We think, however, that Griswold is to the contrary. In Griswold the parties challenging the statute in question stood convicted as aiders and abettors of their married couple clients' violation of the birth control regulations. The Court was careful to

point out that the question of standing was answered favorably to the challenging parties because they had been convicted under the statutes. The Court noted that standing requirements were to be strict in cases where the challenging party was seeking only declaratory relief, citing Tileston v. Ullman, 318 U.S. 44 (1943). Our case is quite similar to Tileston, including the circumstance that it would be a simple matter for the parties addressed by section 76-2-1 to assert their own rights. We hold, therefore, that plaintiff does not have standing to challenge the constitutionality of section 76-2-1 in this suit for injunctive and declaratory relief.

As to the constitutionality of section 76-2-2 of the Utah Code Anno. 1953, plaintiff raises six arguments in her challenge to this statute. The first of these is that the statute is indefinite,vague, and uncertain, in violation of the due process clause of the fourteenth amendment. Specifically, plaintiff challenges the statutory language, "necessary to preserve her life." In arguing that that language is vague, plaintiff relies on People v. Belous, 458 P.2d 194 (Cal. 1969); Roe v. Wade,

314 F.Supp. 1217 (N.D.Tex. 1970), and United States v. Vuitch, 305 F.Supp. 1032 (D.D.C. 1969). Other cases have reached the opposite conclusion; see Babbitz v. McCann, 310 F.Supp. 293 (E.D.Wis. 1970), and Rosen v. Louisiana State Board of Medical Examiners, 318 F.Supp. 1217 (E.D.La. 1970). Not all of these cases were concerned with the precise language found in the Utah statutes. In the Vuitch case, the word considered vague was the word "health" in a statute prohibiting all abortions except those necessary to preserve the mother's life or "health." In the other four cases the concept of preserving or saving the life of the mother was at issue. As noted, the courts have split on this question, some finding the "preservation of life-type" statutes vague, others finding them clear. There is really little to choose between the contending cases. However, we think that a recent Supreme Court opinion is helpful. On reviewing the Vuitch case, the Supreme Court held that the term "health" was not unconstitutionally vague. We are not concerned here with the term "health" specifically; however, the conclusion is virtually inescapable that if

the phrase, "preservation of health" meets the vagueness test, so does the phrase "preservation of life." Admittedly, this is not a necessary inference; on the other hand, it is not unreasonable. We hold, therefore, that the Utah statute is not unconstitutionally vague.

Secondly, plaintiff alleges that the Utah abortion statute constitutes an illegal invasion of her right to privacy as guaranteed by the ninth and fourteenth amendments. This is the most difficult question presented. It has been considered by several courts. Some courts have held that the right to privacy enunciated in Griswold v. Connecticut, 381 U.S. 479 (1965), extends to the decision to have an abortion. Doe v. Scott, 321 F.Supp. 1385 (N.D.Ill. 1971); Doe v. Bolton, 319 F.Supp. 1048 (N.D. Ga. 1970); Roe v. Wade, 314 F.Supp. 1217 (N.D.Tex. 1970); Babbitz v. McCann, 310 F.Supp. 293 (E.D.Wis. 1970); People v. Belous, 458 P.2d 194 (Cal. 1969). Other courts have reached the opposite conclusion. Corkey v. Edwards, 322 F.Supp. 1248 (W.D.N.C. 1971); Steinberg v. Brown, 321 F.Supp. 741 (N.D.Ohio 1970); Rosen v. Louisiana State Board of Medical Examiners, 318 F.Supp. 1217 (E.D.

La. 1970). We think the better reasoning is found in the latter cases, specifically in Corkey v. Edwards. There the three-judge court noted that it was not contended that the State has no interest whatsoever in the regulation of abortions. This point appears to be conceded inall of those cases. Given that the State may have some interest in this area, it follows that any right to privacy here is not unlimited. Continuing, the court in Corkey found that it is not unreasonable for the State to have an interest in the embryo or foetus. Accordingly, the court concluded that the weighing of competing interests in this area is properly a matter for the State legislature and its decision on this question would not be foreclosed by the federal courts. We agree, and hold, therefore, that the Utah statute will not be held unconstitutional on this ground.

Plaintiff also raises the problem of overbreadth. In view of our holding on the question of the right of privacy, we must conclude that the Utah statute is not overbroad. Had we not found a State interest in the preservation of the embryo or foetus, the result here could

be otherwise. But finding such an interest insulates the statute against a charge of overbreadth.

Finally, plaintiff attacks the statute because it violates the Equal Protection Clause, delegates authority to physicians, and constitutes an establishment of religion. The second of these arguments does not really apply to the statute in question. The establishment argument is without merit. The equal protection argument has been raised in other abortion cases, but has not, to our knowledge, been held sufficient to invalidate any abortion statutes. We agree with the court in Steinberg v. Brown, 321 F.Supp. 741 (N.D.Ohio 1970), that the Equal Protection Clause is not designed to prevent all inequality. The fact that some States have more relaxed requirements for obtaining abortions does not invalidate the Utah statute on equal protection grounds. To conclude otherwise would obviously be to reduce all different State regulations to a common denominator. Equal protection does not require that result. Accordingly, we deny both the injunctive and declaratory relief sought by plaintiff.

IT IS SO ORDERED.

Dated this 8th day of September, 1971.

Oliver Seth

United States Circuit Judge.

A. Sherman Christensen

Senior United States District Judge.

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

FILED United States District Court, District of Utah
SEP 2 0 1971
[signature]
Clerk

JANE DOE,

Plaintiff,

v.

CALVIN L. RAMPTON, Governor of the State of Utah, and VERNON G. ROMNEY, Attorney General of the State of Utah,

Defendants.

No. C 234-70

DISSENTING OPINION

In this action plaintiff asks for declaratory and injunctive relief. She asks the three-judge District Court to declare that the Utah abortion statute[1] is violative of the United States Constitution and to issue a permanent injunction enjoining defendants, the Governor and Attorney General of Utah, from enforcing the statute. I find that plaintiff should be granted the relief she seeks.

I am unable to agree with several of the conclusions reached by Judges Seth and Christensen. First, they hold that plaintiff does not have standing to challenge Utah Code Ann. §76-2-1 since it provides for punishment of the abortionist and not the pregnant woman. They erroneously rely on Tileston v. Ullman, 318 U.S. 44 (1943), to support that holding. In Tileston, "The complaint set out in detail the danger to the lives of the appellant's patients in the event they should bear children, but contained no allegations asserting any claim under the Fourteenth Amendment of infringement of appellant's liberty or his property rights." Id. at 45, Tileston asserted no rights of his own, and therefore the Court held that he lacked standing to assert the rights of his patients. Contrariwise, plaintiff Doe asserts her own right to have an abortion and that she cannot legally obtain

1/ Sections 76-2-1 and 76-2-2, Utah Code Annotated, 1953.

an abortion in Utah so long as §76-2-1 remains in effect.

The majority treats plaintiff's contentions as if she relied solely on the standing recognized in Griswold v. Connecticut, 381 U.S. 479 (1965). They fail to note, however, that in each of the cases which they cite in their opinion and which involve a woman asserting her rights are abridged by the abortion statute, the woman is granted standing to challenge the statute.[2/] In Roe v. Wade, 314 F.Supp. 1217, appeal pending (N.D.Tex. 1970), a three-judge court held that a pregnant woman asserting the right to choose whether to bear the child she was carrying, occupied a position "vis-a-vis the Texas Abortion Laws sufficient to differentiate [her] and the claim [she] presents." Id. at 1220 (citing and quoting from Flast v. Cohen, 392 U.S. 83 (1968)). Plaintiff Doe cites and relies on the following from Flast v. Cohen, supra, to support her standing to challenge §76-2-1:

> "The gist of the question of standing is whether the party seeking relief has alleged such a personal stake in the outcome of the controversy as to assure that concrete adverseness which sharpens the presentation of the issues upon which the court largely depends for illumination of difficult constitutional questions." Id. at 99.

Plaintiff has her own "personal stake" in the outcome of her challenge to §76-2-1. Defendants assert that this section does not prevent her from performing any act or place her in personal jeopardy for such acts. On the contrary, the statute prevents plaintiff from obtaining a legal abortion within the State of Utah. Plaintiff would be placed in personal jeopardy should she be forced to seek help from an unlicensed abortionist.

2/ Doe v. Bolton, 319 F. Supp. 1048 (N.D.Ga. 1970); Roe v. Wade, 314 F.Supp. 1217 (N.D.Tex. 1970); Steinberg v. Brown, 321 F.Supp. 741 (N.D.Ohio 1970); Doe v. Scott, 321 F.Supp. 1385 (N.D.Ill. 1971). See also Crossen v. Breckenridge, 40 U.S.L.W. 1007, 2016-2017 (6th Cir. 6/23/71), holding that a pregnant woman had standing to challenge the Kentucky abortion statute.

To rule that section 76-2-2 alone is unconstitutional would be of little assistance to the plaintiff, since she would still be unable to secure a legal abortion in Utah. Plaintiff need not assert the rights of her physician--she can assert her own rights and should be granted standing to do so. I am convinced that the test announced in Flast v. Cohen is fully met here.

Second, the majority holds that the Utah abortion statute is not unconstitutionally vague. I disagree. The majority notes that the cases considering the certainty of such phrases as "unless necessary to preserve her life" (contained in both §76-2-1 and §76-2-2) are not in agreement. The disagreement among the courts is a clear indication that the phrase is far from being definite and certain. As the court in Doe v. Scott, 321 F.Supp. 1385 (N.D.Ill. 1971), observed: "If courts cannot agree on what is the essential meaning of 'necessary for the preservation of the woman's life' and like words, we fail to see how those who may be subject to the statute's proscriptions can know what it prohibits." Id. at 1388.

The majority relies on the recent Supreme Court decision of United States v. Vuitch, 400 U.S. 813, 39 U.S.L.W. 4464 (April 21, 1971), to support the contention that the phrase "necessary to preserve her life" is not vague. In Vuitch, however, the Court held that the single word "health" was not vague. The Court did not consider the other words in the District of Columbia abortion statute, which are: "unless the same were done as necessary for the preservation of the mother's life or health" (emphasis added). The Court confined itself to that narrow issue because of the narrow holding in the district court. Furthermore, the term "health" had been made more definite and certain by judicial interpretation handed down after the initial decision in the Vuitch case. The phrase "unless necessary to preserve her life" has not had the benefit of such clarification.[3/] Thus, reliance on the Vuitch decision is inappropriate in deciding

---

3/ The phrase is mentioned, but not construed, in State v. Wells, 35 Utah 400, 100 P. 681 (1909), and in State v. McCoy, 15 Utah 136, 49 P. 420 (1897). See also State v. Cragun, 85 Utah 149, 38 P.2d 1071 (1934).

the issue of vagueness presently before us.

Dissenting in Vuitch, Justice Douglas does not confine his opinion to the single word "health". He finds that the judgment to be made by the physician under the statute "is highly subjective, dependent on the training and insight of the particular physician and his standard as to what is 'necessary' for the 'preservation' of the mother's life or health.'" 39 U.S. L.W. 4467. After observing that "abortion touches intimate affairs of the family, of marriage, of sex" and that abortion statutes "deal with conduct which is heavily weighted with religious teachings and concepts", he concludes:

> "Unless the statutory code of conduct is stable and in very narrow bounds, juries have a wide range and physicians have no reliable guideposts. The words 'necessary for the preservation of the mother's life or health' become free-wheeling concepts, too easily taking on meaning from the juror's predilections or religious prejudices." 39 U.S.L.W. 4468-4469.

The Utah abortion statute first appeared in the Revised Statutes of 1898.[4/] It was copied from provisions in the California Penal Code of 1872.[5/] The Utah statute, and the California statute prior to its amendment in 1967, proscribe an abortion "unless the same is necessary to preserve her life." As indicated previously, this language has not been construed by the Utah Supreme Court but in 1969 the Supreme Court of California held that the phrase "necessary to preserve" in the California statute "is not susceptible of a construction that does not violate legislative intent and that is sufficiently certain to satisfy due process requirements without improperly infringing on fundamental constitutional rights." People v. Belous, 80 Cal. Rptr. 354, 458 P.2d 194 (1969), cert denied, 397 U.S. 915 (1970).

---

4/ Sec. 4226, Revised Statutes of 1898, is the same as sec. 76-2-1, and sec. 4227 is the same as 76-2-2.

5/ Sections 4226 and 4227 of the Utah Revised Statutes of 1898 are identified as having been derived from sections 274 and 275 of the California Penal Code enacted in 1872. The provisions of sections 274 and 275 were originally enacted in California in 1850. Stats. 1850, ch. 99, sec. 45, p. 233.

The California court looked to dictionary definitions, the common law, state cases and the practices of the medical profession in an effort to find whether the California abortion statute satisfied the constitutional requirement that:

> " . . . a statute which either forbids or requires the doing of an act in terms so vague that men of common intelligence must necessarily guess at its meaning and differ as to its application, violates the first essential of due process of law." Lanzetta v. New Jersey, 306 U.S. 451, 453 (1939). See also Connally v. General Constr. Co., 269 U.S. 385 (1926).

However, the court failed to find the requisite clarification of the phrase "necessary to preserve." I find this interpretation of the very statute adopted by the Utah legislature strongly persuasive. Hardenbergh v. Ray, 151 U.S. 112, 124.

This same conclusion was reached by three-judge courts in Roe v. Wade, supra, and Doe v. Scott, 321 F. Supp. 1385 (N.D.Ill. 1971). In Roe v. Wade, the court held that the Texas abortion statute, which permitted abortions only "for the purpose of saving the life of the mother", was unconstitutionally vague. The fatal defect of vagueness was characterized by the following:

> "How likely must death be? Must death be certain if the abortion is not performed? Is it enough that the woman could not undergo birth without an ascertainably higher possibility of death than would normally be the case? What if the woman threatened suicide if the abortion is not performed? How imminent must death be if the abortion is not performed? Is it sufficient if having the child will shorten the life of the woman by a number of years? These questions simply cannot be answered." 314 F. Supp. at 1223.

The Utah abortion statute likewise fails to provide adequate guidelines for answering such questions.

The court in Doe v. Scott, supra, held an Illinois abortion statute, which proscribed all abortions unless performed by a physician because "necessary for the preservation of the woman's life," to be unconstitutionally vague. After concurring with People v. Belous and Roe v. Wade,and noting that the word

"necessary" is susceptible of meanings ranging from inevitability to convenience, that court writes:

> "The word 'preserve' is similarly susceptible of so broad a range of connotations as to render its meaning in the statute greatly amorphous, since it can mean anything from maintaining the status quo to preventing the total destruction of something. The treating physician who believes an abortion is medically or psychiatrically indicated thus finds himself threatened with becoming a felon as well as with the possibility of losing his right to practice his profession if he errs in the legal interpretation of a penal statute, the words of which have not been sufficiently definite for courts to agree on their meaning." 321 F. Supp. at 1389.

Defendants attempt to distinguish the present case from People v. Belous by quoting the following: "Our courts . . . have rejected an interpretation of 'necessary to preserve'which requires certainty or immediacy of death", then the defendants assert:

> "The Utah courts have never rejected this interpretation [requiring certainty or immediacy of death] and, in fact, appear clearly to have accepted and adopted such definition in the cases under the statutes which have been before the Utah Supreme Court."

I have found no Utah case which considers whether the phrase "necessary to preserve her life" requires certainty or immediacy of death. In People v. Belous, supra, the court notes that two other jurisdictions--Iowa and Minnesota-- have rejected the interpretation of "necessary to preserve" as requiring certainty or immediacy of death.6/ I am convinced of the correctness of such a conclusion.

I find that the Utah abortion statute is so vague that men must guess at the meaning of the phrase "necessary to preserve her life" and differ as to its application--thus violating the due process clause of the Fourteenth Amendment.

---

6/ See State v. Dunklebarger, 206 Iowa 971, 221 N.W. 592, 596 (1928), and State v. Hatch, 138 Minn. 317, 164 N.W. 1017 (1917). In People v. Belous, supra, the court observed that "a definition requiring certainty of death would work an invalid abridgment of the woman's constitutional rights. The rights involved in the instant case are the woman's rights to life and to choose whether to bear children. The woman's right to life is involved because childbirth involves risks of death." 458 P.2d at 199.

Third, the majority states that plaintiff's argument concerning the delegation of authority to the physician does not apply to the statute in question. I have already stated the reasons for allowing plaintiff standing to challenge the entire abortion statute. Delegating to the physician the duty of determining plaintiff's right to an abortion places both physician and patient in a precarious situation. The physician is subject to imprisonment and the loss of his license to practice medicine if he violates the statute. As the California Supreme Court observed in People v. Belous, supra:

> "Rather than being impartial, the physician has a 'direct, personal, substantial, pecuniary interest in reaching a conclusion' that a woman should not have an abortion. The delegation of decision-making power to a directly involved individual violates the Fourteenth Amendment. (Tumey v. Ohio (1927), 273 U.S. 510, 523 . . . .)" 458 P. 2d at 206, 80 Cal. Rptr. at 366.

There are no penalties for refusal to perform an abortion, even if it is "necessary." Under the circumstances, "a woman whose life is at stake may be as effectively condemned to death as if the law flatly prohibited all abortions." Id.

Fourth, the majority rejects plaintiff's contention that the Utah abortion statute invades her right of privacy, i.e., her right to choose whether she will bear a child, as guaranteed by the Ninth and Fourteenth Amendments. I cannot agree. The majority erroneously adopts the reasoning of the court in Corkey v. Edwards, 322 F. Supp. 1248 (W.D.N.C. 1971). That court observed:

> "It seems to us the legislature may not unreasonably conclude that there is a sufficient public interest in protecting the embryo to permit limited statutory intrusion into what would otherwise be a protected zone of privacy." Id. at 1250 (emphasis added).

Thus, limited intrusion into the woman's right of privacy is to be tolerated. The North Carolina abortion statute considered in Corkey permits abortions when the physician can establish any of the following:

FER-154

> "There is substantial risk that continuance of the pregnancy would threaten the life or gravely impair the health of the said woman, or
> There is substantial risk that the child would be born with grave physical or mental defect, or
> The pregnancy resulted from rape or incest . . . ." Id. at 1249.

That is indeed a limited intrusion when contrasted with the Utah abortion statute requirement that the abortion must be "necessary to preserve" the woman's life. The Utah statute is not a limited but a very broad intrusion upon the plaintiff's right to privacy.

Further, the following summary of the majority's reasoning (based on Corkey, supra) discloses the error of their holding:

> "Given that the state may have some interest in this area, it follows that any right to privacy here is not unlimited. Continuing, the court in Corkey found that it is not unreasonable for the State to have an interest in the embryo or foetus. Accordingly, the court concluded that the weighing of competing interests in this area is properly a matter for the State legislature and its decision on this question would not be foreclosed by the federal courts." Majority opinion at 7. (Emphasis added.)

Granted, the right to privacy is not unlimited. It is not, however, sufficient to merely find some state interest. The crucial issue is whether the state has a compelling interest which may interfere with this right of privacy.[7/] In his concurring opinion in Griswold v. Connecticut, supra, Justice Goldberg remarks:

> "In a long series of cases this Court has held that where fundamental personal liberties are involved, they may not be abridged by the States simply on a showing that a regulatory statute has some rational relationship to the effectuation of a proper state purpose. 'Where there is a significant encroachment upon personal liberty, the State may prevail only upon showing a subordinating interest which is compelling,' Bates, v. Little Rock, 361 U.S. 516, 524. The law must be shown 'necessary, and

7/ People v. Belous, 458 P.2d at 200; Doe v. Scott, 321 F. Supp. at 1390; Babbitz v. McCann, 310 F. Supp. 293 (E.D. Wis.) appeal dismissed, 400 U.S. 1 (1970).

> not merely rationally related, to the accomplishment of a permissible state policy.' McLaughlin v. Florida, 379 U.S. 184, 196." Id. at 497.

The defect in the anti-contraceptive statute considered in Griswold was that it swept unnecessarily broadly and invaded the area of constitutionally protected freedoms. Id. at 485 (Justice Douglas' opinion for the Court). The flaw in the Utah abortion statute is that it, too, is overbroad since it invades the plaintiff's right of privacy with no showing of a compelling state interest.

The evaluation and weighing of interests is not simply a matter for the legislature. When constitutional rights are being invaded, as in this case, the court makes the determination of whether the statute is unconstitutionally overbroad. To simply find an interest in the embryo or fetus is not enough. The State must establish that the interest it seeks to protect is compelling enough to subordinate the right of the mother.[8/] After examining the interests in question, I concur with Chief Circuit Judge Swygert that:

> ". . . a statute which forces the birth of every fetus, no matter how defective or how intensely unwanted by its future parents, displays no legitimate compelling state interest in fetal life, especially when viewed with regard to the countervailing rights of pregnant women. We do not believe that the state has a compelling interest in preserving all fetal life which justifies the gross intrusion on a woman's privacy which is involved in forcing her to bear an unwanted child." Doe v. Scott, 321 F. Supp. at 1391.[9/]

The courts in Doe v. Bolton, supra, Roe v. Wade, supra, and People v. Belous, supra, have also reached the conclusion that

8/ Courts have described the right of privacy in relation to abortion as: "the fundamental right of the woman to choose whether to bear children," People v. Belous, 458 P.2d at 199; "the Ninth Amendment right to choose to have an abortion," Roe v. Wade, 314 F. Supp. at 1223; "a right to privacy broad enough to include the decision to abort a pregnancy," Doe v. Bolton, 319 F. Supp. at 1055; "a fundamental interest in choosing whether to terminate pregnancies," Doe v. Scott, 321 F. Supp. at 1390-1391; and "a woman's right to refuse to carry an embryo during the early months of pregnancy," Babbitz v. McCann, 310 F. Supp. at 301.

9/ See also Babbitt v. McCann, 310 F. Supp. at 301, Roe v. Wade, 314 F. Supp. at 1223, dissent of Justice Douglas in United States v. Vuitch, 39 U.S.L.W. at 4468.

abortion statutes with language similar to that of the Utah abortion statute invade constitutionally protected rights unnecessarily and are too sweeping to be justified as protecting the fetus or embryo. I am convinced of the correctness of that conclusion.

I would hold that the Utah abortion statute is unconstitutionally vague and an unnecessarily broad invasion of plaintiff's right of privacy. Declaratory and injunctive relief should be allowed. I therefore dissent from the majority's opinion.

Willis W. Ritter, Chief Judge
United States District Court.

# Dispelling the Myths of Abortion History

REVISED EDITION
*with New Introduction*

**Joseph W. Dellapenna**
Visiting Professor of Law
Peking University School of Transnational Law

CAROLINA ACADEMIC PRESS
Durham, North Carolina

FER-158

Copyright © 2023
Joseph W. Dellapenna
All Rights Reserved

Library of Congress Cataloging-in-Publication Data

Names: Dellapenna, Joseph W., author.
Title: Dispelling the myths of abortion history / Joseph W. Dellapenna.
Description: Revised edition. | Durham, North Carolina :
Carolina Academic Press, 2022. | Includes index.
Identifiers: LCCN 2022040172 (print) | LCCN 2022040173 (ebook) |
ISBN 9781531026752 (hardback) | ISBN 9781531026769 (ebook)
Subjects: LCSH: Abortion—Law and legislation—United States—
History. | Abortion—Law and legislation—Great Britain—History. |
Abortion—Social aspects.
Classification: LCC KF3771 .D45 2022 (print) | LCC KF3771 (ebook) |
DDC 342.7308/4—dc23/eng/20220924
LC record available at https://lccn.loc.gov/2022040172
LC ebook record available at https://lccn.loc.gov/2022040173

Carolina Academic Press
700 Kent Street
(919) 489-7486
www.cap-press.com

Printed in the United States of America

FER-159

Mohr sought to buttress his claim that self-serving competitive goals underlay the campaign to enact statutes prohibiting abortions by noting that the statutes relating to medical practice engendered protests by the "irregulars." Mohr focused on the mass rallies that resulted and indicated that the irregulars achieved some legislative success in modifying the restrictions on the practice of medicine enacted in New York in 1827,[327] but he did not notice that the irregulars, in their efforts to counter those restrictions, did not even attempt to modify or repeal the abortion statutes. Indeed, by phrasing his observation in terms of the date of the enactment of the medical practice statutes (1827), he might very well have misled readers who did not recall that the abortion statutes were enacted in December of 1828 (coming into effect in 1829).[328] Rather, Mohr argued, apparently without evidence other than his own intuition, that the public protests against restrictions on access to the profession of medicine caused the New York authorities to forbear enforcing the statutory prohibitions on abortion.[329]

Mohr inferred the lack of prosecution in New York from the absence of *reported* cases. Of course, he did not indicate that he had researched original trial court records to verify his inference, and he himself cited several unreported cases from other states at this time.[330] In other contexts, Mohr himself attributed the failure to enforce the new abortion statutes to the difficulty of proving the specific intent required under these early statutes rather than to official tolerance of the practice.[331] This brings us to perhaps the central point of the new orthodoxy of abortion history: Was abortion an accepted social practice in the nineteenth century?

## The Realities of Abortion in the Mid-Nineteenth Century

*I am toiling uphill against that heaviest of all argumentative weights—the weight of a slogan.*

—Charles Black[332]

We have, of course, no records that might enable us to reconstruct accurate measures of the frequency of abortion at any time in the nineteenth century, although we have plenty of information about how abortions were done then. The new orthodoxy of abortion history has it that abortion in the mid-nineteenth century was common throughout the United States, openly advertised and practiced, and not socially condemned except by a few religious fanatics—and by the self-serving allopathic physicians.[333] These claims are unreal, particularly early in the century when abortion techniques were crude, painful, and dangerous.

---

327. MOHR, *supra* note 29, at 39.
328. *See also* MOHR, *supra* note 78, at 88–89.
329. MOHR, *supra* note 29, at 39.
330. *Id.* at 275 n.55.
331. *Id.* at 26, 41–43, 138–40, 142, 144.
332. CHARLES BLACK, THE PEOPLE AND THE COURT 88 (1960).
333. *See, e.g.,* 1 BONNIE ANDERSON & JUDITH ZINSSER, A HISTORY OF THEIR OWN: WOMEN IN EUROPE FROM PREHISTORY TO THE PRESENT 137–38 (1988); BRODIE, *supra* note 220, at 33, 41–44, 224–25; BROOKES, *supra* note 220, at 1, 24; REBECCA CHALKER & CAROL DOWNER, A WOMAN'S BOOK OF CHOICES: ABORTION, MENSTRUAL EXTRACTION, RU 486, at 9 (1993); CELESTE MICHELLE CONDIT, DECODING ABORTION RHETORIC: COMMUNICATING SOCIAL CHANGE 77 n.29 (1990); D'EMILIO & FREEDMAN, *supra* note 233, at 63, 145–50; GINSBURG, *supra* note 138, at 23–24, 30; GORDON, *supra* note 75, at 28–29, 35–39, 52–54; HARRISON, *supra* note 233, at 238–44; OLWEN HUFTON, THE POOR IN EIGHTEENTH CENTURY FRANCE 331 (1974); JUDGES,

Statistics are sparse for any nineteenth century medical procedure. For a procedure like abortion, which was widely disapproved and unquestionably illegal throughout the nineteenth century, contemporary statistics do not exist. Furthermore, like the sex act itself, even the most personally revealing diaries from earlier times tell us little or nothing that is relevant about what was, after all, a crime. As one historian pointed out, "[i]t is easier to know what [a diarist] dreamed than to speak with confidence about his pelvic thrust."[334] Such details we will never know, and cannot expect to know, although this did not stop the *New York Times* from describing abortion as "The Evil of the Age" in 1871.[335]

Contrary to the new orthodoxy, there actually is little evidence (apart from an occasional criminal prosecution) to suggest that abortions even occurred in the middle of the nineteenth century in England, in America, or anywhere else, let alone that it was common.[336] Nor do we find records of abortions in the private diaries of midwives of the time.[337] This utter lack of records of abortions suggests that the practice either was not common or was sufficiently socially disapproved that anyone engaged in the practice wanted to keep it a secret. Most telling in clarifying which explanation is correct is the near total absence in the medical records of the time of treatments for incomplete septic abortions. Even Cyril Means was aware that no abortions of any kind are recorded in the records of the New York Hospital for the period 1808–1833.[338] The necessity of treatment of septic abortions only became common after 1880,[339] well after nearly all the nineteenth century legislative activity directed at abortion had occurred. Unless we are to suppose that some truly remarkable folk remedies were available in the early years of the century that somehow mysteriously were abandoned in favor of far more dangerous (and far less effective) techniques later in the century, the absence of evidence of incomplete or septic abortions is irrefutable proof that abortions of all kinds were in fact rare. Careful review of the indirect evidence for abortion does not contradict this conclusion.

Those who insist that abortion was a common practice by the middle of the nineteenth century, and even before, generally turn to two sorts of sources to support the claim. First, they turn to the advertisements of those who began, rather openly but almost always through eu-

---

*supra* note 155, at 32, 83–84, 96–97, 101; McLaren, *supra* note 233, at 34, 241; McLaren, *supra* note 35, at 5–7, 107, 111–12, 114; Mohr, *supra* note 29, at 11–14, 18, 25–40, 85–118, 128, 147–82; Connie Paige, The Right to Lifers: Who They Are; How They Operate; Where They Get Their Money 32–33 (1983); Petchesky, *supra* note 233, at 1–2, 28–30, 48–57, 70–71, 76–78; Petersen, *supra* note 38, at 1, 12; Deborah Rhode, Justice and Gender 202–05 (1989); Patrick Sheeran, Women, Society, the State, and Abortion: A Structuralist Analysis 49–51, 54, 58, 73, 75 (1987); Shorter, *supra* note 37, at 177–91; Smith-Rosenberg, *supra* note 71, at 217; Tribe, *supra* note 138, at 30–34; Jeffrey Weeks, Sex, Politics and Society 72 (1981); Catherine Whitney, Whose Life? A Balanced, Comprehensive View of Abortion from Its Historical Context to the Current Debate 39–44 (1991); *Casey Historians' Brief, supra* note 32, at 4–10; *Webster Historians' Brief, supra* note 32, at 170–77; Dayton, *supra* note 61, at 19–20, 23; Sheila Dickinson, *Abortion in Antiquity,* 6 Arethusa 159 (1973); Siegel, *supra* note 32, at 318 n.235; Étienne van de Walle, *Motivations and Technology and the Decline of French Fertility,* in Family and Sexuality in French History 135, 144–45 (Robert Wheaton & Tamara Hareven eds. 1980); Ray Bowen Ward, *The Use of the Bible in the Abortion Debate,* 13 St. L.U. Pub. L. Rev. 391, 392–93 (1993).

334. G.S. Rousseau & Roy Porter, *Introduction,* in Sexual Underworlds of the Enlightenment, *supra* note 251, at 1, 7. *See also* David Vincent, *Love and Death and the Nineteenth Century Working Class,* 5 Social Hist. 223 (1980).

335. August St. Clair, *The Evil of the Age,* N.Y. Times, Aug. 23, 1871, at 6. *See also* Martin Luther Holbrook, Parturition without Pain: A Code of Directions for Escaping from the Primal Curse 16 (1871) (describing abortion as a common "addiction").

336. *See* Chapter 1.

337. *See, e.g.,* Ulrich, *supra* note 27. See also the text *supra* at notes 27, 28.

338. Means II, *supra* note 29, at 384–85.

339. Shorter, *supra* note 37, at 191–96.

phemisms, to peddle purported abortifacients in the middle years of the century.[340] Second, they look to the assertions in the anti-abortion polemics that began to appear at about the same time.[341] Both sources do indeed report that abortions are alarmingly rampant and growing in number. Finally, they note the demographic transition (with the average white American woman having seven children in 1800 and only 3.5 children in 1900) as indirect evidence of the popularity of abortion.[342] Even James Mohr, however, has conceded that abortion could not have been the primary means by which this demographic transition took place.[343]

The public dissemination of information about abortion techniques and pervasive advertising of abortion services and abortifacients became common from the 1840s on.[344] Historians who support abortion rights also sometimes claim that nineteenth-century public schools, through instruction on anatomy and physiology, played a central role in popularizing abortion, without, however, providing any evidence of what those courses taught. They simply do not go beyond the highly general condemnations of committed opponents of any such education.[345] One wonders how future historians will evaluate contemporary sex education if they rely only on the attacks of its harshest critics.

These historians seldom provide better support for their reliance on the advertised products as proof of the growing availability of abortifacients. They seldom examine whether these advertised products would actually have worked as claimed. Mohr is particularly puzzling in this regard. After citing the advertisement of pills, nostrums, douches, and pessaries as proof that knowledge of how to do abortions was widespread, he expressly acknowledged that the items in these advertisements would not have been effective except through grave danger to the life or health of the mother.[346] As late as 1939, the Federal Trade Commission undertook to ban the advertisement or sale of "abortifacient preparations" because of the risk to women's health, including such standard herbal remedies as aloes, apiol, ergot, hellebore, and savin.[347]

The advertising itself also reveals that the practice of abortion was not socially acceptable. Invariably, the advertisements used euphemisms and often included (sometimes in bold type) warnings of the need for care in use to avoid inducing a miscarriage.[348] Even if we assume that these "warnings" were actually meant to convey the information that the product could induce an abortion, this practice hardly suggests that abortion had become a practice that was widely thought in society to be unobjectionable. Furthermore, the advertisements appear in what media historian Frank Mott described as the "lower class of story papers"—cheap periodicals designed for "*sub rosa* circulation to resorts of questionable character."[349] The better class of magazines mostly did not begin to carry any type of advertising until the later years of the nineteenth century.[350] Furthermore, much of this advertising literature appeared under pseudonyms or anonymously. And the advertisements frequently promised to send the product in a plain

340. *See, e.g.*, MOHR, *supra* note 29, at 50–52, 61.

341. *Id.* at 68–76, 149–52; SMITH-ROSENBERG, *supra* note 71, at 220–21.

342. MOHR, *supra* note 29, at 82–85.

343. *Id.* at 83.

344. D'EMILIO & FREEDMAN, *supra* note 233, at 63–64; MOHR, *supra* note 29, at 48–72; Michael La Sorte, *Nineteenth-Century Family Planning Practices,* 31 J. PSYCHOHIST. 163, 167–69 (1976).

345. MOHR, *supra* note 29, at 69–70.

346. *Id.* at 55–58, 61. *See also id.* at 9, 21–22, 71–73; BRODIE, *supra* note 220, at 224–27.

347. *The Action of the Federal Commission against Abortifacient Preparations,* 4 J. CONTRACEPTION 198 (1939). Curiously, Janet Brodie, in discussing this action, describes the ban as applying to "medicines designed to induce a delayed menstruation." BRODIE, *supra* note 220, at 226.

348. *See* BRODIE, *supra* note 220, at 225, 228–29; OLASKY, *supra* note 46, at 94–96.

349. 2 FRANK MOTT, HISTORY OF AMERICAN MAGAZINES, 1741–1850, at 185 (1930).

350. *See generally* BRODIE, *supra* note 220, at 191, 194–201, 227; 3 MOTT, *supra* note 350, at 9.

wrapper with no distinguishing external marks.[351] All of these steps suggest that what was being advertised was socially disapproved or fraudulent, something that had to be marketed surreptitiously. Reputable doctors, when describing what appeared to be abortion techniques, consistently declared that they were merely providing information on how to unblock the menses and that their suggestions should not be attempted if there was any reason to suspect pregnancy.[352] Mohr knew this, but buried it in a distant endnote or near the end of the chapter in which he identified the dissemination of information by reputable doctors as a factor in making abortions, in his view, popular and socially accepted.[353]

In place of hard evidence of the frequency of abortion, we are given enormously varied "guestimates."[354] Mohr cites different sources written by the same author but containing guestimates that vary wildly.[355] The evident lack of information did not prevent Mohr from guestimating that abortions amounted to as much as 20 percent of the number of live births,[356] although he did concede (in an endnote 225 pages from the guestimates he presents) that there is no hard evidence to support his claim.[357] Historian Carl Degler presented evidence of a sudden increase in abortions after 1820, conceding (unlike Mohr) that abortion was rare in the United States before then.[358] Degler noted the temporal correlation between this change in behavior and the decision to include abortion in the early criminal codes beginning in 1821, but he did not consider whether this supposed rise in frequency explained the sudden spate of legislative activity.

While abortion was a crime in many states by 1840, rates of prosecution probably do not indicate the true incidence of the crime. Rates of prosecution tell us more about general or official public attitudes than about actual personal behavior.[359] Consider that sodomy was a commonly prosecuted crime in seventeenth-century France and almost unknown in the courts of that country in the eighteenth century when literary representations of sodomy had become more common.[360] Also recall the changing rates of prosecution for witchcraft over the centuries. Yet we also know that infanticide prosecutions were still common in the United States in the years leading up to 1840—in contrast with the rarity of abortion prosecutions up to that time.[361]

At least four women were prosecuted for infanticide in South Carolina between 1794 and 1836,[362] and at least six women were convicted for infanticide under Pennsylvania's concealment

351. Brodie, *supra* note 220, at 232–33.

352. *See, e.g.*, Frederick Hollick, Diseases of Women, Their Causes and Cure Familiarly Explained; with Practical Hints for Their Prevention, and for the Preservation of Female Health; for Every Female's Private Use 149–53 (1849); George Gregory, Medical Morals, Illustrated with Plates and Extracts from Medical Works: Designed to Show the Pernicious Social and Moral Influence of the Present System of Medical Practice, and the Importance of Establishing Female Medical Colleges, and Educating Female Physicians for Their Own Sex 13–16 (1853); G. Lammert, *Volskmedizin und medizinischer Aberglaube in Bayern* 252 (1869); Storer, *supra* note 137, at 26, 41, 48. *See generally* 1 Anderson & Zinsser, *supra* note 334, at 29–30; Brookes, *supra* note 220, at 3; Shorter, *supra* note 37, at 180, 286–87. The practice is discussed at some length in Chapter 1, at notes 141–83.

353. Mohr, *supra* note 29, at 66, 68, 278 n.37. *See also id.* at 141–42.

354. *See, e.g.*, *id.* at 74–82; R. Sauer, *Attitudes to Abortion in America, 1800–1973*, 28 Pop. Studies 53, 54–55 (1974).

355. See the discussion of the estimates of Dr. Edwin Hale, discussed in Chapter 7, at notes 163–71.

356. *Id.* at 50. *See also* Gordon, *supra* note 75, at 45–53.

357. Mohr, *supra* note 29, at 275 n.12. *See also* Chapter 7, at notes 163–206.

358. Degler, *supra* note 234, at 228–29, 245–46.

359. *See* Théodore Tarczylo, *From Lascivious Erudition to the History of* Mentalités (George St. Andrews trans.), in Sexual Underworlds of the Enlightenment, *supra* note 251, at 26, 29–30.

360. *See* Maurice Lever, Les Bûchers de Sodome (1985).

361. Olasky, *supra* note 46, at 37–38.

362. Jack Kenny Williams, Vogues in Villainy: Crime and Retribution in Ante-Bellum South Carolina 54 (1959).

statute during the same era.[363] While five of these women were sentenced to prison, some 20,000 people turned out to watch the execution of Susanna Cox in Reading, Pennsylvania, on June 10, 1809, for infanticide.[364] We can only infer from the still common occurrence of infanticide and the still extraordinary dangers of abortion, coupled with the lack of actual records of abortions, that infanticide was still the rule and that, in 1840, abortion was still rare—albeit less rare than a century before. To support that inference, it is worth taking a closer look at the rate of mortality associated with abortion in America around 1840.

Given that criminal prosecutions are our only evidence that abortions were done in the early nineteenth century, we should not be surprised that this evidence usually shows that the woman involved nearly always died as a result.[365] Without the woman's death, the crime could too easily be concealed. These cases also illuminate the usual pattern of attempting (usually either fatally or unsuccessfully) to bring on the abortion by ingestion, and then (if the woman was still alive) proceeding to intrusion techniques without either antiseptics or anesthesia. The results always were painful and all too often were fatal. The progression is well illustrated by the testimony of the owner of a boarding house in the prosecution of Dr. Henry Chauncey for the murder of Eliza Sowers in 1839:

> [Chauncey] brought a girl to my house... At breakfast, next morning, Dr. Chauncey came in. He made me make some tea of a powder that looked like black pepper... At 2 o'clock the next morning, she called me. She said she was very bad. She said, "I won't take any more of that doctor's medicine; it will kill me." [Chauncey returned later that morning.] He did to her what doctors do to women when they are confined. He then washed his hands. He picked up something off the washstand, which shined and looked like a knitting needle, and wiped it... Said she was the most difficult person he had ever operated on. Said the medicine he gave her was too powerful, and had acted too quick.[366]

Notice that in this report the doctor, who may or may not have been an experienced abortionist, sought to excuse himself by stating that the potion given to the girl had been too strong. We cannot now determine whether he meant that this happened because his instructions on how to prepare the tea were wrong, or because the boardinghouse operator made a mistake in following the instructions, or because of the inherent variability of the herbs used in the tea.[367] Strong or not, the potion apparently was ineffective, and the doctor had to perform an intrusion abortion. Notice that he did not wash himself or his instruments until after he had performed the abortion. No wonder the girl sickened and died.

Cyril Means actually turns out to be one of the best sources on this question, and his conclusion supports the notion that abortion, even if it was becoming somewhat more common, was still highly dangerous and relatively rare around 1840. Means, who was intent on demonstrating that the abortion statutes of the nineteenth century were enacted to protect the health of the mother rather than the life of the child, made the dangerousness of the procedure the centerpiece of this thesis.[368] Means work in this regard is in some respects not particularly controver-

---

363. Sharon Ann Burnston, *Babies in the Well: An Underground Insight into Deviant Behavior in Eighteenth-Century Philadelphia*, 106 PA. MAG. HIST. & BIOGRAPHY, No. 2, at 151, 176–77 (April 1982).

364. OLASKY, *supra* note 46, at 37.

365. *See* Abrams v. Foshee, 3 Iowa 274 (1856); Smith v. State, 33 Me. 48 (1851); Commonwealth v. Parker, 50 Mass. (9 Met.) 263 (1845); Commonwealth v. Bangs, 9 Mass. 386 (1812); State v. Murphy, 27 N.J.L. 112 (1858); State v. Cooper, 22 N.J.L. 52 (1848); Lohman v. People, 1 N.Y. 379, 382–83 (1848); Mills v. Commonwealth, 13 Pa. 630, 632 (1850); State v. Howard, 32 Vt. 380 (1859). *See also* D'EMILIO & FREEDMAN, *supra* note 233, at 64; OLASKY, *supra* note 46, at 39–41.

366. As quoted in OLASKY, *supra* note 46, at 39–40.

367. *See* Chapter 1, at notes 363–91.

368. Means I, *supra* note 29. *See also* Means II, *supra* note 29, at 382–401.

FER-164

sial. Psychiatrist Jerome Kummer and lawyer Zad Leavy were the first to advance the argument that the nineteenth-century abortion statutes in England and America were adopted to protect the life and health of the mother.[369] Means' version of this proposition was accepted by the majority in *Roe v. Wade*,[370] and has been examined and accepted by some of his sharpest critics[371] as well as by his supporters.[372] On the other hand, supporters of freedom to abort, while accepting protection of maternal health as a legitimate purpose of the abortion statutes, have increasingly downplayed the factual importance of this purpose as they have found it necessary to claim that abortion historically was common and relatively safe.[373] Beverly Harrison is rare among abortion-right's supporters in conceding that "until recently any act of abortion *always endangered the life of the mother* every bit as much as it imperiled the prenatal life in her womb."[374]

The controversy over Means' work in this regard is not over his description of the dangers of abortion in the early nineteenth century; it is over his assertion that the protection of maternal health was the sole purpose for the nineteenth century statutes. Means' actual research to support his widely accepted thesis is characteristically thin. He wrote before any of the extensive recent efforts to recover the medical history of abortion, and he did not attempt to do so himself. He was content to infer that abortion was about as safe (or as dangerous) as most other surgery of the time[375]—a subject that had been studied.

Early in the nineteenth century, all surgical procedures were highly dangerous. Before analgesics, anesthesia, antiseptics, and antibiotics, surgery often merely served to open the body to infection, while the pain of surgery could (and often did) induce fatal shock. Means relied on the research of Dr. William Ober, a prominent physician of the 1960s and 1970s who had studied the records in the early surgery registry of the New York Hospital. Ober was also a noted activist in the abortion reform movement and one of the founders of the National Association for the Repeal of Abortion Laws (NARAL).[376] Based on the information provided by Ober, Means speculated that the death rate early in the nineteenth century from "major peripheral surgery" was 37.5 per cent, of which more than 80 per cent (causing deaths in 31.25 per cent of all surgeries)

369. Zad Leavy & Dr. Jerome Kummer, *Criminal Abortion: Human Hardship and Unyielding Laws,* 35 S. Cal. L. Rev. 123 (1962). Zad Leavy even presented this argument to a California court before Means seized upon it. David Garrow, Liberty and Sexuality: The Right of Privacy and the Making of *Roe v. Wade* 309–10 (2nd ed. 1998).

370. 410 U.S. 113, 141–42, 148–52, 156–62 (1973).

371. *See, e.g.,* Keown, *supra* note 38, at 35–38, 59–78; Dellapenna, *supra* note 187, at 393–95, 400–01, 406–7, 411–17; Shelley Gavigan, *The Criminal Sanction as It Relates to Human Reproduction: The Genesis of the Statutory Prohibition of Abortion,* 5 J. Legal Hist. 20, 36 (1984).

372. Mohr, *supra* note 29, at 25–30; Smith-Rosenberg, *supra* note 71, at 219–20; Tribe, *supra* note 138, at 29; David Walbert & J. Douglas Butler, Abortion, Society and the Law 327–28 (1973); *Amicus Brief of the United States supporting Appellants in* Webster v. Reproductive Health Services, at 16, reprinted in 5 Documentary History, *supra* note 32, at 25; Sarah Weddington, *Keynote Address: Reflections on the Twenty-Fifth Anniversary of* Roe v. Wade, 62 Alb. L. Rev. 811, 825 (1999).

373. *See, e.g., Casey Historians' Brief, supra* note 32, at 4–13; *Webster Historians' Brief, supra* note 32, at 173–77; D'Emilio & Freedman, *supra* note 233, at 145–50; Gordon, *supra* note 75, at 52–53; Mohr, *supra* note 29, at 25–40, 85–118, 128, 147–82, *particularly at* 29–31; Petchesky, *supra* note 233, at 49–55, 70–71, 77–78; Tribe, *supra* note 138, at 30–34; Siegel, *supra* note 77, at 318 n.235. Donald Judges seems to want to have it both ways. Judges, *supra* note 155, at 96–97, 101. *See also* Brookes, *supra* note 220, at 24.

374. Harrison, *supra* note 233, at 124, 167.

375. Means II, *supra* note 29, at 382–87, 391–92; Means I, *supra* note 29, at 418, 436–37, 511–13.

376. William Ober, *We Should Legalize Abortion,* Sat. Evening Post, Oct. 8, 1966, at 14. On his prominence in the abortion reform movement, see Garrow, *supra* note 370, at 308, 334, 346. After 1973, NARAL changed its name to the National Abortion Rights Action League, in 1993 it changed it to the National Abortion and Reproductive Rights Action League, and in 2002 it changed it again to NARAL Pro Choice America.

was the result of septic infection.[377] Whether abortion, had the procedure been lawful, would have produced similar rates can never be known for Ober, in searching the records of New York Hospital, found no abortions recorded for the period 1808–1833.[378]

Given the likelihood that a uterine infection would close the cervical canal, preventing drainage and the healing of the uterus, mortality from abortions—even if they had been legal—might well have been higher than from general surgery, although not higher than for any surgery for which proper dressing and draining would be difficult.[379] With added risks being introduced by the illegality of the practice, the death rate from abortions no doubt would have been higher still. In the mid-nineteenth century, at a time when probably one-third or more of the women who underwent abortions apparently would die, less than three per cent of mothers died in childbirth.[380] Reaching a conclusion based on this assumed general mortality rate for abortions, legal or illegal, Dr. Ober concluded that the risk of death from abortion was 10 to 15 times higher than the risk from childbirth, suggesting death rates from abortion in the range of 30 to 45 per cent.[381]

Several books not cited by Means or Ober, written in the mid-nineteenth century, support their conclusion regarding the mortality risks of abortions.[382] Modern research also supports their conclusions.[383] Childbirth, a riskier procedure then than now, was widely feared even by women who had experienced successful births.[384] These fears and risks are sometimes magnified in the modern imagination due in part, perhaps, to the penchant of novelists in the eighteenth and nineteenth centuries for disposing of unwanted characters through death in childbirth. A truer impression is created by the diary of Martha Ballard, a midwife active in Maine in the late eighteenth and early nineteenth century. Laurel Thatcher Ulrich's review of this detailed diary found that only 5.6 percent of over 800 births involved any complications at all, and that only five out of nearly 1,000 resulted in maternal death.[385]

One study did find that a century earlier about 30 percent of women died before age 45 in the Chesapeake Bay area. While many of these deaths might have resulted from increased morbidity due to childbearing, the number who actually died in childbirth was much lower.[386] Moreover, as malaria and similar diseases apparently played a major role in the increase of female morbidity in the Chesapeake area,[387] in places such as New York, where these diseases were rare, maternal morbidity probably was lower. This reality also suggests that

---

377. Means II, *supra* note 29, at 384–85.

378. *Id.*

379. *Id.* at 385.

380. *Id. See also* C.D. Haagenson & Wyntham Lloyd, A Hundred Years of Medicine 296–97 (1943) (reporting that one-third of women undergoing hysterectomies before 1870 died); Regina Morantz-Sanchez, Conduct Unbecoming a Woman: Medicine on Trial in Brooklyn 96 (1999) (34 percent of women undergoing ovarectomies at the hands of one prominent physician in 1858 died).

381. Means II, *supra* note 29, at 384–85.

382. *See, e.g.*, M.K. Hard, Woman's Medical Guide: Being a Complete Review of the Peculiarities of the Female Constitution and the Derangements to Which It Is Subject, with a Description of Simple Yet Certain Means for Their Cure 3–4, 34, 38, 90 (1848).

383. *See* Jerome Bates & Edward Zawadski, Criminal Abortion 85–87 (1964); Shorter, *supra* note 37, at 191–96; Dellapenna, *supra* note 187, at 394–95, 400–01. *See generally* Chapter 1.

384. *See generally* Judith Walzer Leavitt, Brought to Bed: Childbearing in America 1750–1950, at 20–35 (1986); Jan Lewis & Kenneth Lockridge, *"Sally Has Been Sick": Pregnancy and Family Limitation among Virginia Gentry Women, 1780–1830,* 22 J. Social Hist. 5, 6–9 (1988).

385. Ulrich, *supra* note 27, at 169–83.

386. *See generally* Allan Kulikoff, Tobacco and Slaves: The Development of Southern Culture in the Chesapeake, 1680–1800, at 63 (1986).

387. Darrett Rutman & Anita Rutman, *Of Agues and Fevers: Malaria in the Early Chesapeake,* 33 Wm. & Mary Q. 51 (3rd ser. 1976).

much of the maternal morbidity in the Chesapeake area was not a result of having given birth. Although the rates of maternal death in childbirth in England appear to have been as much as six times higher,[388] Dr. Charles White, an eighteenth century English physician, still could observe that a healthy young woman could give birth alone on the town common and probably do well.[389] Children did not fare quite as well as the mothers. Midwife Martha Ballard experienced 19 stillbirths (or deaths within an hour of birth) out of 814 deliveries.[390] Giving birth seems to have been far less risky to the mother than abortion; for the child, no discussion is necessary.

In comparing maternal deaths from childbirth to maternal deaths from abortion, one should note that Dr. Ober's estimates are only for deaths resulting directly from an abortion. If later morbidity were factored in, the deadly effects of abortion would have been much higher and thus still considerably higher than any reasonable calculation of the effects of childbirth. Given the rising social pressure on unmarried women to avoid illegitimate pregnancies in a time of virtually nonexistent contraceptives,[391] the proliferation of prostitution,[392] and the growing desire of married women to control their family size,[393] one can readily believe that significant numbers of women were prepared to undergo the risks attendant to abortion, especially when those risks began to decline later in the century. There is evidence from the later years of the nineteenth century for each of these factors as significant in the then rising incidence of abortion.[394] Only for prostitution do we have suggestions from the middle of the century that this might be linked to a rise in the rate of abortions.[395]

The abortion-prostitution link is particularly important to keep in mind because of modern assertions that abortion was not only legal in the middle of the nineteenth century, but that it

388. Ulrich, *supra* note 27, at 172–74; B.M. Willmott, *An Attempt to Estimate the True Rate of Maternal Mortality, Sixteenth to Eighteenth Centuries,* 26 Medical Hist. 79 (1982). *See also* Charles White, A Treatise on the Management of Pregnant and Lying-In Women 236–40 (1st Am. ed. 1793).

389. White, *supra* note 389, at 76. Martha Ballard, the Maine midwife of the same era, did express considerable anxiety over unattended births. Ulrich, *supra* note 27, at 170.

390. *See also* Laurel Thatcher Ulrich, *The Living Mother and a Living Child: Midwifery and Mortality in Eighteenth-Century New England,* 46 Wm. & Mary Q. 27 (1989).

391. Michael Gordon, The American Family: Past, Present, and Future 173 (1978); Peter Hoffer & N.E.H. Hull, Murdering Mothers: Infanticide in England and New England 1558–1803, at 55, 109 (1981); Mohr, *supra* note 29, at 17–19; Olasky, *supra* note 46, at 37–44; Robert Wells, Revolutions in Americans' Lives 353 (1982); *Casey Historians' Brief, supra* note 32, at 7–8; *Webster Historians' Brief, supra* note 32, at 171; Daniel Scott Smith & Michael Hindus, *Premarital Pregnancy in America, 1640–1971: An Overview and Interpretation,* 5 J. Interdisciplinary Hist. 537, 553–57 (1975). On the ineffectiveness of the contraceptives in use during the mid-nineteenth century, see Chapter 2.

392. *See generally* D'Emilio & Freedman, *supra* note 233, at 137; Olasky, *supra* note 46, at 44–59, 133–48; Tannahill, *supra* note 252, at 355–57.

393. *See* Hodge, *supra* note 278, at 6; E..M. Buckingham, *Criminal Abortion,* 10 Cin. Lancet & Observer 139 (1867); Gibbons, *supra* note 278, at 212; Smith, *supra* note 274, at 211. *See generally* Degler, *supra* note 234, at 244–46; Mohr, *supra* note 29, at 86–110; Olasky, *supra* note 46, at 61–82; Petchesky, *supra* note 233, at 49–57, 73–78; John Mack Farragher, *History From the Inside-Out: Writing the History of Women in Rural America,* 33 Am. Q. 536, 549 (1981); Daniel Scott Smith, *Family Limitation, Sexual Conduct, and Domestic Feminism in Victorian America,* 1 Feminist Stud. 40 (1973).

394. *Lack of safe and effective contraceptives:* John Cowan, The Science of a New Life 279 (1871); Elizabeth Edson Evans, The Abuse of Maternity 13 (1875); Mulheron, *supra* note 278, at 387. *The close link between the incidence of abortion and the needs of prostitutes:* Hays v. State, 40 Md. 633, 645 (1874); Cowan, *supra,* at 285; C.E. Rogers, Secret Sins of Society 76, 144 (1881); John Warren, jr., Thirty Years Battle with Crime, or the Crying Shame of New York as Seen Under the Broad Glare of an Old Detective's Lantern 37–38, 53 (1874); Mulheron, *supra,* at 387. *Desire to control family size:* Mulheron, *supra,* at 391; Smith, *supra* note 274, at 211.

395. Acton, *supra* note 183, at 206; John McDowell, First Annual Report of the New York Magdalen Society 23 (1831); William Sanger, The History of Prostitution 482, 586 (1859).

was not morally condemned "by the vast majority of Americans, provided it was accomplished before quickening."[396] Instead, a link of abortion and prostitution would have added to the unsavory reputation in which abortion and its practitioners were so manifestly clothed—a reputation that doctors could exploit successfully in seeking to suppress competition from midwives by stressing the link between the practice of midwifery and infanticide and abortion.[397] In 1874, we even find a court in Maryland, in a prosecution for an abortion committed in a brothel, commenting that a "house of ill-fame [was] most fitted for the perpetration of a crime like this."[398]

The attitudes of the nineteenth feminists are suggestive of the attitudes of mainstream women. The feminists of that time almost uniformly condemned prostitution and made various crusades against it a mainstay of their activities, often seeing this as necessary to achieve control over male sexuality.[399] Current feminist historians have tended to link the increasingly harsh criminal penalties for prostitution and the increasing legal activity directed against abortion, seeing both as attempts to control female sexuality—without bothering to explain why such control should have come to the fore in the nineteenth century.[400] They have missed completely the empirical link between abortion and prostitution as well as the causes of the increasing activity directed at abortion because of their blind insistence that the anti-abortion activity was without precedent before 1840 or (for some) later in the century.

Marvin Olasky has studied the link between abortion and prostitution in considerable detail.[401] He found that prostitution was a rare phenomenon in the American colonies before the middle of the eighteenth century,[402] while a century later one doctor was estimating that there were 60,000 prostitutes working nationwide.[403] During the recurring crusades for "social purity,"

---

396. Mohr, *supra* note 29, at 16.

397. Petersen, *supra* note 38, at 13. *See generally* Chapter 2, at notes 324–30.

398. Hays v. State, 40 Md. 633, 645 (1874). *See also* Olasky, *supra* note 46, at 49, 59.

399. *See, e.g.*, Ellen Battelle Dietrick, *Rescuing Fallen Women*, Women's J., May 27, 1893, at 162. *See generally* Barbara Berg, The Remembered Gate: Origins of American Feminism 181–84, 211 (1978); Ruth Bordin, Women and Temperance: The Quest for Power and Liberty, 1873–1900, at 110–11 (1981); D'Emilio & Freedman, *supra* note 233, at 140–45, 148–56, 202–15; Barbara Epstein, The Politics of Domesticity: Women, Evangelism, and Temperance in Nineteenth-Century America 125–28 (1981); Gordon, *supra* note 75, at 116–35; Grossberg, *supra* note 67, at 47–48; David Pivar, Purity Crusade: Sexual Morality and Social Control, 1868–1900 (1973); Mary Lyndon Shanley, Feminism, Marriage, and the Law in Victorian England, 1850–1895, at 79–86, 92–93 (1989); Smith-Rosenberg, *supra* note 71, at 109–28; Elizabeth Pleck, *Feminist Responses to "Crimes against Women," 1800–1896*, 8 Signs 459 (1983). *See also* Chapter 2, at notes 229–32.

400. *See, e.g.*, D'Emilio & Freedman, *supra* note 233, at 64; Mary Odem, *Fallen Women and Thieving Ladies: Historical Approaches to Women and Crime in the United States*, 17 Law & Soc. Inquiry 351, 352 (1992).

401. Olasky, *supra* note 46, at 44–59.

402. Olasky, *supra* note 46, at 44–45. *See also* Carl Bridenbaugh, Cities in the Wilderness: The First Century of Urban Life in America, 1625–1742, at 71–73 (1968); D'Emilio & Freedman, *supra* note 233, at 49–52; David Flaherty, Privacy in Colonial New England 160, 212 (1972); Lyle Koehler, A Search for Power: The "Weaker Sex" in Seventeenth-Century New England 208 (1980); Milton Rugoff, Prudery and Passion: Sexuality in Victorian America 252 (1971); Roger Thompson, Women in Stuart England and America 42 (1974).

403. Sanger, *supra* note 396, at 614. *See also* James McCabe, New York by Sunlight and by Gaslight 477–80 (1882); Hiram Knox Root, The Lover's Marriage Lighthouse 389 (1859). *See generally* Lois Banner, American Beauty 42, 75–76 (1983); Ann Butler, Daughters of Joy, Sisters of Misery: Prostitutes in the American West, 1865–1890 (1985); D'Emilio & Freedman, *supra* note 233, at 132–45; Marion Goldman, Gold Diggers and Silver Miners: Prostitution and Social Life on the Comstock Lode (1981); Julie Roy Jeffrey, Frontier Women: The Trans-Mississippi West, 1840–1880, at 121–24 (1979); Olasky, *supra* note 46, at 44–48; Mary Ryan, Womanhood in America: From Colonial Times to the Present 49 (2nd ed. 1979); Sanger, *supra;* Christine Stansell, City of Women: Sex and Class in New York, 1789–1860, at 181–88 (1986); Lucie Cheng Hirata, *Free, Indentured, Enslaved: Chinese Prostitution*

investigators found evidence that prostitutes had many pregnancies but few children.[404] Other observers, however, commented that infanticide was the common means of child limitation for prostitutes.[405] Given the absence of effective contraceptives, some resort to either abortion or infanticide might be necessary to explain why prostitutes had few children.[406] Still, many prostitutes would eventually be rendered sterile by the effects of gonorrhea and many other children (perhaps as many as 30 percent) would die before birth because of syphilis.[407] Another bit of evidence suggests a strong link between prostitution and abortion by mid-century. The best contemporary statistics show that fetal deaths in New York City rose from 1 in 376 pregnancies in 1805 to 1 in 13 in 1849.[408] These New York statistics probably reflect the particular prevalence of prostitution in that city, with 6,000 (10 percent) of the nation's estimated total prostitutes.[409]

While prostitutes might well have provided a secure market for the emerging professional abortionists of the time, the relative scarcity of prostitution before the nineteenth century is yet another reason to conclude that abortion was a rare phenomenon in those early times. A nineteenth century physician who treated a lot of prostitutes might easily conclude, as Dr. Edwin Hale did in 1860, that 90 per cent of such women had undergone abortions.[410] None of this would be representative of the millions of women who were not prostitutes. Furthermore, abortion no doubt contributed to the short life span (literally) of prostitutes. Prostitutes could expect to spend five years or less in the "trade" in the nineteenth century, with many prostitutes descending through disease and debilitation to an early grave.[411] Becoming a victim of murder also appears to have been a risk of a trade characterized by alcoholism, drugs, beatings, and abortion.[412]

Given the state of abortion technology in the early and middle nineteenth century, one might also readily agree, as Means argued,[413] that the abortion statutes enacted at that time might have been adopted as a paternalistic measure to protect women, increasingly tempted by the slow but

---

*in Nineteenth-Century America,* 5 SIGNS 3 (1979); Yuki Ichioka, *Ameyuki-San: Japanese Prostitutes in Nineteenth-Century America,* 4 AMERASIA J. 1 (1977); Richard Tansey, *Prostitution and Politics in Antebellum New Orleans,* 18 SOUTHERN STUD. 451 (1979).

404. MCDOWELL, *supra* note 182, at 23; ROGERS, *supra* note 395, at 76, 144; SANGER, *supra* note 396, at 482, 586; WARREN, *supra* note 395, at 37–38. *See also* OLASKY, *supra* note 46, at 48–49, 54–55.

405. ACTON, *supra* note 183, at 206; CHARLES ROBERT DRYSDALE, PROSTITUTION MEDICALLY CONSIDERED, WITH SOME OF ITS SOCIAL ASPECTS 10–11, 14 (1866) (finding infanticide prevalent along with prostitution). *See generally* OLASKY, *supra* note 46, at 49 n.31; RUTH ROSEN, THE LOST SISTERHOOD: PROSTITUTION IN AMERICA, 1900–1918, at 99 (1982) (estimating 20,000 prostitution-related abortions in New York City annually during the period she studied); JUDITH WALKOWITZ, PROSTITUTION AND VICTORIAN SOCIETY: WOMEN, CLASS AND THE STATE 19 (1980) (arguing that prostitution leads to disease, abortion, and infanticide).

406. *See* OLASKY, *supra* note 46, at 49–52, 55–59. *See generally* Chapter 2.

407. OLASKY, *supra* note 46, at 52–54.

408. HORATIO ROBINSON STORER & FRANKLIN FISKE HEARD, CRIMINAL ABORTION: ITS NATURE, ITS EVIDENCE AND ITS LAW 24 (1868) (reporting the studies of Dr. Elisha Harris, Registrar of Vital Statistics for New York City during 1840s). *See also* MOHR, *supra* note 29, at 50–52, 71–73, 76–83; OLASKY, *supra* note 46, at 77–78; SMITH-ROSENBERG, *supra* note 71, at 221.

409. SANGER, *supra* note 396, at 579–680. Sanger's rather precise figure might not be entirely accurate, but it probably reflects the general relationship of prostitution in New York to prostitution nationwide. *See also* OLASKY, *supra* note 46, at 133–34.

410. EDWIN HALE, ON THE HOMEOPATHIC TREATMENT OF ABORTION, ITS CAUSES AND CONSEQUENCES; WITH SOME SUGGESTIONS, AND INDICATIONS FOR THE USE OF THE NEW REMEDIES 5–15 (1860).

411. *See* MCCABE, *supra* note 406, at 479–80; CLIFFORD GRIFFITH ROE, THE GREAT WAR ON WHITE SLAVERY 15 (1911); C.E. ROGERS, SECRET SINS OF SOCIETY 76 (1881); SANGER, *supra* note 396, at 614. *See also* OLASKY, *supra* note 46, at 47, 58, 189.

412. *See, e.g.,* PATRICIA CLINE COHEN, THE MURDER OF HELEN JEWETT: THE LIFE AND DEATH OF A PROSTITUTE IN NINETEENTH-CENTURY NEW YORK (1998).

413. Means I, *supra* note 29, at 418, 453, 511–15; Means II, *supra* note 29, at 382–91.

steady improvements of abortion technology, from themselves. One might even be tempted to agree with Mohr that the emerging allopathic medical profession seized upon abortion as a useful weapon against its competitors, although hardly an important one given the rarity of the practice in the early and middle nineteenth century. Such conclusions, however, hardly suggest that legislatures could not also have had other purposes in mind in adopting those statutes. And the evidence is overwhelming that the protection of the life of the unborn child (as they termed it) was the primary purpose underlying these statutes.

making ante-quickening-foeticide individually penal. If, however, as has been argued, no such gap exists, it will be worth while for the courts of those States which have not legislated on the subject, to consider how far an exploded notion in physics is to be allowed to suspend the operation of a settled doctrine of the common law.

§ 1227. It is remarkable that both in Massachusetts and New Jersey, a leading English case on this point was not referred to, where in an investigation before a jury of matrons, Gurney, B., said, after taking medical counsel, "Quick with child, is having conceived; with *quick* child is when the child is quickened."[156] This view disposes of all the common law authorities against the indictability of the offence.

[Wharton concluded his discussion with a brief comment on certain points about framing an indictment and proving the elements of the crime.]

## Nineteenth Century Prosecutions of Abortion

*I still haven't found what I'm looking for.*

—U2[157]

Discussions such as those of Bishop and Wharton could hardly take the place of precedent or statute if the law relating to abortion was to be codified and clarified. By 1861, 70 percent of the American states (with 85 percent of the American population) had adopted statutes.[158] By 1895 abortion was clearly a serious crime in every state,[159] but this was hardly an innovation. The statutes settled the somewhat uncertain law of abortion, making clear that the crime related to every technique for abortion and at every stage of pregnancy, solemnly reaffirming social policy in the face of changing social behavior. But legislators and scholars provide a rather abstract form of law. The "living" law is what happens in actual courtrooms and in people's lives; it is to the living law that we now turn.

Prosecutions began to appear with some frequency in the judicial records after 1840, just as one might expect given the slow but steady rise in the incidence of abortion during the same period. Generally, however, these prosecutions resulted in acquittal or in conviction for lesser crimes such as attempted abortion.[160] Scholars and others—on both sides of the abortion controversy—have inferred from this pattern that jurists or jurors were tolerant of the crime.[161] Yet there were convictions for abortion, and not just for lesser crimes, sometimes involving well-es-

156. [Renumbered footnote in original] R. *v.* Wycherley, 8 C. & P. 265.

157. Paul Hewson (Bono of U2), *I Still Haven't Found What I'm Looking for* (1987).

158. Dellapenna, *supra* note 102, at 389.

159. See the statutes collected in Chapter 7, at notes at notes 9–15. *See generally* Dellapenna, *supra* note 102, at 389–407; Quay, *supra* note 33; James Witherspoon, *Reexamining* Roe: *Nineteenth-Century Abortion Statutes and the Fourteenth Amendment,* 17 St. Mary's L.J. 29, 34–36 (1985).

160. Gordon, *supra* note 29, at 57; Mohr, *supra* note 5, at 48–49, 120–22, 125, 136–38.

161. Robert Bell, Social Deviance: A Substantive Analysis 126 (1971); Brookes, *supra* note 37, at 27–29, 35–39; James Burtchaell, Rachel Weeping and Other Essays on Abortion 244 (1982); Davis, *supra* note 56, at 103; John D'Emilio & Estelle Freedman, Intimate Matters: A History of Sexuality in America 66 (1988); Marian Faux, *Roe v. Wade:* The Untold Story of the Landmark Supreme Court Decision that Made Abortion Legal 88 (1988); Paul Gebhard *et al.*, Pregnancy, Birth and Abortion 192 (1958); Grossberg, *supra* note 20, at 165–66, 181; Fowler Harper & Jerome Skolnick, Problems of the Family 184 (1962); Graber, *supra* note 72, at 45; Luker, *supra* note 46, at 53; Patricia Miller, The Worst of Times 132 (1993); Reagan, *supra* note 38, at 116; Schur, *supra* note 72, at 38; Smith-Rosenberg,

tablished allopathic physicians. Thus Dr. William Graves of Lowell, Massachusetts, was convicted in September 1837.[162] Historians of the new orthodoxy either ignore such convictions altogether or dismiss them as insignificant when compared to the general tendency not to convict.

Acquittals or dismissals do predominate among reported cases.[163] No one, thus far, has actually dug into the unpublished judicial archives to determine whether those cases for which a judge's opinion or similar document happened to be published in the nineteenth century are actually representative of what was happening in the larger number of cases for which no report was published. For example, in one case that Mohr relied on as demonstrating the purported social acceptance of abortion, the only published document is the defense summation.[164] Mohr didn't tell us what the outcome of the case was; apparently no one knows.

Assuming that the reported cases are representative, before making definite judgments about jury nullification, one would also like to know how conviction rates for abortion compared with conviction rates for other crimes by or against women, such as homicide, arson, rape, and so on, during the same era.[165] This was an era, after all, when even novelists were beginning to depict trials as generally hamstrung by formal rules of evidence[166]—a favorite theme of fiction ever since.[167] Mohr himself concluded (in a study not focused on abortion) that American juries were "legendarily reluctant to convict in [all] capital cases."[168] Nor should one overlook the punitive effects of police investigations or public disclosure even if no prosecution resulted.[169]

There are serious reasons for concluding that a low conviction rate for abortion in the nineteenth century is not evidence of social or legal tolerance for abortion. Consider, for example, a recent failure to indict a woman for causing the death of her two toddlers run over by a train

---

*supra* note 10, at 220; STORER, CRIMINAL ABORTION, *supra* note 35, at 44, 86, 97, 99; LAURENCE TRIBE, ABORTION: THE CLASH OF ABSOLUTES 35 (1990); WILLIAMS, *supra* note 56, at 206–07; Adelstein, *supra* note 72, at 85; Samuel Buell, Note, *Criminal Abortion Revisited,* 66 N.Y.U. L. REV. 1774, 1795, 1828 (1991); Robert Byrn, *An American Tragedy: The Supreme Court on Abortion,* 41 FORDHAM L. REV. 807, 817–19 (1973); T.R. Forbes, *Early Forensic Medicine in England: The Angus Murder Trial,* 36 J. HIST. MED. 296, 303–05 (1981); Shelley Gavigan, *The Criminal Sanction as It Relates to Human Reproduction: The Genesis of the Statutory Prohibition of Abortion,* 5 J. LEGAL HIST. 20, 20 (1984); Thomas Harris, Note, *A Functional Study of Existing Abortion Laws,* 35 COLUM. L. REV. 87, 90–91 (1935); Michael La Sorte, *Nineteenth-Century Family Planning Practices,* 31 J. PSYCHOHIST. 163, 167–69 (1976); James Mohr, *Patterns of Abortion and the Response of American Physicians, 1790–1930,* in WOMEN AND HEALTH IN AMERICA: HISTORICAL READINGS 117, 120 (Judith Leavitt ed. 1984); Marvin Moore, *Antiquated Abortion Laws,* 20 WASH. & LEE L. REV. 250, 252 (1963); James Ridgeway, *One Million Abortions: Its Your Problem, Sweetheart,* THE NEW REP., Feb. 9, 1963, at 14; Harold Rosen, *The Psychiatric Indications of Abortion: A Case Study in Hypocrisy,* in THERAPEUTIC ABORTION at 72, 92 (Harold Rosen ed. 1954) (this book was reissued in 1967 under the title ABORTION IN AMERICA); James Voyles, *Changing Abortion Laws in the United States,* 7 J. FAM. L. 496, 500 (1967); Witherspoon, *supra* note 158, at 31–32, 56–58; Howard Ziff, *Recent Abortion Law Reforms,* 60 J. CRIM. L. & CRIMINOLOGY 3, 8 (1969). *See also* Constance Backhouse, *Involuntary Motherhood: Abortion, Birth Control and the Law in Nineteenth Century Canada,* 3 WINDSOR Y.B. OF ACCESS TO JUSTICE 61, 82–110 (1983).

162. The transcript is quoted at length in GORDON, *supra* note 29, at 55–56.

163. *See, e.g.,* Horatio Robinsion Storer, *Contributions to Obstetric Jurisprudence—Criminal Abortion III: Its Obstacles to Conviction,* 3 N. AM. MEDICO-CHIRURIGICAL REV. 833, 834 (1859) (lamenting that none of the 32 prosecutions for abortion in Massachusetts of which he knew had resulted in conviction).

164. MOHR, *supra* note 5, at 310 nn.19, 20.

165. Compare the conviction patterns for infanticide in England in the sixteenth and seventeenth centuries with those of other serious crimes. *See* Chapter 2, at notes 366–411.

166. *See, e.g.,* J.F. COOPER, THE WAYS OF THE HOUR 469 (1850).

167. *See* Allen Boyer, *Formalism, Realism, and Naturalism: Cross-Currents in American Letters and Law,* 23 CONN. L. REV. 669 (1991).

168. MOHR, *supra* note 76, at 126, 230, 237.

169. REAGAN, *supra* note 38, at 116–17.

after the mother showed traces of drugs in her blood but the prosecution had no means for proving when the drugs had been taken or how the drugs might have affected the mother's behavior at the time of the deaths.[170] Does this failure to indict indicate official tolerance for infanticide? Or could it merely indicate an unwillingness to spend resources on a trial when the prosecution recognized that it could not prove its case?

Criminal abortion by its nature is a highly private activity in which all persons who are capable of speaking are voluntarily (more or less) involved in the crime. This makes abortion an extremely difficult crime to detect and prove.[171] Abortion (and even the fact of pregnancy) was virtually impossible to prove by medical examination in the nineteenth century, unless the abortion seriously injured or killed the mother, and even then it would be difficult to prove.[172] Remember that there simply was no reliable clinical test for pregnancy until 1927.[173] Francis Wharton and Moreton Stillé identified these serious impediments to conviction in 1855:

> The signs of abortion, as obtained by an *examination of the female,* are not very certain in their character. It is seldom, indeed, that an examination of the living female is had, and especially at a period early enough to afford any valuable indications. When abortion occurs in the early months, it leaves but slight and evanescent traces behind it.[174]

A Chicago coroner, John Traeger, noted the problems in 1905 in these terms:

> Notwithstanding the prevalence of the crime there are few accusations or indictments for inducing abortion unless the death of the mother results when of course the indictment is for murder. In the few cases of indictment for producing abortion the action was brought because of the serious injury to the mother. Ordinarily it is very difficult to get satisfactory evidence against a professional abortionist. The relatives or others interested in the case are generally very anxious to prevent any publicity for obvious reasons and even in case of the death of the mother it is frequently impossible to get any member of the family to take action in the matter. Outside parties cannot be expected to interest themselves with such matters which can concern them only in a very indirect way and which would bring them only great annoyance and perhaps place them in a very embarrassing position. This difficulty of securing evidence and initiating an accusation is the reason why the abortion law is so much of a dead letter.[175]

Traeger was not the only person to note that when a woman died, her family might very well prove reluctant to publicize her "disgrace."[176] As attorney Robert Taylor summed the matter up in 1896,

---

170. *Girls' Mother Released in Train Deaths,* PHILA. INQUIRER, Nov. 8, 1997, at A28.

171. *See, e.g.,* Slattery v. People, 76 Ill. 217 (1875); Rhodes v. State, 27 N.E. 866, 867 (Ind. 1891); Commonwealth v. Leach, 30 N.E. 163, 164 (Mass. 1892); People v. Sessions, 26 N.W. 291, 298 (Mich. 1886); People v. Van Zile, 73 Hun. 534 (N.Y. Sup. Ct. 1893); Commonwealth v. W., 3 Pitts. R. 463 (Pa. C.P. 1871). *See generally* BROOKES, *supra* note 37, at 26–29, 34, 37; MOHR, *supra* note 5, at 26, 41–43, 72–73, 124, 138–40, 142, 144; STORER, WHY NOT?, *supra* note 35, at 51–52; FREDERICK TAUSSIG, ABORTION: SPONTANEOUS AND INDUCED 438 (1936); WILLIAMS, *supra* note 56, at 207; D.V Glass, *The Effectiveness of Abortion Legislation in Six Countries,* 2 MOD. L. REV. 97 (Pt.1), 227 (Pt. II) (1938).

172. *See, e.g.,* HORATIO ROBINSON STORER, HENRY INGERSOLL BOWDITCH, & CALVIN ELLIS, SUFFOLK DISTRICT MEDICAL SOCIETY, REPORT OF THE COMMITTEE ON CRIMINAL ABORTION (1857); C.S. Bacon, *The Duty of the Medical Profession in Relation to Criminal Abortion,* 7 ILL. MED. J. 18, 21 (Jan. 1905); John Traeger, *Criminal Abortion as It Comes before the Coroner's Office,* 7 ILL. MED. J. 35 (Jan. 1905). *See generally* GROSSBERG, *supra* note 20, at 183; MOHR, *supra* note 5, at 72; RICKIE SOLINGER, THE ABORTIONIST: A WOMAN AGAINST THE LAW 13–14 (paperback ed. 1996). On the difficulties of proving pregnancy, see Chapter 1, at notes 145–51.

173. THOMAS EDEN & EARDLEY HOLLAND, A MANUAL OF MIDWIFERY 77–78 (7th ed. 1931)

174. FRANCIS WHARTON & MORETON STILLÉ, TREATISE ON MEDICAL JURISPRUDENCE 277 (1855).

175. Traeger, *supra* note 172, at 35. *See also* St. Clair, *supra* note 32.

176. REAGAN, *supra* note 38, at 119, 125–28, 130; Bacon, *supra* note 172, at 21.

> Every person involved in the affair...is, for her own sake, pledged to secrecy.... The explanation of the small number of convictions...lies in the secrecy with which this crime in its very nature is committed, and in the fact that such proofs as are attainable rarely do more than cast a strong suspicion of guilt upon the person charged with the offense.[177]

Finally, if abortion were a crime only after quickening, it would be virtually impossible to prove if the mother died for she alone could give evidence regarding whether she had perceived the fetus moving.[178] Those who suggest that how rare it was to obtain a conviction for abortion demonstrates a high degree of social tolerance for the practice simply overlook these difficulties in obtaining a conviction.[179] Given the difficulties involved, what is truly impressive about the reported cases is how persistent lawyers were in searching out and prosecuting the crime, and how creative judges were in overcoming obstacles to proving the crime.

Prosecutors never abandoned attempts to enforce abortion laws.[180] Many, but not all, of the resulting prosecutions did involve the death or serious injury of the mother. The reported cases from New York illustrate the pattern.[181] Similarly, 37 of 43 abortion cases that reached the Supreme Court of Illinois between 1870 and 1940 involved a woman's death.[182] By the end of the nineteenth century, dying declarations became a central piece of evidence in many prosecutions for abortion, with coroner's inquests providing much of the rest of the evidence needed to convict abortionists.[183] Dr. Leonard Parry, who wrote extensively about abortion early in the twentieth century, concluded that abortions could seldom be prosecuted except if the mother died.[184]

If a conviction were to be obtained without the woman's death, it was imperative to obtain the testimony of the woman who had undergone the abortion. This reality explains the struggles over whether the woman was an accomplice to the crime, and the practice in those states where she was an accomplice of granting her immunity from prosecution.[185] Even so, she was not likely to testify against her abortionist without a change of heart about the abortion (or perhaps a new-found willingness to defy those who might have pressured her into having an abortion she had not wanted).[186] Even if a woman complained to authorities about an abortion, she might not be willing to testify at a trial for any number of reasons. As her word was often the only real

---

177. Robert Taylor, *Why Do Abortions Go Unpunished?*, 9 AM. MEDICO-SURGICAL BULL. 453, 453–54 (1896).

178. WILLIAMS, *supra* note 56, at 158–59.

179. See the authorities collected *supra* at note 161.

180. *See generally* D'EMILIO & FREEDMAN, *supra* note 51, at 66; GROSSBERG, *supra* note 53, at 166–69; REAGAN, *supra* note 54, at 116–18.

181. People v. Van Zile, 38 N.E. 380 (N.Y. 1894); People v. McGonegal, 32 N.E. 616 (N.Y. 1892); People v. Davis, 56 N.Y. 95 (1874); Weed v. People, 56 N.Y. 628 (1874); Lohman v. People, 1 N.Y. 379 (1848) (injury); People v. Flaherty, 218 N.Y.S. 148 (App. Div. 1926); Bradford v. People, 20 Hun. 309 (N.Y. Sup. Ct. 1880); People v. Restell, 3 Hill 289 (N.Y. Sup. Ct. 1842). *See also* Larocque v. Conheim, 87 N.Y.S. 625 (N.Y. Sup. Ct. 1904); OLASKY, *supra* note 12, at 154–57, 168.

182. REAGAN, *supra* note 38, at 116.

183. *Id.*, at 113–31; Backhouse, *supra* note 161, at 99–103; William Durfor English, *Evidence—Dying Declaration—Preliminary Questions of Fact—Degree of Proof*, 15 B.U. L. REV. 380, 381–82 (1935). The Supreme Court of Illinois commented on dying declarations in about one-third of the appeals of convictions for abortion-related deaths between 1870 and 1940. REAGAN, *supra*, at 297 n.6 *See also* Chapter 11, at notes 391–99.

184. L.A. PARRY, CRIMINAL ABORTION 41 (1932). *See also* Wilhelm Becker, *The Medical, Ethical, and Forensic Aspects of Fatal Criminal Abortion*, 7 WIS. MED. J. 619, 633 (1909); H.H. Hawkins, *The Colorado Law on Abortion*, 40 JAMA 1096, 1099 (1903). *See generally* MOHR, *supra* note 76, at 121; McLaren, *supra* note 38, at 334–37.

185. *See* Chapter 6, at notes 293–319.

186. *See* JEROME BATES & EDWARD ZAWADSKI, CRIMINAL ABORTION 10 (1964); DAVIS, *supra* note 56, at 51; GRABER, *supra* note 72, at 44–45; EVA RUBIN, ABORTION, POLITICS, AND THE COURTS 87 (rev. ed. 1987); Buell, *supra* note 162, at 1789–90; Moore, *supra* note 162, at 252.

FER-174

evidence, the prosecution's case would collapse. Thus, in *State v. Quinn,*[187] Rose Haughey initially complained to authorities that George Quinn had attempted to abort her but then refused to testify against him at trial. The resulted was an acquittal.

The necessary change of heart leading a woman to testify against an abortionist was most likely if the woman was dying or seriously injured. Many courts created an exception to the hearsay rule in order to admit the dying declarations of women who had had the abortion as evidence against the abortionist.[188] From the beginning, doctors played a central role in obtaining dying declarations, a task that by the middle of the twentieth century some doctors found demeaning or demoralizing.[189] Injury, however, was not an indispensable precursor to prosecution. In fact, in most cases prosecuted in New York and Philadelphia, the mother was not seriously injured as far as one can determine from the reports of the cases.[190] In several cases, there was not even an abortion because the at tempt failed,[191] or because the mother declined to ingest the recommended drug,[192] or even because the woman was not pregnant.[193] (The crime was likely to be only a misdemeanor if there was no pregnancy.)[194]

Nor was prosecutorial zeal a reaction to criticism or pressure from the allopaths. New York prosecutors denounced abortion in the strongest terms at least from the 1840s onward, giving the lie to those who claim that abortion was socially, morally, and legally accepted prior to the American Medical Association's anti-abortion campaign of the later 1850s. The more persistent professional abortionists, if they escaped conviction or were convicted of minor infractions early in their careers, faced repeated police investigations and prosecutions until the law achieved its purpose. In the nineteenth century, the most prominent abortionists, whose activities pro-abortion historians claim demonstrate a lack of public disapproval of their practice, ended up in jail. Philadelphia's Dr. Isaac Hathaway was sentenced to seven years at hard labor years in 1883—

---

187. 45 A. 544 (Del. 1899).

188. *See, e.g.,* Montgomery v. State, 80 Ind. 338 (1881); State v. Baldwin, 45 N.W. 297 (Iowa 1890); Smith v. State, 33 Me. 48 (Me. 1851); People v. Olmstead, 30 Mich. 431 (1874); State v. Pearce, 57 N.W. 652 (Minn. 1894); People v. Davis, 56 N.Y. 95 (1874); State v. Harper, 35 Ohio St. 78 (1878); Commonwealth v. Keene, 7 Pa. Super. 293 (1898); State v. Dickinson, 41 Wis. 299 (1877). *See also* State v. Carey, 56 A. 632 (Conn. 1904); Commonwealth v. Brown, 121 Mass. 69 (1876); Frazer v. People, 1 Cowen's Crim. 377 (N.Y. Sup. Ct. 1863). *See generally* Chapter 11, at notes 391–98.

189. *See generally* REAGAN, *supra* note 38, at 115–16, 120–24.

190. People v. Blank, 29 N.E.2d 73 (N.Y. 1940); People v. Murphy, 101 N.Y. 126 (1886); People v. Vedder, 98 N.Y. 630 (1885); Evans v. People, 49 N.Y. 86 (1872); Crichton v. People, 1 Cowen's Crim. 454 (N.Y. 1864); People v. Hager, 168 N.Y.S. 182 (App. Div. 1917); People v. Lovell, 242 N.Y.S.2d 958 (Sup. Ct. 1963); People v. Candib, 129 N.Y.S.2d 176 (N.Y. Sup. Ct. 1954); Cobel v. People, 5 Park. Crim. 348 (N.Y. Sup. Ct. 1862); People v. Stockham, 1 Park. Crim. 424 (N.Y. Sup. Ct. 1853); People v. Costello, 1 Denio 83 (N.Y. Sup. Ct. 1845). *See generally* ROGER LANE, VIOLENT DEATH IN THE CITY: SUICIDE, ACCIDENT, AND MURDER IN NINETEENTH CENTURY PHILADELPHIA 93 (1979).

191. Dunn v. People, 29 N.Y. 523 (1864); Frazer v. People, 1 Cowen's Crim. 377 (N.Y. Sup. Ct. 1863). *See also* State v. Reed, 45 Ark. 333 (1885); Dougherty v. People, 1 Colo. 514 (1872); State v. Magnell, 51 A. 606 (Del. 1901); State v. Montgomery, 33 N.W. 143 (Iowa 1887); State v. Fitzgerald, 49 Iowa 260 (1878); Bassett v. State, 41 Iowa 303 (1872); State v. Watson, 1 Kan. 770 (Kan. 1883); Commonwealth v. Morrison, 82 Mass. (16 Gray) 224 (1860); State v. Baldwin, 45 N.W. 297 (Iowa 1890); State v. Owens, 22 Minn. 238 (1875); State v. Van Houten, 37 Mo. 357 (1866); State v. Dean, 85 Mo. App. 473 (1900); State v. Cave, 26 S.W. 503 (Tex. Ct. Crim. App. 1894).

192. People v. Phelps, 30 N.E. 1012 (N.Y. 1892).

193. People v. Axelsen, 119 N.E. 708 (N.Y. 1918). *See* Witherspoon, *supra* note 158, at 57–58. *See also* Rex v. Anonymous, 170 ENG. REP. 1310 (1811); People v. Cummings, 296 P.2d 610 (Cal. Ct. App. 1956); Commonwealth v. Surley, 42 N.E. 502 (Mass. 1895); Commonwealth v. Tibbetts, 32 N.E. 910 (Mass. 1893); Commonwealth v. Follansbee, 29 N.E. 471 (Mass. 1892).

194. Smith v. State, 33 Me. 48, 55 (1851); People v. Abbott, 74 N.W. 529, 530 (Mich. 1898); State v. Emerich, 87 Mo. 110, 116 (1885); State v. Dickenson, 41 Wis. 299, 309–10 (1877).

when he was 83 years old.[195] New York City's Dr. Henry McGonegal was sentenced in 1892 to 14 years after a patient died.[196] If McGonegal's acquittal 30 years earlier is supposed to demonstrate that jury nullification protected abortionists, does his later conviction demonstrates the opposite? Means, who highlighted McGonegal's acquittal,[197] never mentioned the evidence of a strong desire to "get" the abortionist. Nor did he comment on what McGonegal's ultimate conviction might tell us about either popular or official attitudes.

The career of the notorious "Madame Restell" illustrates both the determination of prosecutors to bring abortionists to justice and the difficulties prosecutors had to overcome in order to accomplish the task. Ann Lohman, who operated under the pseudonym of "Madame Restell," was the most notorious professional abortionist in the United States during much of the nineteenth century.[198] She advertised openly and aggressively various abortifacient potions for sale—consistently using euphemisms for the effects to be achieved by her products.[199] We have already examined the fraudulent nature of this advertising in reviewing the career of her husband, Charles Lohman, a printer who operated under the pseudonym "Dr. A.M. Mauriceau."[200] Like her husband, she also falsely claimed a medical education in Europe.[201] Restell (Lohman) even had the temerity to charge her competitors with falsely advertising ineffective "counterfeit pills" under a fraudulent claim of false medical credentials![202]

Pro-abortion historians like to extol Madame Restell as a model of a woman providing a much needed service for women and as demonstrating the openness of abortion practice in the mid-nineteenth century.[203] Historian Linda Gordon, who found Restell's husband to be a paradigm of male exploitation of gullible women through the fraudulent sales of fake abortifacients,[204] failed utterly to make any connection between his practices those Madame Restell. Nor do the feminists extolling her virtues attend to the evidence that she frequently blackmailed her patients, asking them for "loans" under threat of disclosure, sometimes doing so years after the event, all fully understanding that the loan would never be repaid.[205]

Despite the claim that Ann Lohman—Madame Restell—was tolerated by society and by the police, she was prosecuted repeatedly, beginning in 1842.[206] A public demonstration in front of her house in February, 1846, drew as many as a thousand persons (quite a crowd for the time) to

---

195. Olasky, *supra* note 12, at 170; Olasky, *supra* note 8, at 34–35, 39.

196. People v. McGonegal, 32 N.E. 616 (N.Y. 1892). *See also* Olasky, *supra* note 12, at 170–71; Olasky, *supra* note 8, at 46.

197. Means I, *supra* note 54, at 457–58

198. *See* Brodie, *supra* note 56, at 229–31; Gordon, *supra* note 29, at 54–58; Grossberg, *supra* note 20, at 167; Alan Keller, Scandalous Lady: The Life and Times of Madame Restell, New York's Most Famous Abortionist (1981); Milbauer & Obrentz, *supra* note 46, at 138–42; Mohr, *supra* note 5, at 48–53, 88–89, 94, 96, 125–28, 182, 199; Olasky, *supra* note 12, at 150–52, 158–61; Olasky, *supra* note 8, at 4–13. Indeed, Restell's notoriety was such that her prominence as a "female physician" tarnished the opportunities for more legitimate women doctors. *See* Virginia Drachman, Hospital with a Heart: Women Doctors and the Paradox of Separatism at the New England Hospital, 1862–1969, at 34 (1984).

199. *See particularly* Olasky, *supra* note 8, at 4–8, 14–16.

200. *See* Chapter 6, at notes 242–44, and Chapter 7, at notes 140–49. Some argue that the false "Mauriecau" was her brother rather than her husband.

201. Olasky, *supra* note 8, at 8.

202. *Id.* at 15–16.

203. Brodie, *supra* note 56, at 229; Gordon, *supra* note 29, at 64; Grossberg, *supra* note 20, at 167; Keller, *supra* note 198, at 28; Milbauer & Obrentz, *supra* note 46, at 138–39; Mohr, *supra* note 5, at 48–49.

204. Gordon, *supra* note 29, at 165.

205. Olasky, *supra* note 12, at 159, quoting Edward Martin, The Secrets of the Great City 430 (1868). "Edward Martin" apparently was a pseudonym for journalist James McCabe. *See* Olasky, *supra*, at 159 n.57.

206. People v. Restell, 3 Hill 289 (N.Y. Sup. Ct. 1842).

FER-176

protest Restell (Lohman) as a "wholesale female strangler."[207] Subsequently arrested, a prosecuting attorney at the trial in 1847 described her as "one who disgraces her sex, forgetting that she is a mother, disregarding at once divine providence and human laws, who has amassed a fortune in the daily perpetuation of a crime which violates and annuls one of the most sacred ordinances of Almighty God."[208] The prosecutor also was able to find, at last, a patient who had survived the procedure and was willing to describe graphically the horror of an intrusive abortion without anesthesia.[209] Although Restell was only convicted of a misdemeanor, she was sentenced to one year in prison—the maximum penalty.[210] Restell did not suffer over much, however, being allowed to bring her own feather bed to the prison, as well as easy chairs, a rocker, and carpeting. She was even allowed conjugal visits by her husband (unusual for the time).[211]

The language of the prosecutor and unwillingness of the Court of Appeals to consider evidence of jury tampering[212] hardly suggests a legal profession, or a society, that condoned her activities. This experience apparently did not deter her, as we find her back in court in 1848, shortly after leaving prison.[213] First, the *National Police Gazette* and later the *New York Times* launched press crusades against abortion generally, and against Madame Restell in particular.[214] For 35 years, Lohman/Restell apparently was willing to accept social opprobrium and frequent prosecutions as part of the cost of doing business.[215] When she was arrested and prosecuted by Anthony Comstock in 1878, however, she faced the possibility, given that she was 65 years old, of spending the rest of her life in prison. Rather than rely on the "jury nullification" that modern historians insist was routine in abortion prosecutions, she committed suicide in her ornate New York mansion the night before her trial was to begin.[216]

Courts as well as prosecutors took an increasingly dim view of abortion as its incidence increased. Courts upheld convictions under the abortion statutes when the attempt failed or when the woman was not even pregnant.[217] Courts also relaxed the rules of evidence in abortion cases, upholding convictions when the prosecution could not prove which drug was used for the abortion.[218] In other cases, courts approved the introduction of business cards and advertisements as

207. Olasky, *supra* note 12, at 151; Olasky, *supra* note 8, at 11.

208. Quoted in Grossberg, *supra* note 20, at 167.

209. Olasky, *supra* note 12, at 151; Olasky, *supra* note 8, at 11.

210. Brodie, *supra* note 56, at 230; Olasky, *supra* note 12, at 151; Olasky, *supra* note 8, at 11.

211. Olasky, *supra* note 12, at 151.

212. Grossberg, *supra* note 20, at 167.

213. Lohman v. People, 1 N.Y. 379 (1848).

214. Olasky, *supra* note 12, at 150–72; Olasky, *supra* note 8, at 10–11, 19, 22–47, 51–59, 62–66.

215. *See* Olasky, *supra* note 54, at 11–12, 32.

216. *See* Broun & Leech, *supra* note 71, at 156–57; Anthony Comstock, Traps for the Young 137 (1882); Grossberg, *supra* note 20, at 190, 192; Milbauer & Obrentz, *supra* note 46, at 140–42; Mohr, *supra* note 5, at 199; Olasky, *supra* note 12, at 161; Olasky, *supra* note 8, at 32–33; Carol Flora Brooks, *The Early History of the Anti-Contraception Laws,* 18 Am. Q. 3, 4–5 (1966); Means II, *supra* note 106, at 455–56 n.102; James Morton, jr., *A Little Chapter of the Early History of Anti-Contraception Laws,* 20 Med. Critic & Guide 258 (1917).

217. Dougherty v. People, 1 Colo. 514 (1872); State v. Magnell, 51 A. 606 (Del. 1901); State v. Montgomery, 33 N.W. 143 (Iowa 1887); State v. Fitzgerald, 49 Iowa 260 (1878); Bassett v. State, 41 Iowa 303 (1872); State v. Watson, 1 P. 770 (Kan. 1883) (not pregnant); Commonwealth v. Morrison, 82 Mass. (16 Gray) 224 (1860); People v. Abbott, 116 Mich. 263 (1898) (not pregnant); State v. Owens, 22 Minn. 238 (1875); State v. Van Houten, 37 Mo. 357 (1866); State v. Dean, 85 Mo. App. 473 (1900); State v. Emerich, 87 Mo. 110 (1885) (not pregnant); People v. Phelps, 30 N.E. 1012 (N.Y. 1892); Dunn v. People, 29 N.Y. 523 (1864); Frazer v. People, 1 Cowen's Crim. 377 (N.Y. Sup. Ct. 1863); State v. Cave, 26 S.W. 503 (Tex. Ct. Crim. App. 1894).

218. State v. Vawter, 7 Blackf. 592 (Ind. 1845); State v. Sherwood, 75 Ind. 15 (1881); People v. Stockham, 1 Parker's Crim. 424 (N.Y. Sup. Ct. 1853); State v. Cave 26 S.W. 503 (Tex. Ct. Crim. App. 1894); Rex v. Anonymous, 170 Eng. Rep. 1310 (1811). *See also* Hays v. State, 40 Md. 633 (1874); Commonwealth v. Blair, 126 Mass. 40 (1878); Commonwealth v. Brown, 121 Mass. 69 (1876); Commonwealth v. Harvey, 103 Mass. 451

proof of the intent to abort required under the statutes—even though these cards and ads spoke only in euphemisms.[219] As one judge reasoned, "[i]t is not to be expected that cards and circulars of this kind will state in precise terms, or that their meaning will not be more or less disguised."[220] Such cases flatly contradict assertions that courts applied strict burdens of proof in order to protect abortionists against a law that the judges did not want to enforce.[221]

If proof of quickening was required for conviction, courts also had to deal with women who were unable or unwilling to testify whether the fetus had quickened. Courts were willing to assume that a woman had perceived that a child had quickened based on fetal maturity when the woman was dead and could not testify to the matter.[222] One New York court also held that the accusation of a woman of having had a pre-quickening abortion was to charge such an immoral act as to be slander *per se*.[223] No proof of injury to her reputation was necessary for her to sue for the affront. Decisions to the contrary in several states[224] were promptly reversed by statutes making pre-quickening abortions a crime—the imputation of which would be slander *per se*.[225] We find a particularly dramatic instance of such a legislative reaction in Iowa. There, when the state's Supreme Court held that there was no libel because the alleged pre-quickening abortion was not a crime, the state legislature in its very next session enacted a statute making it a crime to abort "any pregnant woman"—by a vote of 27-0 in the Senate, and of 53-1 in the House.[226]

Not all judges were willing to relax the rules of evidence, however, helping to keep the conviction rate for abortions low, even with new and tighter statutory prohibitions of abortion.[227] While such decisions were common even in the later nineteenth century, the judges usually coupled the decision with a clear and unequivocal condemnation of the crime, and sometimes complained of the inadequacies of the statute.[228] Nor did these courts stretch legal rules in order to free abortionists guilty under normal rules of evidence and statutory construction.[229] Such judi-

---

(1869); Commonwealth v. Sholes, 95 Mass. (13 Allen) 554 (1866); People v. McDowell, 30 N.W. 68 (Mich. 1886); State v. McLeod, 37 S.W. 828 (Mo. 1896); Backhouse, *supra* note 161, at 103–08 (Canadian cases).

219. *See, e.g.,* United States v. Kelly, 26 Fed. Cas. 128 (D. Nev. 1876) (No. 15,514); Holliday v. People, 9 Ill. 111 (1847); Commonwealth v. Barrows, 56 N.E. 830 (Mass. 1900); Commonwealth v. Jackson, 81 Mass. (15 Gray) 187 (1860).

220. Commonwealth v. Barrows, 56 N.E. 830 (Mass. 1900).

221. *See, e.g.,* GRABER, *supra* note 72, at 45; SCHUR, *supra* note 72, at 55–56; Zad Leavy & Jerome Kummer, *Criminal Abortion: Human Hardship and Unyielding Laws,* 35 S. CAL. L. REV. 123, 130–31 (1962).

222. *See, e.g.,* Evans v. People. 49 N.Y. 86, 89–91 (1872). *See also* State v. Steadman, 51 S.E.2d 91, 94 (S.C. 1948).

223. Bissell v. Cornell, 24 Wend. 354 (N.Y. 1840).

224. Abrams v. Foshee, 3 Iowa 274 (1856); Smith v. Gaffard, 33 Ala. 168 (1858).

225. MOHR, *supra* note 5, at 144.

226. JOURNAL OF THE SEN. OF THE 7TH GEN. ASSEMBLY OF IOWA, 1858, at 284 (1858); JOURNAL OF THE H. REP. OF THE 7TH GEN. ASSEMBLY OF IOWA, 1858, at 612–13 (1858). For the votes on other such laws, see Witherspoon, *supra* note 158, at 69.

227. *See, e.g.,* Eggart v. State, 25 So. 144 (Fla. 1898); State v. Forsythe, 43 N.W. 548 (Iowa 1889); Crichton v. People, 1 Cowen's Crim. 454 (N.Y. Sup. Ct. 1864). For similar highly technical evidentiary and procedural rulings in England that saved abortionists from conviction, see Regina v. Fretwell, 9 COX. CRIM. CASES 152 (Ct. Crim. App. 1862); Regina v. Wright, 173 ENG. REP. 1039 (1841); Rex v. Enoch, 172 ENG. REP. 1089 (1833); Rex v. Russell, 168 ENG. REP. 1302 (1832).

228. *See, e.g.,* Holland v. State, 31 N.E. 359 (Ind. 1891); State v. Young, 40 P. 659 (Kan. 1895); Lamb v. State, 10 A. 208 (Md. 1887); People v. Aiken, 33 N.W. 821 (Mich. 1887); People v. Olmstead, 30 Mich 431 (1874); State v. McIntyre, 19 Minn. 93 (1872); State v. Schverman, 70 Mo. App. 518 (1897); Cobel v. People, 5 Park. Crim. 348 (N.Y. Sup. Ct. 1862); State v. Drake, 1 Vroom 422 (N.J. 1863); Commonwealth v. Railing, 4 A. 459 (Pa. 1886).

229. *See, e.g.,* State v. Lee, 37 A. 75 (Conn. 1897); Hauk v. State, 47 N.E. 465 (Ind. 1897); State v. Moothart, 80 N.W. 301 (Iowa 1899); Jones v. State, 17 A. 89 (Md. 1889); Eckhart v. People, 22 Hun. 525 (N.Y. Sup. Ct. 1880); State v. Morrow, 18 S.E. 853 (S.C. 1893). *See generally* GROSSBERG, *supra* note 20, at 180–82.

cial patterns hardly demonstrate judicial resistance to the stricter abortion laws—especially when the judicial denunciations even influenced legislatures considering new statutes.[230] Yet non-lawyer crusaders against the rising incidence of abortion were predictably frustrated by a lawyerly caution that they tended to interpret it as subversion of the tighter laws.[231]

The nineteenth-century legal effort against abortion is too great to be denied. Given this evidence, the claim that the legal profession was indifferent to abortion collapses. The attitudes of the legal profession might, however, be dismissed as the efforts of a misogynistic profession that barred women from its ranks.[232] While women in general and feminists in particular in fact were strongly supportive of the codification and strengthening of abortion laws, did the handful of women attorneys hold a different view?

## The Role of Women Lawyers in the Nineteenth Century

*For the master's tools will never dismantle the master's house. They may allow us temporarily to beat him at his own game, but they will never enable us to bring about genuine change.*

—Audrey Lorde[233]

The voices of women were notably absent from discussions or actions within the legal profession regarding abortion. Women in the second half of the nineteenth century who sought to become licensed as physicians could draw upon the long tradition of women healers. While they encountered intense resistance, they overcame the opposition and achieved considerable success before career paths closed for them at the turn of the century.[234] Women who sought to become lawyers during this same period had no such traditions to draw upon and encountered even more resistance.

In ancient times, on rare occasions, women became distinguished advocates. Generally, they were not allowed to do so. In ancient Rome, a woman named Carfania achieved notoriety as an advocate, provoking a praetorian edit around 60 BCE[235] that prohibited women from serving as advocates.[236] The Roman praetor Ulpian explained the prohibition in a passage written around 210 CE that comes down to us through Justinian's *Digest* prepared in the early sixth century:

> Next comes an edict against those who are not to plead on behalf of others: In this edict the praetor debarred on grounds of sex and disability, and also persons in disrepute. On the ground of sex, it is prohibited to women to plead on behalf of others, the reason for the prohibition is to prevent women from mixing themselves in other people's cases

230. GROSSBERG, *supra* note 20, at 173–74.
231. See the authorities collected *supra* at note 71.
232. *See, e.g.*, Bradwell v. Illinois, 83 U.S. (16 Wall.) 130 (1871).
233. AUDREY LORDE, SISTER OUTSIDER 111 (1984).
234. *See* Chapter 8, at notes 251–324.
235. On the dating of the edict, see TONY HONORÉ, ULPIAN 48 (1982).
236. According to one Roman historian, Carfania died in 48 BCE. VALERIUS MAXIMUS ¶ 8.3.2. Apparently other women also appeared as advocates in Roman proceedings to some extent before Ulpian's edict, but the evidence of such activity is sparse. *See generally* RICHARD POWELL, WOMEN AND POLITICS IN ANCIENT ROME 45–52 (1992); Anthony Marshall, *Ladies at Law: The Role of Women in the Roman Civil Courts*, in 5 STUDIES IN LATIN LITERATURE AND ROMAN HISTORY 35 (C. Deroux ed. 1989).

## Prosecutions of Abortion before 1940

*In abortion cases, the investigation procedures themselves constituted a form of control and punishment.*

—Leslie Reagan[362]

We do not have complete figures for the total number of prosecutions for criminal abortion in the United States for any year in the period included in this chapter, or for the number of persons convicted of criminal abortion, let alone figures for the total number of persons prosecuted for the entire period from 1875 to 1945. Any assertion about the overall frequency or success of the efforts to detect and prosecute criminal abortion remains largely speculative. We do know that the press continued to crusade against abortionists, presenting them as well-to-do physicians who exploit, and all too often kill, vulnerable women.[363] And we know that prosecutions for illegal abortions occurred in every decade in every major metropolitan area throughout the nineteenth and first half of the twentieth century.[364]

In 1914, there were 47 arrests for criminal abortion in Chicago alone, with arrests for the decade 1910–1920 averaging 25 or 26 per year.[365] Coroner's inquests were even more common in Chicago.[366] Chicago's coroner sent an average of twelve suspected abortionists per year to the grand jury between 1905 and 1919.[367] The frequency with which coroner's inquests were conducted or prosecutions begun in Chicago increased steadily through the years.[368] Yet less than one-fourth of those arrested in Chicago were convicted, even though most of these prosecutions involved a woman's death as well as an abortion.[369] By the 1930s, prosecutions were common in all states, but convictions remained rare.[370] For example, one study found 44 convictions in 25 states over a period of 10 years in the first quarter of the century.[371]

Abortion rights advocates are prone to dismiss such prosecutions as occurred during this era as merely short-term crackdowns that always fizzled out within a year and therefore do not signify popular or even official perspectives.[372] These commentators further stress that convicted abortionists sometimes were promptly pardoned by the governor, without attempting to discover how general this practice might have been.[373] Other abortion rights advocates seem not even to notice

---

362. Reagan, *supra* note 22, at 5.

363. Olasky, *supra* note 28, at 265–73; Olasky, The Press, *supra* note 228, at 51–54, 58–59, 64–65, 72–74, 78–79; Reagan, *supra* note 22, at 46–61, 101–06, 109, 125.

364. Harris, *supra* note 230, at 91 n.18. *See also* Olasky, The Press, *supra* note 228, at 16, 25–30, 34–40, 45–46, 51–54, 58, 60, 62–68, 71–75, 77, 80–84, 90.

365. Reagan, *supra* note 22, at 107, 117.

366. *Id.* at 118–19.

367. *Id.* at 118.

368. *Id.*

369. *Id.* at 116–17; Harris, *supra* note 230, at 91 n.17.

370. Iseman, *supra* note 17, at 140–58; Palmer Findley, *The Slaughter of the Innocents,* 3 Am. J. Ostet. & Gynecology 35 (1922); Harris, *supra* note 230, at 91 n.17; N.W. Moore, *Abortion, Criminal and Inevitable,* 21 Ky. Med. J. 332 (1923).

371. E.A. Ficklen, *Some Phases of Criminal Abortion,* 79 New Orleans. Med. & Surgical J. 884 (1927).

372. *See* Mark Graber, Rethinking Abortion: Equal Choice, the Constitution, and Reproductive Politics 44 (1996); James Mohr, *Patterns of Abortion and the Response of American Physicians, 1790–1930,* in Women and Health in America: Historical Readings 117, 119–20 (Judith Leavitt ed. 1984).

373. Graber, *supra* note 371, at 45; Mohr, *supra* note 371, at 121.

such events, simply asserting that abortion was not prosecuted.[374] Yet others have argued that prosecution rates declined during the Depression and climbed during the post-war era, all without statistical backing for this conclusion.[375] The actual record suggests a different story.

Abortion has always been a difficult crime to prove.[376] Abortions took place in secret and left little physical evidence. Abortionists were careful to perform the procedure with no one in the room except the woman undergoing the abortion (and the fetus, if one counts it as a person), so there would be no witness but the woman herself.[377] If the woman died, there could be no witness at all. Some abortionists entered the room already masked, so even if the woman were willing to testify, she would have difficulty identifying the abortionist. The *corpus delicti,* at least early in a pregnancy, was disposed of simply through flushing a toilet.

Without witnesses or evidence, the crime would be undetected and unpunished. Only if the mother died or was seriously injured by the procedure was it likely to come to light—if the family or paramour did not prefer silence to the shame of public disclosure. Prosecutors responded to the difficulties of proving abortion by resorting to dubious techniques of investigation. Numerous convictions of abortionists were reversed for entrapment, that is, on the theory that the government itself had instigated the crime (a crime that otherwise would not have happened) in order to convict an individual for a crime not really of his or her doing.[378] While such results kept the abortionists out of prison, these practices did not betoken tolerance toward abortion.

As the entrapment decisions themselves demonstrate, police and prosecutors were going to extraordinary lengths to detect and eliminate abortionists. This pattern suggests that the police and prosecutors took the problem very seriously and were frustrated only by the difficulties of proving a case. Still, some modern historians continue to insist that the common failure to imprison abortionists demonstrates official as well as public tolerance toward abortion.[379]

Physicians, on the other hand, claimed to be able to distinguish between unlawful and medically justified abortions when a patient requested to be relieved of a pregnancy. This proved a slippery distinction and doctors increasingly found themselves caught "between the shore of extreme regard for religion and the law of the one hand, and sympathy and dishonesty on the

374. *See, e.g.,* Gebhard *et al., supra* note 22, at 192; Graber, *supra* note 371, at 44–45, 85–87; Otto Pollak, The Criminality of Women 44 (1950); Taussig, *supra* note 26, at 427; Samuel Buell, Note, *Criminal Abortion Revisited,* 66 NYU L. Rev. 1774, 1798 (1991); Russell Fisher, *Criminal Abortion,* in Therapeutic Abortion, *supra* note 346, at 3, 6; Zad Leavy & Jerome Kummer, *Criminal Abortion: Human Hardship and Unyielding Laws,* 35 Cal. L. Rev. 123, 125 (1962); James Voyles, *Changing Abortion Laws in the United States,* 7 J. Fam. L. 496, 510 (1967).

375. *See, e.g.,* Graber, *supra* note 371, at 52–53 (as a perusal of the last several footnotes will disclose, Graber apparently never encountered any numerical assertion that supposedly demonstrates popular and official tolerance for abortion that he could not embrace).

376. *See* John & J. Collyer Adam, Criminal Investigation: A Practical Textbook 453 (1924); Charles O'Hara, Fundamentals of Criminal Investigation 477–89 (1956); Harry Soderman & John O'Connell, Modern Criminal Investigations 294–95 (1952); John Harlen Amen, *Some Obstacles to Effective Legal Control of Criminal Abortions,* in National Comm. on Maternal Health, The Abortion Problem 133, 135–36 (1944). *See also* Olasky, *supra* note 28, at 224–31, 233. *See also* Ficklen, *supra* note 370, at 886.

377. Rudolph Holmes, *The Methods of the Professional Abortionist,* 10 J. Surgery, Gynecology, & Obstet. 542, 542–43 (1910).

378. *See, e.g.,* People v. Reed, 275 P.2d 633 (Cal. 1954). *See generally* Grossberg, *supra* note 17, at 179–88; Patricia Miller, The worst of Times 103 (1993).

379. *See, e.g.,* Graber, *supra* note 371, at 45; Reagan, *supra* note 22, at 59–60, 87, 116.

other."[380] Perhaps a third or more of illegal abortions were performed by licensed physicians.[381] Because of their ability to present arguably cogent justifications for an abortion—some lawful or at least moral excuse for the procedure—even if they were caught, doctors convicted of performing abortions often received less severe penalties even if the mother died.[382] Additionally, the penalty varied according to whether the physician-abortionist's activities appeared to be part of a commercial abortion enterprise or simply the offering of help to an occasional desperate woman.[383] Finally, a convicted physician would lose the license to practice medicine, which ironically could lead a physician to become a full-time abortionist upon release from prison as the only means left open for making a living from now-forbidden medical skills.[384]

In the nineteenth century, the most prominent abortionists in the United States, whose activities pro-abortion historians claim demonstrate public approval of their practice, ended up in jail. Philadelphia's Dr. Isaac Hathaway was sentenced to seven at hard labor years in 1883.[385] New York City's Dr. Henry McGonegal was sentenced in 1894 to 14 years after a patient died.[386] Madame Restell committed suicide when faced with yet another of her several prosecutions.[387] Other reports indicate the arrest of abortionists in police sweeps, although not all of those arrested were ultimately convicted.[388] Even in the last years of the prohibition of abortion, with widespread dissent from the enforcement of the laws, it remained true that virtually every professional abortionist had had "at least one brush with the law."[389]

Police training manuals also indicate substantial efforts to search out and arrest abortionists.[390] Obtaining proof of the crime continued to be particularly troublesome for abortion. Thomas Peters, an assistant district attorney in Queens County, New York, lamented in 1929 that "prosecutions are frequent, but in my experience convictions are seldom obtained."[391] Given the improbability of detection of a criminal abortion unless the mother died or was close to death, it is hardly surprising that criminal prosecutions in the United States depended to a large extent on the deathbed statements of aborted women. This led to what now appear to be unseemly efforts to pressure a dying woman into naming the abortionist.[392] While some doctors, at least by the middle of the

380. John Ellison *et al.*, Sex Ethics: The Principles and Practice of Contraception, Abortion, and Sterilization 147 (1934). *See also* Iseman, *supra* note 17, at 140; C.S. Bacon, *Chicago Medical Society: Regular Meeting, Held Nov. 23, 1904,* 43 JAMA 1889 (1904); Frank Higgins, *The Proper Indications and Methods for the Termination of Pregnancy,* 43 JAMA 1531 (1904); Charles Jewett, *Indication for Artificial Abortion in the First Three Months of Pregnancy,* 8 N.Y. St. J. Med. 113 (1908); E.A. Weiss, *Some Moral and Ethical Aspects of Foeticide,* 67 Am. J. Obstet. 79 (1913). *See generally* Reagan, *supra* note 22, at 19–20, 46–61, 67–73.

381. Jerome Bates & Edward Zawadski, Criminal Abortion 202 (1964); Graber, *supra* note 371, at 48–49; Reagan, *supra* note 22, at 70–73; Carol Joffe, *"Portraits of Three Physicians of Conscience:" Abortion before Legalization in the United States,* 2 J. Hist. Sexuality 46, 47 (1991).

382. *See, e.g.,* Rex v. Bourne, [1939] 1 K.B. 687, [1938] 3 All Eng. Rep. 615. *See generally* Brookes, *supra* note 17, at 36–37, 41; Graber, *supra* note 371, at 48–49; Messer & May, *supra* note 251, at 179–80; Bernard Nathanson & Richard Ostung, Aborting America 21–22 (1979); Joffe, *supra* note 380, at 54.

383. Brookes, *supra* note 17, at 37, 139–44; Bernard Dickens, Abortion and the Law 93–94 (1966).

384. Brookes, *supra* note 17, at 36–37.

385. Olasky, *supra* note 28, at 170–71.

386. *Id.*

387. *See* Chapter 9, at notes 198–216.

388. *See generally* Olasky, *supra* note 28, at 170–71; Harris, *supra* note 230, at 91 nn.17–18.

389. Miller, *supra* note 377, at 9.

390. John & J. Collier Adam, Criminal Investigation: A Practical Textbook 477 (1934); O'Hara, *supra* note 375, at 477–89; Harry Soderman & John O'Connell, Modern Criminal Investigation 298 (1952).

391. Quoted in Samuel Burke, *The Development of the Law of Criminal Abortion,* 57 Med. Times, 153, 158 (1929).

392. *See generally* Reagan, *supra* note 22, at 113–31. *See* Chapter 9, at notes 182–84.

twentieth century, found the task demeaning and demoralizing, many doctors and hospital administrators,[393] at least in the early decades of the century, apparently cooperated in this effort willingly.[394] In Chicago in 1917, the hospitals pledged to undertake to obtain dying declarations in a formal agreement with the coroner, the chief of police, and the state's attorney.[395] The editors of the *Journal of the American Medical Association* even recommended that physicians deny treatment to dying women until they named the abortionist, or at least exonerated the attending physician.[396]

Even efforts to obtain dying declarations from women suffering from septic abortions often did not produce evidence admissible in a court.[397] The dying woman had to believe that she was about to die,[398] and, at least in some states, she had to consent to the use of the information in a court after her passing because a doctor would not be allowed to testify to something told him in confidence, particularly when it would "tend to blacken the character of the patient."[399] Yet while convictions remained rare relative to the number of crimes, police investigations in themselves could be a form of punishment and a serious deterrent even if no charges were ever brought—as some pro-abortion historians have conceded.[400]

While arrests continued to be common during the 1930s,[401] enforcement in the United States focused on the revocation of medical licenses.[402] Historian Leslie Reagan asserts that in Illinois medical licenses could be revoked for abortion only after a criminal conviction.[403] Even if she is right in this, in most states licenses could be revoked after a relatively simple civil procedure that

---

393. *See generally* REAGAN, *supra* note 22, at 115–16, 120–24.

394. *See, e.g.*, N.F. Thiberge, *Report of Committee on Criminal Abortion*, 70 N. ORLEANS MED. & SURGICAL J. 802, 807–08 (1918).

395. REAGAN, *supra* note 22, at 121, 131.

396. Editorial, *Criminal Abortion*, 39 JAMA 706 (1902). *See also* ROBINSON, *supra* note 27, at 105–11; Findley, *supra* note 379, at 37. *See generally* REAGAN, *supra* note 22, at 122–24, 301 n.34.

397. OLASKY, *supra* note 28, at 224–27; REAGAN, *supra* note 22, at 123–24; Constance Backhouse, *Involuntary Motherhood: Abortion, Birth Control and the Law in Nineteenth Century Canada*, 3 WINDSOR Y.B. OF ACCESS TO JUSTICE 61, 99–103 (1983).

398. *See, e.g.*, Winfrey v. State, 296 S.W. 82 (Ark. 1927); State *ex rel.* Johnson v. Clark, 232 S.W. 1031 (Mo. 1921). *See generally* GRAHAM LILLY, AN INTRODUCTION TO THE LAW OF EVIDENCE §7.25 (2nd ed. 1987); EDMUND MORGAN & JACK WEINSTEIN, BASIC PROBLEMS OF STATE AND FEDERAL EVIDENCE 281 (5th ed. 1976). For examples of this sort of interrogation in an abortion case, see People v. Cheney, 13 N.E.2d 171, 172–74 (1938); Hagenow v. People, 59 N.E. 242, 243–45 (Ill. 1901); OLASKY, *supra* note 28, at 266–67; REAGAN, *supra* note 22, at 113, 122.

399. W.S. Carroll, *The Rights of the Unborn Child*, 13 PA. MED. J. 941 (1910). *See also* Earnest Oakley, Jr., *Legal Aspects of Abortion*, 3 AM. J. OBSTET. & GYNECOLOGY 37, 37–41 (1922). *See generally* REAGAN, *supra* note 22, at 124–25.

400. MILLER, *supra* note 377, at 215–16; REAGAN, *supra* note 22, at 114–15, 121, 125–26, 130–31, 161, 164–72, 191–92. *See also* OLASKY, *supra* note 28, at 234.

401. OLASKY, *supra* note 28, at 68, 80; POLLAK, *supra* note 373, at 45.

402. Sos v. Board of Regents, 281 N.Y.S.2d 831 (N.Y. 1967) (annulling a revocation a medical license for insufficient evidence); Walsh v. Board of Regents, 209 N.E.2d 821 (N.Y. 1965); Jablon v. Board of Regents, 73 N.E.2d 904 (N.Y. 1947); Friedel v. Board of Regents, 73 N.E.2d 545 (N.Y. 1947); Neshamkin v. Board of Regents, 66 N.E.2d 124 (N.Y. 1946); Epstein v. Board of Regents, 65 N.E.2d 756 (1946); Weinstein v. Board of Regents, 56 N.E.2d 104 (N.Y. 1944); Kasha v. Board of Regents, 48 N.E.2d 712 (N.Y. 1943); Kahn v. Board of Regents, 23 N.E.2d 16 (N.Y. 1939); Zimmerman v. Board of Regents, 294 N.Y.S.2d 435 (App. Div. 1968); Ciofalo v. Board of Regents, 258 N.Y.S.2d 881 (App. Div.), *appeal denied*, 261 N.Y.S. 2d 1025 (N.Y. 1965); Shapiro v. Board of Regents, 254 N.Y.S.2d 906 (App. Div. 1964), aff'd, 209 N.E. 2d 821 (N. Y. 1965); Robinson v. Board of Regents, 164 N.Y.S.2d 863 (App. Div. 1957); Genova v. Board of Regents, 74 N.Y.S.2d 729 (App. Div. 1947); Newman v. Board of Regents, 61 N.Y.S.2d 841 (App. Div. 1946); Rothenberg v. Board of Regents, 44 N.Y.S.2d 926 (App. Div. 1943), *appeal denied*, 47 N.Y.S.2d 284 (App. Div. 1944); Reiner v. Board of Regents, 6 N.Y.S.2d 356 (App. Div. 1938); Minton v. Board of Regents, 287 N.Y.S. 502 (App. Div. 1936). *See also* REAGAN, *supra* note 22, at 67, 280 n.68.

403. REAGAN, *supra* note 22, at 97, 120.

required a lower burden of proof than a criminal prosecution.[404] The necessary proof was often obtained by "testers," that is, by women who visited suspected doctors while posing as abortion seekers.[405] A license could be revoked if the doctor merely offered to perform an abortion even if the offer itself was not a crime.[406]

The license revocation process remained almost entirely in the hands of the medical profession itself, with courts becoming involved only in appeals by the accused physician after his or her license had been revoked. License revocations for offering to abort were frequent in New York between 1930 and 1970, and the cases upholding such revocations are numerous, in contrast with the sparsity of criminal prosecutions for abortions. License revocation proceedings are too numerous, at least in New York, to allow the claim that the medical profession as a whole was tolerant of abortion so long as performed by a licensed physician. Recurring campaigns by the medical profession to ferret out physicians performing abortions in order to revoke their licenses demonstrate that the organized profession was committed to stamping out abortion across the nation.[407] Physicians also occasionally turned abortionists into the police for criminal prosecution, as well as appearing as witnesses in coroner's inquests or criminal prosecutions.[408] In 1906, the American Medical Association even established its own "Bureau of Investigation" to pursue abortionists within the profession along with its pursuit of quacks.[409]

The American Medical Association or its local branches were also leaders in the effort to search out and convict midwives who were performing abortions.[410] For midwives, this effort took two forms—the imposition of licensing requirements intended both to upgrade the quality of care provided by midwives and to control their activities, and direct efforts to suppress abortion.[411] Additionally, while proving that a midwife had performed an abortion was no easier than proving that a physician had done so, midwives could rather easily be convicted of practicing medicine without a license—and 71 were in one five year period in New York City alone at the start of the century.[412]

The incidence of hospital performed "therapeutic" abortions declined sharply after 1940.[413] At one hospital in Los Angeles, the rate of therapeutic abortions dropped from 1/106 live births in 1931–1935, to 1/2,864 in 1946–1949, to 1/8,383 in 1950.[414] This happened at the same time that some physicians and lawyers were arguing for an increasingly expansive interpretation of what constitutes a therapeutic abortion.[415] The decline tells us little, however, about the incidence of illegal abortions during the same period. Nor are the prosecution or conviction rates particularly good evidence of the rate at which abortions were being performed illegally.

---

404. *See, e.g.,* Zimmerman v. Board of Regents, 294 N.Y.S.2d 435 (App. Div. 1968); Reiner v. Board of Regents, 6 N.Y.S.2d 356 (App. Div. 1938).

405. *See, e.g.,* Epstein v. Board of Regents, 65 N.E.2d 756 (N.Y. 1946); Rothenberg v. Board of Regents, 44 N.Y.S.2d 926 (App. Div. 1943), *appeal denied,* 47 N.Y.S.2d 284 (App. Div. 1944); Weinstein v. Board of Regents, 44 N.Y.S.2d 917 (App. Div. 1943), *rev'd,* 56 N.E.2d 104 (N.Y. 1944).

406. Olasky, *supra* note 28, at 233–35 (1992).

407. *See, e.g.,* Reagan, *supra* note 22, at 86–98. The periods of intense anti-abortion campaigns were interrupted by intervals when the profession seemed apathetic about abortion and did little. *Id.* at 89–90

408. *Id.* at 88.

409. *Id.* at 89.

410. *Id.* at 90–112.

411. *Id.* at 95–96.

412. F. Elisabeth Crowell, *The Midwives of New York,* 17 Charities & the Commons 667, 668 (1907).

413. D'Emilio & Freedman, *supra* note 250, at 253; Faye Ginsburg, Contested Lives: The Abortion Debate in an American Community 34–35 (1989); Williams, *supra* note 219, at 167–69; Hammond, *supra* note 346.

414. Russell, *supra* note 347, at 111.

415. *See, e.g.,* Williams, *supra* note 219, at 160–83; Hefferman & Lynch, *supra* note 347, at 343; Levine, *supra* note 347; Rosen, *supra* note 347; Russell, *supra* note 347.

The 111 convictions in New York city between 1925 and 1950 can hardly have been more than a merest sample of the actual number of abortions performed there in that period.[416] We continue to know very little about the number of abortions in the United States or elsewhere before its legalization. The cautionary words of Judith Leavitt, already quoted, regarding statistical studies of childbirth (the study of which does not confront the added problem of active efforts to hide the records because the acts were illegal) remain compelling here.[417] One must keep this reality in mind in evaluating all estimates of the number of abortions. There is some reason to question even the apparently carefully developed statistics regarding legal abortions given the political uses of those statistics.[418]

Estimates for illegal abortions in the United States have generally ranged between 41,000 and 700,000 per year for the years 1935–1940.[419] The higher figure, derived from the work of Dr. Frederick Taussig, was based upon statistics gathered at a single birth control clinic in a poor section of the city of New York estimating 681,600 abortions nationally per year, without any attempt to determine whether the figures developed from this study were likely to be representative of the nation as a whole.[420] Taussig himself repudiated this figure as far too high six years after he published it.[421] Dr. Abraham Rongy, in his early polemic urging the legalization of abortion, estimated 2,000,000 induced abortions per year (5 percent therapeutic) in the early 1930s.[422] Modern supporters of abortion rights continue to cite Taussig's repudiated figure as authoritative without acknowledging the weakness of the data.[423] Historian David Garrow has proposed the slightly higher figure of 800,000 per year, without providing a basis for it.[424]

In England, where detection was as difficult as in the United States, we appear to have somewhat harder data regarding the number of prosecutions and convictions than we have for the United States. The number of prosecutions increased steadily, doubling between 1900 and 1910, and doubling again between 1910 and 1930.[425] In contrast with the United States, conviction rates in these cases were not particularly low. In 1919, of 60 people charged with procuring abortions in England, 42 were convicted.[426] In what Barbara Brookes describes as a typical year (1934), 50 of 73 indictments went to trial and 33 of those resulted in convictions.[427] In any given

---

416. D'Emilio & Freedman, *supra* note 250, at 253–54.

417. Judith Walzer Leavitt, Brought to Bed: Childbearing in America 1750–1950, at 24 (1986), quoted in Chapter 2, at note 461; Chapter 10, at note 223.

418. Gerald Rosenberg, The Hollow Hope: Can Courts Bring About Social Change? 178 (1992); Paige Comstock Cunningham & Clarke Forsythe, *Is Abortion the "First Right" for Women?: Some Consequences of Legal Abortion,* in Abortion, Medicine and the Law 100, 100 (J. Douglas Butler & David Walbert eds., 4th ed. 1992).

419. D'Emilio & Freedman, *supra* note 250, at 252–53; Williams, *supra* note 219, at 191, 209.

420. Taussig, *supra* note 219, at 26, 388. *See also,* Katharine Bement Davis, Factors in the Sex Life of Twenty-Two Hundred Women xi–xiii, 20–21 (1929); Gilbert Van Tassel Hamilton, A Research in Marriage 133–34 (1929); Marie Kopp, Birth Control in Practice 121–23 (1934); Regine Stix, *A Study of Pregnancy Wastage,* 13 Milbank Mem. Fund Q. 347 (1935). *See generally* Olasky, *supra* note 28, at 70; Olasky, The Press, *supra* note 228, at 70.

421. *Statement of Dr. Frederick Taussig,* National Comm. on Maternal Health, The Abortion Problem 28 (1944). *See also Statement of Dr. Hermann Bundesan, Id.* at 155; Jerome Bates, *The Abortion Mill,* 45 J. Crim. L. & Criminology 157, 158 (1954). Regine Stix also repudiated her estimate. Regine Stix & Dorothy Wiehl, *Abortion and the Public Health,* 28 Am. J. Pub. Health 621, 623 (1938).

422. Rongy, *supra* note 219, at 89. *See also* Robinson, Against Abortion, *supra* note 27, at 114.

423. *See, e.g.,* Graber, *supra* note 371, at 44–45; Edwin Schur, Crimes without Victims: Deviant Behavior and Public Policy 25 (1965); Alfred Kinsey, *Illegal Abortions in the United States,* in The Unwed Mother 196–97 (Robert Roberts ed. 1966). *See generally* Gebhard *et al., supra* note 29, at 189–214.

424. Garrow, *supra* note 211, at 272.

425. Brookes, *supra* note 17, at 28, 45 n.46.

426. *Id.* at 28.

427. *Id.*

year, about three-quarters of the abortionists charged were likely to be women.[428] Two statistics show the vigor with which the crime of abortion was prosecuted in England. There appear to have been only 40 convictions in the state of Michigan during the 30 years from 1910–1940, yet in England (with a population about six to ten times as large) there were 52 prosecutions in 1955 alone, with 49 convictions.[429]

In England as in the United States, the woman who had undergone the abortion usually was deceased. Her death was the event the led to the uncovering of the abortion. Prosecutors generally were successful in cases that went to trial in England even though the trial judge would routinely remind women who had undergone an abortion before testifying that by giving evidence they could incriminate themselves. Yet, immediately after providing the figures indicating the high degree of prosecutorial success in England, Brookes concluded that "[j]uries, usually sympathetic to the abortionist and appreciative of the heavy sentences, were reluctant to convict."[430] Brookes does not explain her remarkable conclusion.

Penalties for conviction of abortion remained severe even in England where, although the death sentence imposed by statute was routinely commuted to terms ranging from seven to ten or more years for physicians or to life in prison for professional abortionists if they had no formal medical training.[431] Neighborhood women who did not charge a fee or despairing husbands, either of which were seen as acting from motives that justified mercy, were often given briefer jail terms even if the woman undergoing the abortion died.[432] What Brookes describes as the "harsh sentences" in such cases, in fact, averaged less than one year in prison.[433] Such a result, however, hardly suggests that the acts were not considered criminal. In England, women continued to be charged for procuring their own abortions, usually serving sentences of days or months, however, rather than years.[434]

With the apparently sharp rise in criminal abortions in England during World War II, prosecutions rose dramatically.[435] Despite the insistence of pro-abortion historians that there was no serious effort to enforce the prohibition of abortion, we find that at least 14 physicians were convicted in England between 1939 and 1944 of procuring abortions.[436] This represents more than 25 percent of all physicians struck from the medical register between 1900 and 1958.[437] Early abortion activist Stella Browne was no doubt exaggerating when she estimated that someone was convicted of abortion in England "every fortnight."[438] Browne was, however, closer to the truth that those who deny today that any serious steps were taken to enforce the abortion laws.

It is noteworthy that many of the doctors who were prosecuted for abortion in England after World War II, were foreigners who were, perhaps, outside the shield of professional solidarity that to some extent protected English doctors.[439] Prison sentences for foreign physicians also tended to be harsher.[440] This pattern is harder to discern, however, before the war.

---

428. *Id.* at 28–29.
429. Williams, *supra* note 219, at 209–10.
430. Brookes, *supra* note 17, at 29.
431. *Id.* at 26, 35–37, 138–39.
432. *Id.* at 137–39; Williams, *supra* note 219, at 146–47.
433. Brookes, *supra* note 17, at 29.
434. *Id.* at 139.
435. See the text *supra* at notes 355–58.
436. Brookes, *supra* note 17, at 65.
437. *Id.* at 142.
438. *Id.* at 91.
439. *Id.* at 140–41.
440. *Id.*

# HISTORIA
## PLACITORUM CORONÆ.

THE

# HISTORY

OF THE

## Pleas of the Crown.

By Sir *MATTHEW HALE* Knt.
ſometime Lord Chief Juſtice of the Court of King's Bench.

Now firſt publiſhed from his Lordſhip's Original Manuſcript, and the ſeveral References to the Records examined by the Originals, with large Notes.

By *SOLLOM EMLYN* of *Lincoln's-Inn* Eſq;

To which is added
A Table of the Principal Matters.

In Two Volumes.

VOL. I.

In the SAVOY:
Printed by E. and R. Nutt, and R. Gosling, (Aſſigns of *Edward Sayer*, Eſq;) for F. Gyles over-againſt *Grays-Inn* in *Holborn*, T. Woodward at the Half-Moon between the Two *Temple-Gates* in *Fleet-ſtreet*, and C. Davis in *Pater-noſter-row*.
M DCC XXXVI.

PLAINTIFF'S
TRIAL EXHIBIT
1054
1:24-cv-00244-BLW

# Extract from the Journal of the Houſe of Commons.

## *Lunæ* 29° *die* *Novemb.* 1680.

Orderd, That the Executors of Sir *Matthew Hale*, late Lord Chief Juſtice of the court of King's Bench, be deſired to print the MSS. relating to the Crown-law, and that a committee be appointed to take care in the printing thereof, and it is referred to

| | |
|---|---|
| Sir *Will. Jones*, | Mr. *Sacheverel*, |
| Serj. *Maynard*, | Mr. *Geo. Pelham*, |
| Sir *Fra. Winnington*, | Mr. *Paul Foley*. |

To the RIGHT HONOURABLE

# Sir *JOSEPH JEKYLL* Knt.

## MASTER of the ROLLS,

## And One of his Majeſty's moſt Honourable Privy-Council.

*SIR*,

AS it is to you that the public are indebted for reſcuing this valuable work from the obſcurity wherein it had long lain, the preparing of which for the preſs you were pleaſed to commit to my care, I thought it became me to inſcribe your name on that, to which you are ſo juſtly intitled: Nor know I any to whom it could with greater propriety be addreſt, than to one, who bears ſo near a reſemblance to the author in thoſe great and good qualities, for which he was ſo deſervedly eſteemed.

An unblemiſhed integrity and upright conduct in every character of life, whether as a private perſon, a ſenator, or a judge; A generous frankneſs and open ſincerity in converſation; An unalterable adherence in all ſtations to the principles of civil and religious liberty, accompanied with a ſerious regard to true piety and virtue; A firm attachment to our conſtitution in times of the greateſt difficulty and danger; A diſintereſted zeal for the welfare of mankind, manifeſted by unwearied

unwearied labours for the public good, uninfluenced by the ſpirit of a party or any ſiniſter motive, are excellencies, which no leſs eminently diſtinguiſh you than they did the author of this treatiſe; and as they procured him ſuch a laſting veneration and eſteem, ſo while the ſame cauſes are productive of the ſame effects, they will in like manner tranſmit your memory to after-times with honour and renown.

To enlarge upon this ſubject, how agreable ſoever to others, would I know be offenſive to you, who are more regardful of the approbation of your own mind, than any outward applauſes, and while you are intent upon really being and doing good, are no leſs ſtudious to avoid all oſtentatious ſhews of it. I ſhall therefore only add, that I am,

*SIR,*

*With great reſpect,*

*Your Honour's*

*Moſt obedient*

*Humble ſervant,*

Sollom Emlyn.

FER-190

But now, what ſhall be ſaid the ſea or ſalt water?

My lord *Coke, ubi ſupra, viz. p.* 58. ſaith, and that truly, the arm of the ſea is included herein; and by the book of 22 *Aſſize, pl.* 93. ſo far as the ſea flows and reflows is an arm of the ſea.

And thus far of deodands.

I ſhall only add this one thing more relating to the coroner's office touching thoſe, that come to a violent death *de ſubito mortuis:* if the townſhip bury the body before the coroner be ſent for, the townſhip ſhall be amerced; and if the coroner come not to make his inquiry upon notice given, he ſhall be fined in *eyre*, or in the king's bench, or before the juſtices of gaol-delivery.

# CHAP. XXXIII.

## *Of* homicide, *and it's ſeveral kinds, and firſt of thoſe conſiderations that are applicable, as well to* murder *as* manſlaughter.

HAving diſpatched the buſineſs of *ſuicidium* or ſelf-murder, and *per infortunium ſimplex*, I come now to conſider of homicide, as it relates to others.

And this is of three kinds: 1. Purely voluntary, *viz.* murder and manſlaughter. 2. Purely involuntary, as that other kind of homicide *per infortunium.* 3. Mixt, partly voluntary, and partly involuntary, or in a kind neceſſary, and this again of two kinds, *viz.* inducing a forfeiture, as *ſe defendendo*, or not inducing a forfeiture, as, 1. In defenſe of a man's houſe. 2. Defenſe of his perſon againſt an aſſault *in viâ regiâ.* 3. In advance-

4

FER-191

advancement or execution of juſtice, and according to this diſtribution I ſhall proceed.

I ſhall begin with thoſe matters conſiderable, which are applicable as well to homicide, as to murder.

*Murder* is a killing of a man *ex malitiâ præcogitatâ*; *homicide* is killing a man without forethought malice.

It is a miſtake in thoſe, that think, that before the ſtatute of *Marlebridge, cap.* 26. all killing of a man, tho *per infortunium* or *ſe defendendo*, was murder, for the ſtatute ſaith, that *murdrum de cætero non adjudicetur coram juſticiariis, ubi infortunium tantummodo adjudicatur, ſed locum habet murdrum de interfectis per feloniam tantum, & non aliter*, and therefore they thought that before this ſtatute a man ſhould be hanged for killing another in his own defenſe. 21 *E.* 3. 17. *b.* (*a*)

But the truth is, *murdrum* in this caſe was but an amercement, that was antiently impoſed upon a townſhip, where the death of a man happend (*b*); and this appears by many hundred old charters of the kings of *England*, eſpecially to biſhops and monaſteries, whereby it was granted, that they and their poſſeſſions ſhould be quit *de murdro & latrocinio* among divers other immunities, whereby we muſt not think that they had power granted them to commit murder or theft, but they were thereby acquitted of thoſe common amercements, uſually in thoſe antient times impoſed in *eyre* upon vills for murder and theft committed there.

To make up the crime of homicide or murder there muſt be theſe three concurring circumſtances.

I. The party muſt be kild, antiently indeed a barbarous aſſault with an intent to murder, ſo that the party was left for dead, but yet recoverd again, was adjudged murder, and



(*a*) See alſo 2 *Co. Inſtit. p.* 148. who is of that opinion.

(*b*) This is ſo plain, that it is matter of ſurprize, that any ſhould miſtake it; the word *murdrum* uſually ſignifying a *ſecret* killing of another, ſo that the murderer was not known, for if the murderer was known, it was not in this ſenſe murder; as if the murderer was taken, *& judicium ſuſtinuerit, nullum erit murdrum, quia convincitur felonia*, or if the murderd perſon lived for ſome time after his wounds, it was no murder, becauſe he might diſcover the murderers, the meaning of which is not, that the offender would not in thoſe caſes be liable to be indicted and puniſhed for murder, but that the vill or townſhip would not in ſuch caſes be liable to any amerciament. *Bract. Lib.* III. *de corona, cap.* 15. *p.* 135. *a. Wilk. Leg. Anglo-Sax. p.* 280. *vide ſupra p.* 39. *in notis, vide poſtea cap.* 35. See alſo *Kelynge* 121.

petit treason, 15 *E.* 2. *Coron.* 383. but that holds not now, for the stroke without the death of the party stricken, nor the death without the stroke or other violence makes not the homicide or murder, for the death consummates the crime.

It remains therefore to be considerd, to what intents the offense of murder or manslaughter relates to the stroke or other cause of the death, and to what purposes it relates to the death only.

If a man give another a mortal stroke, and he lives a month, two or three, or more, and die within the year and day, the title of the lord by eschete to avoid mesne incumbrances relates to the stroke given, and not only to the death. *Plowd. Com.* 263. Dame *Hale*'s case.

If a man give another a mortal stroke, and he dies thereof within a year and a day, but mesne between the stroke and the death there comes a general pardon, whereby all misdemeanors are pardoned, this doth pardon the felony consequentially, because the act, that is the offense, is pardoned, tho it be not a felony till the party die. *Ibid.* 401. *Cole*'s case.

If a mortal stroke be given on the high sea, and the party comes to land in *England* and die, the admiral shall not have jurisdiction in this case to try the felon, because the death, that consummated the felony, happend upon the land, nor the common law shall not try him, because the stroke, that made the offense, was not *infra corpus comitatûs*, 5 *Co. Rep.* 106. *b.* Sir *Henry Constable*'s case, 2 *Co. Rep.* 93. *a.* *Bingham*'s case, *Co. P. C. p.* 48. and *Lacie*'s case 25 *Eliz.* cited there to that purpose; *de quo alibi.*

At common law, if a man had been stricken in one county and died in another, it was doubtful whether he were indictable or triable in either, but the more common opinion was, that he might be indicted, where the stroke was given, for the death is but a consequent, and might be found tho in another county. 9 *E.* 4. 48. 7 *H.* 7. 8. and if the party died in another county, the body was removed into the county, where the stroke was given, for the coroner to take an inquest *super visum corporis*, 6 *H.* 7. 10. but now by the statute of 2 & 3 *E.* 6. *cap.* 24. the justices or coroner of the county,

 where

where the party died, shall inquire and proceed, as if the stroke had been in the same county, where the party died.

On the other side, as to some respects, the law regards the death as the consummation of the crime, and not merely the stroke.

If a party be kild in one county, the coroner *super visum corporis* might at common law inquire of all accessaries or procurers before the fact, tho the procurement were in another county, 20 *H.* 7. *Kelw.* 67. *b. per omnes justiciarios* Angliæ; but now by the statute of 2 *&* 3 *E.* 6. *cap.* 24. the indictment and trial of the accessaries shall be in the county, where they were accessary, *viz.* procuring, abetting or receiving.

If a party be mortally wounded, and the offender taken and in the custody of the constable, and he suffer him to escape before the wounded person die, it is not felony in the constable, tho he die after within the year. 11 *H.* 4. 12. *Plow. Com.* 401. *Cole*'s case.

If a stroke be given the 1st of *January*, and the party die the 1st of *March* following, the year and day to bring an appeal is to be accounted from the death, and not from the stroke, contrary to the opinion of *Stamford P. C.* 63. *a. quod vide Co. P. C. p.* 53. *& sur statute de* Glouc. *cap.* 9. (c), 4 *Co. Rep.* 42. *b. Haydon*'s case, *Statut.* 3 *H.* 7. *cap.* 1.

If *A.* give a mortal stroke the 1st of *January*, and the party lives till the 1st of *February*, and then dies of the stroke, the conclusion of the indictment is best, *Et sic præfatus* A. *&c. modo & formâ prædictâ interfecit & murdravit*, because it applies to the whole case. 2. But if it be, *Et sic præfatus* A. *prædicto* 1 *Januarii ipsum, &c. interfecit & murdravit*, it is naught, because it is no murder till the party dies, 4 *Co. Rep.* 42. *Haydon*'s case, *vide ibidem Katharine Hume*'s case. 3. But if it conclude, *Et sic præfatus* A. *ipsum, &c. prædicto* 1 *Februarii interfecit & murdravit*, it is good, because then the murder is complete, 4 *Co. Rep.* 47. *a. Wigge*'s case, tho in such a case of a stroke at one day or one place, and a death at another day or place, the best conclusion, and that which

(c) 2 *Co. Instit.* 320.

which is in common uſe at this day is, *Et ſic prædictus* A. *ipſum, &c. modo & forma prædictis interfecit & murdravit.*

And thus far touching the relation to the ſtroke or death.

Now what ſhall be ſaid a killing and death within the year and day.

If a man give another a ſtroke, which it may be, is not in itſelf ſo mortal, but that with good care he might be cured, yet if he die of this wound within the year and day, it is homicide or murder, as the caſe is, and ſo it hath been always ruled.

But if the wound or hurt be not mortal, but with ill applications by the party, or thoſe about him, of unwholeſome ſalves or medicines the party dies, if it can clearly appear, that this medicine, and not the wound, was the cauſe of his death, it ſeems it is not homicide, but then that muſt appear clearly and certainly to be ſo.

But if a man receives a wound, which is not in itſelf mortal, but either for want of helpful applications, or neglect thereof, it turns to a gangrene, or a fever, and that gangrene or fever be the immediate cauſe of his death, yet this is murder or manſlaughter in him, that gave the ſtroke or wound, for that wound, tho it were not the immediate cauſe of his death, yet, if it were the mediate cauſe thereof, and the fever or gangrene was the immediate cauſe of his death, yet the wound was the cauſe of the gangrene or fever, and ſo conſequently is *cauſa cauſati.*

If a man be ſick of ſome ſuch diſeaſe, which poſſibly by courſe of nature would end his life in half a year, and another gives him a wound or hurt, which haſtens his end by irritating and provoking the diſeaſe to operate more violently or ſpeedily, this haſtening of his death ſooner than it would have been is homicide or murder, as the caſe happens, in him, that gives the wound or hurt, for he doth not die ſimply *ex viſitatione dei*, but the hurt that he receives haſtens it, and an offender of ſuch a nature ſhall not apportion his own wrong, and thus I have often heard that learned and wiſe judge juſtice *Rolle* frequently direct.



FER-195

If a man either by working upon the fancy of another, or poſſibly by harſh or unkind uſage put another into ſuch paſſion of grief or fear, that the party either die ſuddenly, or contract ſome diſeaſe, whereof he dies, tho as the circumſtances of the caſe may be, this may be murder or manſlaughter in the ſight of God, yet *in foro humano* it cannot come under the judgment of felony, becauſe no external act of violence was offerd, whereof the common law can take notice, and ſecret things belong to God; and hence it was, that before the ſtatute of 1 *Jac. cap.* 12. witchcraft or faſcination was not felony, becauſe it wanted a trial, tho ſome conſtitutions of the civil law make it penal.

If a phyſician gives a perſon a potion without any intent of doing him any bodily hurt, but with an intent to cure or prevent a diſeaſe, and contrary to the expectation of the phyſician it kills him, this is no homicide, and the like of a chirurgeon, 3 *E.* 3. *Coron.* 163. And I hold their opinion to be erroneous, that think, if he be no licenſed chirurgeon or phyſician, that occaſioneth this miſchance, that then it is felony, for phyſic and ſalves were before licenſed phyſicians and chirurgeons; and therefore if they be not licenſed according to the ſtatute of 3 *H.* 8. *cap.* 11. or 14 *H.* 8. *cap.* 5. they are ſubject to the penalties in the ſtatutes, but God forbid that any miſchance of this kind ſhould make any perſon not licenſed guilty of murder or manſlaughter.

Theſe opinions therefore may ſerve to caution ignorant people not to be too buſy in this kind with tampering with phyſic, but are no ſafe rule for a judge or jury to go by: we ſee the ſtatute of 34 & 35 *H.* 8. *cap.* 8. diſpenſeth with the penalty of thoſe former ſtatutes, as to outward applications and medicines for agues, ſtone, or ſtrangury, which may be adminiſterd by any perſon, and the preamble of the ſtatute tells us, that if none but licenſed chirurgeons ſhould be uſed in many caſes, many of the king's ſubjects were like to periſh for want of help.

But if a woman be with child, and any gives her a potion to deſtroy the child within her, and ſhe take it, and it works ſo ſtrongly, that it kills her, this is murder, for it was not

given to cure her of a diſeaſe, but unlawfully to deſtroy her child within her, and therefore he, that gives a potion to this end, muſt take the hazard, and if it kill the mother, it is murder, and ſo ruled before me at the aſſizes at *Bury* in the year 1670.

And certainly if that opinion ſhould obtain, that if one not licenſed a phyſician ſhould be guilty of felony, if his patient miſcarry, we ſhould have many of the poorer ſort of people, eſpecially remote from *London*, die for want of help, leſt their intended helpers might miſcarry.

This doctrine therefore, that if any die under the hand of an unlicenſed phyſician, it is felony, is apochryphal, and fitted, I fear, to gratify and flatter doctors and licentiates in phyſic, tho it may, as I ſaid, have its uſe to make people cautious and wary, how they take upon them too much in this dangerous employment.

If a man have a beaſt, as a bull, cow, horſe or dog, uſed to hurt people, if the owner know not his quality, he is not puniſhable, but if the owner be acquainted with his quality, and keep him not up from doing hurt, and the beaſt kill a man, by the antient *Jewiſh* law (*) the owner was to die for it, *Exod.* xxi. 29. and with this ſeems to agree the book of 3 *E.* 3. *Coron.* 311. *Stamf. P. C.* 17. *a.* wherein theſe things ſeem to be agreeable to law.

1. If the owner have notice of the quality of his beaſt, and it doth any body hurt, he is chargeable with an action for it.

2. Tho he have no particular notice, that he did any ſuch thing before, yet if it be a beaſt, that is *feræ naturæ*, as a lion, a bear, a wolf, yea an ape or monkey, if he get looſe and do harm to any perſon, the owner is liable to an action for the damage, and ſo I knew it adjudged in *Andrew Baker*'s caſe, whoſe child was bit by a monkey, that broke his chain and got looſe.

3. And therefore in caſe of ſuch a wild beaſt, or in caſe of a bull or cow, that doth damage, where the owner knows of it, he muſt at his peril keep him up ſafe from doing hurt, for tho he uſe his diligence to keep him up, if he eſcape and do harm, the owner is liable to anſwer damages.

I 4. But

(*) *Vide ſupra p.* 3. *in notis.*

FER-197

4. But as to the point of felony, if the owner have notice of the quality of the ox, *&c.* and uſe all due diligence to keep him up, yet the ox breaks looſe and kills a man, this is no felony in the owner, but the ox is a deodand.

5. But if he did not uſe that due diligence, but thro negligence the beaſt goes abroad after warning or notice of his condition, and kills a man, I think it is manſlaughter in the owner.

6. But if he did purpoſely let him looſe, or wander abroad with deſign to do miſchief, nay tho it were with deſign only to fright people and make ſport, and it kill a man, it is murder in the owner, and I have heard, that long ſince at the aſſizes held at *St. Albans* for *Hertfordſhire* it was ſo ruled, and the owner hanged for it, but this is but an hearſay.

If a man lay poiſon to kill rats, and a man caſually take it, whereby he is poiſoned, this is no felony, but if a man lay poiſon to the intent that *B.* ſhould take it, to be poiſoned therewith, and *C.* by miſtake takes it, and is poiſoned to death, this is murder, tho it were not intended for him. *Dalt. cap.* 93. (*d*). 9 *Co. Rep.* 81. *b.* *Agnes Gore*'s caſe, *Plowd. Com.* 474. *Saunder*'s caſe.

And altho the party take the poiſon himſelf by the perſuaſion of another in the abſence of the perſuader, yet it is a killing by the perſuader, and he is principal in it, tho abſent at the taking of it. 4 *Co. Rep.* 44. *b.* *Vauxe*'s caſe.

If *A.* gives poiſon to *B.* intending to poiſon him, and *B.* ignorant of it give it to *C.* a child, or other near relation of *A.* againſt whom he never meant harm, and *C.* takes it and dies, this is murder in *A.* and a poiſoning by him, *Plowd. Com.* 474. *a.* *Dalt. cap.* 93. but *B.* becauſe ignorant, is not guilty.

If *A.* gives purging comfits to *B.* to make ſport, and not to hurt him, and *B.* dies thereof, it is a killing by *A.* but not murder, but manſlaughter. *Dalt. cap.* 93.

There are ſeveral ways of killing, 1. By expoſing a ſick or weak perſon or infant unto the cold to the intent to deſtroy him, 2 *E.* 3. 18. *b.* whereof he dieth. 2. By laying an impotent perſon abroad, ſo that he may be expoſed to and receive

(*d*) *New Edit.* 1727. *cap.* 145. *p.* 471.

ceive mortal harm, as laying an infant in an orchard, and covering it with leaves, whereby a kite ſtrikes it, and kills it. *6 Eliz. Crompt. de Pace* 24. *Dalt. cap.* 93. (*e*). 3. By impriſoning a man ſo ſtrictly that he dies, and therefore where any dies in gaol, the coroner ought to be ſent for to inquire of the manner of his death. 4. By ſtarving or famine. 5. By wounding or blows. 6. By poiſoning. 7. By laying noiſome and poiſonous filth at a man's door, to the intent by a poiſonous air to poiſon him, Mr. *Dalton*, *cap.* 93. out of Mr. *Cook*'s reading. 8. By ſtrangling or ſuffocation.

*Moriendi mille figuræ.*

A man infected with the plague, having a plague ſore running upon him, goes abroad, this is made felony by the ſtatute of 1 *Jac. cap.* 31. but is now diſcontinued (*f*); but what if ſuch perſon goes abroad to the intent to infect another, and another is thereby infected and dies? whether this be not murder by the common law might be a queſtion, but if no ſuch intention evidently appear, tho *de facto* by his converſation another be infected, it is no felony by the common law, tho it be a great miſdemeanor, and the reaſons are,

1. Becauſe it is hard to diſcern, whether the infection ariſe from the party, or from the contagion of the air, it is God's arrow, and

2. Nature prompts every man, in what condition ſoever, to preſerve himſelf, which cannot be well without mutual converſation.

3. Contagious diſeaſes, as plague, peſtilential fevers, ſmall-pox, *&c.* are common among mankind by the viſitation of God, and the extenſion of capital puniſhments in caſes of this nature would multiply ſevere puniſhments too far, and give too great latitude and looſe to ſevere puniſhments.

II. The ſecond conſideration, that is common both to murder and manſlaughter, is, who ſhall be ſaid a perſon, the killing of whom ſhall be ſaid murder or manſlaughter.



(*e*) *New Edit. cap.* 145. *p.* 469.

(*f*) It was made at firſt to continue no longer, than until the end of the firſt ſeſſion of the next parliament.

FER-199

If a woman be quick or great with child, if ſhe take, or another give her any potion to make an abortion, or if a man ſtrike her, whereby the child within her is kild, it is not murder nor manſlaughter by the law of *England*, becauſe it is not yet *in rerum naturâ*, tho it be a great crime, and by the judicial law of *Moſes* (*g*) was puniſhable with death, nor can it legally be known, whether it were kild or not, 22 *E.* 3. *Coron.* 263. ſo it is, if after ſuch child were born alive, and baptized, and after die of the ſtroke given to the mother, this is not homicide. 1 *E.* 3. 23. *b. Coron.* 146.

But if a man procure a woman with child to deſtroy her infant, when born, and the child is born, and the woman in purſuance of that procurement kill the infant, this is murder in the mother, and the procurer is acceſſary to murder, if abſent, and this whether the child were baptized or not. 7 *Co. Rep.* 9. *Dyer* 186.

The killing of a man attaint of felony, otherwiſe than in execution of the ſentence by a lawful officer lawfully appointed, is murder or manſlaughter, as the caſe happens, and tho there was ſome doubt, whether the killing of a perſon outlawed of felony were homicide or no, 2 *E.* 3. 6. yet it is homicide in both caſes. 27 *Aſſiz.* 41. *Coron.* 203.

If a perſon be condemned to be hanged, and the ſheriff behead him, this is murder, and the wife may have an appeal. 35 *H.* 6. 58. (*h*)

If a man be attaint in a *præmunire*, whereby he is put out of the king's protection, the killing of him was held not homicide. 24 *H.* 8. *B. Coron.* 197. but the ſtatute of 5 *Eliz. cap.* 1. (*i*) hath now put that out of queſtion declaring it to be unlawful. (*k*)

If a man kill an alien enemy within this kingdom, yet it is felony, unleſs it be in the heat of war, and in the actual exerciſe thereof.

5 S III. The

(*g*) *Exod.* xxi. 22.

(*h*) See alſo *Co. P. C. p.* 52. *quære*, in caſe of treaſon, (where the ſentence is, that the party ſhall be hanged, but not till he be dead, *&c.*) if the king remit all, but the hanging, whether it be not murder in the ſheriff to hang him till he be dead?

(*i*) *In fine.*

(*k*) See *Coron.* 203. where it is declared felony to kill one outlawed for felony.

FER-200

III. The third inquiry is, who ſhall be ſaid a perſon killing.

An infant under the age of fourteen years in preſumption of law is ſuppoſed without diſcretion, and therefore *primâ facie* he cannot commit murder or manſlaughter, but being indicted thereof, upon not guilty pleaded he ought to be found not guilty.

But if he be above that age, in preſumption of law he is of diſcretion, and may be guilty.

But if he be under the age of fourteen, yet if upon circumſtances it can appear, that he hath diſcretion, he may be convict of felony. 3 *H.* 7. 1. *b.* 12. *a.* (*l*)

If a man be *non compos mentis*, and kill a man, he is to plead not guilty, and ſhall be acquitted, and is not driven to purchaſe a pardon, tho antiently it was ſo uſed. *Stamford*'s *P. C.* 16. *b.* & *libros ibi.*

And the ſame law it is of a lunatic, that kills a man in the time of his lunacy; but if it be in thoſe intervals, when he hath his underſtanding, then he is a felon, *ſed de his ſupra. p.* 31.

If there be an actual forcing of a man, as if *A.* by force take the arm of *B.* and the weapon in his hand, and therewith ſtabs *C.* whereof he dies, this is murder in *A.* but *B.* is not guilty. *Dalt. cap.* 93. *p.* 242. (*m*). *Plowd. Com.* 19. *a.*

But if it be only a moral force, as by threatning, dureſs, or impriſonment, &c. this excuſeth not.

A *feme covert* is in law under the coercion of her huſband, and therefore, if ſhe commit larciny or burglary together with her huſband, the huſband is in law guilty, but regularly the wife is not guilty. *Stamf.* 26. *a. Coron.* 160. *Dalt. cap.* 104. *p.* 267. (*n*)

But if ſhe commit murder, or treaſon, or manſlaughter, it is no plea to ſay ſhe did it by coercion of her huſband, but ſhe is guilty, tho committed with her huſband. *Dalt. Ibid.*

3 CHAP.

(*l*) *Vide ſupra, p.* 27. (*m*) *New Edit. cap.* 145. *p.* 473. (*n*) *New Edit. cap.* 157. *p.* 503.

FER-201

**The Statutes Project**

Putting Historic British Law Online

PLAINTIFF'S
TRIAL EXHIBIT
1057
1:24-cv-00244-BLW

# 1803: 43 George 3 c.58: Lord Ellenborough's Act

**1803: 43 Geo 3 c.58: An Act for the further prevention of malicious shooting and attempting to discharge loaded fire-arms, stabbing, cutting, wounding, poisoning and the malicious using of means to procure the miscarriage of women; and also the malicious setting fire to buildings; and also for repealing a certain Act, made in England in the twenty-first year of the late King James the First, intituled *An act to prevent the destroying and murthering of bastard children*; and also an act made in Ireland in the sixth year of the late Queen Anne, also intituled, *An act to prevent the destroying and murthering of bastard children*; and for making other provisions in lieu thereof.**

[June 24, 1803.]

WHEREAS divers cruel and barbarous outrages have been of late wickedly and wantonly committed in divers parts of England and Ireland, upon the persons of divers of his Majesty's subjects, either with intent to murder, or to rob, or to maim, disfigure or disable, or to do other grievous bodily harm to such subjects: and whereas the provisions now by law made for the prevention of such offences, have been found ineffectual for that purpose: and whereas certain other heinous offences, committed with intent to destroy the lives of his Majesty's subjects by poison or with intent to procure the miscarriage of women, or with intent, by burning, to destroy or injure the buildings and other properties of his Majesty's subjects, or to prejudice persons who have become insurers of or upon the same, have been of late also frequently committed; but no adequate means have been hitherto provided for the prevention and punishment of such offences; be it therefore enacted by the King's most excellent majesty, by and with the advice and consent of the lords spiritual and temporal, and commons, in this present parliament assembled, and by the authority of the same, That if any person or persons from and after the first day of July in the year of our Lord one thousand eight hundred and three, shall, either in England or Ireland, wilfully, maliciously, and unlawfully shoot at any of his Majesty's subjects or shall wilfully, maliciously, and unlawfully present, point, or level any kind of loaded fire-arms at any of his Majesty's subjects, and attempt by drawing a trigger or in any other manner, to discharge the same at or against his or their person or persons, or shall wilfully, maliciously, and unlawfully stab or cut any of his Majesty's subjects, with intent in so doing, or by means thereof, to murder, or rob, or to maim, disfigure or disable such his Majesty's subject or subjects, or with intent to do some other grievous bodily harm to such his Majesty's subject or subjects, or with intent to ob-

struct, resist, or prevent the lawful apprehension and detainer of the person or persons so stabbing or cutting, or the lawful apprehension and detainer of any of his, her, or their accomplices for any offences for which he, she or they may respectively be liable by law to be apprehended, imprisoned, or detained, or shall wilfully, maliciously, and unlawfully administer to, or cause to be administered to or taken by any of his Majesty's subjects, any deadly poison, or other noxious and destructive substance or thing, with intent such his Majesty's subject or subjects thereby to murder, or thereby to cause and procure the miscarriage of any woman, then being quick with child; or shall wilfully, maliciously, and unlawfully set fire to any house, barn, hop oast, malthouse, stable, coach house, outhouse, mill, warehouse or shop, whether such house, barn, hop oast, malthouse, stable, coach house, outhouse, mill, warehouse or shop shall then be in the possession of the person or persons so setting fire to the same, or in the possession of any other person or persons, or of any body corporate, with intent thereby to injure or defraud his Majesty or any of his Majesty's subjects, or any body corporate, that then, and in every such case, the person or persons so offending, their counsellors, aiders, and abettors, knowing of any privy to such offence, shall be and are hereby declared to be felons, and shall suffer death as in felony without benefit of clergy: provided always, that in case it shall appear on the trial of any person or persons indicted for the wilfully, maliciously, and unlawfully shooting at any of his Majesty's subjects, or for wilfully, maliciously, and unlawfully presenting, pointing, or levelling any kind of loaded fire-arms at any of his Majesty's subjects, and attempting, by drawing a trigger, or in any other manner, to discharge the same at or against his or their person or persons, or for the wilfully, maliciously, and unlawfully stabbing or cutting any of his Majesty's subjects with such intent as aforesaid, that such acts of stabbing or cutting were committed under such circumstances as that if death had ensued therefrom the same would not in law have amounted to the crime of murder, that then and in every such case the person or persons so indicted shall be deemed and taken to be not guilty of the felonies whereof they shall be so indicted, but be thereof acquitted.

II. And whereas it may sometimes happen that poison or some other destructive or noxious and destructive substance or thing may be given, or other means used, with intent to procure miscarriage or abortion where the woman may not be quick with child at the time, or it may not be proved that she was quick with child; be it therefore further enacted, That if any person or persons, from and after the said first day of July in the said year of our Lord one thousand eight hundred and three, shall wilfully and maliciously administer to, or cause to be administered to, or taken by any woman, any medicines, drug, or other substance or thing whatsoever, or shall use or employ or cause or procure to be used or employed any instrument or other means whatsoever, with intent thereby to cause the miscarriage of any woman not being, or not being proved to be, quick with child at the time of administering such things or using such means, that then and in every such case the person or persons so offending, their counsellors, aiders, and abettors, knowing of and being privy to such offence, shall be and are hereby declared to be guilty of felony, and shall be liable to be fined, imprisoned, set in and upon the pillory, publickly or privately whipped, or to suffer one or more of the said punishments, or to be transported beyond the seas for any term not exceeding fourteen years, at the discretion of the court before which such offender shall be tried and convicted.

III. And whereas doubts have been entertained respecting the true meaning of a certain act of parliament made in England in the twenty-first year of the reign of his late majesty King James the First, intituled *An act to prevent the destroying and murthering of bastard children*; and also of a certain other act of parliament, made in Ireland in the sixth year of the reign of her late Majesty Queen Anne, also intituled, *An act to prevent the destroying and*

*murthering of bastard children*; and the same have been found in sundry cases difficult and inconvenient to be put in practice; for remedy whereof, be it enacted by the authority aforesaid, That, from and after the first day of July in the year of our Lord one thousand eight hundred and three, the said two several acts, and everything therein contained, shall be, and the same are hereby repealed; and that, from and after the said first day of July in the said year of our Lord one thousand eight hundred and three, the trials in England and Ireland respectively of women charged with the murder of any issue of their bodies, male or female, which being born alive would by law be bastard, shall proceed and be governed by such and the like rules of evidence and of presumption as are by law used and allowed to take place in respect to other trials for murder, and as if the two said several acts had never been made.

IV. Provided always, and be it enacted, That it shall and may be lawful for the jury by whole verdict any prisoner charged with such murder as aforesaid shall be acquitted, to find in case it shall so appear in evidence that the prisoner was delivered of issue of her body, male or female, which, if born alive, would have been bastard, and that she did, by secret burying, or otherwise, endeavour to conceal the birth thereof, and thereupon it shall be lawful for the court before which such prisoner shall have been tried to adjudge that such prisoner shall be committed to the common goal or house of correction for any time not exceeding two years.

Source: Wikisource

Further information: Wikipedia

# Offences Against the Person Act 1861

**1861 CHAPTER 100**

An Act to consolidate and amend the Statute Law of *England* and *Ireland* relating to Offences against the Person. [6th August 1861]

WHEREAS it is expedient to consolidate and amend the Statute Law of *England* and *Ireland* relating to Offences against the Person :

Be it enacted by the Queen's most Excellent Majesty, by and with the Advice and Consent of the Lords Spiritual and Temporal, and Commons, in this present Parliament assembled, and by the Authority of the same, as follows :

*Homicide*

**1 Murder.**

Whosoever shall be convicted of Murder shall suffer Death as a Felon.

**2 Sentence for Murder.**

Upon every Conviction for Murder the Court shall pronounce Sentence of Death, and the same may be earned into execution, and all other Proceedings upon such Sentence and in respect thereof may be had and taken, in the same Manner in all respects as Sentence of Death might have been pronounced and carried into execution, and all other Proceedings thereupon and in respect thereof might have been had and taken, before the passing of this Act, upon a Conviction for any other Felony for which the Prisoner might have been sentenced to suffer Death as a Felon.

**3 Body to be buried in Prison.**

The Body of every Person executed for Murder shall be buried within the Precincts of the Prison in which he shall have been last confined after Conviction, and the Sentence of the Court shall so direct.

PLAINTIFF'S
TRIAL EXHIBIT
1058
1:24-cv-00244-BLW
FER 205

### 4 Conspiring or soliciting to commit Murder

All Persons who shall conspire, confederate, and agree to murder any Person, whether, he be a Subject of Her Majesty or not, and whether he be within the Queen's Dominions or not, and whosoever shall solicit, encourage, persuade, or endeavour to persuade, or shall propose to any Person, to murder any other Person, whether he be a Subject of Her Majesty or not, and whether he be within the Queen's Dominions or not, shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for any Term not more than Ten and not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

### 5 Manslaughter.

Whosoever shall be convicted of Manslaughter shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour, or to pay such Fine as the Court shall award, in addition to or without any such other discretionary Punishment as aforesaid.

### 6 Indictment for Murder or Manslaughter.

In any Indictment for Murder or Manslaughter, or for being an Accessory to any Murder or Manslaughter, it shall not be necessary to set forth the Manner in which or the Means by which the Death of the Deceased was caused, but it shall be sufficient in any Indictment for Murder to charge that the Defendant did feloniously, wilfully, and of his Malice aforethought kill and murder the Deceased ; and it shall be sufficient in any Indictment for Manslaughter to charge that the Defendant did feloniously kill and slay the Deceased; and it shall be sufficient in any Indictment against any Accessory to any Murder or Manslaughter to charge the Principal with the Murder or Manslaughter (as the Case may be) in the Manner herein-before specified, and then to charge the Defendant as an Accessory in the Manner heretofore used and accustomed.

### 7 Excusable Homicide.

No Punishment or Forfeiture shall be incurred by any Person who shall kill another by Misfortune or in his own Defence, or in any other Manner without Felony.

### 8 Petit Treason.

Every Offence which before the Commencement of the Act of the Ninth Year of King *George* the Fourth, Chapter Thirty-one, would have amounted to Petit Treason, shall be deemed to be Murder only, and no greater Offence; and all Persons guilty in respect thereof, whether as Principals or as Accessories, shall be dealt with, indicted, tried, and punished as Principals and Accessories in Murder.

### 9 Murder or Manslaughter abroad.

Where any Murder or Manslaughter shall be committed on Land out of the United Kingdom, whether within the Queen's Dominions or without, and whether the Person killed were a Subject of Her Majesty or not, every Offence committed by any Subject of Her Majesty, in respect of any such Case, whether the same shall amount to

the Offence of Murder or of Manslaughter, or of being accessory to Murder or Manslaughter, may be dealt with, inquired of, tried, determined, and punished in any County or Place in *England* or *Ireland* in which such Person shall be apprehended or be in Custody, in the same Manner in all respects as if such Offence had been actually committed in that County or Place; provided that nothing herein contained shall prevent any Person from being tried in any Place out of *England* of *Ireland* for any Murder or Manslaughter committed out Of *England* or *Ireland*, in the same Manner as such Person might have been tried before the passing of this Act.

**10 Provision for the Trial of Murder and Manslaughter where the Death or Cause of Death only happens in England or Ireland.**

Where any Person, being feloniously stricken, poisoned, or otherwise hurt upon the Sea, or at any Place out of *England* or *Ireland*, shall die of such Stroke, Poisoning, or Hurt in *England* or *Ireland*, or, being feloniously stricken, poisoned, or otherwise hurt at any Place in *England* or *Ireland*, shall die of such Stroke, Poisoning, or Hurt upon the Sea, or at any Place out of *England* or *Ireland*, every Offence committed in respect of any such Case, whether the same shall amount to the Offence of Murder or of Manslaughter, or of being accessory to Murder or Manslaughter, may be dealt with, inquired of, tried, determined, and punished in the County or Place in *England* or *Ireland* in which such Death, Stroke, Poisoning, or Hurt shall happen, in the same Manner in all respects as if such Offence had been wholly committed in that County or Place.

*Attempts to murder*

**11 Administering Poison, or wounding with Intent to murder.**

Whosoever shall administer to or cause to be administered to or to be taken by any Person any Poison or other destructive Thing, or shall by any Means whatsoever wound or cause any grievous bodily Harm to any Person, with Intent in any of the Cases aforesaid to commit Murder, shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Three Years, or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour, and with or without Solitary Confinement.

**12 Destroying or damaging a Building with Gunpowder, with Intent to murder.**

Whosoever, by the Explosion of Gunpowder or other explosive Substance, shall destroy or damage any Building with Intent to commit Murder, shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Three Years, or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour, and with or without Solitary Confinement.

**13 Setting fire to or casting away a Ship with Intent to murder.**

Whosoever shall set fire to any Ship or Vessel or any Part thereof, or any Part of the Tackle, Apparel, or Furniture thereof, or any Goods or Chattels being therein, or shall cast away or destroy any Ship or Vessel, with Intent in any of such Cases to commit Murder, shall be guilty of Felony, and being convicted thereof shall be liable, at the

Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour, and with or without Solitary Confinement.

### 14 Attempting to Administer Poison, or shooting or attempting to shoot or attempting to drown &c., with Intent to murder.

Whosoever shall attempt to administer to or shall attempt to cause to be administered to or to be taken by any Person any Poison or other Destructive Thing, or shall shoot at any Person, or shall, by drawing a Trigger or in any other Manner, attempt to discharge any kind of loaded Arms at any Person, or shall attempt to drown, suffocate, or strangle any Person, with Intent, in any of the Oases aforesaid, to commit Murder, shall, whether any bodily Injury be effected or not, be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour, and with or without Solitary Confinement.

### 15 By any other Means attempting to commit Murder.

Whosoever shall, by any Means other than those specified in any of the preceding. Sections of this Act, attempt to commit Murder, shall be guilty of Felony, and being convicted thereof shall be liable, at tho Discretion of the Court, to be kept in Penal Servitude for Life or for any Terra not less than Three years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour, and with or without Solitary Confinement.

*Letters threatening to murder*

### 16 Sending Letters threatening to murder.

Whosoever shall maliciously send, deliver, or utter, or directly or indirectly cause to be received, knowing the Contents thereof, any Letter or Writing threatening to kill or murder any Person, shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for any Term not exceeding Ten Years and not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour, and with or without Solitary Confinement, and, if a Male under the Age of Sixteen Years, with or without Whipping.

*Acts causing or tending to cause Danger to Life or bodily Harm*

### 17 Impeding a Person endeavouring to save himself from Shipwreck.

Whosoever shall unlawfully and maliciously prevent or impede any Person, being on board of or having quitted any Ship or Vessel which shall be in Distress, or wrecked, stranded, or cast on shore, in his Endeavour to save his Life, or shall unlawfully and maliciously prevent or impede any Person in his Endeavour to save the Life of any such Person as in this Section first aforesaid, shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Three Years,—or to be imprisoned

for any Term not exceeding Two Years, with or without Hard Labour, and with or without Solitary Confinement.

**18 Shooting or attempting to shoot, or wounding with Intent to do grievous bodily Harm.**

Whosoever shall unlawfully and maliciously by any Means whatsoever wound or cause any grievous bodily Harm to any Person, or shoot at any Person, or, by drawing a Trigger or in any other Manner, attempt to discharge any Kind of loaded Arms at any Person, with Intent, in any of the Cases aforesaid, to maim, disfigure, or disable any Person, or to do some other grievous bodily Harm to any Person, or with Intent to resist or prevent the lawful Apprehension or Detainer of any Person, shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour, and with or without Solitary Confinement.

**19 What shall constitute loaded Arms.**

Any Gun, Pistol, or other Arms which shall be loaded in the Barrel with Gunpowder or any other explosive Substance, and Ball, Shot, Slug, or other destructive Material, shall be deemed to be loaded Arms within the Meaning of this Act, although the Attempt to discharge the same may fail from want of proper Priming or from any other Cause.

**20 Inflicting bodily Injury, with or without Weapon.**

Whosoever shall unlawfully and maliciously wound or inflict any grievous bodily Harm upon any other Person, either with or without any Weapon or Instrument, shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for the Term of Three Years, or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

**21 Attempting to choke, &c. in order to commit any indictable Offence.**

Whosoever shall, by any Means -whatsoever, attempt to choke, suffocate, or strangle any other Person, or shall, by any Means calculated to choke, suffocate, or strangle, attempt to render any other Person insensible, unconscious, or incapable of Resistance, with Intent in any of such Cases thereby to enable himself or any other Person to commit, or with Intent in any of such Cases thereby to assist any other Person in committing, any indictable Offence, shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

**22 Using Chloroform, &c. to commit any indictable Offence.**

Whosoever shall unlawfully apply or administer to or cause to be taken by, or attempt to apply or administer to or attempt to cause to be administered to or taken by, any Person, any Chloroform, Laudanum, or other stupefying or overpowering Drug, Matter, or Thing, with Intent in any of such Cases thereby to enable himself or any other Person to commit, or with Intent in any of such Cases thereby to assist any

other Person in committing, any indictable Offence, shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any other Term not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

### 23 Maliciously administering Poison, &c. so as to endanger Life or inflict grievous bodily Harm.

Whosoever shall unlawfully and maliciously administer to or cause to be administered to or taken by any other Person any Poison or other destructive or noxious Thing so as thereby to endanger the Life of such Person, or so as thereby to inflict upon such Person any grievous bodily Harm, shall be guilty of Felony and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for any Term not exceeding Ten Years and not less than Three Years, or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

### 24 Maliciously administering Poison, &c. with Intent to injure, aggrieve, or annoy any other Person.

Whosoever shall unlawfully and maliciously administer to or cause to be administered to or taken by any other Person any Poison or other destructive or noxious Thing, with Intent to injure, aggrieve, or annoy such Person, shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for the Term of Three Years, or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

### 25 If the Jury be not satisfied that any Person charged is guilty of Felony; but guilty of Misdemeanor they may find him guilty accordingly.

If, upon the Trial of any Person for any Felony in the last but one preceding section mentioned, the Jury shall not be satisfied that such Person is guilty thereof, but shall be satisfied that he is guilty of any Misdemeanor in the last preceding Section mentioned, then and in every such Case the Jury may acquit the Accused of such Felony, and find him guilty of such Misdemeanor, and thereupon he shall be liable to be punished in the same Manner as if convicted upon an Indictment for such Misdemeanor.

### 26 Not providing Apprentices or Servants with Food, &c. whereby Life endandered.

Whosoever, being legally liable, either as a Master or Mistress, to provide for any Apprentice or Servant necessary Food, Clothing, or Lodging, shall wilfully and without lawful Excuse refuse or neglect to provide the same, or shall unlawfully and maliciously do or cause to be done any bodily Harm to any such Apprentice or Servant, so that the Life of such Apprentice or Servant shall be endangered, or the Health of such Apprentice or Servant shall have been or shall be likely to be permanently injured, shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for the Term of Three Years, or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

## 27 Exposing Children whereby Life endangered.

Whosoever shall unlawfully abandon or expose any Child, being under the Age of Two Years, whereby the Life of such Child shall be endangered, or the Health of such Child shall have been or shall be likely to be permanently injured, shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for the Term of Three Years, or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

## 28 Causing bodily Injury by Gunpowder.

Whosoever shall unlawfully and maliciously, by the Explosion of Gunpowder or other explosive Substance, burn, maim, disfigure, disable, or do any grievous bodily Harm to any Person, shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour, and with or without Solitary Confinement, and, if a Male under the Age of Sixteen Years, with or without Whipping.

## 29 Causing Gunpowder to explode, to any Person an explosive Substance, or throwing corrosive Fluid on a Person, with Intent to do grievous bodily Harm.

Whosoever shall unlawfully and maliciously cause any Gunpowder or other explosive Substance to explode, or send or deliver to or cause to be taken or received by any Person any explosive Substance or any other dangerous 01 noxious Thing, or put or lay at any Place, or cast or throw at or upon or otherwise apply to any Person, any corrosive Fluid or any destructive or explosive Substance, with Intent in any of the Cases aforesaid to burn, maim, disfigure, or disable any Person, or to do some grievous bodily Harm to any Person, shall, whether any bodily Injury be effected or not, be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour, and with or without Solitary Confinement, and if a Male under the Age of Sixteen Years, with or without Whipping.

## 30 Placing Gunpowder near a Building, with Intent to do bodily Injury to any Person.

Whosoever shall unlawfully and maliciously place or throw in, into, upon, against, or near any Building, Ship, or Vessel any Gunpowder or other explosive Substance, with Intent to do any bodily Injury to any Person, shall, whether or not any Explosion take place, and whether or not any bodily Injury be effected, be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for any Term not exceeding Fourteen Years and not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour, and with or without Solitary Confinement, and if a Male under the Age of Sixteen Years, with or without Whipping.

## 31 Setting Spring Guns, &c., with Intent to inflict grievous bodily Harm.

Whosoever shall set or place, or cause to be set or placed, any Spring Gun, Man Trap, or other Engine calculated to destroy Human Life or inflict grievous bodily

Harm, with the Intent that the same or whereby the same may destroy or inflict grievous bodily Harm upon a Trespasser or other Person coming in contact therewith, shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for the Term of Three Years, or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour; and whosoever shall knowingly and wilfully permit any such Spring Gun, Man Trap, or other Engine which may have been set or placed in any Place then being in or afterwards coming into his Possession or Occupation by some other Person to continue so set or placed, shall be deemed to have set and placed such Gun, Trap, or Engine with such Intent as aforesaid: Provided that nothing in this Section contained shall extend to make it illegal to set or place any Gin or Trap such as may have been or may be usually set or placed with the Intent of destroying Vermin: Provided also, that nothing in this Section shall be deemed to make it unlawful to set or place or cause to be set or placed, or to be continued set or placed, from Sunset to Sunrise, any Spring Gun, Man Trap, or other Engine, which shall be set or placed, or caused or continued to be set or placed, in a Dwelling House, for the Protection thereof.

### 32 Placing Wood, &c., on a Railway, with Intent to endanger Passengers.

Whosoever shall unlawfully and maliciously put or throw upon or across any Railway any Wood, Stone, or other Matter or Thing, or shall unlawfully and maliciously take up, remove, or displace any Rail, Sleeper, or other Matter or Thing belonging to any Railway, or shall unlawfully and maliciously turn, move, or divert any Points or other Machinery belonging to any Railway, or shall unlawfully and maliciously make or show, hide or remove, any Signal or Light upon or near to any Railway, or shall unlawfully and maliciously do or cause to be done any other Matter or Thing, with Intent, in any of the Cases aforesaid, to endanger the Safety of any Person travelling or being upon such Railway, shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour, and if a Male under the Age of Sixteen Years with or without Whipping.

### 33 Casting Stone, &c. upon a Railway Carriage, with Intent to endanger the Safety of any Person therein.

Whosoever shall unlawfully and maliciously throw, or cause to fall or strike, at, against, into, or upon any Engine, Tender, Carriage, or Truck used upon any Railway, any Wood, Stone, or other Matter or Thing, with Intent to injure or endanger the Safety of any Person being in or upon such Engine, Tender, Carriage, or Truck, or in or upon any other Engine, Tender, Carriage, or Truck of any Train of which such first-mentioned Engine, Tender, Carriage, or Truck shall form Part, shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

### 34 Doing or emitting anything to endanger Passengers by Railway.

Whosoever, by any unlawful Act, or by any wilful Omission or Neglect, shall endanger or cause to be endangered the Safety of any Person conveyed or being in or upon a Railway, or shall aid or assist therein, shall be guilty of a Misdemeanor, and

being convicted thereof shall be liable, at the Discretion of the Court, to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

### 35 Drivers of Carriages injuring Persons by furious Driving.

Whosoever, having the Charge of any Carriage or Vehicle, shall, by wanton or furious Driving or Racing, or other wilful Misconduct, or by wilful Neglect, do or cause to be done any bodily Harm to any Person whatsoever, shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

*Assaults*

### 36 Obstructing or assaulting a Clergyman or other Minister in the Discharge of his Duties.

Whosoever shall, by Threats or Force, obstruct or prevent, or endeavour to obstruct or prevent, any Clergyman or other Minister in or from celebrating Divine Service or otherwise officiating in any Church, Chapel, Meeting House, or other Place of Divine Worship, or in or from the Performance of his Duty in the lawful Burial of the Dead in any Churchyard or other Burial Place, or shall strike or offer any Violence to, or shall, upon any Civil Process, or under the Pretence of executing any Civil Process, arrest any Clergyman or other Minister who is engaged in, or to the Knowledge of the Offender is about to engage in, any of the Rites or Duties in this Section aforesaid, or who to the Knowledge of the Offender shall be going to perform the same or returning from the Performance thereof, shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

### 37 Assaulting a Magistrate, &c. on account of his preserving Wreck.

Whosoever shall assault and strike or wound any Magistrate, Officer, or other Person whatsoever lawfully authorized, in or on account of the Exercise of his Duty in or concerning the Preservation of any Vessel in Distress, or of any Vessel, Goods, or Effects wrecked, stranded, or cast on shore, or lying under Water, shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for any Term not exceeding Seven Years and not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

### 38 Assault with Intent to commit Felony, or on Peace Officers, &c.

Whosoever shall assault any Person with Intent to commit Felony, or shall assault, resist, or wilfully obstruct any Peace Officer in the due Execution of his Duty, or any Person acting in aid of such Officer, or shall assault any Person with Intent to resist or prevent the lawful Apprehension or Detainer of himself or of any other Person for any Offence, shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

### 39 Assaults with Intent to obstruct the Sale of Grain, or its free Passage.

Whosoever shall beat, or use any Violence or Threat of Violence to any Person, with Intent to deter or hinder him from buying, selling, or otherwise disposing of, or to compel him to buy, sell, or otherwise dispose of, any heat or other Grain, Flour, Meal, Malt, or Potatoes, in any Market or other Place, or shall beat or use any such Violence or Threat to any Person having the Care or Charge of any Wheat or other Grain, Flour, Meal, Malt, or Potatoes, whilst on the Way to or from any City, Market Town, or other Place, with Intent to stop the Conveyance of the same, shall, on conviction thereof before Two Justices of the Peace, be liable to be imprisoned and kept to Hard Labour in the Common Gaol or House of Correction for any Term not exceeding Three Months: Provided that no Person who shall be punished for any such Offence by virtue of this Section shall be punished for the same Offence by virtue of any other Law whatsoever.

### 40 Assaults on Seamen, &c.

Whosoever shall unlawfully and with Force hinder or prevent any Seaman, Keelman, or Caster from working at or exercising his lawful Trade. Business, or Occupation, or shall beat or use any Violence to any such Person with Intent to hinder or prevent him from working at or exercising the same, shall, on Conviction thereof before Two Justices of the Peace, be liable to be imprisoned and kept to Hard Labour in the Common Gaol or House of Correction for any Term not exceeding Three Months: Provided that no Person who shall be punished for any such Offence by reason of this Section shall be punished for the same Offence by virtue of any other Law whatsoever.

### 41 Assaults arising from Combination.

Whosoever, in pursuance of any unlawful Combination or Conspiracy to raise the Rate of Wages, or of any unlawful Combination or Conspiracy respecting any Trade, Business, or Manufacture, or respecting any Person concerned or employed therein, shall unlawfully assault any Person, shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour,

### 42 Persons committing any Common Assault or Battery may be imprisoned or compelled by Two Magistrates to pay Fine and Costs not exceeding 5l.

Where any Person shall unlawfully assault or beat any other Person, Two Justices of the Peace, upon Complaint by or on behalf of the Party aggrieved, may hear and determine such Offence, and the Offender shall, upon Conviction thereof before them, at the Discretion of the Justices, either be committed to the Common Gaol or House of Correction, there to be imprisoned with or without Hard Labour for any Term not exceeding Two Months, or else shall forfeit and pay such Fine as shall appear to them to be meet, not exceeding, together with Costs (if ordered), the Sum of Five Pounds; and if such Fine as shall be so awarded, together with the Costs (if ordered), shall not be paid, either immediately after the Conviction or within such Period as the said Justices shall at the Time of the Conviction appoint, they may commit the Offender to the Common Gaol or House of Correction, there to be imprisoned, with or without Hard Labour, for any Term not exceeding Two Months, unless such Fine and Costs be sooner paid.

### 43 Persons convicted of aggravated Assaults on Females and Boys under Fourteen Years of Age may be imprisoned or fined.

When any Person shall be charged before Two Justices of the Peace with an Assault or Battery upon any Male Child whose Age shall not in the Opinion of such Justices exceed Fourteen Years, or upon any Female, either upon the Complaint of the Party aggrieved or otherwise, the said Justices, if the Assault or Battery is of such an aggravated Nature that it cannot in their Opinion be sufficiently punished under the Provisions herein-before contained as to Common Assaults and Batteries, may proceed to hear and determine the same in a summary Way, and, if the same be proved, may convict the Person accused ; and every such Offender shall be liable to be imprisoned in the Common Gaol or House of Correction, with or without Hard Labour, for any Period not exceeding Six Months, or to pay a Fine not exceeding (together with Costs) the Sum of Twenty Pounds, and in default of Payment to be imprisoned in the Common Gaol or House of Correction for any Period not exceeding Six Months, unless such Fine and Costs be sooner paid, and, if the Justices shall no think fit, in any of the said Oases, shall be bound to keep the Peace and be of good Behaviour for any Period not exceeding Six Months from the Expiration of such Sentence.

### 44 If the Magistrates dismiss the Complaint, they shall make out a Certificate to that Effect.

If the Justices, upon the Hearing of any such Case of Assault or Battery upon the Merits, where the Complaint was preferred by or on the Behalf of the Party aggrieved, under either of the last Two preceding Sections, shall deem the Offence not to be proved, or shall find the Assault or Battery to have been justified, or so trifling as not to merit any Punishment, and shall accordingly dismiss the Complaint, they shall forthwith make out a Certificate under their Hands stating the Fact of such Dismissal and shall deliver such Certificate to the Party against whom the Complaint was preferred.

### 45 Certificate or Conviction shall be a Bar to any other Proceedings.

If any Person, against whom any such Complaint as in either of the last Three preceding Sections mentioned shall have been preferred by or on the Behalf of the Party aggrieved, shall have obtained such Certificate, or, having been convicted, shall have paid the whole Amount adjudged to be paid, or shall have suffered the Imprisonment or Imprisonment with Hard Labour awarded, in every such Case he shall be released from all further or other Proceedings, Civil or Criminal, for the same Cause.

### 46 These Provisions not to apply to certain Cases.

Provided, That in case the Justices shall find the Assault or Battery complained of to have been accompanied by any Attempt to commit Felony, or shall be of opinion that the same is, from any other Circumstance, a fit Subject for a Prosecution by Indictment, they shall abstain from any Adjudication thereupon, and shall deal with the Case in all respects in the same Manner as if they had no Authority finally to hear and determine the same: Provided also, that nothing herein contained shall authorize any Justices to hear and determine any Case of Assault or Battery in which any Question shall arise as to the Title to any Lands, Tenements, or Hereditaments, or any

Interest therein or accruing therefrom, or as to any Bankruptcy or Insolvency, or any Execution under the Process of any Court of Justice.

**47 Assault occasioning bodily Harm.**

Whosoever shall be convicted upon an Indictment of any Assault occasioning actual bodily Harm shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for the Term of Three Years, or to be imprisoned for any Term not exceeding Two Years, with of without Hard Labour; and whosoever shall be convicted upon an Indictment for a common Assault shall be liable, at the Discretion of the Court, to be imprisoned for any Term not exceeding One Year, with or without Hard Labour.

*Rape, Abduction, and Defilement of Women*

**48 Rape.**

Whosoever shall be convicted of the Crime of Rape shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Three Years, or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

**49 Procuring the Defilement of Girl under Age.**

Whosoever shall, by false Pretences, false Representations, or other fraudulent Means, procure any Woman or Girl under the Age of Twenty-one Years to have illicit carnal Connexion with any Man, shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

**50 Carnally knowing a Girl under Ten Years of Age.**

Whosoever shall unlawfully and carnally know and abuse any Girl under the Age of Ten Years shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

**51 Carnally knowing a Girl between the Ages of Ten and Twelve.**

Whosoever shall unlawfully and carnally know and abuse any Girl being above the Age of Ten Years and under the Age of Twelve Years shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for the Term of Three Years, or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

**52 Attempt to commit the last Two Offences.**

Whosoever shall be convicted of any indecent Assault upon any Female, or of any Attempt to have carnal Knowledge of any Girl under Twelve Years of Age, shall be liable, at the Discretion of the Court, to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour

### 53 Abduction of a Woman against her Will, from Motives of Lucre. Fraudulent Abduction of a Girl under Age against the Will of her Father, &c. Offender incapable of taking any of her Property.

Where any Woman of any Age shall have any Interest, whether legal or equitable, present or future, absolute, conditional, or contingent, in any Real or Personal Estate, or shall be a presumptive Heiress or Coheiress, or presumptive Next of Kin, or One of the presumptive Next of Kin, to any one having such Interest, whosoever shall, from Motives of Lucre, take away or detain such Woman against her Will, with Intent to marry or carnally know her, or to cause her to be married or carnally known by any other Person; and whosoever shall fraudulently allure, take away, or detain such Woman, being under the Age of Twenty-one Years, out of the Possession and against the Will of her Father or Mother, or of any other Person having the lawful Care or Charge of her, with Intent to marry or carnally know her, or to cause her to be married or carnally known by any other Person, shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for any Term not exceeding Fourteen Years and not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour; and whosoever shall be convicted of any Offence against this Section shall be incapable of taking any Estate or Interest, legal or equitable, in any Real or Personal Property of such Woman, or in which she shall have any such Interest, or which shall come to her as such Heiress, Coheiress, or Next of Kin as aforesaid; and if any such Marriage as aforesaid shall have taken place, such Property shall, upon such Conviction, be settled in such Manner as the Court of Chancery in *England* or *Ireland* shall upon any Information at the Suit of the Attorney General appoint.

### 54 Forcible Abduction of any Woman with Intent to marry her.

Whosoever shall, by Force, take away or detain against her Will any Woman, of any Age, with Intent to marry or carnally know her, or to cause her to be married or carnally known by any other Person, shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for any Term not exceeding Fourteen Years and not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

### 55 Abduction of a Girl under Sixteen Years of Age.

Whosoever shall unlawfully take or cause to be taken any unmarried Girl, being under the Age of Sixteen Years, out of the Possession and against the Will of her Father or Mother, or of any other Person having the lawful Care or Charge of her, shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

*Child-stealing*

### 56 Child-stealing.

Whosoever shall unlawfully, either by Force or Fraud, lead or take away, or decoy or entice away or detain, any Child under the Age of Fourteen Years, with Intent to deprive any Parent, Guardian, or other Person, having the lawful Care or Charge of such Child of the Possession of such Child, or with Intent to steal any Article

upon or about the Person of such Child, to whomsoever such Article may belong, and whosoever shall, with any such Intent, receive or harbour any such Child, knowing the same to have been, by Force or Fraud, led, taken, decoyed, enticed away, or detained as in this Section before mentioned, shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for any Term not exceeding Seven Years and not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour, and, if a Male under the Age of Sixteen Years, with or without Whipping: Provided that no Person who shall have claimed any Bight to the Possession of such Child, or shall be the Mother or shall have claimed to be the Father of an illegitimate Child, shall be liable to be prosecuted by virtue hereof on account of the getting Possession or such Child, or taking such Child out of the Possession of any Person having the lawful Charge thereof.

*Bigamy*

### 57 Bigamy. Offence may be dealt with where Offender shall be apprehended. Not to extend to Second Marriages, &c. herein stated.

Whosoever, being married, shall marry any other Person during the Life of the former Husband or Wife, whether the Second Marriage shall have taken place in *England* or *Ireland* or elsewhere, shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for any Term not exceeding Seven Years and not less than Three Years,—or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour; and any such Offence may be dealt with, inquired of, tried, determined, and punished in any County or Place in *England* or *Ireland* where the Offender shall be apprehended or be in Custody, in the same Manner in all respects as if the Offence had been actually committed in that County or Place: Provided that nothing in this Section contained shall extend to any Second Marriage contracted elsewhere than in *England* and *Ireland* by any other than a Subject of Her Majesty, or to any Person marrying a Second Time whose Husband or Wife shall have been continually absent from such Person for the Space of Seven Years then last past, and shall not have been known by such Person to be living within that Time, or shall extend to any Person who, at the Time of such Second Marriage, shall have been divorced from the Bond of the First Marriage, or to any Person whose former Marriage shall have been declared void by the Sentence of any Court of Competent Jurisdiction.

*Attempts to procure Abortion*

### 58 Administering Drugs or using Instruments to procure Abortion.

Every Woman, being with Child, who, with Intent to procure her own Miscarriage, shall unlawfully administer to herself any Poison or other noxious Thing, or shall unlawfully use any Instrument or other Means whatsoever with the like Intent, and whosoever, with Intent to procure the Miscarriage of any Woman, whether she be or be not with Child, shall unlawfully administer to her or cause to be taken by her any Poison or other noxious Thing, or shall unlawfully use any Instrument or other Means whatsoever with the like Intent, shall be guilty of Felony, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Three Years,—or to be imprisoned for any Term

not exceeding Two Years, with or without Hard Labour, and with or without Solitary Confinement.

**59 Procuring Drugs, &c. to cause Abortion.**

Whosoever shall unlawfully supply or procure any Poison or other noxious Thing, or any Instrument or Thing whatsoever, knowing that the same is intended to be unlawfully used or employed with Intent to procure the Miscarriage of any Woman, whether she be or be not with Child, shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for the Term of Three Years, or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

*Concealing the Birth of a Child*

**60 Concealing the Birth of a Child.**

If any Woman shall be delivered of a Child, every Person who shall, by any secret Disposition of the dead Body of the said Child, whether such Child died before, at, or after its Birth, endeavour to conceal the Birth thereof, shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour: Provided that if any Person tried for the Murder of any Child shall be acquitted thereof, it shall be lawful for the Jury by whose Verdict such Person shall be acquitted to find, in case it shall so appear in Evidence, that the Child had recently been born, and that such Person did, by some secret Disposition of the dead Body of such Child, endeavour to conceal the Birth thereof, and thereupon the Court may pass such Sentence as if such Person had been convicted upon an Indictment for the Concealment of the Birth.

*Unnatural Offences*

**61 Sodomy and Bestiality.**

Whosoever shall be convicted of the abominable Crime of Buggery, committed either with Mankind or with any Animal, shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Ten Years.

**62 Attempt to commit an infamous Crime.**

Whosoever shall attempt to commit the said abominable Crime, or shall be guilty of any Assault with Intent to commit the same, or of any indecent Assault upon any Male Person, shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for any Term not exceeding Ten Years and not less than Three Years, or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour.

**63 Carnal Knowledge defined.**

Whenever, upon the Trial for any Offence punishable under this Act, it may be necessary to prove carnal Knowledge, it shall not be necessary to prove the actual

Emission of Seed in order to constitute a carnal Knowledge, but the carnal Knowledge shall be deemed complete upon Proof of Penetration only.

*Making Gunpowder to commit Offences, and searching for the same*

### 64 Making or having Gunpowder, &c., with Intent to commit any Felony against this Act.

Whosoever shall knowingly have in his Possession, or make or manufacture, any Gunpower, explosive Substance, or any dangerous or noxious Thing, or any Machine, Engine, Instrument, or Thing, with Intent by means thereof to commit, or for the Purpose of enabling any other Person to commit, any of the Felonies in this Act mentioned, shall be guilty of a Misdemeanor, and being convicted thereof shall be liable, at the Discretion of the Court, to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour, and with or without Solitary Confinement, and if a Male under the Age of Sixteen Years, with or without Whipping.

### 65 Justices may issue Warrants for searching Houses, &c. in which explosive Substances are suspected to be made for the Purpose of committing Felonies against this Act

Any Justice of the Peace of any County or Place in which any such Gunpowder, or other explosive, dangerous, or noxious Substance or Thing, or any such Machine, Engine, Instrument, or Thing, is suspected to be made, kept, or carried for the Purpose of being used in committing any of the Felonies in this Act mentioned, upon reasonable Cause assigned upon Oath by any Person, may issue a Warrant under his Hand and Seal for searching, in the Daytime, any House, Mill, Magazine, Storehouse, Warehouse, Shop, Cellar, Yard, Wharf, or other Place, or any Carriage, Waggon, Cart, Ship, Boat, or Vessel, in which the same is suspected to be made, kept, or carried for such Purpose as herein-before mentioned; and every Person acting in the Execution of any such Warrant shall have, for seizing, removing to proper Places, and detaining all such Gunpowder, explosive, dangerous, or noxious Substances, Machines, Engines, Instruments, or Things, found upon such Search, which he shall have good Cause to suspect to be intended to be used in committing any such Offence, and the Barrels, Packages, Cases, and other Receptacles in which the same shall be, the same Powers and Protections which are given to Persons searching for unlawful Quantities of Gunpowder under the Warrant of a Justice by the Act passed in the Session holden in the Twenty-third and Twenty-fourth Years of the Reign of Her present Majesty, Chapter One hundred and thirty-nine, intituled *An Act to amend the Law concerning the making, keeping, and Carriage of Gunpowder and Compositions of an explosive Nature, and concerning the Manufacture, Sale, and Use of Fireworks*.

*Other Matters*

### 66 A Person loitering at Night, and suspected of any Felony against this Act, may be apprehended.

Any Constable or Peace Officer may take into Custody, without a Warrant, any Person whom he shall find lying or loitering in any Highway, Yard, or other Place during the Night, and whom he shall have good Cause to suspect of having committed or being

about to commit any Felony in this Act mentioned, and shall take such Person as soon as reasonably may be before a Justice of the Peace, to be dealt with according to Law.

**67 Punishment of Principals in the Second Degree, and Accessories.**

In the Case of every Felony punishable under this Act, every Principal in the Second Degree, and every Accessory before the Fact, shall be punishable in the same Manner as the Principal in the First Degree is by this Act punishable; and every Accessory after the Fact to any Felony punishable under this Act (except Murder) shall be liable to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour ; and every Accessory after the Fact to Murder shall be liable, at the Discretion of the Court, to be kept in Penal Servitude for Life or for any Term not less than Three Years, or to be imprisoned for any Term not exceeding Two Years, with or without Hard Labour; and whosoever shall counsel, aid, or abet the Commission of any indictable Misdemeanor punishable under this Act shall be liable to be proceeded against, indicted, and punished as a principal Offender.

**68 Offences committed within the Jurisdiction of the Admiralty.**

All indictable Offences mentioned in this Act which shall be committed within the Jurisdiction of the Admiralty of *England* or *Ireland* shall be deemed to be Offences of the same Nature and liable to the same Punishments as if they had been committed upon the Land in *England* or *Ireland*, and may be dealt with, inquired of, tried, and determined in any County or Place in *England* or *Ireland* in which the Offender shall be apprehended or be in Custody, in the same Manner in all respects as if they had been actually committed in that County or Place; and in any Indictment for any such Offence, or for being an Accessory to such an Offence, the Venue in the Margin shall be the same as if the Offence had been committed in such County or Place, and the Offence shall be averred to have been committed " on the High Seas :" Provided that nothing herein contained shall alter or affect any of the Laws relating to the Government of Her Majesty's Land or Naval Forces.

**69 Hard labour in Gaol or House of Correction.**

Whenever Imprisonment, with or without Hard Labour, may be awarded for any indictable Offence under this Act, the Court may sentence the Offender to be imprisoned, or to be imprisoned and kept to Hard Labour, in the Common Gaol or House of Correction.

**70 Solitary Confinement and Whipping**

Whenever Solitary Confinement may be awarded for any Offence under this Act, the Court may direct the Offender to be kept in Solitary Confinement for any Portion or Portions of any Imprisonment, or of any Imprisonment with Hard Labour, which the Court may award, not exceeding One Month at any One Time, and not exceeding Three Months in any One Year; and whenever Whipping may be awarded for any Offence under this Act, the Court may sentence the Offender to be once privately whipped, and the Number of Strokes and the Instrument with which they shall be inflicted shall be specified by the Court in the Sentence.

### 71 Fine, and Sureties for keeping the Peace; in what Cases.

Whenever any Person shall be convicted of any indictable Misdemeanor punishable under this Act, the Court may, if it shall think fit, in addition to or in lieu of any Punishment by this Act authorized, fine the Offender, and require him to enter into his own Recognizances, and to find Sureties, both, or either, for keeping the Peace and being of good Behaviour; and in case of any Felony punishable under this Act otherwise than with Death the Court may, if it shall think fit, require the Offender to enter into his own Recognizances and to find Sureties, both or either, for keeping the Peace, in addition to any Punishment by this Act authorized; provided that no Person shall be imprisoned for not finding Sureties under this Clause for any Period exceeding One Tear.

### 72 No Certiorari, &c.

No summary Conviction under this Act shall be quashed for Want of Form, or be removed by Certiorari into any of Her Majesty's Superior Courts of Record ; and no Warrant of Commitment shall be held void by reason of any Defect therein, provided it be therein alleged that the Party has been convicted, and there be a good and valid Conviction to sustain the same.

### 73 Guardians and Overseers may be required to prosecute in certain Cases of Offences against this Act. Costs of Prosecution. Clerk of Guardians may be bound over to prosecute.

Where any Complaint shall be made of any Offence against Section Twenty-six of this Act, or of any bodily Injury inflicted upon any Person under the Age of Sixteen Years, for which the Party committing it is liable to be indicted, and the Circumstances of which Offence amount, in point of Law, to a Felony, or an Attempt to commit a Felony, or an Assault with Intent to commit a Felony, and Two Justices of the Peace before whom such Complaint is heard shall certify under their Hands that it is necessary for the Purposes of Public Justice that the Prosecution should be conducted by the Guardians of the Union or Place, or, where there are no Guardians, by the Overseers of the Poor of the Place, in which the Offence shall be charged to have been committed, such Guardians or Overseers, as the Case may be, upon personal Service of such Certificate or a Duplicate thereof upon the Clerk of such Guardians or upon any One of such Overseers, shall conduct the Prosecution, and shall pay the Costs reasonably and properly incurred by them therein (so far as the same shall not be allowed to them under any Order of any Court) out of the Common Fund of the Union, or out of the Funds in the Hands of the Guardians or Overseers, as the Case may be; and, where there is a Board of Guardians, the Clerk or Borne other Officer of the Union or Place, and, where there is no Board of Guardians, One of the Overseers of the Poor, may, if such Justices think it necessary for the Purposes of Public Justice, be bound over to prosecute.

### 74 On a Conviction for Assault the Court may order Payment of the Prosecutor's Costs by the Defendant.

Where any Person shall be convicted on any Indictment of any Assault, whether with or without Battery and Wounding, or either of them, such Person may, if the Court think fit, in addition to any Sentence which the Court may deem proper for the Offence, be adjudged to pay to the Prosecutor his actual and necessary Costs and Expenses of the Prosecution, and such moderate Allowance for the Loss of Time

as the Court shall by Affidavit or other Inquiry and Examination ascertain to be reasonable; and, unless the Sum so awarded shall be sooner paid, the Offender shall be imprisoned for any Term the Court shall award, not exceeding Three Months, in addition to the Term of Imprisonment (if any) to which the Offender may be sentenced for the Offence.

**75 Such Costs may be levied by Distress.**

The Court may, by Warrant under Hand and Seal, order such Sum as shall be so awarded to be levied by Distress and Sale of the Goods and Chattels of the Offender, and paid to the Prosecutor, and that the Surplus, if any, arising from such Sale, shall be paid to the Owner; and in case such Sum shall be so levied the Imprisonment awarded until Payment of such Sum shall thereupon cease.

**76 Summary Proceedings in England may be under the 11 & 12 Vict. c. 43., and in Ireland under the 14 & 15 Vict. c. 93. Except in London and the Metropolitan Police District.**

Every Offence hereby made punishable on summary Conviction may be prosecuted in *England* in the Manner directed by the Act of the Session holden in the Eleventh and Twelfth Years of Queen Victoria, Chapter Forty-three, and may be prosecuted in *Ireland* before Two or more Justices of the Peace, or One Metropolitan or Stipendiary Magistrate, in the Manner directed by the Act of the Session holden in the Fourteenth and Fifteenth Years of Queen Victoria, Chapter Ninety-three, or in such other Manner as may be directed by any Act that may be passed for like Purposes ; and all Provisions contained in the said Acts shall be applicable to such Prosecutions in the same Manner as if they were incorporated in this Act: Provided that nothing in this Act contained shall in any Manner alter or affect any Enactment now in force relating to Procedure, in the Case of any Offence punishable on summary Conviction, within the City of *London* or the Metropolitan Police District, or the Recovery or Application of any Penalty or Forfeiture for any such Offence.

**77 The Costs of the Prosecution of Misdemeanors against this Act may be allowed.**

The Court before which any Misdemeanor indictable under the Provisions of this Act shall be prosecuted or tried may allow the Costs of the Prosecution in the same Manner as in Cases of Felony; and every Order for the Payment of such Costs shall be made out, and the Sum of Money mentioned therein paid and repaid, upon the same Terms and in the same Manner in all respects as in Cases of Felony.

**78 Act not to extend to Scotland.**

Nothing in this Act contained shall extend to *Scotland*, except as herein-before otherwise expressly provided.

**79 Commencement of Act**

This Act shall commence and take effect on the Day of November One thousand eight hundred and sixty-one.

**UNITED STATES DISTRICT COURT**

**DISTRICT OF IDAHO**

| | |
|---|---|
| STACY SEYB, M.D., Plaintiff, vs. MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; et al., Defendants. | CASE NO. 1:24-cv-00244-BLW **BENCH TRIAL DAY 1** |

**TRANSCRIPT OF PROCEEDINGS**
**BEFORE THE HONORABLE SENIOR DISTRICT JUDGE B. LYNN WINMILL**
**MONDAY, JUNE 8, 2026, 9:16 A.M.**
**BOISE, IDAHO**

Proceedings recorded by mechanical stenography, transcript produced by computer.

**TAMARA I. HOHENLEITNER, CSR 619, CRR, FCRR**
FEDERAL OFFICIAL COURT REPORTER
550 WEST FORT STREET, BOISE, IDAHO 83724

that route or for whatever reason did not have that opportunity. What you're saying is that in virtually all of the cases you were dealing with in terms of medically indicated abortions at a somewhat later stage in the pregnancy, those were all wanted pregnancies in which complications had arisen and called into question whether or not the pregnancy could be completed safely. Is that fair? If not, correct me.

THE WITNESS: I think that's fair, yes. I mean, a lot of ours depends on the pregnancy being far enough along that we can make a diagnosis if it's for fetal indication. And then, you know -- by the time people get to us, they -- yeah, it's a wanted pregnancy, and -- yeah.

THE COURT: All right. Go ahead.

Q. BY MS. O'NEILL: Dr. Seyb, since Idaho's abortion bans have been in effect, have you had to refer patients with serious medical needs to out-of-state abortion providers?

A. Yes.

Q. And if the abortion bans in Idaho were not in place, would you continue to provide abortion care to all patients with serious medical needs instead of referring them out of state?

A. Yes.

Q. Does that include patients with serious medical needs arising from physical health conditions?

A. Yes.

Q. How about mental health conditions?

early bleeding in her pregnancy, about 12 weeks or so. It -- pretty much it was a continual on and off thing over a period of time.

She was becoming anemic. She actually did receive some blood transfusions, and by the time we were to 17, 18 weeks, it was pretty clear that not only was this placing her in jeopardy, but the -- maternal health in jeopardy, but it was pretty unlikely that this patient -- the pregnancy was going to make it to 24 weeks, to viability.

And at that point, we decided to go to termination.

Q. If you encountered that same situation today, what would you have to do?

A. Send her to -- out of state.

Q. To receive abortion care?

A. To receive the abortion care, yes.

Q. In your medical opinion, is preeclampsia an indication for abortion?

A. Yes.

Q. Have you ever had a patient who had an abortion because of preeclampsia?

A. I have.

Q. I'll ask you again to return to Exhibit 1022, your expert report, if you could please go to page 8, paragraph 34, and review.

A. Yes.

patient-identifying details, could you discuss a specific example of a patient with heart failure?

A. Yes. This was a patient who actually developed what we call postpartum cardiomyopathy about three years prior to the index- -- the pregnancy where we were taking care of her.

Unfortunately, her heart condition really had not improved much, and ultimately the heart's ability to contract was compromised, and we worked with the cardiologist and, you know, looked at, Okay, what are the medical treatments that are available, and what are the risks of her getting much sicker or, you know, even going into complete heart failure, and ultimately we did terminate the pregnancy.

Q. Do you recall if this was before the abortion bans?

A. It definitely was.

Q. If you encountered a patient with the same condition today, what would you have to do?

A. I would refer her out of state.

Q. In your medical opinion, is chronic kidney disease an indication for abortion?

A. Yes.

Q. Have you ever had an abortion -- have you ever had a patient who had an abortion because of kidney disease?

A. Yes.

Q. Now, I'm going to ask you to refer to Plaintiff's Exhibit 1023, which is your expert -- your rebuttal expert report. If

**UNITED STATES DISTRICT COURT**

**DISTRICT OF IDAHO**

| | |
|---|---|
| STACY SEYB, M.D., | ) CASE NO. 1:24-cv-00244-BLW |
| | ) |
| Plaintiff, | ) **BENCH TRIAL DAY 4** |
| | ) |
| vs. | ) |
| | ) |
| MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; et al., | ) |
| | ) |
| Defendants. | ) |
| ______________________________ | ) |

**TRANSCRIPT OF PROCEEDINGS - VOLUME 4**
**BEFORE THE HONORABLE SENIOR DISTRICT JUDGE B. LYNN WINMILL**
**THURSDAY, JUNE 11, 2026, 9:12 A.M.**
**BOISE, IDAHO**

Proceedings recorded by mechanical stenography, transcript produced by computer.

__________________________________________________

**TAMARA I. HOHENLEITNER, CSR 619, CRR, FCRR**
FEDERAL OFFICIAL COURT REPORTER
550 WEST FORT STREET, BOISE, IDAHO  83724

And so I think what Coke was -- well, he certainly doesn't spell it out this way, but I think what he was getting at was given the uncertainties of proof, we shouldn't impose a death penalty in this case, so treat it not as a felony, murder, but as a great misprision.

Q. Let's talk about Hale. How does Hale treat abortion?

A. Hale is an interesting fellow. He was also a judge. And Coke -- Coke, by the way, besides being a judge, published the first case reports ever published in England and wrote these magnificent treatises that became the first systematic attempt to restate the common law after Bracton.

Hale, a generation younger than Coke, was a judge who made a lot of extensive notes for his own use about all kinds of legal questions. And in his will, he provided that they should be destroyed, they should not be published, which suggests to me that he didn't think they were finished, complete.

Nonetheless, they were not destroyed, and they were published in two forms with regard to abortion. Two different publications of Hale's notes were published, one called *Pleas of the Crown*, which was published in 1678, two years after he died, which is just an outline, an outline -- you know, this, this, this, this.

And then 60 years after he died, in 1736, a book was published in edited form, in textual narrative form, you could read it, called *History of the Pleas of the Crown*. Now, they

Q. So we're still talking about doctors. What role did medical license boards have in the 19th century with respect to abortion?
A. They actually took a stronger role in disciplining allopathic physicians at least, that is, so-called regulars, if they were found doing abortions and the courts said -- we don't know how many -- at least I don't know if anybody has done a compendium that would allow us to say how many licenses were suspended or revoked in total, or how many investigations medical license boards undertook in the 19th century.
But we do know that they did it because we have appeals in -- that reached the courts where someone was a doctor who had his -- and there is -- it was almost always a male, there were a few women doctors -- had his license revoked or suspended and appealed to the courts to challenge it.
And actually we have more appeals to the courts on license suspensions than we do on criminal prosecutions, so they're -- they're among the leading forces in enforcing the abortion prohibition.
Q. Are there state cases that reflect the life of the unborn as the justification for abortion statutes in the 19th century?
A. Oh, yes, almost all of them do.
Q. And those are reflected in your book?
A. Yes.
Q. All right. So moving to the 20th century in America, how

**UNITED STATES DISTRICT COURT**

**DISTRICT OF IDAHO**

| | |
|---|---|
| STACY SEYB, M.D., Plaintiff, vs. MEMBERS OF THE IDAHO BOARD OF MEDICINE, in their official capacities; et al., Defendants. | CASE NO. 1:24-cv-00244-BLW **BENCH TRIAL DAY 5** |

**TRANSCRIPT OF PROCEEDINGS - VOLUME 5**
**BEFORE THE HONORABLE SENIOR DISTRICT JUDGE B. LYNN WINMILL**
**FRIDAY, JUNE 12, 2026, 9:07 A.M.**
**BOISE, IDAHO**

Proceedings recorded by mechanical stenography, transcript produced by computer.

**TAMARA I. HOHENLEITNER, CSR 619, CRR, FCRR**
FEDERAL OFFICIAL COURT REPORTER
550 WEST FORT STREET, BOISE, IDAHO 83724

A. It increased.
Q. How do you know?
A. Well, one of the findings of my project to explore what women could learn about actual abortions in the 19th century involved amassing a database of abortions that were reported in the newspapers. The court records on abortions are remarkably terse and sparse. Docket books just often record the fact of the trial and the names of the participants and the charge and the outcome without any of the testimony.
And where we find the -- the rich fabric or the texture of what was going on in a trial was in newspaper reports that were happening at the time, and there was also a transformation in journalistic practices that welcomed crime reports and trial reports as a way of selling more newspapers, the kind of sensationalism in the news.
So in my study of 500 cases between 1800 -- 1820 is my first and 1868 was my stopping point, a quarter of those cases happened between 1820 and 1855, so 35 years to have the first quarter of cases.
MR. GREEN: Your Honor, I'm going to --
THE COURT: Well, let me ask a question and then you can state your --
MR. GREEN: There may be a salient point with my objection, Your Honor. Professor Cohen is talking about a database of 500 newspapers. That database in its complete form

A. Okay.
Q. You agree with Professor Dellapenna that abortion was uncommon in 18th century colonial America; right?
A. I do.
Q. Okay. You agree that it is not possible to determine if a miscarriage described in the historical record was actually code for abortion; right?
A. Could you say that again?
Q. You agree that it is not possible to determine if a miscarriage described in the historical record was actually code for an abortion; right?
A. Oh, in the historical record, you mean like advertisements?
Q. Generally.
A. Generally. I think when we talked about that before you drew my attention to advertisements in papers where -- I would say that they were advertisements by doctors who promised to unblock blocked flows, and that those, to my mind, could be completely legitimate because the whole history humoral medicine up through Storer here and Dr. Miller indicates that they think that's a treatment that needs to happen.
But there are also advertisements I've seen in newspapers where the unblocked flow or the pills advertised to solve female problems carry the line "not to be used if you are pregnant," you know. You know, serious problems if you do that. And that verges to me on being code for, if you want a treatment

Let's take a 15-minute break now, and if we have to take another break later, it will be very short, five minutes or so.

MR. GREEN: Thank you.

THE COURT: All right. We'll be in recess for 15 minutes.

(Recess at 1:33 p.m. until 1:52 p.m.)

THE COURT: Dr. Cohen, I'll remind you, you are still under oath.

Mr. Green, you may resume your cross.

MR. GREEN: Thank you.

Q. BY MR. GREEN: Professor, I believe you testified on direct concerning a number of articles and primary sources from the 19th and early 20th century.

Do you recall that?

A. Yes.

Q. And you testified that those are the kinds of articles and primary sources that you rely on as a historian in forming your opinion. Is that fair?

A. Yes.

Q. Okay. First, I would like to ask you about the -- I believe it's Bowditch letter?

A. Bowditch.

Q. Bowditch, thank you.

You were asked to read the Bowditch letter to

Dr. Storer; correct?
A. Yes.
Q. You did not read a reply from Dr. Storer; correct?
A. That's right.
Q. You were asked about exam questions published in the *Northwest Medical Journal*.
Do you recall that?
A. Yes.
Q. No answer was provided to those questions; correct?
A. Right.
Q. Okay. Do you recall being asked to read from -- or to discuss *Williams Obstetrics*?
A. Yes.
Q. Do you still have it in front of you?
A. I can pull it up.
Can remind me of the number of the exhibit.
Q. 1069, Plaintiff's 1069.
A. Yes.
Q. All right. And on the first page, is there a date of publication given?
A. On the second page there is, yes, 1903.
Q. All right. And you were asked to read part of page 338.
Do you recall that?
A. Yes.
Q. Okay. I'll have you read page 338 in context beginning

with the word "with" to the end of the page, and we'll move on to page 339.

A. "With the spread of Christianity, however, it came to be considered as criminal except when undertaken as a last resort in order to save the life of the mother. And we now draw a sharp distinction between criminal and therapeutic abortion.

"For full historical details, the reader is referred to the works of Levin and Brenning, Brouardel and Kleinwächter."

Continuing?

Q. Yes.

A. "Indications -- The three groups of cases may offer an indication for the operation. Thus, we may think it our duty to induce an abortion: One, as a direct means of saving the life of the mother; two, to do away with a condition which may threaten her life if gestation continues; and three, to avoid certain dangers which may supervene if the pregnancy is allowed to progress to full term.

"Under no circumstances should the operation be undertaken unless a careful and thorough examination has demonstrated that the patient is in a most serious condition. Her statements are entitled to but little weight, and the decision to interfere should be based

entirely upon objective symptoms and conditions.

"Moreover, the operation should never be undertaken without a consultation with a second physician, who assumes his share of the responsibility. This precaution, besides securing for the patient additional advice, will protect the physician from a possible blackmailing on the part of unscrupulous persons."

Another one?

Q. No. Thank you.

Do you recall being asked to read from an article by Russell entitled "Criminal Abortion"?

A. Yes.

Q. And did you, in reviewing the work, review the entire volume or issue of *Northwest Medicine* in which that article appears?

A. No.

Q. Are you aware that there is an article that immediately follows Russell's article?

A. I can't recall. I don't -- it's not in my brain right now.

MR. GREEN: I'm going to ask that a copy of this article, including both Russell and the following article, be given to the witness, hard copy.

THE COURT: Ms. Ardman.

Q. BY MR. GREEN: And if you would just take a moment to

review the entire document that's been given to you.

Does it appear to contain the work of Montgomery Russell that you quoted from previously?

A. The article? It follows the Russell article. I haven't had a chance to read it yet.

Q. Okay.

A. Just -- you mean by contain, refer to it; right?

Q. If you go back, this should contain pages 296 through 311 of Volume 5 of the *Journal of Northwest Medicine*. So including Russell and the following article.

A. Ah, okay. And I should read it quietly now?

Q. I was checking to see if that -- does this appear to be the article that follows upon Russell's article?

A. Yes. The pagination indicates that.

Q. All right. And if I could please have you read the title of the following article.

A. "A Plea for the Protection of the Unborn."

Q. And could I please have you read the paragraph at the end of the page and continuing on to the following page.

A. "Intention abortions are of two classes: Criminal, when performed for social reasons; and obstetric, when performed by the physician to save the life of the mother. We all consider it a gross blunder against the science of obstetrics to sacrifice the life of the infant unless it be the only means to save the life of

the mother.

"Of the latter form of abortion, it is scarcely necessary to speak, as the profession with asepsis and perfected technique has relegated craniotomy and other similar operations to oblivion where they rightfully belong. But of the former, there is an appalling increase. In fact, the modern Herod, in his slaughter of the innocents, is holding sway."

Q. Thank you. One moment.

Now I'll have you turn back to the Russell article on page 303, and I will have you read the final two paragraphs on that page.

A. "Abortion, of course, is sometimes justifiable as a therapeutic measure, and there are very few physicians who have practiced medicine for any length of time who have not had to perform the operation to save the life of the mother.

"The law leaves it entirely to the judgment of the medical profession to determine when it is necessary and warrantable to produce abortion. No wise physician, however, would bring this about except after deliberate consultation with one or more fellow-practitioners of repute.

"There is no immorality in producing an abortion therapeutically if it gives a chance of saving the

life of the mother, when, if it were not done, it would be almost certain that both mother and child would perish. The indications for therapeutic abortion appear, 'whenever the mother is suffering from disease arising from the pregnancy or originating before it, or accidentally occurring during it, which imperils her life, and there is a reasonable probability that she will recover if abortion occur.'"

The quotation was not credited to anyone that I see.

Q. Thank you.

You were also asked to read from an article by Parish; correct?

A. Yes.

Q. Would you please turn to that.

And once you're there, would you please tell me the date which Parish was published?

A. Yes. I'm still trying to find it.

Do you have the number handy there?

Q. Yes. That is 1067.

A. Published in 1893.

Q. You were asked to read part of page 154.

Do you recall that?

A. Yes.

Q. Would you please begin reading page 154 starting from the

top.

A. "A few words in reference to the justifiable production of abortion or of premature labor by members of the medical profession. That the production of delivery before the viability of the child, i.e., before the end of the sixth month, is at times justifiable, is recognized in the courts and by the medical profession. But the conditions which justify such a radical procedure are not numerous."

Continuing?

Q. Yes, please.

A. "Whenever it is necessary to terminate pregnancy in order to save the life of the mother, such a procedure is justifiable; if not thus necessary, the procedure is criminal.

"I grant that there is room for difference of opinion in the medical profession as to what conditions justify the production of abortion. The resort to an abortion may be reprehensible, though not criminal; for instance, when it is performed by a practitioner of medicine under the mistaken, though honest, opinion that an abortion is necessary to save the life of the mother.

"It is quite generally accepted that there are cases of disorders of the kidneys, or of the heart, of

degenerations of the ovum -- such as myxoma of the chorion and polyhydramnios" --

Q. I won't even attempt it.

A. Are you asking me to try again?

Q. No, I am not. Please continue.

A. -- "and very rarely instances of uncontrollable vomiting, in which the production of early or late abortion is demanded and justifiable, because it is necessary to save the life of the mother, and also because the death of the mother also always involves the death of the embryo and usually that of the child approaching maturity.

"The authoritative works on 'Medical Jurisprudence' class among the conditions justifying abortion, extreme pelvic deformity. Although this statement was a proper one at one time, it is not so at present, in my opinion."

Q. Please continue.

A. "The very favorable results of the Caesarean section, and of its modification, the Porro operation, and of symphysiotomy, so recently introduced into this country -- the results, I say, of these operations are now so very favorable, both to the mother and to the child, that it is time to eliminate even extreme pelvic deformity from the list of conditions

justifying early abortion.

"The law leaves it quite entirely to the medical profession to determine what constitutes justifiable abortion, either early or late. The responsibility in this direction thus placed upon us is a very weighty one, and the privilege conferred with it should be exercised with the utmost discretion.

"I have, in a very few instances, felt that the physician was getting very close to criminal ground when he produced an abortion under the plea of justifiability."

Q. I'll have you pause there for just a moment. Do you recall that you summarized a circumstance that Parish relates concerning a woman with a plea of insanity?

A. Yes.

Q. Okay. I'm going to have you read that section next, please.

A. "For instance, a lady pregnant three months wanted an abortion produced, and so did her husband, because she, having had one very painful labor, had great dread of another labor in advanced pregnancy. They both expressed great fear that insanity would develop if her pregnancy was not terminated.

"Her physician asked me in consultation. We decided that an abortion was unjustifiable. She

returned to her former home in a distant city, and there the abortion was produced by a regular practitioner.

"I saw a letter from this physician in which he attempted to justify on medical grounds, not only this abortion, but two previous ones of the same lady. His plea was that of justifiability because of apprehended insanity. Such and similar cases seem to me to quite merge into criminality.

"Professional opinion in reference to what constitutes justifiable abortion should be so firmly crystalized that criminal abortion could not be performed under a false plea of justifiability."

Q. Do you recall --
A. Is that it?
Q. Yes. That's it. Thank you.

Do you recall reading from T. Gaillard Thomas?
A. Yeah. Dr. Thomas, we can call him.
Q. Dr. Thomas. That works by me.

Would you please turn to that. That's Plaintiff's 1066.
A. Yes.
Q. Do you see a date on the front in which the document was published?
A. 1896.

Q. Please turn to page 99.
A. Yes.
Q. And I will have you read the first paragraph on page 99.
A. In the middle?
Q. No. Excuse me. The one that bleeds over from 98.
A. Okay.
"You may perhaps ask me why" --
Shouldn't I read the previous sentence, what that is?
Q. Just go ahead and read from "remember," is what I meant to say.
A. "Remember, in the first place, that a human life depends upon your decision. It is better, therefore, that the responsibility should be shared. He who can take a human life into his hands without a desire to thus have the responsibility divided is not, in my opinion, a man of proper feeling."
Continuing?
Q. No.
Do you recall a brief mention of Charlotte Bronte?
A. Yes.
Q. And her death as a result of obstinate vomiting?
A. That's right, yes.
Q. Are you -- would you please turn to page 100.
A. Yes.

Q. Could I please have you read the sentence beginning "When you find" towards the -- I believe it's the bottom quarter of the page.

A. "When you find that the obstinate vomiting is a reality, and it seems probable that the woman will die if she is not relieved, it will be nothing less than criminal not to bring on abortion."

More?

Q. Thank you.

Do you recall reading a selection or discussing Robert Campbell Eve's work?

A. Yes.

Q. All right. Would you please turn to his work. That's Plaintiff's Exhibit 1065, and I'll ask you to turn to page 520.

A. Yes.

Q. I'm going to have you read page 520, beginning with "The terms authorized" towards the top.

A. "The terms" --

Q. I'll have you continue through 521, and I'll indicate when to stop.

A. "The terms authorized, or justifiable, abortion are interchangeable and are to encompass all conditions necessitating the induction of abortion, where the object to be attained is the preservation of the life of the mother or child, or both.

"Tidy, when reverting to the law in reference to justifiable abortion, says: 'Our laws do not formally recognize the induction of premature labor by the medical practitioner. Judges, however, have always held that medical men are morally justified in inducing premature labor, provided the object be to save the life of the mother, or child, or both, as the law regards operations as justifiable, though, as Dr. Taylor remarks, no such exceptions are made in the statutes on wounding."

The next paragraph is a quotation. "The first general medical agreement upon this question appears to have been about 1756, in which Dr. Kelly informed Dr. Deneman that there was a consultation of the most eminent men of that time in London, to consider the moral rectitude of, and the advantages which might be expected from, this practice, which met with their general approbation."

And I guess that's Dr. Taylor's remarks.

Continuing:

"The induction of abortion is justifiable, and it is recommended in the following cases: extreme narrowness of the pelvic brim, where, owing to deformity, neither the forceps nor version will succeed in bringing into the world a living child at full term: obstinate

vomiting, where death seems imminent and expedients have proven ineffectual; in some cases of pregnancy complicated with insanity; and in certain diseases of the uterus, such as cancer, et cetera, placenta previa, rupture of the uterus, narrowing of the soft passages, cicatrices of the vagina, et cetera."

"Though we are justifiable in producing abortion, should any of the above conditions, or conditions equally urgent, present themselves demanding an interference of pregnancy for the preservation of the life of the mother or child, or both, still at all times we should exert all prudence and caution, and this should be an act of conservatism born of the most mature deliberation and thought."

Q. Thank you.

You were asked about Horatio Robinson Storer's text *Why Not? A Book for Every Woman*.

Do you recall that?

A. Yes.

Q. I'm going to hand you -- I'll ask for assistance again. I apologize that this is a loose leaf. I'm going to hand you a selection from that work.

A. Okay.

Q. This will contain both the text referred to on part of Exhibit 1064 and what will contain the preceding two pages of

the text.
A. Could you give the page numbers again?
Q. We're going to be beginning on the last sentence on page 21.
A. "An opinion has obtained credence to a certain extent, and it has been fostered by the miserable wretches for pecuniary gain at once pandering to the lust and fattening upon the blood of their victims that induced abortions are not unfrequently effected by the better class of physicians.
"Such representations are grossly untrue, for wherever and whenever a practitioner of any standing in the profession has been known, or believed to be guilty of producing abortion, except absolutely to save the woman's life, he has immediately and universally been cast from fellowship, in all cases losing the respect of his associates, and frequently, by formal action, being expelled from all professional associations he may have held or enjoyed."
Q. Thank you.
I'm going to have you turn to -- I am actually just going to have you drop down to the next sentence starting that -- I apologize. I interrupted myself. Start from the Hippocratic oath, and please continue.
A. "The old Hippocratic oath, to which each of his pupils

was sworn by the father of medicine, pledged the physician never to be guilty of unnecessarily inducing miscarriage; that the standard, in this respect, of the profession of the present day has not deteriorated is proved by the first of the resolutions adopted by the convention at Louisville in 1859, quote" -- and I was quoting the resolutions -- "that while physicians have long been united in condemning the procuring of abortion, at every period of gestation, except as necessary for preserving the life of either mother or the child, it has become the duty of this Association, in view of the prevalence and increasing frequency of the crime, publicly to enter an earnest and solemn protest against such unwarrantable destruction of human life."

More?

Q. Yes.

A. "It is true, however, that while physicians are unanimous as to the sanctity of fetal life, they have yet, to a certain extent, innocently and unintentionally given grounds for the prevalent ignorance upon this subject, to which I shall soon allude.

"The fact that in some cases of difficult labor it becomes imperatively necessary to remove the child

piecemeal, if dead, or, if living, to destroy it for the sake of saving the mother's life, ought not to imply that the physician has attached a trifling value to the child itself.

"Compared with the mother, who is already mature and playing so important a part in the world, he justly allows the balance to fall, but he fully recognizes that he is assuming a tremendous responsibility, that his action is only justified by the excuse of dire necessity, and he suffers, if he is a man of any sensibility and feeling, an amount of mental anguish not easily to be described, and that none of us, who have compelled to so terrible a duty, need feel ashamed to confess."

Q. Thank you.

You were also asked to discuss Storer's *On Criminal Abortion*.

Do you recall that?

A. Yes.

Q. I'm going to have you turn to that. That is Plaintiff's 1063, and we're going to be turning to page 65.

A. Okay.

Q. And do you recall being asked to read part of the first half of that page?

A. Yes, I do.

Q. Okay. I'm going to have you read the second -- you see there is a break in the middle of the page?

A. Right.

Q. I'll have you read the two paragraphs following that break once I put it on the screen.

A. "There are several subordinate questions arising in this connection, neither metaphysical nor merely casuistic, but practical, and because bearing on the increase of criminal abortion, directly involving human life to an indefinite extent. One of them we shall now mention.

"Let physical incapacity to the birth of a living or viable child through the natural passages be supposed to exist on the part of the mother; that this has been proved by examination, or by the result of a former labor, induced or at the full time.

"To save the mother's life, early abortion is once brought on and the child destroyed; the woman and her husband being, of course, informed of the true state of the case. Is it right or justifiable, again, to destroy the fetus, and as often as sexual lust may repeat impregnation? Or should the patient be left to the risks of a subsequent cesarean section which would at least give the chance of life to her child?"

Q. We started with the story of Dr. Bedford.

Do you recall that?
A. Yes.
Q. Do you recall what year Dr. Bedford gave his lecture?
A. What he gave --
Q. Of what year?
A. 1847.
Q. All right. I'll have you turn to his lecture now.
A. Near the beginning, right?
Q. Yes, I apologize. That is Plaintiff's Exhibit 1061.
And I'm going to have you read from page 17 on to the first full sentence of page 18. My recollection is you gave a summary of this section; correct?
A. Yeah, right.
Q. You weren't asked to read from it?
A. That's my recollection.
Q. Please go ahead and read the case.
A. "The following case will illustrate forcibly the absolute necessity of constantly bearing in mind the influence exerted by the womb in certain forms of disease: During the month of February last, I was requested to visit a lady in consultation with Dr. Whiting of this city. Several medical gentlemen, among whom was Dr. Willard Parker, had, previous to my visit seen, and prescribed for this patient.
"When I saw her, in company of Dr. Whiting, she

was apparently near dissolution. Her prostration was extreme; her countenance almost hippocratic; in a word, her friends had abandoned all hope of recovery.

"The particulars of the case were these: She was the mother of one child, 17 months old. About a month previous to my seeing her, she had occasionally been troubled with nausea and vomiting, and for the week previous to my visit she had vomited incessantly. She could retain nothing on her stomach; the vomiting resisted every remedy that had been administered.

"It was under these circumstances that I was called to see her. The medical gentlemen who had preceded me in attendance, ordered cups, leeches, and blisters over the region of the stomach, with various internal remedies, but all without the slightest appreciable effect. The vomiting was still unchecked, and her death hourly expected."

MR. GREEN: Thank you. No further questions.

THE COURT: Let me ask one question before we go to the redirect. Dr. Cohen, it appears that, as we've discussed, that there were some variations in how the statutes were drafted in the 19th century, that they would have language requiring that an abortion would constitute a crime if it was unlawfully and I think maliciously performed. There was language that there would be an exception for the life of the mother, the